# UNITED STATES DISTRICT COURT
## IN THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

MILISSA JONES,     *
           *
   Plaintiff,     *
           *
versus         *   **CASE NO: 2:07CV273-WKW**
           *
FLYING J, INC.     *
           *
   Defendant.     *
           *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION FOR SUMMARY JUDGMENT

**NOW INTO COURT,** through undersigned counsel, comes Defendant, Flying J Inc., and upon suggesting to this Honorable Court that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law, respectfully moves this Honorable Court pursuant to Rule 56 of the Federal Rules of Civil Procedure, to enter judgment in its favor, and against Plaintiff, Milissa Jones, and dismiss all of Plaintiff's claims against Flying J with prejudice, at Plaintiff's cost, for the reasons more fully set forth in the attached memorandum of law.

Respectfully submitted,

s/Olivia S. Regard
Olivia S. Regard (La. Bar No. 27114)
**Jones, Walker, Waechter, Poitevent,**
 **Carrère & Denègre, L.L.P.**
500 Dover Boulevard, Ste. 120
Lafayette, Louisiana 70503
Telephone: (337) 406-5613
Facsimile: (337) 406-5620
Email: oregard@joneswalker.com

and

Robert B. Worley, Jr. (La. Bar No. 17212)
**Jones, Walker, Waechter, Poitevent,**
  **Carrère & Denègre, L.L.P.**
201 St. Charles Avenue, 47th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:   (504) 582-8015
Email: rworley@joneswalker.com

and

Carole G. Miller
Audrey Dupont
**Maynard Cooper & Gale, P.C.**
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203
Telephone: (205) 254-1096
Facsimile: (205) 254-1999
Email: cmiller@maynardcooper.com

*Counsel for Defendant, Flying J Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served on counsel of record for the plaintiff via Federal Express this 17th day of December, 2007.


  s/Olivia S. Regard
Olivia S. Regard

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MILISSA JONES,                    *
                                  *
        Plaintiff,                *
                                  *
versus                            *        CASE NO: 2:07CV273-WKW
                                  *
FLYING J, INC.                    *
                                  *
        Defendant.                *
                                  *
* * * * * * * * * * * * * * * * * *

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Milissa Jones ("Plaintiff") filed this lawsuit against Flying J Inc. asserting two claims arising out of her employment with Flying J: (1) that she was sexually harassed in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et. seq*; and (2) that she was discharged in retaliation for having complained that she was sexually harassed, an alleged violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et. seq.*  Flying J is entitled to summary judgment because (1) Flying J took prompt remedial action in response to her internal complaint; and (2) the supervisor who terminated Plaintiff did so for a legitimate, non-discriminatory reason without any knowledge that Plaintiff had complained of sexual harassment - - meaning Plaintiff cannot prove she was terminated because she had complained.

## FACTUAL BACKGROUND

Flying J operates travel plazas that cater to professional and non-professional travelers.  Declaration of Jerry Beckman, Exhibit "A".  Each travel plaza has a restaurant and convenience store, and also provides fuel and vehicle maintenance.  Beckman

Declaration.  Plaintiff was employed at Flying J's Hope Hull, Alabama Travel Plaza as a Convenience Store Manager.  Beckman Declaration.

Flying J hired Plaintiff on December 8, 2005. Beckman Declaration. At that time, she received a Flying J employee handbook, entitled Retail/Interstate Operations Employee Handbook. Jones Depo., p. 29, Exhibit B.  She read and understood its content, which included Flying J's prohibition against harassment and discrimination. Jones Depo., pp 29-30.  The anti-harassment and discrimination policy contains a multi-level complaint procedure whereby an aggrieved employee is required to complain immediately.  Beckman Declaration; Jones Depo, p. 30; Exhibit "2" to Jones Depo.

Plaintiff's supervisor was Thomas "Butch" Jacobs.  Jones Depo., pp 27-28. They began working together at Flying J in December 2005.  Jones Depo., pp. 23, 27-28.

Plaintiff never complained to Flying J herself that Mr. Jacobs was harassing her sexually.  Jones Depo., p. 70.  However, on March 30, 2006, her lawyer, Adam Morel, sent a letter of complaint to Flying J's General Counsel's Office on her behalf, claiming that Mr. Jacobs has sexually harassed her. Jones Depo., p. 70, Exhibit "4" to Jones Depo.

Flying J began its investigation of this complaint immediately.  Jones Depo., p. 72.  Mr. Jacobs was not present at Plaintiff's travel plaza at the time the complaint was logged, as he was in Utah at Flying J's Corporate Headquarters conducting training. Jones Depo., pp. 74, 76-77.  In fact, Plaintiff and Mr. Jacob never again worked together at any Flying J travel plaza. Jones Depo., pp. 74, 76-77.

Flying J fired Mr. Jacobs for the stated reason of misrepresentation during an investigation on April 10, 2006.  Beckman Declaration.  Plaintiff remained employed. Jones Depo, pp. 78-79.

Plaintiff worked on Monday, April 10, 2006, and the following day, Tuesday, April 11, 2006. Jones Depo., p 79. Plaintiff did not work on Wednesday, April 12, 2006. Jones Depo., p 80. Plaintiff worked the following day, Thursday, April 13, 2006, but was approximately one and one-half hours late for her shift. Jones Depo., p. 81. Plaintiff called in sick on Friday, April 14, 2006. Jones Depo., p. 81. Plaintiff's next scheduled work day was Tuesday, April 18, 2006; however, Plaintiff did not work as scheduled. Jones Depo., pp. 83-84. When Plaintiff called in to give notice that she would not work on Tuesday, April 18, 2006 as scheduled, she indicated that she did not know when she would be able to return to work. Jones Depo., pp. 84-85.

Plaintiff testified during her deposition that she informed either Kerry Lake or Chris Andrews that she was undergoing medical treatment and that she was not yet able to return to work. Jones Depo., pp. 82-83, 85-86. Mr. Lake wrote to Mr. Jerry Beckman, at Flying J's Utah headquarters to report, among other things, that Plaintiff has mentioned that she was undergoing medical treatment and was not yet ready to return to work. Beckman Declaration.

Mr. Lake was not present at the Hope Hull Travel Plaza from April 10, 2006 through April 21, 2006. Staples Depo., p. 11, Exhibit C; Beckman Declaration. District Accounting Manager Keith Staples was present in his place, and thus, Mr. Staples had the authority to discipline employees, up to and including termination of employment. Staples Depo., 11, 13-14; Declaration of Jerry Beckman. Plaintiff missed work on April 13, 2006 through April 21, 2006, so Mr. Staples terminated Plaintiff for excessive absenteeism. Staples Depo., p. 15. Mr. Staples testified during his deposition that by the time he terminated Plaintiff, no one, not even the Plaintiff, had ever informed him that

she had complained to management that she had been sexually harassed. Staples Depo.,
pp. 14-15, 43-44.   Mr. Staples knew that an investigation of some kind was being
conducted, but he did not know that it was the result of any sexual harassment complaint
that Plaintiff had made.  Staples Depo., pp. 12-13.

**ARGUMENT**

### I.     Summary Judgment Standard

Summary judgment is mandatory when there is no genuine issue as to any
material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(c).  The purpose of summary judgment is to pierce the pleadings and assess the
proof to determine if a genuine need for trial exists.  *Matsushita Elec. Indus., Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  When the nonmoving party has the
burden of proof at trial, the moving party need only alert the court that there is an absence
of evidence in support of one or more elements essential to the plaintiff's claims; the
movant need not produce sworn evidence.  *See Celotex Corp. v. Catrett*, 477 U.S. 317,
325 (1986).

Once the movant has made the proper showing, the nonmoving party has the
burden to produce sworn evidence to rebut the motion.  *Celotex*, 477 U.S. at 324;
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Matsushita*, 475 U.S. at 586.
The nonmoving party cannot rely on argument or naked assertions to withstand a motion
for summary judgment but, rather, must come forward with sworn evidence
demonstrating a genuine material fact issue for trial.  *See Anderson*, 477 U.S. at 256
(finding that a plaintiff cannot survive summary judgment without offering "any
significant probative evidence tending to support the complaint").  The Eleventh Circuit
"has consistently held that conclusory allegations without specific supporting facts have

no probative value." *Leigh v. Warner Brothers, Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). Thus, if the Plaintiffs cannot support each essential element of their claims, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders other facts immaterial. *Celotex*, 477 U.S. at 322-23. As Plaintiff cannot establish factual support for all elements of her claims, this Motion for Summary Judgment should be granted and Plaintiff's claims should be dismissed.

## II.    Sexual Harassment Claim

Plaintiff claims that Flying J is liable for the sexual harassment allegedly committed by Butch Jacobs, but Plaintiff does not automatically prevail on this claim even if she could prove that Mr. Jacobs sexually harassed her. Flying J has an affirmative defense available that insulates it from liability if it took prompt remedial action in response to her complaint. Flying J can establish this defense, so Plaintiff cannot prevail even if Mr. Jacobs has sexually harassed her.

In *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the United States Supreme Court explained the circumstances under which an employer is vicariously liable under the doctrine of *respondeat superior* for the sexual harassment committed by a supervisor, and also a circumstance under which an employer can avoid liability, even when the elements of sexual harassment have been proven.

To establish her *prima facie* case of sexual harassment, Plaintiff must prove each and every one of the following: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based

on sex; (4) the harassment was sufficiently pervasive and severe so as to alter a term, condition, or privilege of employment and create an abusive environment; and (5) a basis for holding an employer liable. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63, 106 S. Ct. 2399 (1986); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982).

When analyzing whether an employer should be held liable for a supervisor's harassment, cases are divided into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions. *Ellerth,* 524 U.S. at 761-63, 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 790, 807, 118 S.Ct. 2275. Under this analysis, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held vicariously liable for the harassment. *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257;*Faragher,* 524 U.S. at 790, 118 S.Ct. 2275. In contrast, if the sexual harassment does not involve a tangible employment action, an employer can avoid vicarious liability for the supervisor's conduct by proving both elements of its affirmative defense: (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. In both *Faragher* and *Ellerth*, the plaintiff failed to utilize the employer's complaint procedure, so the employer prevailed even though the plaintiff had established the elements of sexual harassment. *Faragher,* 524 U.S. 775, 118 S.Ct. 2275; *Ellerth,* 524

U.S. 742, 18 S.Ct. 2257.

*Indest v. Freeman Decorating, Inc.*, 164 F. 3d 258 (5th Cir. 1999), was one of the first federal appellate decisions following the Supreme Court cases of *Faragher/Ellerth* that concerned the way in which an employer may avoid liability for supervisory sexual harassment once the aggrieved employee had complained at work. In that case, the plaintiff had complained that she has been subjected to a sexually hostile work environment by a company executive who made sexual comments and gestures towards her. Eventually she complained of sexual harassment, and the company conducted an investigation in which it interviewed witnesses to the harassment. The company issued a verbal and written reprimand to the offending executive. Thereafter, the complainant filed an EEOC charge on the basis that she feared retaliation. She was promised that she would never again have to work with the sexual harasser, and the company guaranteed that she would not lose her job as a result of her report. The plaintiff conceded that the executive never again sexual harassed her. Nevertheless, she filed a lawsuit on the basis of sexual harassment.

The district court granted the employer's motion for summary judgment, and the plaintiff appealed. The United States Court of Appeals for the Fifth Circuit affirmed summary judgment in favor of the employer because the company had promptly responded, disciplined the executive, and stopped the harassment. The Fifth Circuit held that even if a sexual hostile work environment claim had been stated, due to satisfaction of the elements of harassment, the company nevertheless should be exonerated because it took prompt remedial action upon receipt of the complaint.

Although the Fifth Circuit jurisprudence is persuasive authority, though not controlling authority over district courts in the State of Alabama, Eleventh Circuit decisions have followed the reasoning of *Indest* in exonerating employers for taking prompt remedial action, even when sexual harassment occurred, or was not in dispute. *Nurse Be v. Columbia Palms*, 490 F. 3d 1302 (11th Cir. 2007) is one such decision. *Nurse Be* involved a claim of hostile environment, sexual harassment under Title VII. There was  trial judgment in favor of the plaintiff who had claimed harassment.  The employer appealed on the basis that it could not be held liable vicariously under the doctrine of *respondeat superior* for the sexual harassment of its supervisor.

The plaintiff was a nurse who complained that a doctor was making unwanted sexual advances toward her.  She waited several months before complaining, but it was undisputed that ultimately she did complain.  In analyzing the test it was to apply, the Eleventh Circuit noted that "we are only concerned with whether she unreasonably failed to take advantage of [a] sexual harassment policy, and if not, whether [the employer] responded by taking reasonable and prompt corrective action." *Id* at 1309.  The Eleventh Circuit noted that for almost ten months the plaintiff had not allowed the employer to rectify the sexual harassment because she waited until then to complain.  Therefore, for the period of time she had not complained, the Eleventh Circuit held that the employer was not responsible.  But the employer was obligated to take prompt action once it had received a complaint.  The Eleventh Circuit held that the employer had discharged that duty by warning the doctor that any further contact with the nurse would result in immediate termination, and the nurse never reported any further sexual harassment.  The Eleventh Circuit held that it was clear that once the employer was put on notice of the

doctor's behavior, the employer responded with reasonable and prompt corrective action. Therefore, the Eleventh Circuit reversed the judgment of the trial court and the award was vacated.

*Coats v. Sundor*, 164 F. 3d 1361 (11th Cir. 1999) is another Eleventh Circuit decision that addressed whether the employer could escape liability by proving that it took prompt remedial action for supervisory sexual harassment once the plaintiff complained. In *Coats*, the employer did not contest that the plaintiff had established the elements of sexual harassment, meaning that she had been subjected to unwelcomed sexual harassment that was so severe and pervasive as to adversely effect the terms and conditions of her employment. The Eleventh Circuit determined that its task was to determine whether or not the plaintiff has made reasonably sufficient use of the channels created by the sexual harassment policy to put the employer on notice of the ongoing harassment. The Court went on to note that if adequate notice of the harassment had been given to the employer, the issue then became whether or not the employer reasonably responded to the complaint. The Eleventh Circuit found that the plaintiff did in fact complain of sexual harassment, but that the employer acted reasonably by immediately suspending without pay the supervisor pending the investigation and that the supervisor/harasser resigned before the day was out. There was nothing further the employer could have been expected to do, and the Eleventh Circuit decided in the employer's favor.

The facts of the case *subjudice,* for all practical purposes, are identical to those involved in *Indest*, *Nurse Be*, and *Coats* decisions. In all four, the employer either had conceded that sexual harassment had occurred, or was not making an issue of it as part of

its legal defense,[1] and the issue was whether or not the employer acted reasonably and promptly in correcting the alleged harassing behavior. As in the other cases, Flying J promptly investigated once the Plaintiff had complained. Mr. Jacobs and Plaintiff did not work together following her complaint of harassment, and that in connection with the sexual harassment investigation, Flying J terminated Mr. Jacobs. Plaintiff has no evidence that Mr. Jacobs sexually harassed her after she made the complaint, nor could she have considering that they did not work together following the complaint to managers. Nothing further could be expected of Flying J upon her complaint of harassment through her lawyer, and for this reason, Flying J has established the *Faragher/Ellerth* defense and summary judgment must be entered in its favor on the sexual harassment claim.

## III.    Retaliation Claim

Plaintiff claims she was discharged because her lawyer wrote to Flying J to complain that Mr. Jacobs had sexually harassed her. In order to prevail, the Plaintiff must prove that (1) she was engaged in protected activity, (2) she suffered adverse employment action, and (3) she suffered the adverse action because of the protected activity. *Gupta v. Florida Bd. Of Regents,* 212 F.3d 571, 587 (11th Cir.2000). For purposes of this motion only, Flying J does not dispute that Plaintiff's lawyer complained to management on her behalf (element one), and that she was terminated (element two). However, Flying J denies that Plaintiff can prove the third element, that she was terminated because of the complaint.

---

[1] Flying J does not concede that Butch Jacobs sexually harassed the plaintiff, but for purposes of this motion only, it is not making that argument on summary judgment.

Mr. Staples testified that he terminated Plaintiff's employment because she was not coming to work. Staples Depo., pp. 15, 112. This reason was a legitimate, nondiscriminatory reason for her discharge. *Chenault v. Ameripride Linen and Apparel Services,* 188 Fed.Appx. 974 (11th Cir.2006); *Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir.2002). Mr. Staples testified that, as District Accounting Manager, he was never informed that Plaintiff's attorney had complained to Flying J's General Counsel of sexual harassment. Staples Depo., pp. 14-15; 43-44. In order to withstand summary judgment, Plaintiff must produce sworn evidence to rebut Mr. Staples's testimony that he had no knowledge that Plaintiff's attorney had complained for her. *Keith* 2006 WL 987154, 2. Whether Flying J's corporate office should have notified Mr. Staples is beside the point: the claim is one of retaliation under Title VII, not a claim of negligence, and the Plaintiff cannot escape the fact that Mr. Staples did not know of Plaintiff's complaint at the time he discharged her. Flying J defeats Plaintiff's claim because she cannot prove this causal nexus.

Plaintiff's lawsuit also alleges that some of her co-workers retaliated against her following her complaint against Butch Jacobs. But regardless of the severity of the alleged actions by her co-workers (which is not conceded here), Flying J cannot be vicariously liable for these acts of her co-workers unless Flying J management knew of the actions, but failed to stop them. *Olson v. Lowe's Home Ctrs., Inc.,* 130 F. App'x 380 (11th Cir. 2005).

Plaintiff cannot establish causation for this particular claim. She testified that she told a male in Human Resources Director, whose name is unknown, that the co-workers were mistreating her, but she did not explain that the behavior was in response to her

complaint about Butch Jacobs. Jones Depo., pp. 87-92. Since Plaintiff cannot prove that she did not put management on notice that co-workers' behavior was in response to Plaintiff's complaint about Mr. Jacobs, then Flying J cannot be liable for retaliation by failing to intervene.

**IV.    Conclusion**

Summary judgment should be entered in Flying J's favor on the sexual harassment claim because it took prompt, remedial action in response to Plaintiff's complaint.   Summary judgment should e entered in Flying J's favor on the retaliation claim because the one who discharged Plaintiff had no knowledge that Plaintiff had complained of sexual harassment. Accordingly, the complaint should be dismissed with prejudice at Plaintiff's costs.

Respectfully submitted,

 s/Olivia S. Regard
Olivia S. Regard (La. Bar No. 27114)
**Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.**
500 Dover Boulevard, Ste. 120
Lafayette, Louisiana  70503
Telephone:  (337) 406-5613
Facsimile:  (337) 406-5620
Email:  oregard@joneswalker.com

and

Robert B. Worley, Jr. (La. Bar No. 17212)
**Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.**
201 St. Charles Avenue, 47th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 582-8015
Email:  rworley@joneswalker.com

and

Carole G. Miller
**Maynard Cooper & Gale, P.C.**
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203
Telephone: (205) 254-1096
Facsimile: (205) 254-1999
Email: cmiller@maynardcooper.com

*Counsel for Defendant, Flying J Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served on

counsel of record for the plaintiff via Federal Express this 17th day of December, 2007.

 s/Olivia S. Regard
Olivia S. Regard

UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MILISSA JONES,                          *
                                        *
        Plaintiff,                      *
                                        *
versus                                  *        CASE NO: 2:07CV273-WKW
                                        *
FLYING J, INC.                          *
                                        *
        Defendant.                      *
                                        *
* * * * * * * * * * * * * * * * *

## DECLARATION OF JERRY BECKMAN

Pursuant to 28 U.S.C. § 1746, I, Jerry Beckman, declare under the penalty of perjury that the following statements are true and correct to the best of my recollection, information, and belief and are based on my personal knowledge:

1.      I am an adult resident of the state of Utah.

2.      From November of 1995 until present, I have been employed by Flying J Inc. ("Flying J"), as the Director of Human Resources in Ogden, Utah.

3.      Flying J operates travel plazas that cater to professional, as well as to non-professional travelers.

4.      Each travel plaza has a restaurant and convenience store and also provides fuel and vehicle maintenance.

5.      Flying J operates a travel plaza in Hope Hull, Alabama.

6.      Flying J hired Butch Jacobs as the General Manager of the Hope Hull, Alabama Travel Plaza on July 25, 2005.

{L0035966.1}



7.    Milissa Jones was employed at Flying J's Hope Hull, Alabama Travel Plaza as a Convenience Store Manager.

8.    Flying J hired Milissa Jones on December 8, 2005.

9.    Upon hire, Milissa Jones received a Flying J employee handbook, entitled Retail/Interstate Operations Employee Handbook.  She executed an acknowledgment indicating that she read and understood the content of the handbook.

10.    Flying J's employee handbook includes its prohibition against harassment and discrimination.  Flying J's anti-harassment and discrimination policy contains a multi-level complaint procedure whereby an aggrieved employee is required to complain immediately.

11.    On March 30, 2006, Milissa Jones, through her attorney, Adam Morel, made a complaint of sexual harassment and other inappropriate behavior by Thomas "Butch" Jacobs.

12.    I consulted with Kerry Lake, Flying J District Manager over Hope Hull, Alabama, about the investigation of the complaints against Butch Jacobs.  The investigation revealed that Butch Jacobs made certain misrepresentations to Flying J during the investigation in violation of Flying J's policies.

13.    Flying J terminated Butch Jacobs' employment on April 10, 2006.

14.    From April 13 through April 21, 2006, Milissa Jones did not work her scheduled shifts.

15.    During this time, Keith Staples, Flying J District Accounting Manager, was present at the Hope Hull, Alabama Travel Plaza.  He had the authority to discipline employees, up to and including termination of employment.

16.    Keith Staples terminated Milissa Jones for excessive absenteeism on April 21, 2006.

17.    The decision to terminate Milissa Jones for excessive absenteeism was not a result of her complaint of sexual harassment, but was a legitimate, nondiscriminatory reason for her discharge.

18.    Flying J, through its Human Resources Department and managers, makes and keeps personnel records regarding its employees, including but not limited to records of their employment status, pay, performance, discipline, and discharge.  Flying J's personnel records are made at or near the time of the acts or events recorded therein, and are part of Flying J's regularly conducted business activity and procedure.  As the Director of Human Resources, I am charged with the responsibility for making and/or keeping employees' personnel records.  Attached hereto are the following personnel records regarding Milissa Jones:

A.    New Hire Form for Millissa Jones  (Exhibit "1");

B.    Acknowledgement of Flying J's standards, handbook, and manuals dated December 1, 2005  (Exhibit "2");

C.    Flying J's Policy Against Discrimination and Harassment  (Exhibit "3");

D.    Letter from Kerry Lake to Jerry Beckman  (Exhibit "4");

E.    Letter from Adam Morel dated March 30, 2006  (Exhibit "5");

F.    Employee Termination Form dated April 21, 2006  (Exhibit "6");

19.    Attached hereto are the following personnel records of Butch Jacobs:

    A.    New Hire Form for Butch Jacobs  (Exhibit "7");

    B.    Employee Termination Form dated April 10, 2006  (Exhibit "8").


Executed this __7ᵗʰ__ day of December, 2007 at Ogden, Utah.


                                    _____
                                      JERRY BECKMAN



**New Hire Form**
(New Hire Travel Plaza Salary)

Requester: gm tyson  Phone#  Date: 12/06/2005 02:37 PM

\* -- Required Field

Please enter the new hire's name as it appears on their Social Security Card or Social Security Card application receipt (or application recieved). THIS FORM CANNOT BE SUBMITTED UNTIL THE ABOVE FORMS HAVE BEEN ATTACHED TO THIS E-FORM.

| | |
|---|---|
| Last Name (As it appears on the Social Security Card) | Jones |
| First Name  (As it appears on the Social Security Card) | Milissa |
| Middle Name  (As it appears on the Social Security Card) | Dawn |
| Suffix | |
| Social Security Number | 019 - 60 - 4261 |
| Y  Applied for a new Social Security Number (only for New Hires who do not have a physical Social Security Card) | |

Social Security Card Application Date

| | |
|---|---|
| Registration # | 998137 |
| Chain of Custody # | 0209537 |
| Branch # (7 digit) | 0500143 |
| Branch # (5 digit) | 05143 |
| Branch Description | TYSON, AL FC |
| Employment Date (mm/dd/yyyy) | 12/08/2005 |
| New Hire/Rehire | New Hire If rehire call Human Resources for rehire status |
| Comments | |
| Street Address | 229a Erwin Ct |
| 2nd Address Line | |
| City (Please abbreviate only when necessary) | Montgomery |
| State | AL |
| Zip Code | 36115 |
| Telephone Number | (334) 356 - 5060 |
| Gender | F |
| Birth Date (mm/dd/yyyy) | 01/17/79 |
| Employee Ethnic Origin | White |
| Marital Status | Married |

In addition to submitting this electronic form, an original I-9 hard copy needs to be filled out and retained at the loca

| | |
|---|---|
| Do you have a completed I-9 form signed by the employee? (Y / N) | Y |
| Eligibility Status: | A citizen or national of the United States |
| Name of person who verified ID(s): | Debbie McCullough |
| Alien Admission #: | |
| Expiration Date: | |
| Alien #: | |
| Alien Authorized to Work Resident Country | |

Selecting **Other** will automatically fill out the correct federal withholding information in the W-4 section of the form.  This information cannot be ch selected.

**List A**

Document Title:
Issuing Authority:
Document #:



EXHIBIT
I

## Deduction/Withholding of Wage Authorization

Flying J is authorized to deduct and withhold from wages due the employee, amounts equal to any invalid claim Flying J may have against the employee, including, but not limited to, past due credit account balances; contractual obligations; money or property entrusted to employee that the employee does not account for to Flying J, or uncollectable checks made by the employee.

## Acknowledgement

I _Milissa Jones_ hereby acknowledge that I have read, understand, and will abide by the rules, regulations, and service standards of the employee handbook, and the Interstate Operations Manual. I understand that failure to comply with policies or guidelines may result in disciplinary action including termination.

I understand that the material covered in this handbook and in company policy and procedure manuals may be changed as business necessity requires. The above does not constitute a written contract and I understand my employment is for no definite period and may be terminated at will.

I acknowledge that I have had an opportunity to discuss all of the above with the manager signing below.

Employee Signature _[signature]_          Social Security # _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_    Date _12/6/03_

General Manager Signature _____          Date _____

95

EXHIBIT

2

## Discrimination and Harassment

It is the policy of Flying J Inc. to provide a work environment for all of its employees that is free from discrimination and harassment based on sex, race, religion, color, disability, age and national origin. To this end, the Company will comply with and strictly enforce within the Company, federal, state and local laws that prohibit discrimination or harassment based on sex, race, religion, color, disability, and national origin (protected classifications). Employees who by act or omission discriminate against or harass any employee based upon a protected classification shall be subject to disciplinary action including discharge from employment. Without limiting the applicability or coverage of this policy to the conduct here described, the following conduct shall be deemed a violation of this policy:

1.  Making any decision regarding the hiring, firing, promotion, or demotion of an employee or making any decision that affects the wages, benefits or working conditions of an employee based in whole or in part on sex, race, religion, color, disability, age or national origin.

2.  Making sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature at the workplace. Making sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature outside of the workplace if: (i) The conduct is directed toward another employee and; (ii) The conduct is unwelcome or adversely affects the working conditions, morale or environment of employees at a Flying J workplace.

3.  Making submission to or rejection of any conduct referred to in paragraph two above the basis for any employment decision affecting an employee.

4.  Creating an intimidating, hostile, or offensive working environment by engaging in any of the following conduct or any similar conduct that offends another employee:

    a.  Calling, addressing or referring to any person by a demeaning name that relates to a person's sex, race, color, religion, age,

48

disability or national origin.

b.  Belittling or denigrating another because of the person's sex, race, color, religion, age, disability or national origin.

c.  Relating stories, jokes, experiences or anecdotes that relate to sex, race, color, religion, age, disability or national origin and that might offend any person of a particular sex, race, color, religion, age, disability or national origin.

d.  Displaying pictures, photographs, depictions, artwork, quotes, stories, jokes or other media that may be offensive because of its sexual, racial or religious content or that may reasonably offend another because of his or her color, national origin, disability or age.

e.  Touching another employee in a manner that may be offensive to the other employee or making lewd or suggestive gestures or comments in the presence of another employee.

f.  Engaging in any conduct that tends to harass, annoy or inflame another employee, customer, or vendor based on sex, race, color, religion, age, disability or national origin including, but not limited to, the use of epithets, slurs, threats, offensive language, intimidation or hostile acts.

This list is not exclusive. Other conduct that results in discrimination or harassment based upon a protected classification may result in immediate disciplinary action, up to and including termination of employment.

## What To Do If You Are Subjected To Discrimination or Harassment

1.  Do not put up with conduct that violates this policy. Immediately send a written complaint to the Flying J Human Resources Department at 1104 Country Hills Drive, Ogden, Utah 84403. Your complaint should identify specifically who has violated the policy. Your complaint should also describe in detail each act that you allege to be a violation of this policy. Your complaint should also list all witnesses to the policy violation. Finally, please include your name and home phone number in the complaint. Anonymous

49

EXHIBIT
3

To: Jerry Beckman,

On Monday April 9th, 2006 myself and my assistant Chris Andrews went to Tyson AL.. where I been instructed to terminate Butch Jacobs for violation of company policy. When I terminated Butch he told me that most of his people would walk out on me. After terminating Butch I talked with the accounting manager Debbie and she informed that tomorrow would be her last day.  At 2pm the 2 cashiers on duty were auto clocked out and we had no cashiers so Chris and I pulled tills and ran the fuel desk. I called Melissa Jones the assistant manager and told her we needed help to see if she would come in. She said she was busy but would take care of her business and come in as soon as she could. Probably sometime between 4 and 5pm Melissa showed up and 1 other cashier came in at 4.

Tuesday I had just left the store around 9pm and received a call from Melissa who I had just left at the store to inform me that her in-law was going in for emergency surgery and she would not be to work on Wednesday. She said they had to go to Florida about 4 hours away for the surgery and she would return to work on Thursday but would be late. I thought it very unusual that this was an emergency yet she knew she would return to work on Thursday. Melissa called me sometime Thursday afternoon and told me she was driving home from Florida and would be to work as soon as she could, sometime around 4pm Melissa showed up at work and seemed fine.

Friday morning Melissa called me and told me she had been to the doctor and she would not be to work on Friday. I told Melissa when she returned to work on Tuesday I would need a doctor's excuse, she said that would be no problem as this was an old illness that caused her to get a medical leave from the service. She told me that she was going to her regular doctor Monday and she would be to work on Tuesday.

On Monday evening Melissa called me and told me she would not be to work on Tuesday as she was still not feeling well. I told her that Keith Staples was at the store this week and if she needs anything else to call Keith unless she felt it necessary to speak to me as I would be there next week. Tuesday morning I called Keith to see if he had heard from Melissa and he said he had not. Later that morning Keith called me and said that Melissa had just called him and informed him she would not be to work the rest of the week and she would call him next Monday to let him know of that week. She also told Keith that when she returned to work that she would not be able to work 10 hours a day anymore. Keith asked her if she would give him a little more notice than next Monday and she said she would if she could.

Since Butch's termination on Monday April 9th Melissa has only worked 3 days and 2 of those where not even full days. Last Friday the 14th when I got to the store and the night manager Marzet informed me that Melissa had left her there alone the night before, as an employee had called and said they where running late and she was alone for about half an hour. On Friday morning when Melissa called me I asked her about this incident and she said she knew of the employee calling in but left anyway. Remember Melissa came to work late that day because of driving home from Florida. I just don't see Melissa stepping to the plate to help out at all.

Thanks, Kerry Lake

EXHIBIT

4

LAW OFFICES OF

## ADAM MOREL, LLC

*Admitted in Alabama & Florida*

2300 10th Court South • Birmingham, AL 35205 • Phone (205) 252-8841 • Fax (205) 252-7787
adam@morellawfirm.com

March 30, 2006

ATTN: General Counsel
Flying J. Inc.
1104 Country Hills Drive
Ogden. Utah 84403

                RE:    **Ms. Milissa Jones**

Dear Sir or Madam:

This office represents Ms. Melissa Jones in connection with her employment by Flying J. Inc. Please direct any response to this correspondence to the undersigned.

Ms. Jones is presently employed by Flying J as Convenience Store Manager at its location in Hope Hull, Alabama. This correspondence will serve as Ms. Jones' written complaint, pursuant to the company's reporting policy, that she is being subjected to a sexually hostile work environment.

During the course of Ms. Jones' employment, she has been subjected to sexual harassment by Convenience Store General Manager Butch Jacobs. The harassment began shortly after Ms. Jones was hired in December of 2005 and continues to date. Because Ms. Jones had hoped the conduct would cease if she continued to make it clear that it was unwelcome and because Mr. Jacob's has chastised other employees for contacting the corporate office with problems, Ms. Jones has waited until now to make this written complaint. In addition, because upper management has been aware of prior inappropriate conduct and failed to address it, Ms. Jones has had little confidence that making such a complaint would be effective.

Since December of 2005, Mr. Jacob's has regularly directed sexually inappropriate comments toward Ms. Jones. These comments include but are not limited to ongoing comments about the size of his genitalia - which he calls his "package" and lewd comments whenever he sees Ms. Jones drinking from a Starbucks bottle or eating certain foods such as corndogs. Jacob's usual comment is "Umm. Let me watch you do that again" and/or "Let [Facility Manager] John see you do that." In addition, Jacobs regularly makes comments to Ms. Jones about his personal sexual practices such as "I like to please my partner" and "In bed, I'm the kind of man who isn't finished until my partner is pleased." Jacobs has also made comments to Ms. Jones about her looks, comparing her to other employees. On several occasions, Jacobs has discussed pornographic videos while at work. After hearing that a prostitute was on the premises, Jacobs asked if she was good looking, stating "Don't kick her out, come get me instead." Jacobs also discusses a prior affair he had with a co-worker at another place of business from time to time.

EXHIBIT

5

In addition to the making sexually charged comments, Jacobs has repeatedly touched Ms. Jones in sexually offensive ways. On a regular basis, and apparently whenever he can manage to do it, Jacobs has pressed his pelvis into Ms. Jones' buttocks and front side. On five or six occasions, he has tried to pull Ms. Jones down into his lap. He has repeatedly placed his hands on Ms. Jones' legs and attempted to massage her shoulders. He has hugged her against her will both from the front and the side. On one occasion, Jacobs grabbed the back of Ms. Jones' pants and forced his fingers into her undergarment.

Since it began, Ms. Jones has made it clear to Jacobs that his conduct is offensive and unwelcome. Jacobs has made it clear that he understands Ms. Jones is upset by his conduct as evidenced by conversations between Jacobs and Facility Manager John Frazier in which they laugh while pointing out that sex talk makes Ms. Jones uncomfortable. In one such conversation, Jacobs pointed out "It embarrassed her so bad she left the room."

Regrettably, we believe the evidence will show Ms. Jones is not the first female subjected to Jacobs' sexual misconduct at Flying J. We anticipate one former and one present employee will testify, if necessary, that they were subjected to similar conduct and that the management team at Flying J was well aware of it. We anticipate that one of the young ladies will testify she was fondled by Jacobs. We are also troubled to note that upper management has also been aware for some time that Jacobs and other management employees visited a strip club while on company training time in Texas in 2005. On that occasion, Ms. Jones' District Manager was not only present but actually got on stage with the dancers where he engaged in inappropriate conduct. This incident, demonstrating the company's tolerance for this kind of conduct, has been a conversation piece among the management team in Hope Hull, further undermining any confidence Ms. Jones has had in company management adequately addressing her concerns.

We are prepared to file a Charge of Discrimination against the company with the Equal Employment Opportunity Commission stating clams of sexual harassment/gender discrimination in violation of Title VII of the Civil Rights Act, as amended. In addition, we plan to file litigation against Jacobs and Flying J in the Circuit Court for Lowndes County, Alabama for negligent supervision, retention and/or training, as well as invasion of privacy and assault and battery.

If the company has any interest in resolving this matter amicably and in lieu of litigation, please contact me no later than Monday, April 10, 2006. If I have not been contacted by that date, I will assume the company would prefer to litigate and I will proceed accordingly. In the meantime, we trust that Ms. Jones will suffer no retaliation for reporting this unlawful conduct.

Respectfully,

Adam P. Morel

cc:     Ms. Milissa Jones

FJ 0101

 **Employee Termination Form**

(Employee Termination Travel Plaza)

Requester: bk tyson  Phone#  Date: 04/25/2006 06:48 AM

* -- Required Field

| | |
|---|---|
| Last Name | jones |
| First Name | milissa |
| Middle Name | dawn |
| Social Security Number | 019 - 60 - 4261 |
| Branch # (7 digit) | 0500143 |
| Branch # (5 digit) | 05143 |
| Branch Description | TYSON, AL FC |

Note: If you have an address change for the employee, make the change under the Employee Change of Address Form.

| | |
|---|---|
| Last day worked | 04/13/2006 |
| Termination Date | 04/21/2006 |

Enter the employee's actual termination date. NOT THE DATE THIS FORM IS BEING SUBMITTED.

| | |
|---|---|
| Was the employee transferred to another Flying J location? | No |
| Type of Termination: | Involuntary |
| Reason for Termination: | EXCESSIVE ABSENTEEISM |
| | |
| Would you rehire this employee? | N |
| Comments: (120 characters max) | too many call in (seven days) |

### Approval Information

**Status**          Complete by gm tyson

| Requester | Approvers |
|---|---|
| bk tyson | gm tyson |
| | Kerry Lake |

**Other Approval Information**

| Approver Name | Function | Due Date | Exp Action | Advance | Status | Date |
|---|---|---|---|---|---|---|
| gm tyson | Manager | 04/27/2006 | Notification | Skip | Approved | 04/28/2006 02:42:29 PM |
| Kerry Lake | Supervisor | 04/28/2006 | Notification | Standard | Skipped | 04/25/2006 06:48:33 AM |

**EXHIBIT**

**6**

tabbies

lcgemp:: Print Que

 **New Hire Form**

(New Hire C-Store Managers In Training
Hourly)

Requester: gm temple  Phone#  Date: 07/27/2005 03:06 PM

-- Required Field

Please enter the new hire's name as it appears on their Social Security Card or Social Security Card application receipt (or application
recieved). THIS FORM CANNOT BE SUBMITTED UNTIL THE ABOVE FORMS HAVE BEEN ATTACHED TO THIS EFORM.

| | |
|---|---|
| Last Name (As it appears on the Social Security Card) | Jacobs |
| First Name (As it appears on the Social Security Card) | Thomas |
| Middle Name (As it appears on the Social Security Card) | B |
| Suffix | |
| Social Security Number | 422 - 78 - 5283 |
| Applied for a new Social Security Number (only for New Hires who do not have a physical Social Security Ca | |
| Social Security Card Application Date | |
| Registration # | 998187 |
| Chain of Custody # | 0048762439 |
| Branch # (7 digit) | 0580013 |
| Branch # (5 digit) | 05813 |
| Branch Description | EC DISTRICT 13 TRAINING |
| Employment Date (mm/dd/yyyy) | 07/25/2005 |
| New Hire/Rehire | New Hire If rehire call Human Resources for rehire status |
| Comments | |
| Street Address | 1219 Rue Vieux Carre |
| 2nd Address Line | |
| City (Please abbreviate only when necessary) | Sulacauga |
| State | AL |
| Zip Code | 35150 |
| Telephone Number | (256) 249 - 2619 |
| Gender | M |
| Birth Date (mm/dd/yyyy) | 01/10/54 |
| Employee Ethnic Origin | White |
| Marital Status | Married |

In addition to submitting this electronic form, an original I-9 hard copy needs to be filled out and retained at th

| | |
|---|---|
| Do you have a completed I-9 form signed by the employee? (Y / N) | Y |
| Eligibility Status: | A citizen or national of the United States |
| Name of person who verified ID(s): | tracey |
| Alien Admission #: | |

**EXHIBIT**

**7**

legemp:: Print Que

 **Employee Termination Form**

(Employee Termination Travel Plaza)

Requester: dam jackson   Phone#   Date: 04/12/2006 04:13 PM

× -- Required Field

| | |
|---|---|
| × Last Name | Jacobs |
| × First Name | Thomas |
| Middle Name | Butch |
| × Social Security Number | 422 - 78 - 5283 |
| × Branch # (7 digit) | 0500143 |
| × Branch # (5 digit) | 05143 |
| Branch Description | TYSON, AL FC |

Note: If you have an address change for the employee, make the change under the Employee Change of Address Form.

| | |
|---|---|
| × Last day worked | 04/10/2006 |
| × Termination Date | 04/10/2006 |

Enter the employee's actual termination date. NOT THE DATE THIS FORM IS BEING SUBMITTED.

| | |
|---|---|
| × Was the employee transferred to another Flying J location? | No |
| × Type of Termination: | Involuntary |
| × Reason for Termination: | MISREPRESENTATION DURING INVESTIGATION |
| × Would you rehire this employee? | N |
| × Comments: (120 characters max) | Violation of Company Policy |

**Approval Information**

Status     Complete by Kerry Lake

Requester           Approvers
dam jackson         Kerry Lake
                   Scott McMillan

*Other Approval Information*

| Approver Name | Function | Due Date | Exp Action | Advance | Status | Date |
|---|---|---|---|---|---|---|
| Kerry Lake | Manager | 04/14/2006 | Notification | Skip | Approved | 04/13/2006 05:48:28 AM |
| Scott McMillan | Supervisor | 04/13/2006 | Notification | Standard | Skipped | 04/12/2006 04:13:49 PM |



EXHIBIT
**8**

# FREEDOM COURT REPORTING

Page 1

1          UNITED STATES DISTRICT COURT

2      IN THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    MILISSA JONES,                    *ORIGINAL*

6

7              Plaintiff,

8

9        VS.                    CASE NO.

10                              2:07CV273-WKW

11

12   Flying J, INC.,

13

14              Defendant.

15

16

17        DEPOSITION OF MILISSA JONES

18

19           STIPULATIONS

20        IT IS STIPULATED AND

21   AGREED, by and between the parties,

22   through their respective counsel,

23   that the deposition of MILISSA JONES

**EXHIBIT**

B

## FREEDOM COURT REPORTING

Page 23

1      Q.    When did you apply for work

2  at Flying J?

3      A.    I was offered the position

4  before I filled out the application.

5      Q.    Who offered you the

6  position?

7      A.    Butch Jacobs.

8      Q.    Do you remember what month

9  and year that was?

10     A.    December '05.

11     Q.    How did you come to know

12 Butch Jacobs?

13     A.    American Family Care was

14 doing the drug screening for all his

15 employees.

16     Q.    At Flying J?

17     A.    Yes.

18     Q.    How long had you known

19 Butch Jacobs before you worked at

20 Flying J, the best you can estimate?

21     A.    A couple of weeks.

22     Q.    Just a couple of weeks?

23     A.    Uh-huh.

## FREEDOM COURT REPORTING

Page 27

1    Q.   And would the maintenance

2    department be separate from the

3    convenience store -- servicing of

4    trucks, repairs, and that kind of

5    thing?

6    A.   We didn't have a

7    maintenance department like that.  It

8    was facility maintenance.  They

9    maintained the facility itself.

10    Q.   Was there a maintenance or

11    facility department separate from the

12    convenience store?

13    A.   Yes.

14    Q.   And, then, Butch Jacobs

15    would be the manager over all three

16    of those components or groups?

17    A.   Not over the restaurant,

18    no.

19    Q.   The restaurant had its own

20    general manager?

21    A.   Yes.

22    Q.   And Butch would be your

23    immediate -- was your immediate

## FREEDOM COURT REPORTING

Page 28

1    supervisor, correct?

2        A.    Correct.

3        Q.    There was a district

4    manager who would out rank Butch?

5        A.    Yes.

6        Q.    Did you know your district

7    manager when you were employed there?

8        A.    Briefly.

9        Q.    Do you remember his name?

10       A.    Honestly, no.

11       Q.    All right.  Was it Mike

12   Walton?

13       A.    No.  Chris -- I think Chris

14   was the accounting manager.

15       Q.    Let me show you and counsel

16   what I've marked as Defendant's

17   Number 1.

18            (Whereupon, Defendant's

19            Exhibit Number 1 Jones was

20            Marked for identification.)

21            (Handing document to

22            Witness.)

23       Q.    This is a document entitled

## FREEDOM COURT REPORTING

1    Acknowledgment -- at least a portion

2    of it is entitled Acknowledgment.  Is

3    that your signature?

4          A.    Yes.

5          Q.    And this is dated December

6    of '05?

7          A.    Yes.

8          Q.    December 1st of '05?

9          A.    Yes.

10         Q.    And this is a handbook

11   acknowledgment that you signed on

12   that date?

13         A.    Yes.

14         Q.    Did you in fact receive a

15   Flying J Handbook?

16         A.    Yes, I did.

17         Q.    And this statement is

18   true -- this Acknowledgment is true

19   where you acknowledged?

20         A.    Yes.

21               (Whereupon, Defendant's

22               Exhibit Number 2 Jones was

23               Marked for identification.)

## FREEDOM COURT REPORTING

1              (Handing document to

2              Witness.)

3         Q.    I'll mark now Exhibit 2.

4    Do you recognize -- well, what I've

5    handed you we've marked as Exhibit 2,

6    and it's a two-page document.  The

7    first page has FJ144, and the second

8    page FJ145.  And it's entitled

9    Discrimination and Harassment.  Have

10   you seen these excerpts from the

11   handbook before?

12        A.    Yes, I have.

13        Q.    And you're familiar with

14   the discrimination and harassment

15   policy?

16        A.    Yes.

17        Q.    At the time you worked at

18   Flying J?

19        A.    Yes.

20        Q.    Bear with me just a minute,

21   if you would.  Do you still have a

22   copy of your handbook from Flying J?

23   Did you retain a copy?

## FREEDOM COURT REPORTING

Page 70

1  you're copied on this, correct?  Turn

2  the page.  You received a copy of

3  that at the time?

4      A.    Yes.

5      Q.    Would this have been the

6  first contact that either you or

7  someone on your behalf made to Flying

8  J to complain about Mr. Jacobs?

9      A.    Yes.

10      Q.    And the purpose of the

11  letter was to get Mr. Jacobs to stop

12  harassing you sexually?

13      A.    Yes.

14      Q.    Up until this point, March

15  30th, 2006, were you still working in

16  the same facility with Mr. Jacobs?

17      A.    Yes.

18      Q.    Did you ever learn that

19  Flying J had conducted a sexual

20  harassment investigation in response

21  to the letter?

22          MR. MOREL:  Let me stop and

23  just interject that if you have

## FREEDOM COURT REPORTING

Page 72

1      A.    Another district manager

2   came and spoke with me in regards to

3   my claim.

4      Q.    Was that Mike Walton?

5      A.    I'm not sure.

6      Q.    When you say another

7   district manager, it would have been

8   a manager from another district other

9   than yours?

10     A.    Yes.

11     Q.    Do you remember when that

12  DM came to speak with you?

13     A.    The Wednesday prior to

14  Butch being terminated.  Or

15  Tuesday -- Wednesday or Tuesday --

16  Wednesday.

17     Q.    Just by way of reference,

18  Exhibit 4, the complaint letter, is

19  dated March 30, 2006; is that right?

20     A.    Yes.

21     Q.    And would it be true that

22  the last day you were actually

23  physically at work for Flying J was

## FREEDOM COURT REPORTING

Page 74

1  Q.   Go ahead.

2  A.   I'm not sure of the exact

3  date, because he was doing training.

4  He was out of town for like a couple

5  of days.

6  Q.   And, so, when I said

7  physically in the complex, let me

8  clarify or expound on that.  I'm not

9  asking when the last date was that he

10  was still actually employed at Flying

11  J?

12  A.   Right.

13  Q.   Even though he may be

14  off-site.  But I'm asking, as best

15  you can recall, when was the last

16  time that you and he worked together

17  physically in the same complex?

18  A.   Without a calendar I can't

19  say for sure.

20  Q.   Could you say relative to

21  March 30th -- relative to the date of

22  March 30th, 2006, a complaint letter?

23  A.   It would have been after

## FREEDOM COURT REPORTING

Page 76

1  happened?

2      A.    I continued working.   If he

3  was there, then I saw him.   I just --

4  I'm not sure when he went out of

5  town.

6      Q.    And I just have to be as

7  specific with you as I can.   Are you

8  assuming that after March 30th, 2006,

9  you continued to work with him, or do

10  you -- is that your testimony that

11  you did, in fact, do that?

12          MR. MOREL:   He just wants

13  to know whether you can specifically

14  recall working with him after the

15  date -- after the date that I

16  generated the letter.   I don't

17  remember.   I probably sent it

18  certified mail, but I don't know.

19          MR. WORLEY:   That's the

20  question.   That's right.

21          MR. MOREL:   Do you remember

22  specifically whether or not you

23  worked with him after in the same

## FREEDOM COURT REPORTING

Page 77

1    facility physically?

2         A.   I can't -- I can't say that

3    I know for a fact that I did, no.

4         Q.   (BY MR. WORLEY:)   Okay.

5    Fair enough.  How did you learn that

6    Jacobs had been terminated?  And

7    again, I'm not asking for what your

8    lawyer may have told you, but you did

9    testify that he was terminated?

10        A.   I got a phone call from the

11   district manager, or one of the

12   district people, and they asked me to

13   come in because he had been

14   terminated and they needed my

15   assistance at the store.

16        Q.   Was this the district

17   manager who had investigated, or a

18   different one?

19        A.   It was my district --

20   someone within my district.

21        Q.   Did that person tell you

22   why Butch had been terminated?

23        A.   No.

## FREEDOM COURT REPORTING

Page 78

1    Q.    Did that person tell you

2    that Butch had been terminated in

3    response or in connection with the

4    complaint of March 30th, 2006?

5    A.    No.

6    Q.    Did you ask?

7    A.    No.  I assumed, but I

8    didn't ask.

9    Q.    Did anybody -- I'm not

10   asking what your lawyer may have told

11   you, thereafter tell you why Butch

12   had been terminated?  If the DM

13   didn't tell you at that time, did

14   anyone else tell you later?

15   A.    No, it was not discussed to

16   me.

17   Q.    Would it be fair to say

18   that from the date Butch was

19   terminated, around April 10th, 2006,

20   until the last day you worked --

21   well, strike that.  Let me rephrase

22   the question.

23        Tell me again what the

## FREEDOM COURT REPORTING

1    district manager was telling you --

2    something that Butch had been

3    terminated so he needed your help?

4        A.    Mondays are usually my day

5    off.  The 10th was a Monday.  Butch

6    normally would have been there to

7    handle a bunch of stuff.  And since

8    he was terminated they needed me to

9    come in.  They didn't really go into

10   why. They just asked me to come in,

11   and as I always did, I went in.  I

12   was asked, I came.

13       Q.    Did you work a full day

14   that day that you came back in?

15       A.    No.

16       Q.    And why is that?

17       A.    They didn't call me until

18   it was after my time when I normally

19   would have been there.

20       Q.    What about the next time

21   you worked, was it the following day?

22       A.    Yes.

23       Q.    Was that a full day?

# FREEDOM COURT REPORTING

Page 80

1      A.    I believe so.

2      Q.    You didn't punch a time

3  clock when you were there, did you?

4      A.    We only had to swipe our

5  card at one point during our shift.

6  It didn't matter when.

7      Q.    Just to reflect that you

8  were there that day?

9      A.    Yes.

10      Q.    All right.  What about the

11  day after that?

12      A.    No.

13      Q.    And why is that?

14      A.    My -- I had received a

15  phone call on Tuesday night.  My

16  mother-in-law was going to be having

17  a biopsy -- I believe it was a biopsy

18  done, and my husband was upset and

19  was asked to be there.  And I spoke

20  with the district people, and they

21  said that since I had worked Monday

22  that I could have Wednesday off in

23  place of my regular day off.

## FREEDOM COURT REPORTING

Page 81

1    Q.    And, so, that was Wednesday

2    that they were talking about?

3    A.    Yes, I let them know that

4    it was in Florida and that, you know,

5    it should be -- it was on an

6    outpatient thing, so I should be back

7    at some point on Thursday.  I had let

8    him know ahead of time that I may

9    miss Thursday, but I would try to get

10   in because I knew I was needed.

11   Q.    What about -- how long were

12   you in Florida for the biopsy?

13   A.    Just Wednesday, and we got

14   back Thursday afternoon.

15   Q.    So you missed Thursday as

16   well?

17   A.    No, I was about an hour,

18   hour-and-a-half late by the time I

19   got there.

20   Q.    And can you recall the name

21   of the person who -- at Flying J in

22   management, who was allowing you to

23   miss for that?

## FREEDOM COURT REPORTING

Page 82

1      A.   It was -- I want to say it
2  was Chris that I was speaking with.
3      Q.   Do you remember Chris's
4  full name?  I may have asked you that
5  earlier?
6      A.   No, I'm terrible with
7  names.
8      Q.   Would it have been Chris
9  Andrews?
10     A.   Yes.
11     Q.   Did you work the day after
12  that?
13     A.   No, I called out sick.
14     Q.   Were you sick?
15     A.   Yes.
16     Q.   What was wrong?
17     A.   At the time I believed it
18  was my endometriosis acting up.
19     Q.   That's what you thought
20  when you called out?
21     A.   Yes.
22     Q.   Do you remember who you
23  spoke with?

## FREEDOM COURT REPORTING

Page 83

1      A.    It was either Chris or

2  Kerry.

3      Q.    And that would have been a

4  Friday?

5      A.    Yes.

6      Q.    What about the day after?

7  When was the next day you were

8  scheduled to work?

9      A.    The following Tuesday.

10     Q.    So Saturday through Monday

11 you were not scheduled to work?

12     A.    Correct.  I had worked

13 other shifts to insure having

14 Saturday off, because it was my son's

15 birthday.

16     Q.    So that takes us to

17 Tuesday, correct?

18     A.    Yes.

19     Q.    Did you work that Tuesday?

20     A.    No.

21     Q.    Why not?

22     A.    I had found out on Monday

23 that I was pregnant, and the

## FREEDOM COURT REPORTING

Page 84

1  pregnancy was in jeopardy, and I was

2  told to stay off my feet for a couple

3  of days.

4        MR. MOREL:  By the way, it

5  occurs to me, I've got your

6  authorizations downstairs signed.

7  There is one that she forgot to get

8  witnessed, so we can just resign and

9  witness.  I'll give all that to you

10  today.

11        MR. WORLEY:  Okay.  Thank

12  you.

13    Q.  (BY MR. WORLEY:)  Who did

14  you -- strike that.

15        Did you call off sick that

16  day, that Tuesday?

17    A.  I had actually called them

18  Monday, as soon as I found out I was

19  pregnant, and was -- what was going

20  on.  I had spoke with them Monday and

21  let them know that I would definitely

22  be out for the next couple of days.

23  I wasn't sure exactly when I would be

## FREEDOM COURT REPORTING

Page 85

1  coming back.  That I hoped it would

2  only be that week, and that I hoped I

3  would be back the following Tuesday,

4  but I would keep them apprised of the

5  situation.  I called them Tuesday, as

6  well, and let them know that I still

7  had not -- one of the things I was

8  waiting on was some test results.

9  And I called them on Tuesday to let

10 them know that the test results had

11 not been given to me yet, and the

12 situation was still the same.  And,

13 then, I spoke with them either

14 Wednesday or Thursday, possibly both.

15 I can't say for sure.

16      Q.    So you did not work

17 Wednesday or Thursday?

18      A.    No.

19      Q.    Am I correct about that?

20      A.    Yes.

21      Q.    You said you spoke with

22 they or them.  Who is that?

23      A.    It would have been Chris or

## FREEDOM COURT REPORTING

1    Kerry throughout that timeframe.  I

2    had spoke with -- I made sure I spoke

3    with one of the two of them in

4    regards to it.

5         Q.   Did you work any more days

6    for Flying J?

7         A.   No.

8         Q.   When were you terminated

9    relative to that Thursday you just

10   described?

11        A.   The following morning.

12        Q.   Which would have been a

13   Friday?

14        A.   Yes.

15        Q.   From the time that Butch

16   Jacobs was terminated through the

17   time that you were terminated, did

18   you complain to anybody at Flying J

19   that you were being mistreated?

20        A.   I spoke with someone in

21   human resources, yes.

22        Q.   When did you speak with

23   that person?

## FREEDOM COURT REPORTING

Page 87

1     A.    Probably the -- maybe the

2   11th.  I'm not sure.  I'm not sure of

3   the exact day.

4     Q.    How many days after Jacobs

5   had been terminated was this?

6     A.    I can't say for sure.  It

7   was a day, maybe two.

8     Q.    Do you remember who it was

9   in HR that you spoke with?

10    A.    No.

11    Q.    Male or female?

12    A.    Male.

13    Q.    How did you come to contact

14  HR?

15    A.    It was -- I had a new hire

16  that I needed to get some information

17  for, which I normally would have

18  gotten from Debbie McCollough, but

19  because of what was going on she

20  refused to give it to me.  And,

21  actually, I think it may have been on

22  that Monday -- Monday or Tuesday.

23  And she wouldn't give me the

## FREEDOM COURT REPORTING

1   information.  She was being very

2   rude, very -- just nasty.  And I

3   ended up calling human resources to

4   receive that information; and I

5   explained to the person why I was

6   calling them instead of getting it

7   off of the office.

8       Q.   And you told the HR person

9   that Debbie was not cooperating with

10  you?

11      A.   Yes.

12      Q.   But did you tell the HR

13  person that you were being mistreated

14  other than the fact that Debbie

15  wouldn't give you the information?

16      A.   Yes.

17      Q.   And what did you say to the

18  HR as far as what was being done to

19  you that was not right?

20      A.   She was being rude, refused

21  to answer my questions,

22  uncooperative, just nasty.

23      Q.   What do you mean by nasty?

## FREEDOM COURT REPORTING

1     A.   Her tone, her demeanor.  I

2  overheard her and Tanisha speaking,

3  and she said she didn't know if she

4  wanted to deal with anything that

5  bitch, referring to myself, had to

6  say.

7     Q.   Let's do like we did a

8  moment ago with respect to Mr.

9  Jacobs.  Let me ask you to tell me

10  each and every thing -- we'll list

11  them, that you told HR that Debbie

12  had done to you, during that phone

13  call.  Well, let me rephrase the

14  question.

15         During your phone call to

16  HR, you said that you told someone at

17  HR that Debbie had not been treating

18  you fairly?

19     A.   Right.

20     Q.   Or words to that effect?

21     A.   Yes.

22     Q.   Tell me each and every

23  thing that you told HR that she had

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 90

1  done?

2      A.    Refused to give me, I

3  guess, paperwork that was pertinent

4  to my job.

5      Q.    The new hire paperwork?

6      A.    Yes.  She wouldn't even

7  answer the door to the office.  I had

8  needed something else for the job.

9  You know, she did all the -- she had

10  all the numbers, everything -- any

11  report or anything that I would need

12  to do my job, she had.  She wouldn't

13  answer the door.  She wouldn't give

14  me anything that I requested from

15  her.  She wouldn't answer her phone

16  if she knew it was me.  Very -- she

17  was just -- I don't know how to

18  explain it.  She was just rude.

19      Q.    So the question was, what

20  did you tell HR that Debbie had done

21  to you, and you said that you told

22  them that Debbie had refused to give

23  you the new hire paperwork, she

## FREEDOM COURT REPORTING

Page 91

1   wouldn't even answer the door to her

2   office when it was you, wouldn't

3   answer the phone if you were calling?

4        A.    Uh-huh.

5        Q.    And wouldn't give you any

6   information or anything that you had

7   requested?

8        A.    Yes.

9        Q.    And you don't recall who it

10  was in HR that you spoke with?

11       A.    No, I don't.

12       Q.    Was it one of the hotline

13  numbers --

14       A.    No.

15       Q.    -- contained in the sexual

16  harassment policy?

17       A.    No -- well, it may be.  I

18  don't know if it was the same number

19  that's there that -- I don't know

20  what number I dialed.

21       Q.    Do you know where you got

22  the number from in order to call?

23       A.    It was posted; just the

## FREEDOM COURT REPORTING

Page 92

1   human resources number.

2       Q.   Did you ask them in human

3   resources to take any action in

4   response to your complaint about

5   Debbie?

6       A.   At that time I was trying

7   to do my job and get keep the

8   facility from going -- falling apart.

9   And I was concentrating more on

10  getting the information that I needed

11  at the time.

12      Q.   But the question was, did

13  you ask anybody in HR to do anything

14  for you?

15      A.   Not specifically.

16      Q.   How about generally?

17      A.   Not that I can think of,

18  no.

19      Q.   Did Debbie ever tell you

20  why she had responded that way to

21  you, or reacted that way to you?

22      A.   No.

23      Q.   Other than Debbie, during

## Discrimination and Harassment

It is the policy of Flying J Inc. to provide a work environment for all of its employees that is free from discrimination and harassment based on sex, race, religion, color, disability, age and national origin. To this end, the Company will comply with and strictly enforce the Company, federal, state and local laws that prohibit discrimination or harassment based on sex, race, religion, color, disability, age and national origin (protected classifications). Employees who by act or omission discriminate against or harass any employee based upon a protected classification shall be subject to disciplinary action including discharge from employment. Without limiting the applicability or coverage of this policy to the conduct here described, the following conduct shall be deemed a violation of this policy.

1. Making any decision regarding the hiring, firing, promotion, or demotion of an employee or making any decision that affects the wages, benefits or working conditions of an employee based in whole or in part on sex, race, religion, color, disability, age or national origin.

2. Making sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature in the workplace. Making sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature outside of the workplace if: (i) The conduct is directed toward another employee and; (ii) The conduct is unwelcome or adversely affects the working conditions, morale or environment of employees at a Flying J workplace.

3. Making submission to or rejection of any conduct referred to in paragraph two above the basis for any employment decision affecting an employee.

4. Creating an intimidating, hostile, or offensive working environment by engaging in any of the following conduct or any similar conduct that offends another employee:

   a. Calling, addressing or referring to any person by a demeaning name that relates to a person's sex, race, color, religion, age,

48

disability or national origin.

b. Belittling or denigrating another because of the person's sex, race, color, religion, age, disability or national origin.

c. Relating stories, jokes, experiences or anecdotes that relate to sex, race, color, religion, age, disability or national origin and that might offend any person of a particular sex, race, color, religion, age, disability or national origin.

d. Displaying pictures, photographs, depictions, artwork, quotes, stories, jokes or other media that may be offensive because of its sexual, racial or religious content or that may reasonably offend another because of his or her color, national origin, disability or age.

e. Touching another employee in a manner that may be offensive to the other employee or making lewd or suggestive gestures or comments in the presence of another employee.

f. Engaging in any conduct that tends to harass, annoy or inflame another employee, customer, or vendor based on sex, race, color, religion, age, disability or national origin including, but not limited to, the use of epithets, slurs, threats, offensive language, intimidation or hostile acts.

This list is not exclusive. Other conduct that results in discrimination or harassment based upon a protected classification may result in immediate disciplinary action, up to and including termination of employment.

## What To Do If You Are Subjected To Discrimination or Harassment

1. Do not put up with conduct that violates this policy. Immediately send a written complaint to the Flying J Human Resources Department at 1104 Country Hills Drive, Ogden, Utah 84403. Your complaint should identify specifically who has violated the policy. Your complaint should also describe in detail each act that you allege to be a violation of this policy. Your complaint should also list all witnesses to the policy violation. Finally, please include your name and home phone number in the complaint. Anonymous

49

FJ 0144



LAW OFFICES OF

# ADAM MOREL, LLC

*Admitted in Alabama & Florida*

2300 10th Court South • Birmingham, AL 35205 • Phone (205) 252-8841 • Fax: (205) 252-7787
adam@morellawfirm.com

March 30, 2006

ATTN: General Counsel
Flying J. Inc.
1104 Country Hills Drive
Ogden, Utah 84403

RE:    Ms. Milissa Jones

Dear Sir or Madam:

This office represents Ms. Melissa Jones in connection with her employment by Flying J. Inc. Please direct any response to this correspondence to the undersigned.

Ms. Jones is presently employed by Flying J as Convenience Store Manager at its location in Hope Hull, Alabama. This correspondence will serve as Ms. Jones' written complaint, pursuant to the company's reporting policy, that she is being subjected to a sexually hostile work environment.

During the course of Ms. Jones' employment, she has been subjected to sexual harassment by Convenience Store General Manager Butch Jacobs. The harassment began shortly after Ms. Jones was hired in December of 2005 and continues to date. Because Ms. Jones had hoped the conduct would cease if she continued to make it clear that it was unwelcome and because Mr. Jacob's has chastised other employees for contacting the corporate office with problems, Ms. Jones has waited until now to make this written complaint. In addition, because upper management has been aware of prior inappropriate conduct and failed to address it, Ms. Jones has had little confidence that making such a complaint would be effective.

Since December of 2005, Mr. Jacob's has regularly directed sexually inappropriate comments toward Ms. Jones. These comments include but are not limited to ongoing comments about the size of his genitalia - which he calls his "package" and lewd comments whenever he sees Ms. Jones drinking from a Starbucks bottle or eating certain foods such as corndogs. Jacob's usual comment is "Umm. Let me watch you do that again" and/or "Let [Facility Manager] John see you do that." In addition, Jacobs regularly makes comments to Ms. Jones about his personal sexual practices such as "I like to please my partner" and "In bed, I'm the kind of man who isn't finished until my partner is pleased." Jacobs has also made comments to Ms. Jones about her looks, comparing her to other employees. On several occasions, Jacobs has discussed pornographic videos while at work. After hearing that a prostitute was on the premises, Jacobs asked if she was good looking, stating "Don't kick her out, come get me instead." Jacobs also discusses a prior affair he had with a co-worker at another place of business from time to time.

In addition to the making sexually charged comments, Jacobs has repeatedly touched Ms. Jones in sexually offensive ways. On a regular basis, and apparently whenever he can manage to do it, Jacobs has pressed his pelvis into Ms. Jones' buttocks and front side. On five or six occasions, he has tried to pull Ms. Jones down into his lap. He has repeatedly placed his hands on Ms. Jones' legs and attempted to massage her shoulders. He has hugged her against her will both from the front and the side. On one occasion, Jacobs grabbed the back of Ms. Jones' pants and forced his fingers into her undergarment.

Since it began, Ms. Jones has made it clear to Jacobs that his conduct is offensive and unwelcome. Jacobs has made it clear that he understands Ms. Jones is upset by his conduct as evidenced by conversations between Jacobs and Facility Manager John Frazier in which they laugh while pointing out that sex talk makes Ms. Jones uncomfortable. In one such conversation, Jacobs pointed out "It embarrassed her so bad she left the room."

Regrettably, we believe the evidence will show Ms. Jones is not the first female subjected to Jacobs' sexual misconduct at Flying J. We anticipate one former and one present employee will testify, if necessary, that they were subjected to similar conduct and that the management team at Flying J was well aware of it. We anticipate that one of the young ladies will testify she was fondled by Jacobs. We are also troubled to note that upper management has also been aware for some time that Jacobs and other management employees visited a strip club while on company training time in Texas in 2005. On that occasion, Ms. Jones' District Manager was not only present but actually got on stage with the dancers where he engaged in inappropriate conduct. This incident, demonstrating the company's tolerance for this kind of conduct, has been a conversation piece among the management team in Hope Hull, further undermining any confidence Ms. Jones has had in company management adequately addressing her concerns.

We are prepared to file a Charge of Discrimination against the company with the Equal Employment Opportunity Commission stating clams of sexual harassment/gender discrimination in violation of Title VII of the Civil Rights Act, as amended. In addition, we plan to file litigation against Jacobs and Flying J in the Circuit Court for Lowndes County, Alabama for negligent supervision, retention and/or training, as well as invasion of privacy and assault and battery.

If the company has any interest in resolving this matter amicably and in lieu of litigation, please contact me no later than Monday, April 10, 2006. If I have not been contacted by that date, I will assume the company would prefer to litigate and I will proceed accordingly. In the meantime, we trust that Ms. Jones will suffer no retaliation for reporting this unlawful conduct.

Respectfully,

Adam P. Morel

cc:    Ms. Milissa Jones

## NATIONAL COURT REPORTING

1      UNITED STATES DISTRICT COURT
2    IN THE MIDDLE DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4
5  MILISSA JONES,
6
7            Plaintiff,
8
9      VS.              CASE NO.
10                        2:07CV273-WKW
11
12  Flying J, INC.,
13
14            Defendant.
15
16    DEPOSITION OF KEITH STAPLES
17
18          STIPULATIONS
19      IT IS STIPULATED AND
20  AGREED, by and between the parties,
21  through their respective counsel,
22  that the deposition of KEITH STAPLES
23  may be taken before Sunnie Gillespie,

**367 VALLEY AVENUE**
**1-800-638-3917  Birmingham, Alabama 35209  (205) 252-6205**



## NATIONAL COURT REPORTING

1    district manager.

2        Q.    So the district manager is

3    ultimately the one in charge, but he

4    can just say to you as the district

5    accounting manager, "I want you to go

6    handle this for me"?

7        A.    That's correct.

8        Q.    Because I noticed,

9    obviously, in the chronology of what

10    happened in this case, you were there

11    instead of a district manager during

12    the period after Mr. Jacobs was

13    fired, right?

14        A.    I was there off and on from

15    the time we opened the store through

16    that period.

17        Q.    Okay.    When Mr. Jacobs was

18    fired -- and you agree Mr. Jacobs was

19    fired, right, Butch Jacobs?

20        A.    Mr. Jacobs was terminated

21    from the company, yes.

22        Q.    He was involuntarily

23    terminated, correct?

**NATIONAL COURT REPORTING**

```
1         A.    Yes, sir.
2         Q.    And the reason for his
3    involuntary termination was that the
4    company found that Ms. Jones'
5    allegations of sexual misconduct on
6    the part of Mr. Jacobs were at least
7    in part true?
8         A.    I have no knowledge of
9    that.
10        Q.    You don't know that?
11        A.    No, sir.
12        Q.    Well, what is your
13   information about why Mr. Jacobs was
14   fired?
15        A.    During that period I was
16   told there was an investigation.
17        Q.    And were you told anything
18   about why he was fired?
19        A.    No, sir.
20        Q.    What were you told about
21   the investigation?
22        A.    I was told there was an
23   investigation at the Plaza.  I'm
```

## NATIONAL COURT REPORTING

```
 1    referring to that time period.
 2         Q.    All right.
 3         A.    I was told there was an
 4    investigation at the Plaza and that,
 5    you know, it would be business as
 6    usual until the investigation was
 7    complete.
 8         Q.    What were you told the
 9    investigation was about?
10         A.    I wasn't given any
11    information about the investigation.
12         Q.    So you weren't told that
13    the investigation was about sexual
14    harassment?
15         A.    No, sir.
16         Q.    You were the person that
17    communicated to Ms. Jones that she
18    was terminated, correct?
19         A.    Yes, sir.
20         Q.    Who made the decision to
21    terminate her?
22         A.    I did.
23         Q.    And you did that in
```

**NATIONAL COURT REPORTING**

```
1   consultation with the human resources
2   director, correct?
3         A.   Yes, sir.
4         Q.   And also in consultation
5   with the senior counsel, Kelley
6   Lowery, correct?
7         A.   Yes, sir.
8         Q.   You also kept in the loop
9   Kerry Lake; is that right?
10        A.   Yes, sir.
11        Q.   Remind me the name of the
12   HR director, Jerry?
13        A.   Beckman.
14        Q.   Beckman.  And you discussed
15   with those folks the situation with
16   Milissa prior to terminating her, and
17   then at the time you terminated her,
18   right?
19        A.   Yes, sir.
20        Q.   All right.  You knew that
21   Ms. Jones had made sexual harassment
22   allegations, correct?
23        A.   No, sir.
```

## NATIONAL COURT REPORTING

```
 1          Q.    You didn't know that?
 2          A.    No, sir, I didn't.
 3          Q.    Ms. Lowery didn't tell you
 4    that?
 5          A.    No, sir.
 6          MR. WORLEY:  Objection to
 7    what counsel would say, and instruct
 8    him not to answer on the basis that
 9    that would be privileged.
10          MR. MOREL:  I didn't mean
11    to do that.  It's not a habit.
12          MR. WORLEY:  Just for the
13    record, I have to say it.
14          MR. MOREL:  And I should
15    just say part of the reason that led
16    me down the path is y'all produced
17    several memos that I assume you don't
18    have with producing -- you've decided
19    that we were entitled to them.
20          MR. WORLEY:  Right.
21          Q.    (BY MR. MOREL:)  You
22    terminated Ms. Jones for what reason?
23          A.    Absenteeism.
```

## NATIONAL COURT REPORTING

```
1          A.     I do not know that.

2          Q.     Do you know whether Kerry,

3    or you, or anybody else went up to

4    HR, or talked to anybody at HR and

5    said we wonder if Kerry Lake should

6    be one of the people down there

7    considering this --

8          A.     I'm not aware of that.

9          Q.     -- this situation?

10         A.     I'm not aware of that.

11         Q.     All right.  Were you

12   involved in any investigation that

13   was performed by the company with

14   respect to any issue brought up by

15   the Ms. Jones?

16         A.     No, sir.

17         Q.     Do you know whether there

18   was any such investigation?

19         A.     There was an invest -- I

20   was told that there was an

21   investigation when I was, you know,

22   first asked to go down there.  But I

23   was never privy to who it was, or
```

Page 44

**NATIONAL COURT REPORTING**

```
 1   what was going on, or what the
 2   problem was, or anything like that.
 3        Q.   Who told you there was an
 4   investigation?
 5        A.   Kerry.
 6        Q.   He told you it was of
 7   Butch, but he didn't say what it was
 8   about?
 9        A.   No, sir.
10        Q.   Is that correct?
11        A.   That's correct.
12        Q.   Were you interviewed as
13   part of that investigation?
14        A.   No, sir.
15        Q.   How often, when there was a
16   GM in place -- let's talk
17   specifically about December to April,
18   and if that wasn't a typical time for
19   you, tell me.  But how often during
20   that time were you down in Tyson?
21        A.   December until that time,
22   very regular basis, yes, sir.
23        Q.   Were you there daily?
```

**367 VALLEY AVENUE**
**1-800-638-3917  Birmingham, Alabama 35209   (205) 252-6205**

**NATIONAL COURT REPORTING**

1    her to get medical leave from the
2    service, and that she told me she was
3    going to her regular doctor Monday,
4    and she would be to work on Tuesday."
5    Do you see that?
6         A.    Yes, sir.
7         Q.    Now, you were there those
8    days, correct, in Tyson?
9         A.    Yes, sir.
10        Q.    And so was Kerry Lake,
11   correct?
12        A.    Yes, sir.
13        Q.    All right.  Did anybody --
14   Kerry Lake or anybody else ever tell
15   you why Milissa was not in on Friday?
16        A.    No, sir.
17        Q.    Did he ever tell you that
18   she had called him and told him she
19   had to go to the doctor and could
20   easily get a doctor's excuse?
21        A.    No, sir.
22        Q.    Would that have mattered to
23   you to know that?