IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| **MILISSA JONES** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:07 CV273-WKW** |
| | ) | |
| **FLYING J, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S EVIDENTIARY SUBMISSION IN SUPPORT OF HER RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

The Plaintiff submits the following evidence in support of her Response in Opposition to Defendant's Motion for Summary Judgment:

1.    Deposition of Milissa Jones.

2.    Deposition of Keith Staples with Exhibits 1-13, thereto.

Respectfully submitted,

_s/Adam P. Morel_
Adam P. Morel
**ATTORNEY FOR THE PLAINTIFF**

---

[1]Copies of all exhibits referenced herein are being filed with clerk's office by conventional means.

**OF COUNSEL**:

**LAW OFFICES OF ADAM MOREL, LLC**
517 Beacon Parkway West
Birmingham, AL 35209
*Telephone:  (205) 252-8841*
*Facsimile:  (205) 252-3727*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing has been served

via electronic and/or United States Mail, properly addressed and postage prepaid to:

All Attorneys of Record

This the 12th day of January, 2008.

*s/Adam P. Morel* _____
**OF COUNSEL**

# FREEDOM COURT REPORTING

---

Page 1

```
1      UNITED STATES DISTRICT COURT
2    IN THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5   MILISSA JONES,
6
7        Plaintiff,
8
9     VS.       CASE NO.
10          2:07CV273-WKW
11
12  Flying J, INC.,
13
14        Defendant.
15
16
17    DEPOSITION OF MILISSA JONES
18
19       STIPULATIONS
20      IT IS STIPULATED AND
21  AGREED, by and between the parties,
22  through their respective counsel,
23  that the deposition of MILISSA JONES
```

Page 2

```
1   may be taken before Sunnie Gillespie,
2   Commissioner, Certified Court
3   Reporter, State of Alabama at Large,
4   at the law offices of Adam P. Morel,
5   517 Beacon Parkway West, Birmingham,
6   Alabama, on the 8th day of November,
7   2007, commencing at or about 10:44
8   a.m.
9       IT IS FURTHER STIPULATED
10  AND AGREED that the reading and
11  signature to the deposition by the
12  witness is waived, said deposition to
13  have the same force and effect as if
14  full compliance had been had with all
15  laws and rules of court relating to
16  taking of depositions.
17      IT IS FURTHER STIPULATED
18  AND AGREED that it shall not be
19  necessary for any objections to be
20  made by counsel as to any questions,
21  except as to form or leading
22  questions, and that counsel for the
23  parties may make objections and
```

Page 3

```
1   assign grounds at the time of the
2   trial, or at the time said deposition
3   is offered in evidence, or prior
4   thereto.
5       IT IS FURTHER STIPULATED
6   AND AGREED that notice of filing of
7   the deposition by the Commissioner is
8   waived.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
1          I N D E X
2
3   EXAMINATION BY:        PAGE NO.
4   Mr. Worley        7-117
5   Mr. Morel        117-123
6
7
8        E X H I B I T S
9   PLAINTIFF'S EXHIBIT NO.      MARKED
10  1 - Document - Charge of
11     Discrimination        117
12
13  DEFENDANT'S EXHIBIT NO.      MARKED
14  1 - Document - Acknowledgment    28
15  2 - Document - Discrimination
16     and Harassment        29
17  3 - Document - Grounds for
18     Immediate Termination    32
19  4 - Letter to Milissa Jones
20     from Mr. Morel        68
21
22
23
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

```
1   BEFORE: Sunnie Gillespie
2       Certified Court Reporter
3
4   APPEARING ON BEHALF OF THE PLAINTIFF:
5       MR. ADAM P. MOREL
6       Attorney at Law
7       517 Beacon Parkway West
8       Birmingham, Alabama 35209
9
10  APPEARING ON BEHALF OF THE DEFENDANT:
11      MR. ROBERT B. WORLEY, JR.
12      Jones, Walker, Waechter,
13        Poitevent, Carrere & Denegre
14      201 St. Charles Avenue
15      New Orleans, Louisiana 70170-5100
16
17
18
19
20
21
22
23
```

Page 6

```
1        I, Sunnie Gillespie,
2   Certified Court Reporter, State of
3   Alabama at Large, acting as
4   commissioner, certify that on this
5   date, in accordance with the Federal
6   Rules of Civil Procedure and the
7   foregoing stipulations of counsel,
8   there came before me at the law
9   offices of Adam P. Morel, 517 Beacon
10  Parkway West, Birmingham, Alabama, on
11  the 8th day of November, 2007,
12  MILISSA JONES, witness in the above
13  cause for oral examination, whereupon
14  the following proceedings were had:
15
16       MILISSA JONES,
17  having been first duly sworn, was
18  examined and testified as follows:
19       THE COURT REPORTER: Usual
20  stipulations?
21       MR. WORLEY: Yes.
22       MR. MOREL: That's fine
23  with me.
```

Page 7

```
1   EXAMINATION BY MR. WORLEY:
2       Q.  Good morning, Ms. Jones.
3   We met off the record a moment ago.
4   My name is Rob Worley.  I represent
5   Flying J, and I'm here to ask you
6   some questions under oath about the
7   allegations of your lawsuit.  Fair
8   enough?
9       A.  Sounds good.
10      Q.  All right.  The deposition
11  is being taken pursuant to notice and
12  by agreement for all purposes
13  permitted by the Federal Rules of
14  Civil Procedure.  We said off the
15  record a moment ago the usual
16  stipulations.  Those would be the
17  ones set forth in Rule 32, I believe.
18  If I ask you any questions that are
19  unclear to you, please let me know
20  and I'll try to rephrase the
21  question.
22      A.  Okay.
23      Q.  And I would ask you kindly
```

Page 8

```
1   to verbalize or speak your answers,
2   rather than say uh-huh or un-huh, or
3   shrug your shoulders, as we all tend
4   to do in normal conversation.
5       A.  Sounds good.
6       Q.  Because the court reporter
7   is trying to take down your testimony
8   and put it in a transcript for you --
9       A.  All right.
10      Q.  -- and for all of us
11  afterwards.  If you need a break, let
12  me know.  That's fine.  And what I
13  would do is I will do my very best to
14  let you finish your answer before
15  asking the next question.  And, also,
16  if you wouldn't mind, let me finish
17  my question before you answer, too.
18  That would help Sunnie out.  Fair
19  enough?
20      A.  Okay.  Sounds good.
21      Q.  Would you state your full
22  name for the record, please?
23      A.  Milissa Dawn Jones.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1    Q.  I'm sorry.  What was the
2  middle name?
3    A.  Dawn, D-A-W-N.
4    Q.  And your Social Security
5  number?
6    A.  ███████
7    Q.  Your date of birth?
8    A.  ███████
9    Q.  My oldest daughter was born
10  January 17th.
11    A.  That's a good date.
12    Q.  Not 1979, but January 17th.
13  Where were you born?
14    A.  Pittsfield, Massachusetts.
15    Q.  And are you married?
16    A.  Yes.
17    Q.  What is your husband's
18  name?
19    A.  Tommy Jones, Jr.
20    Q.  How long have you been
21  married?
22    A.  Going on eight years.
23    Q.  Is he the only husband

Page 10

1  you've had?
2    A.  Yes.
3    Q.  Do you have any children?
4    A.  Three boys.
5    Q.  Good for you.  What are
6  their names and ages, please?
7    A.  Travis is five.  Tieler,
8  which is spelled T-I-E, not that it's
9  relevant, is three.
10    Q.  T-I?
11    A.  T-I-E-L-E-R.
12    Q.  He's how old?
13    A.  Three.  And, then, Tavin is
14  one.
15    Q.  And what is your current
16  address?
17    A.  Mailing or residential?
18    Q.  Physical?
19    A.  940 Central Avenue, Unit
20  18, Fort Walton Beach, 32547.
21    Q.  Do you own that dwelling?
22    A.  No.
23    Q.  You're renting?

Page 11

1    A.  No.
2    Q.  And how is it you're
3  staying there?
4    A.  We're staying with my
5  mother-in-law right now.
6    Q.  How long have you resided
7  there?
8    A.  Since August.
9    Q.  Of this year?
10    A.  Yes.
11    Q.  Where did you live before
12  that?
13    A.  In Las Vegas.
14    Q.  How long did you live in
15  Las Vegas?
16    A.  11 months.
17    Q.  What were you doing in Las
18  Vegas?
19    A.  Most of the time I just
20  stayed at home.  For a while I worked
21  as an assistant manager for Vegas
22  Express.
23    Q.  And we'll get into your

Page 12

1  employment history in a little while.
2  And before Las Vegas where did you
3  live?
4    A.  Montgomery, Alabama.
5    Q.  Alabama?
6    A.  Yeah.
7    Q.  How long did you live in
8  Montgomery?
9    A.  It was just over a year, I
10  believe.
11    Q.  Do you remember your
12  address in Las Vegas?
13    A.  4109 Generous Court,
14  G-E-N-E-R-O-U-S.
15    Q.  And in Montgomery what was
16  your address, if you recall?
17    A.  229-A, Erwin Court,
18  E-R-W-I-N.  And it's actually Gunter
19  Annex.
20    Q.  Before Montgomery, where
21  did you live?
22    A.  That would be Portales, New
23  Mexico.  Don't ask me the address.  I

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1  can't remember.
2      Q.  And how was it that you
3  lived in those different cities?
4      A.  My husband is -- was
5  military.
6      Q.  Are you on any medication
7  today that would affect your ability
8  to give truthful answers?
9      A.  No.
10     Q.  Do you have a high school
11 education?
12     A.  Yes.
13     Q.  Where did you go to high
14 school?
15     A.  Rockledge High School.
16     Q.  Rockledge?
17     A.  Yes.  R-O-C-K-L-E-D-G-E.
18     Q.  And that was in Rockledge,
19 Florida?
20     A.  Yes.
21     Q.  Where is that?
22     A.  Near Cape Canaveral, Cocoa
23 Beach.

Page 14

1      Q.  What year did you get your
2  diploma?
3      A.  '96.
4      Q.  Did you go to college after
5  that?
6      A.  On and off, yes.
7      Q.  Did you ever obtain or earn
8  a college degree?
9      A.  No.
10     Q.  Which colleges did you
11 attend?
12     A.  Brevard Community College.
13     Q.  All right.
14     A.  Clovis Community College;
15 Eastern New Mexico University.
16     Q.  All right.
17     A.  And Troy State University.
18     Q.  Were you married when you
19 were in college?
20     A.  Everything except for
21 Brevard County, yes.
22     Q.  Do you remember what years
23 you attended those schools?

Page 15

1      A.  Brevard County would have
2  been -- I want to say '97.  Clovis
3  would have been 2003 to probably
4  2004, maybe 2005.  And then I began
5  at Troy as soon as I finished Clovis,
6  2004, 2005 to 2005ish.
7      Q.  And you moved around
8  because your husband was transferred?
9      A.  Yes.  And then I stopped
10 going to Troy in 2006.
11     Q.  And why did you stop going?
12     A.  GI bill ran out.  And I'm
13 going back.  I'm going to finish my
14 degree.
15     Q.  And what is your degree in?
16 Well, let me rephrase the question.
17 What are you studying?
18     A.  My major is history.  My
19 minor is sociology and art.
20     Q.  Have you ever been
21 convicted of a crime?
22     A.  No.
23     Q.  Have you ever been involved

Page 16

1  in a lawsuit as a party before this
2  case, either as a plaintiff or a
3  defendant?
4      A.  No.
5      Q.  Prior to this case against
6  Flying J, have you ever filed a
7  charge of discrimination with the
8  Equal Employment Opportunity
9  Commission?
10     A.  No.
11     Q.  Or a state agency?
12     A.  No.
13     Q.  Let me ask you about your
14 employment history.  What I'd like to
15 do is discuss the full-time jobs
16 you've held, not part-time, and as
17 best you can recall them.  So let me
18 ask you this way in leading up to
19 that topic.  Would it be fair to say
20 that after you graduated from high
21 school that you did not hold any
22 full-time jobs until you finished
23 Troy State?

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    A. No.
2    **Q. That would not be fair?**
3    A. No, that would be
4    incorrect.
5    **Q. Tell me, then, the first**
6    **full-time job that you held?**
7    A. Specialty Merchants, and I
8    was with them from '96 or '97 -- it
9    would have been '96 to '99.
10    **Q. And where was that located?**
11    A. Merritt Island Mall and the
12    Daytona Beach Mall.
13    **Q. And what was the first mall**
14    **you said?**
15    A. Merritt Island.
16    **Q. Florida?**
17    A. Uh-huh.
18    **Q. Is that right?**
19    A. Yes.
20    **Q. And what did you do for**
21    **that company?**
22    A. I was the store manager.
23    **Q. What kind of store was it?**

Page 18

1    A. They had three. One was
2    all beanie babies, which I didn't
3    deal with. The other one was a toy
4    store, wind-up, battery operated
5    toys. And, then, the other one was
6    geared toward upper class
7    fishermen -- Guy Harvey T-shirts,
8    prints, art work, throws -- other
9    artists as well, but he was the main
10    artist we dealt with.
11    **Q. Which of the three did you**
12    **deal with?**
13    A. I dealt with the toy store
14    and the Guy Harvey.
15    **Q. And why did you leave**
16    **there?**
17    A. I joined the military.
18    **Q. What year did you join?**
19    A. I want to say it was in
20    '98.
21    **Q. And what branch?**
22    A. Navy.
23    **Q. How long were you in the**

Page 19

1    Navy?
2    A. 'Til 2001.
3    **Q. What was the highest rank**
4    **you obtained?**
5    A. E-4.
6    **Q. Where were you stationed?**
7    A. Aboard the U.S.S. Cole, and
8    then port operations out of Norfolk.
9    **Q. Honorable discharge?**
10    A. Yes, medical but honorable.
11    **Q. And what was the medical**
12    **issue?**
13    A. Endometriosis.
14    **Q. I could go back and look at**
15    **the dates, I guess, but did you meet**
16    **your husband in the military?**
17    A. Kind of sort of, yeah. We
18    knew each other in high school.
19    **Q. Okay. I see, all right.**
20    **Is he still in the military?**
21    A. No.
22    **Q. All right. So from 1998 to**
23    **2001 you told me you were in the**

Page 20

1    Navy?
2    A. Uh-huh.
3    **Q. What full-time job did you**
4    **hold after that?**
5    A. I did jewelry sales for
6    both Gordon's and Zale's, they're
7    owned by the same company.
8    **Q. How long did you work**
9    **there?**
10    A. I started there while I was
11    in the Navy. I'm not sure of the
12    exact date. And I stopped December
13    of 2001.
14    **Q. Where were you working --**
15    **where did you live when you worked**
16    **for them?**
17    A. Virginia and Merritt
18    Island, Florida.
19    **Q. Is it Norfolk?**
20    A. Yeah, yes.
21    **Q. And why did you stop**
22    **selling jewelry?**
23    A. I was having complications

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  with my pregnancy.
2      **Q.  Did you suffer any**
3  **complications or medical issue from**
4  **that you still suffer from today?**
5      A.  From the pregnancy, no.
6      **Q.  Well, from the**
7  **complications?**
8      A.  No.
9      **Q.  All right.  What job did**
10  **you hold next full-time?**
11      A.  American Family Care.
12      **Q.  Where did you work there?**
13      A.  Montgomery, Alabama.
14      **Q.  And what did you do for**
15  **that company?**
16      A.  Receptionist.
17      **Q.  Is that full-time?**
18      A.  Yes.
19      **Q.  How long did you work**
20  **there?**
21      A.  I want to say like August
22  '05 to December '05.
23      **Q.  And what did you -- you**

Page 22

1  **said receptionist, I'm sorry.  And**
2  **why did you leave there?**
3      A.  I was offered the position
4  at Flying J.
5      **Q.  Other than your high school**
6  **education, as well as the time you**
7  **spent in college, have you had any**
8  **other formal education, whether**
9  **votech schools, trade schools,**
10  **anything like that?**
11      A.  The military training
12  school.  Other than that, no.
13      **Q.  And what is the military**
14  **training school?**
15      A.  Navy A School for my
16  specific job -- Electronic Warfare
17  School is I think what it was called
18  at the time.  And, then, I also went
19  through leadership petty officer
20  training.
21      **Q.  Do you have any**
22  **professional licenses of any kind?**
23      A.  No.

Page 23

1      **Q.  When did you apply for work**
2  **at Flying J?**
3      A.  I was offered the position
4  before I filled out the application.
5      **Q.  Who offered you the**
6  **position?**
7      A.  Butch Jacobs.
8      **Q.  Do you remember what month**
9  **and year that was?**
10      A.  December '05.
11      **Q.  How did you come to know**
12  **Butch Jacobs?**
13      A.  American Family Care was
14  doing the drug screening for all his
15  employees.
16      **Q.  At Flying J?**
17      A.  Yes.
18      **Q.  How long had you known**
19  **Butch Jacobs before you worked at**
20  **Flying J, the best you can estimate?**
21      A.  A couple of weeks.
22      **Q.  Just a couple of weeks?**
23      A.  Uh-huh.

Page 24

1      **Q.  Is that right?**
2      A.  Yes.
3      **Q.  What did he tell you about**
4  **Flying J?  Well, let me rephrase the**
5  **question.**
6          How did it come to be that
7  **he offered you that job?**
8      A.  I actually had asked what
9  positions he was still hiring for,
10  because my husband's cousin was
11  looking for a job, and he named a
12  couple positions, said that there
13  were more on the restaurant side as
14  well.  And I had to do some research
15  about some drug tests for him.  He
16  liked the way I handled myself, and
17  asked me if I would be interested in
18  applying, and I said that I was open
19  to the idea, and he asked me to come
20  in and speak with him.
21      **Q.  And you did, obviously?**
22      A.  Yes.
23      **Q.  Did you interview with**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  anybody else besides Jacobs?
2      A. He had me talk with Debbie
3  McCollough as well, I believe.
4      Q. What was her position; do
5  you remember?
6      A. She was the accounting
7  manager.
8      Q. Butch's position was?
9      A. General manager.
10     Q. Of the complex?
11     A. Yes.
12     Q. What position were you
13  hired in for -- well, let me rephrase
14  that.
15         What position did he hire
16  you for?
17     A. C Store manager.
18     Q. And C Store is a
19  convenience store?
20     A. Yes.
21     Q. What were you duties as C
22  Store manager?
23     A. I was to assist in the

Page 26

1  training of all the cashiers. I
2  needed to run the cash registers as
3  well, myself, when it called for it;
4  do scheduling; training; basically
5  act as a liaison in between the
6  cashiers and Butch, and the other
7  managers; insure proper cash
8  handling; deal with the customers;
9  resolve customer issues; attempt to
10  collect uncollectibles -- drive offs;
11  and try to minimize losses.
12     Q. At the Flying J Travel
13  Plaza -- you're familiar with that
14  term, correct?
15     A. Yes.
16     Q. And the travel plaza would
17  be the complex, right?
18     A. Yes.
19     Q. And in the complex there
20  was a restaurant?
21     A. Yes.
22     Q. Convenience store?
23     A. Yes.

Page 27

1      Q. And would the maintenance
2  department be separate from the
3  convenience store -- servicing of
4  trucks, repairs, and that kind of
5  thing?
6      A. We didn't have a
7  maintenance department like that. It
8  was facility maintenance. They
9  maintained the facility itself.
10     Q. Was there a maintenance or
11  facility department separate from the
12  convenience store?
13     A. Yes.
14     Q. And, then, Butch Jacobs
15  would be the manager over all three
16  of those components or groups?
17     A. Not over the restaurant,
18  no.
19     Q. The restaurant had its own
20  general manager?
21     A. Yes.
22     Q. And Butch would be your
23  immediate -- was your immediate

Page 28

1  supervisor, correct?
2      A. Correct.
3      Q. There was a district
4  manager who would out rank Butch?
5      A. Yes.
6      Q. Did you know your district
7  manager when you were employed there?
8      A. Briefly.
9      Q. Do you remember his name?
10     A. Honestly, no.
11     Q. All right. Was it Mike
12  Walton?
13     A. No. Chris -- I think Chris
14  was the accounting manager.
15     Q. Let me show you and counsel
16  what I've marked as Defendant's
17  Number 1.
18         (Whereupon, Defendant's
19         Exhibit Number 1 Jones was
20         Marked for identification.)
21         (Handing document to
22         Witness.)
23     Q. This is a document entitled

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  Acknowledgment -- at least a portion
2  of it is entitled Acknowledgment. Is
3  that your signature?
4      A.  Yes.
5      Q.  And this is dated December
6  of '05?
7      A.  Yes.
8      Q.  December 1st of '05?
9      A.  Yes.
10     Q.  And this is a handbook
11  acknowledgment that you signed on
12  that date?
13     A.  Yes.
14     Q.  Did you in fact receive a
15  Flying J Handbook?
16     A.  Yes, I did.
17     Q.  And this statement is
18  true -- this Acknowledgment is true
19  where you acknowledged?
20     A.  Yes.
21         (Whereupon, Defendant's
22         Exhibit Number 2 Jones was
23         Marked for identification.)

Page 30

1         (Handing document to
2         Witness.)
3      Q.  I'll mark now Exhibit 2.
4  Do you recognize -- well, what I've
5  handed you we've marked as Exhibit 2,
6  and it's a two-page document. The
7  first page has FJ144, and the second
8  page FJ145. And it's entitled
9  Discrimination and Harassment. Have
10  you seen these excerpts from the
11  handbook before?
12     A.  Yes, I have.
13     Q.  And you're familiar with
14  the discrimination and harassment
15  policy?
16     A.  Yes.
17     Q.  At the time you worked at
18  Flying J?
19     A.  Yes.
20     Q.  Bear with me just a minute,
21  if you would. Do you still have a
22  copy of your handbook from Flying J?
23  Did you retain a copy?

Page 31

1      A.  I'm not sure.
2      Q.  Okay.
3         MR. MOREL: I know that I
4  have something that you gave me. I
5  don't know if it's -- I've got it and
6  you can look at it.
7         MR. WORLEY: Oh, that's
8  fine.
9         MR. MOREL: I probably
10  eluded to it in our responses. I
11  just didn't copy it.
12         MR. WORLEY: That's fine.
13     Q.  (BY MR. WORLEY:) I will
14  show you what I've marked as Exhibit
15  3, and unfortunately I don't have
16  extra copies, but we can look on
17  together. This is Bates stamped
18  Flying J150 --
19     A.  Uh-huh.
20     Q.  -- and it says Grounds for
21  Immediate Termination. Have you seen
22  that excerpt from the Flying J
23  Handbook before?

Page 32

1         (Whereupon, Defendant's
2         Exhibit Number 3 Jones was
3         Marked for identification.)
4         (Handing document to
5         Witness.)
6      A.  Yes.
7      Q.  Thanks. And you had seen
8  that when you had received your copy
9  of the handbook, correct?
10     A.  Yes.
11     Q.  Let's put these for the
12  court reporter here so we don't lose
13  them. Thank you. All right.
14         And as C Store manager you
15  supervised the employees of the
16  convenience store, correct?
17     A.  Yes.
18     Q.  Did there come a time when
19  you became displeased with Butch
20  Jacobs in any way?
21     A.  Yes.
22     Q.  When did you -- and we'll
23  go into detail of what that was, but

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1  when did that first happen,
2  specifically, that you became unhappy
3  or displeased with the way that he
4  was conducting himself?
5      A.  It would have been shortly
6  after I was hired.  I don't have an
7  exact date.
8      Q.  And that's fine.  Just as
9  best as you can determine.  So, you
10 were hired in December of 2005; is
11 that right?
12     A.  Yes.
13     Q.  And when you say shortly
14 thereafter, would that have been days
15 or months after?
16     A.  Maybe a week or two.
17     Q.  What did he do to you that
18 you thought was inappropriate, or
19 that caused you unhappiness?
20     A.  Just comments, sexual in
21 nature, towards myself and towards --
22 well, I didn't hear anything.  I saw
23 him like pulling on Sherrie a couple

Page 34

1  of times, and stuff.
2      Q.  Let's do this.  If you'll
3  do this for me, list each and every
4  thing that he did to you.
5      A.  Okay.
6      Q.  And we can talk about other
7  people next.  But specifically to
8  you, whether comments or otherwise,
9  that you considered to be
10 inappropriate.  And before you
11 answer -- and we can go back and talk
12 about each one in detail, but I'd
13 like to get the list first.
14     A.  Okay.
15     Q.  I believe the first thing
16 you said was he made comments to you
17 that were sexual in nature?
18     A.  Yes, made comments about
19 his genitalia, the size of it.  He
20 made comments about how he performed
21 in the bedroom, that he basically
22 wasn't finished until his partner had
23 been pleased -- made comments about

Page 35

1  he's more of a giver in the bedroom.
2  There was a couple of times when he
3  made comments when I was drinking a
4  drink, about the way I was drinking
5  it, just eluding to sexual
6  activities, and would make comments
7  about, you know, oh you'll have to
8  show John, referring to the facility
9  manager, that.  Same thing if I was
10 eating like a corn dog or anything
11 that was that shaped.
12     Q.  What else?
13     A.  Attempted to pull me into
14 his lap a number of times.  He
15 would -- like if we were reviewing
16 paperwork or something, he would like
17 grab my leg -- my upper thigh.  I'm
18 trying to think.  He'd try and hug
19 my.  I'm sure there's more.  I
20 just --
21     Q.  Well, let me go back and
22 sum up --
23     A.  Okay.

Page 36

1      Q.  -- and if you'll follow
2  along with me and see if I have these
3  right.  If I don't, correct me.  And
4  if something else comes to mind, feel
5  free to add it.
6          The question was for you to
7  list what Butch Jacobs did to you,
8  either through comments or otherwise
9  that you considered to be
10 inappropriate, when you were at
11 Flying J?
12     A.  Okay.
13     Q.  The first thing you said
14 was that he made sexual comments to
15 you -- or comments to you sexual in
16 nature?
17     A.  Uh-huh.
18     Q.  Number two, he made
19 comments about his genitalia,
20 specifically the size of his
21 genitalia?
22     A.  Uh-huh.
23     Q.  Number three, he commented

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1 about how he performed in the
2 bedroom, saying that he was not
3 finished until his partners were
4 pleased, and that he was a giver in
5 the bedroom.
6     Four, he would comment
7 about the way you would drink or eat,
8 and suggesting that it was sexual in
9 nature in some way?
10    A.  Yes.
11    Q.  As an example, eating a
12 corn dog or something shaped that
13 way.  And five, on occasion he would
14 touch you inappropriately such as
15 attempting to pull you into his lap,
16 grabbing your leg or upper thigh, and
17 try and hug you?
18    A.  Yeah.  There was also times
19 when he would rub his genitalias
20 against, you know, my butt.  He would
21 attempt towards the front, but
22 that -- I was usually able to move
23 out of the way.  What else?  I'm

Page 38

1 drawing a blank.  There was something
2 else.
3     Q.  Okay.  Take your time.  Let
4 me sort of sum up again.  I know it
5 may seem meticulous or laborious, but
6 just so we're clear.  And if that
7 prompts you to remember something
8 else, that's fine.
9     I was asking you what Butch
10 Jacobs did to you that you consider
11 to be inappropriate.  Number one, he
12 made comments of a sexual nature
13 towards you.  And number two, he made
14 comments about the size of his
15 genitalia.  Number three, he would
16 brag about his performance in the
17 bedroom, saying that he wasn't
18 finished until his partner was
19 pleased, and that he was a giver in
20 the bedroom.  Four, he would comment
21 about the way you would drink or eat,
22 and he said this as if it were a
23 sexual innuendo or sexually

Page 39

1 suggestive.
2    A.  Yes.
3    Q.  Number five, on occasion he
4 would attempt to pull you into his
5 lap, or grab your leg or upper thigh,
6 or try and hug you?
7    A.  Uh-huh.
8    Q.  And six, he rubbed his
9 genitalia against your behind or
10 butt, and would attempt to move
11 towards the front, but you were able
12 to move away to keep him from your
13 front?
14    A.  Yes.  He would discuss
15 pornography openly, and he also
16 discussed his trip to the strip club
17 with his supervisor.  There was also
18 a discussion of a previous affair he
19 had had with someone from his
20 previous job.
21    Q.  Anything else?
22    A.  I'm sure there's more.  I'm
23 drawing a blank.

Page 40

1    Q.  Well, you can take your
2 time.  Again, just for the record,
3 let me sum up.  I was asking you what
4 Butch Jacobs did to you that you
5 considered inappropriate.  Number
6 one, he made comments to you of a
7 sexual nature.  Number two, he would
8 remark or comment about the size of
9 his genitalia.  Number three, he
10 would brag about how he performed in
11 the bedroom, saying he was not
12 finished until his partner was
13 pleased, and that he was a giver in
14 the bedroom.  Four, he would comment
15 about the way you were drinking or
16 eating, and he would do so as if it
17 were a sexual innuendo, or suggesting
18 that you were -- what you were doing
19 was sexual in nature.  Five, he would
20 touch you in ways you did not approve
21 of, such as pulling you into his lap,
22 grabbing your leg or upper thigh, and
23 would try and hug you.  Six, he would

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  rub his genitalia against your butt,
2  and then attempt to move towards the
3  front of your body, though you would
4  stop him from moving towards the
5  front, or you were able to move away
6  by that time. Seven, he would
7  discuss pornography openly. Eight,
8  he discussed his trip to a strip club
9  that he had made with a supervisor.
10  And nine, Jacobs had discussed an
11  affair he had had from a previous
12  job. Is that fair?
13      A.  I believe that covers the
14  majority of it, yes.
15      Q.  The question is, though,
16  all of it -- can you think of
17  anything that we haven't discussed
18  here?
19      A.  Offhand, no.
20      Q.  All right. As promised, I
21  said we'd go back and talk about each
22  one, so I would like to do that. Let
23  me ask you about the first one, that

Page 42

1  you said he made comments of a sexual
2  nature. Let's talk about that one.
3  What comments did he make? Can you
4  tell me each and every thing as best
5  you can recall?
6      A.  Goodness.
7      MR. MOREL:  Are you asking
8  her in addition to the examples she
9  gave you?
10      MR. WORLEY:  Right.
11      MR. MOREL:  As opposed to
12  expounding on the examples that she
13  gave you?
14      MR. MOREL:  Correct.
15      A.  Yeah, I'm drawing --
16  honestly, I'm drawing a blank. I
17  can't -- I can't say anything
18  specific.
19      Q.  (BY MR. MOREL:)  Okay. I'm
20  not trying to trick you, because you
21  know that in some of the subsequently
22  numbered items you did mention sexual
23  comments --

Page 43

1      A.  Right.
2      Q.  -- and we can talk about.
3  I'm not trying to avoid that. We'll
4  get into those. But other than the
5  things you mentioned, say from items
6  two through nine, is there anything
7  else that he said of a sexual nature
8  that comes to mind?
9      A.  Not that I can think of at
10  this time.
11      Q.  Okay. That's fine. All
12  right. The comments about his
13  genitalia. How many times, best you
14  can say for me, did he make that
15  remark?
16      A.  At least a dozen, I would
17  say.
18      Q.  Were there any witnesses to
19  him saying that, to your knowledge?
20      A.  Not that I can think of.
21      Q.  Can you tell me over what
22  course of time -- period of time he
23  made those comments?

Page 44

1      A.  Matter of weeks, less.
2      Q.  They started a matter of
3  weeks after you started with the
4  company, or they lasted over a matter
5  of weeks?
6      A.  It started probably --
7  maybe a month after I started work,
8  and then probably -- it just varied.
9      Q.  Did there come a time when
10  he stopped?
11      A.  No.
12      Q.  Did you have any reply to
13  him when he would say those things
14  about his genitalia?
15      A.  I would tell him it was
16  inappropriate, and that he needed to
17  watch the sexual harassment video
18  again.
19      Q.  Did he have any comment on
20  that?
21      A.  He would just laugh it off.
22      Q.  Let's talk about the
23  comments about his sexual performance

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1 in the bedroom. Do you know how many
2 times he said that to you?
3     A.  It was usually after the
4 comment about his genitalia, so at
5 least a dozen.
6     Q.  Were there any witnesses to
7 those comments, to your knowledge?
8     A.  No.  Oh, other
9 inappropriate behavior -- he grabbed
10 me when I was walking away and put
11 his hands down the back of my pants.
12 I knew I was forgetting one.
13     Q.  Can we lump that in with
14 the number five item about touching,
15 such as pulling you into his lap,
16 grabbing your leg or thigh, trying to
17 hug you?
18     A.  Other than it went a lot
19 further, I guess.
20     Q.  We can add that as number
21 ten. How about that?
22         MR. MOREL:  I'm not an
23 objector, really, in depos

Page 46

1 unnecessarily. But, I mean, I
2 suppose you could put it under what
3 item you want to since they're your
4 items, but I don't know what that
5 means for her.
6         MR. WORLEY:  I'll explain
7 that.
8     Q.  (BY MR. WORLEY:)  I was
9 asking you what he had done
10 inappropriately and we had listed one
11 through nine.
12     A.  Right.
13     Q.  I just want to have a
14 record of all that you say that he
15 did, so that later --
16     A.  I understand.
17     Q.  I'm not trying to trick
18 you. Why don't we just say that that
19 would be number ten, which was --
20 tell me again if he did something.
21     A.  I was walking away, and he
22 grabbed me by the back of my pants
23 and put -- I would say probably his

Page 47

1 four fingers down the back of my
2 pants, inside my pants.
3     Q.  Can you think of anything
4 else he did that you didn't mention
5 before?
6     A.  No, not at this time.
7     Q.  Just real briefly, just so
8 we have them all, the question was
9 what did Butch Jacobs do to you that
10 you consider to be inappropriate?
11 And you told me number one, he made
12 comments of a sexual nature. Number
13 two, he made comments about the size
14 of his genitalia. Number three, he
15 commented about how he performed in
16 the bedroom, saying he wasn't
17 finished until his partner was
18 pleased, and that he was a giver in
19 the bedroom. Four, he would comment
20 about the way you would drink or eat,
21 and he would do so in a sexually
22 suggestive way. Five, he attempted
23 to pull you into his lap. He grabbed

Page 48

1 your leg or upper thigh, and he tried
2 to hug you. Six, he rubbed his
3 genitalia against your butt, and
4 attempted to move towards the front
5 of your body, though you were usually
6 able to move away before he got to
7 the front. Seven, he would discuss
8 pornography openly. Eight, he
9 discussed his trip to a strip club
10 that he had made with a supervisor.
11 Nine, he had discussed an affair he
12 had had at his previous job. And,
13 ten, he grabbed you and put his four
14 fingers down the back of your pants?
15     A.  Yes.
16     Q.  That completes all the
17 comments or behavior as best you can
18 recall right now?
19     A.  That I can think of right
20 now, yes.
21     Q.  Okay. In asking about the
22 comments, we started to go back. Let
23 me ask you now specifically about

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  when he would comment on the way you
2  would drink or eat something?
3      A.  Specific example, I was
4  eating a corn dog, and he made a
5  comment about he liked the way I was
6  eating the corn dog, and that if
7  that's the way I ate a corn dog, he
8  could imagine how good I would be at
9  giving a blow job.
10     Q.  How many times did he say
11 that to you?
12     A.  Full context one, maybe two
13 times.  The other times he would just
14 kind of make a briefer statement, but
15 I knew what he was alluding to, and
16 it got to the point where I wouldn't
17 eat anything in front of him.
18     Q.  Were there any witnesses to
19 him commenting about the corn dog, to
20 your knowledge?
21     A.  No, but I know he had said
22 he was going to tell John Frazier
23 about it.

Page 50

1      Q.  Jacob said he was going to
2  tell John Frazier that he had made
3  that comment about the corn dog?
4      A.  He was going to make the
5  com -- he was going to say something
6  to John about the way that I ate it,
7  I guess it would be.
8      Q.  And who is John Frazier?
9      A.  The facility manager.
10     Q.  All right.  Let me ask you
11 about what I had listed as number
12 five for you, his attempts to pull
13 you into his lap.  How many times did
14 he do that?
15     A.  I couldn't begin to count.
16     Q.  Can you give me an
17 estimate?
18     A.  A hundred, pretty much
19 every day.
20     Q.  When you say he tried to
21 pull you to his lap, can you be more
22 specific?  How would that happen?
23     A.  In the office he and I --

Page 51

1  me, him and Tanisha and John pretty
2  much shared an office.  It was
3  rectangular in shape.  He'd be
4  sitting down.  If I came in to do
5  paperwork or to get something out of
6  the office, he would attempt to pull
7  me into his lap.
8      Q.  Would he grab you when he
9  would try this?
10     A.  Yes, by the wrist, by the
11 arm, by the waist.
12     Q.  Were there witnesses to
13 this?
14     A.  Not that I can think of.
15     Q.  And tell me about when he
16 would try to grab your leg or upper
17 thigh.
18     A.  One specific instance, we
19 were sitting at the desk.  He was on
20 my right side.  We were going over --
21 I want to say it was a schedule, some
22 sort of paperwork.  He leaned over
23 and put his hand on my upper thigh,

Page 52

1  and I removed it and let him know
2  that it was inappropriate.
3      Q.  Were there witnesses to
4  that, to your knowledge?
5      A.  No.
6      Q.  And then you said he had
7  tried to hug you?
8      A.  Just in passing.  He did it
9  with a lot of the employees.  He
10 hugged a lot of them.
11     Q.  Did anyone see -- to your
12 knowledge, was anyone present when he
13 had tried to hug you?
14     A.  I'm sure at some point.  I
15 can't name anybody specifically,
16 though.  I don't know.
17     Q.  How many times did he try
18 to rub his genitalia against your --
19 well, strike that.
20         How many times did he rub
21 his genitalia against your butt?
22     A.  Seven or eight, probably.
23     Q.  Any witnesses to that to

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1 your knowledge?
2    A.  I know Debbie McCollough
3 saw it.
4    Q.  And how do you know that?
5    A.  One specific time that I
6 can think of, we were in the
7 accounting office, which is her
8 office.  She was sitting to my left.
9 He was behind me, and came up and
10 rubbed it.  I mean, we were in the
11 middle of a conversation, so she was
12 looking at me.
13    Q.  Did she have any comment
14 for you about that, then or later?
15    A.  No -- actually, no, she
16 made a comment about him needing to
17 watch the sexual harassment video
18 again.  And she had at another point
19 made a comment about that if her and
20 I didn't get his sexual harassment
21 under control, that somebody was
22 going to file a complaint.  I forgot
23 about that.

Page 54

1    Q.  And she had said that to
2 you?
3    A.  Yes.
4    Q.  Okay.  All right.  Did she
5 tell that she had ever been sexually
6 harassed by him?
7    A.  No.
8    Q.  Did she tell you what she
9 meant by getting his sexual
10 harassment under control?
11    A.  End it.  She -- she was
12 aware of his inappropriate behavior.
13    MR. MOREL:  Listen to his
14 question.  His question is did she
15 tell you what she meant.
16    A.  Specifically, no.
17    Q.  (BY MR. WORLEY:)  And,
18 then, you said he discussed
19 pornography openly?
20    A.  Yes.  Oft --
21    Q.  Go ahead.
22    A.  Often with Debbie.  They
23 were discussing some video.  It had

Page 55

1 to do with nurses or something.  I
2 really -- I overheard -- I was
3 sitting in the office and heard
4 enough where it offended me, and I
5 got up and walked out.
6    Q.  Can you tell me anything
7 more specifically about that, what he
8 was saying?
9    A.  They were talking about
10 what a good video it was, how
11 explicit it was.
12    Q.  He and Debbie were
13 discussing it, you say?
14    A.  Yes.
15    Q.  Was Debbie saying it was a
16 good video also?
17    A.  Yes.
18    Q.  Did he make any other
19 comments about pornography that you
20 recall?
21    A.  Not specifically, no.
22    Q.  Tell me what you know about
23 his visit to a strip club?

Page 56

1    A.  He and -- it was discussed
2 in front of me among him and Debbie a
3 couple of times, as well as him and
4 John, that when they were training
5 prior to completion of that facility,
6 that they had all gone to a strip
7 club.  And I want to say it was Kerry
8 had been brought up on stage, and
9 there was some stripers who had
10 danced on him, and they laughed and
11 joked about it, and what a great
12 night it was and how much fun they
13 had had.
14    Q.  And was that strip club
15 incident before you were employed at
16 Flying J?
17    A.  Yes.
18    Q.  And, then, you said he
19 discussed his affair from another
20 job?
21    A.  Yeah.
22    Q.  Do you remember what he
23 said?

14 (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1      A.  I believe he had worked
2   at -- I want to say it was a grocery
3   store prior to Flying J.  I'm not
4   sure.  He was having an affair.  I
5   want to say it was his supervisor.
6   And he had said how they had had sex
7   numerous times in her office, I
8   believe it was.  He just would make
9   comments about her giving him blow
10  jobs, how much he liked blow jobs.
11  There were a number of comments.
12     Q.  And he was -- go ahead?
13     A.  It basically centered
14  around those.
15     Q.  And he was telling you this
16  directly?
17     A.  Telling me, discussing it
18  with Debbie, discussing it with John.
19     Q.  What was Debbie saying in
20  response, anything?
21     A.  Nothing negative.  She was
22  aware of it.  They laughed and joked
23  about it.

Page 58

1      Q.  And then you said he
2   grabbed you and put his four fingers
3   down the back of your pants?
4      A.  Yes.
5      Q.  How many times did he do
6   that?
7      A.  That was one incident.
8      Q.  Were his fingers actually
9   inside your underpants?
10     A.  Yes.
11     Q.  Did he try to penetrate
12  you, or anything like that?
13     A.  No, I -- as soon as I
14  realized his hand was there, I was
15  moving as quickly and as far away as
16  possible.
17     Q.  Were there any witnesses to
18  that; do you recall?
19     A.  No.
20     Q.  I may have asked you this
21  question before, and I'm just trying
22  to see if I understand, because if I
23  did I'm not clear.  You did tell me

Page 59

1   that shortly after you came to work
2   at Flying J, Jacobs started doing
3   these things to you that you
4   described?
5      A.  Yes.
6      Q.  And I also think you had
7   told me that it had never stopped?
8      A.  Correct.
9      Q.  Okay.  I'll get back to the
10  timing in a minute.
11     A.  Okay.
12     Q.  Did you ever complain about
13  Butch Jacobs, yourself, to anybody in
14  management at Flying J?
15     A.  No, because I didn't feel
16  that it would -- anything would be
17  done about it.
18     Q.  But, of course, you did
19  understand Flying J had the sexual
20  harassment policy, correct?
21     A.  Yes.
22     Q.  Which had a complaint
23  procedure?

Page 60

1      A.  Yes.
2      Q.  Even a 1-800 number
3   directly to corporate headquarters in
4   Utah?
5      A.  Yes.
6      Q.  Why do you say that you
7   felt that nothing would have been
8   done about it had you complained
9   yourself?
10     A.  I knew his direct immediate
11  supervisors were -- from the story of
12  the strip club, I just didn't think
13  that they would really give any
14  credence to it.  And it was so openly
15  discussed, the strip club, that I
16  was -- they were so blatant about it,
17  I just assumed that it was a well
18  known fact, and if they were not
19  going to do anything about that, then
20  why would they do anything about my
21  complaint.
22     Q.  Who was at the strip club,
23  to your knowledge?  Who were these

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1 supervisors that you were talking
2 about who were there?
3      A.   The district accounting
4 manager, assistant manager, and
5 manager.
6      Q.   Of the store -- the
7 complex?
8      A.   Well, the district
9 managers.
10      Q.   Okay.  I'm sorry.  The
11 district accounting manager.  Who was
12 the district accounting manager?
13      A.   I want to say it was Keith
14 Staples.  He's either the accounting
15 or the assistant.
16      Q.   All right.  And the
17 assistant manager was?
18      A.   One of them was Chris.  I
19 don't recall the names at this point,
20 honestly.
21      Q.   That's all right.  But when
22 you say assistant manager, you mean
23 of that Flying J Travel Plaza where

Page 62

1 you were employed?
2      A.   No, the district assistant
3 manager, district accounting manager,
4 and the district manager.
5      Q.   All right.
6      A.   Sorry.
7      Q.   Look for me, if you will,
8 at Exhibit 2.  Turn the page, and
9 it's Bates stamped Flying J145.  If
10 you'll go ahead and -- see the top
11 left hand corner?
12      A.   Uh-huh.
13      Q.   Actually, let's go back to
14 the previous page.  It says on page
15 Flying J144, but also page 49 of the
16 handbook, What To Do If You Are
17 Subjected to Discrimination or
18 Harassment; do you see that?
19      A.   Yes.
20      Q.   It says, number one, "Do
21 not put up with conduct that violates
22 this policy."  Is that what it says?
23      A.   Yes.

Page 63

1      Q.   If you turn the page,
2 continuing with that paragraph, it
3 says this, does it not, "If the
4 policy violation is egregious, or if
5 the risk of additional discrimination
6 or harassment is serious and eminent,
7 you should immediately notify one of
8 the following who is not involved
9 with the discrimination or
10 harassment: Your department or store
11 manager, your district manager, your
12 department head, the human resources
13 department," and it gives a phone
14 number -- "or the fraud hotline any
15 time 24 hours a day."  And it also
16 gives another number.  I read that
17 correctly, didn't I?
18      A.   Yes.
19      Q.   I didn't read the phone
20 numbers, but I mean, it says that,
21 right?
22      A.   Right.
23      Q.   You didn't attempt to

Page 64

1 contact the human resources
2 department yourself, did you?
3      A.   No, I did not.
4      Q.   You didn't call that fraud
5 hotline number, did you?
6      A.   No.
7      Q.   Why didn't you try to call
8 someone in human resources?
9      A.   In the past we had had one
10 of our employees call corporate and
11 make a complaint about something, and
12 Mr. Jacobs had gotten very upset
13 about it.  And I wasn't sure how to
14 handle it.  I had seen his anger, and
15 I did not want to be on the receiving
16 end of it.
17      Q.   And who was that person who
18 had called?
19      A.   Brandon -- I can't think of
20 his last name.
21      Q.   Do you know what he called
22 about?  You said he called to
23 complain.  Do you know --

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1    A.  I want to say it was about
2   Butch. I don't know for sure.  I
3   can't remember.
4    **Q.  It wasn't a sexual**
5   **harassment complaint?**
6    A.  No.
7    **Q.  Did corporate do anything,**
8   **to your knowledge, in response to his**
9   **complaint?**
10    A.  No.
11    **Q.  And how do you know they**
12   **didn't?**
13    MR. MOREL:  You said to
14   your knowledge.
15    **Q.  (BY MR. WORLEY:)  Okay.**
16   **I'm sorry.  Maybe I didn't**
17   **understand.  Do you know what Brandon**
18   **was asking corporate to do?  Did he**
19   **ever tell you that?**
20    A.  I didn't get into it with
21   him.
22    **Q.  For all you know, corporate**
23   **actually -- strike that.**

Page 66

1    **For all you know, corporate**
2   **may have acted on it; or do you know?**
3    A.  I have no idea.
4    **Q.  Okay.  Fair enough.**
5    MR. MOREL:  Rob, when you
6   get a chance, we've being going about
7   an hour.
8    MR. WORLEY:  Yeah.  That's
9   fine.
10    MR. MOREL:  I don't want to
11   break in unless you're ready.
12    MR. WORLEY:  Sure.  It's a
13   good time.  Let's go ahead and take a
14   break.
15    (Whereupon, a short recess
16    Was taken.)
17    **Q.  (BY MR. WORLEY:)  So when**
18   **you said, Ms. Jones, that the reason**
19   **you had not gone to human resources**
20   **is somebody named Brandon -- you**
21   **think that's his name, had complained**
22   **to corporate about Butch Jacobs, and**
23   **that Butch had gotten upset in**

Page 67

1   **response?**
2    A.  Yes, in part.
3    **Q.  I'm sorry?**
4    A.  That was part of it, yes.
5    **Q.  Part of what, why you**
6   **hadn't complained?**
7    A.  Yes.
8    **Q.  And what was the other**
9   **part?**
10    A.  The relationship he had
11   with the district supervision, I just
12   didn't feel that there was going to
13   be any credence.
14    **Q.  Do you know whether or not**
15   **Butch Jacobs had any relationship**
16   **with the human resources department,**
17   **as opposed to the district manager?**
18    A.  No, but I was pretty
19   certain it was open knowledge of
20   their behavior.
21    **Q.  That was your assumption?**
22    A.  Yes.
23    **Q.  It says here in the policy**

Page 68

1   **that you could also contact your**
2   **department head.  Do you know who**
3   **that would be?**
4    A.  I would have been the
5   department head.
6    **Q.  Had you any knowledge or**
7   **belief that someone had ever tried to**
8   **contact human resources to complain**
9   **of sexual harassment and had not**
10   **gotten an appropriate response?**
11    A.  No.
12    **Q.  At some point, though --**
13    MR. WORLEY:  Let me go off
14   the record just a minute to look at
15   my notes.
16    (Whereupon, a discussion
17    Was held off the record.)
18    (Whereupon, Defendant's
19    Exhibit Number 4 Jones was
20    Marked for identification.)
21    **Q.  (BY MR. WORLEY:)  Let me**
22   **show you what I've marked as Jones**
23   **number 4.  I'll show you and counsel?**

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1    **(Handing document to**
2    **witness and counsel.)**
3    MR. MOREL: Is three the
4    document that you didn't have a copy
5    of?
6    THE WITNESS: Yeah.
7    MR. MOREL: I've got one
8    was the acknowledgment and two was
9    the policy.
10    MR. WORLEY: Three is also
11    part of the policy handbook.
12    MR. MOREL: Okay.
13    **Q. (BY MR. WORLEY:) And now**
14    **what I'm looking at is Exhibit 4,**
15    **which I do have, but it took me**
16    **awhile to find, which is a letter**
17    **from Adam Morel -- am I pronouncing**
18    **that correctly?**
19    MR. MOREL: Morel. Yeah.
20    **Q. (BY MR. WORLEY:) Morel.**
21    **And it's dated March 30th, 2006?**
22    **A. Yes.**
23    **Q. Do you have that? And**

Page 70

1    **you're copied on this, correct? Turn**
2    **the page. You received a copy of**
3    **that at the time?**
4    **A. Yes.**
5    **Q. Would this have been the**
6    **first contact that either you or**
7    **someone on your behalf made to Flying**
8    **J to complain about Mr. Jacobs?**
9    **A. Yes.**
10    **Q. And the purpose of the**
11    **letter was to get Mr. Jacobs to stop**
12    **harassing you sexually?**
13    **A. Yes.**
14    **Q. Up until this point, March**
15    **30th, 2006, were you still working in**
16    **the same facility with Mr. Jacobs?**
17    **A. Yes.**
18    **Q. Did you ever learn that**
19    **Flying J had conducted a sexual**
20    **harassment investigation in response**
21    **to the letter?**
22    MR. MOREL: Let me stop and
23    just interject that if you have

Page 71

1    information that you gleaned from a
2    source other than communications with
3    counsel, then you can answer the
4    question. Let me just finish. And I
5    know what you're intentions are.
6    They're perfectly fine. But if the
7    only way you know the answer to a
8    certain question is because of
9    communications with me, then I
10    instruct you not to answer the
11    question.
12    **Q. (BY MR. MOREL:) And I'll**
13    **rephrase the question, because I**
14    **don't want you to -- I'm not looking**
15    **for you to tell me what Adam had to**
16    **say to you at all.**
17    **A. Right.**
18    **Q. Other than anything Adam**
19    **may have told you -- because I don't**
20    **want you to tell me that, do you have**
21    **any information that Flying J may**
22    **have conducted a sexual harassment**
23    **investigation?**

Page 72

1    **A. Another district manager**
2    came and spoke with me in regards to
3    my claim.
4    **Q. Was that Mike Walton?**
5    **A. I'm not sure.**
6    **Q. When you say another**
7    **district manager, it would have been**
8    **a manager from another district other**
9    **than yours?**
10    **A. Yes.**
11    **Q. Do you remember when that**
12    **DM came to speak with you?**
13    **A. The Wednesday prior to**
14    Butch being terminated. Or
15    Tuesday -- Wednesday or Tuesday --
16    Wednesday.
17    **Q. Just by way of reference,**
18    **Exhibit 4, the complaint letter, is**
19    **dated March 30, 2006; is that right?**
20    **A. Yes.**
21    **Q. And would it be true that**
22    **the last day you were actually**
23    **physically at work for Flying J was**

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 73

1  April 13, 2006?
2      A.  Without seeing a calendar,
3  I can't answer for sure, but that
4  sounds close.
5      Q.  Okay.  Do you know the date
6  that Butch was terminated?
7      A.  I believe it was the 10th
8  of April.
9      Q.  All right.  And in relation
10  to that, your last day you worked
11  would have been maybe three days
12  after that; does that sound about
13  right?
14      A.  Yes, because I worked the
15  10th, 11th -- yeah, the 13th, yes.
16      Q.  Do you recall whether or
17  not -- strike that.
18      Do you recall the last day
19  you actually worked in the same
20  complex where Butch Jacobs was
21  working physically?  And just so I'm
22  clear, I'm not asking when?
23      A.  When --

Page 74

1      Q.  Go ahead.
2      A.  I'm not sure of the exact
3  date, because he was doing training.
4  He was out of town for like a couple
5  of days.
6      Q.  And, so, when I said
7  physically in the complex, let me
8  clarify or expound on that.  I'm not
9  asking when the last date was that he
10  was still actually employed at Flying
11  J?
12      A.  Right.
13      Q.  Even though he may be
14  off-site.  But I'm asking, as best
15  you can recall, when was the last
16  time that you and he worked together
17  physically in the same complex?
18      A.  Without a calendar I can't
19  say for sure.
20      Q.  Could you say relative to
21  March 30th -- relative to the date of
22  March 30th, 2006, a complaint letter?
23      A.  It would have been after

Page 75

1  that.
2      Q.  So after March 30th you
3  continued to work with Butch at the
4  Plaza?
5      A.  Yes.
6      Q.  Do you know about how
7  long -- I know we don't have a
8  calendar here, but --
9      A.  I can't say for sure.
10      Q.  Actually, I had a calendar
11  and I left it at the hotel.  But
12  that's okay.  I don't think we need
13  that.  But your testimony is even
14  after the letter of March 30, 2006,
15  you did work with Butch for a few
16  more days?
17      A.  I believe so.
18      Q.  When you say that you
19  believe that you worked with Butch at
20  the same site for at least some
21  period of time after the letter dated
22  March the 30th of 2006, what is the
23  basis for your brief that that

Page 76

1  happened?
2      A.  I continued working.  If he
3  was there, then I saw him.  I just --
4  I'm not sure when he went out of
5  town.
6      Q.  And I just have to be as
7  specific with you as I can.  Are you
8  assuming that after March 30th, 2006,
9  you continued to work with him, or do
10  you -- is that your testimony that
11  you did, in fact, do that?
12      MR. MOREL:  He just wants
13  to know whether you can specifically
14  recall working with him after the
15  date -- after the date that I
16  generated the letter.  I don't
17  remember.  I probably sent it
18  certified mail, but I don't know.
19      MR. WORLEY:  That's the
20  question.  That's right.
21      MR. MOREL:  Do you remember
22  specifically whether or not you
23  worked with him after in the same

19  (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1  facility physically?
2      A.  I can't -- I can't say that
3  I know for a fact that I did, no.
4      Q.  (BY MR. WORLEY:)  Okay.
5  Fair enough.  How did you learn that
6  Jacobs had been terminated?  And
7  again, I'm not asking for what your
8  lawyer may have told you, but you did
9  testify that he was terminated?
10     A.  I got a phone call from the
11  district manager, or one of the
12  district people, and they asked me to
13  come in because he had been
14  terminated and they needed my
15  assistance at the store.
16     Q.  Was this the district
17  manager who had investigated, or a
18  different one?
19     A.  It was my district --
20  someone within my district.
21     Q.  Did that person tell you
22  why Butch had been terminated?
23     A.  No.

Page 78

1      Q.  Did that person tell you
2  that Butch had been terminated in
3  response or in connection with the
4  complaint of March 30th, 2006?
5      A.  No.
6      Q.  Did you ask?
7      A.  No.  I assumed, but I
8  didn't ask.
9      Q.  Did anybody -- I'm not
10  asking what your lawyer may have told
11  you, thereafter tell you why Butch
12  had been terminated?  If the DM
13  didn't tell you at that time, did
14  anyone else tell you later?
15     A.  No, it was not discussed to
16  me.
17     Q.  Would it be fair to say
18  that from the date Butch was
19  terminated, around April 10th, 2006,
20  until the last day you worked --
21  well, strike that.  Let me rephrase
22  the question.
23         Tell me again what the

Page 79

1  district manager was telling you --
2  something that Butch had been
3  terminated so he needed your help?
4      A.  Mondays are usually my day
5  off.  The 10th was a Monday.  Butch
6  normally would have been there to
7  handle a bunch of stuff.  And since
8  he was terminated they needed me to
9  come in.  They didn't really go into
10  why.  They just asked me to come in,
11  and as I always did, I went in.  I
12  was asked, I came.
13     Q.  Did you work a full day
14  that day that you came back in?
15     A.  No.
16     Q.  And why is that?
17     A.  They didn't call me until
18  it was after my time when I normally
19  would have been there.
20     Q.  What about the next time
21  you worked, was it the following day?
22     A.  Yes.
23     Q.  Was that a full day?

Page 80

1      A.  I believe so.
2      Q.  You didn't punch a time
3  clock when you were there, did you?
4      A.  We only had to swipe our
5  card at one point during our shift.
6  It didn't matter when.
7      Q.  Just to reflect that you
8  were there that day?
9      A.  Yes.
10     Q.  All right.  What about the
11  day after that?
12     A.  No.
13     Q.  And why is that?
14     A.  My -- I had received a
15  phone call on Tuesday night.  My
16  mother-in-law was going to be having
17  a biopsy -- I believe it was a biopsy
18  done, and my husband was upset and
19  was asked to be there.  And I spoke
20  with the district people, and they
21  said that since I had worked Monday
22  that I could have Wednesday off in
23  place of my regular day off.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1    Q.  And, so, that was Wednesday
2  that they were talking about?
3    A.  Yes, I let them know that
4  it was in Florida and that, you know,
5  it should be -- it was on an
6  outpatient thing, so I should be back
7  at some point on Thursday.  I had let
8  him know ahead of time that I may
9  miss Thursday, but I would try to get
10  in because I knew I was needed.
11    Q.  What about -- how long were
12  you in Florida for the biopsy?
13    A.  Just Wednesday, and we got
14  back Thursday afternoon.
15    Q.  So you missed Thursday as
16  well?
17    A.  No, I was about an hour,
18  hour-and-a-half late by the time I
19  got there.
20    Q.  And can you recall the name
21  of the person who -- at Flying J in
22  management, who was allowing you to
23  miss for that?

Page 82

1    A.  It was -- I want to say it
2  was Chris that I was speaking with.
3    Q.  Do you remember Chris's
4  full name?  I may have asked you that
5  earlier?
6    A.  No, I'm terrible with
7  names.
8    Q.  Would it have been Chris
9  Andrews?
10    A.  Yes.
11    Q.  Did you work the day after
12  that?
13    A.  No, I called out sick.
14    Q.  Were you sick?
15    A.  Yes.
16    Q.  What was wrong?
17    A.  At the time I believed it
18  was my endometriosis acting up.
19    Q.  That's what you thought
20  when you called out?
21    A.  Yes.
22    Q.  Do you remember who you
23  spoke with?

Page 83

1    A.  It was either Chris or
2  Kerry.
3    Q.  And that would have been a
4  Friday?
5    A.  Yes.
6    Q.  What about the day after?
7  When was the next day you were
8  scheduled to work?
9    A.  The following Tuesday.
10    Q.  So Saturday through Monday
11  you were not scheduled to work?
12    A.  Correct.  I had worked
13  other shifts to insure having
14  Saturday off, because it was my son's
15  birthday.
16    Q.  So that takes us to
17  Tuesday, correct?
18    A.  Yes.
19    Q.  Did you work that Tuesday?
20    A.  No.
21    Q.  Why not?
22    A.  I had found out on Monday
23  that I was pregnant, and the

Page 84

1  pregnancy was in jeopardy, and I was
2  told to stay off my feet for a couple
3  of days.
4    MR. MOREL:  By the way, it
5  occurs to me, I've got your
6  authorizations downstairs signed.
7  There is one that she forgot to get
8  witnessed, so we can just resign and
9  witness.  I'll give all that to you
10  today.
11    MR. WORLEY:  Okay.  Thank
12  you.
13    Q.  (BY MR. WORLEY:)  Who did
14  you -- strike that.
15    Did you call off sick that
16  day, that Tuesday?
17    A.  I had actually called them
18  Monday, as soon as I found out I was
19  pregnant, and was -- what was going
20  on.  I had spoke with them Monday and
21  let them know that I would definitely
22  be out for the next couple of days.
23  I wasn't sure exactly when I would be

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1  coming back.  That I hoped it would
2  only be that week, and that I hoped I
3  would be back the following Tuesday,
4  but I would keep them apprised of the
5  situation.  I called them Tuesday, as
6  well, and let them know that I still
7  had not -- one of the things I was
8  waiting on was some test results.
9  And I called them on Tuesday to let
10  them know that the test results had
11  not been given to me yet, and the
12  situation was still the same.  And,
13  then, I spoke with them either
14  Wednesday or Thursday, possibly both.
15  I can't say for sure.
16      Q.  So you did not work
17  Wednesday or Thursday?
18      A.  No.
19      Q.  Am I correct about that?
20      A.  Yes.
21      Q.  You said you spoke with
22  they or them.  Who is that?
23      A.  It would have been Chris or

Page 86

1  Kerry throughout that timeframe.  I
2  had spoke with -- I made sure I spoke
3  with one of the two of them in
4  regards to it.
5      Q.  Did you work any more days
6  for Flying J?
7      A.  No.
8      Q.  When were you terminated
9  relative to that Thursday you just
10  described?
11      A.  The following morning.
12      Q.  Which would have been a
13  Friday?
14      A.  Yes.
15      Q.  From the time that Butch
16  Jacobs was terminated through the
17  time that you were terminated, did
18  you complain to anybody at Flying J
19  that you were being mistreated?
20      A.  I spoke with someone in
21  human resources, yes.
22      Q.  When did you speak with
23  that person?

Page 87

1      A.  Probably the -- maybe the
2  11th.  I'm not sure.  I'm not sure of
3  the exact day.
4      Q.  How many days after Jacobs
5  had been terminated was this?
6      A.  I can't say for sure.  It
7  was a day, maybe two.
8      Q.  Do you remember who it was
9  in HR that you spoke with?
10      A.  No.
11      Q.  Male or female?
12      A.  Male.
13      Q.  How did you come to contact
14  HR?
15      A.  It was -- I had a new hire
16  that I needed to get some information
17  for, which I normally would have
18  gotten from Debbie McCollough, but
19  because of what was going on she
20  refused to give it to me.  And,
21  actually, I think it may have been on
22  that Monday -- Monday or Tuesday.
23  And she wouldn't give me the

Page 88

1  information.  She was being very
2  rude, very -- just nasty.  And I
3  ended up calling human resources to
4  receive that information; and I
5  explained to the person why I was
6  calling them instead of getting it
7  off of the office.
8      Q.  And you told the HR person
9  that Debbie was not cooperating with
10  you?
11      A.  Yes.
12      Q.  But did you tell the HR
13  person that you were being mistreated
14  other than the fact that Debbie
15  wouldn't give you the information?
16      A.  Yes.
17      Q.  And what did you say to the
18  HR as far as what was being done to
19  you that was not right?
20      A.  She was being rude, refused
21  to answer my questions,
22  uncooperative, just nasty.
23      Q.  What do you mean by nasty?

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1    A.  Her tone, her demeanor.  I
2  overheard her and Tanisha speaking,
3  and she said she didn't know if she
4  wanted to deal with anything that
5  bitch, referring to myself, had to
6  say.
7    **Q.  Let's do like we did a**
8  **moment ago with respect to Mr.**
9  **Jacobs.  Let me ask you to tell me**
10  **each and every thing -- we'll list**
11  **them, that you told HR that Debbie**
12  **had done to you, during that phone**
13  **call.  Well, let me rephrase the**
14  **question.**
15    **During your phone call to**
16  **HR, you said that you told someone at**
17  **HR that Debbie had not been treating**
18  **you fairly?**
19    A.  Right.
20    **Q.  Or words to that effect?**
21    A.  Yes.
22    **Q.  Tell me each and every**
23  **thing that you told HR that she had**

Page 90

1  **done?**
2    A.  Refused to give me, I
3  guess, paperwork that was pertinent
4  to my job.
5    **Q.  The new hire paperwork?**
6    A.  Yes.  She wouldn't even
7  answer the door to the office.  I had
8  needed something else for the job.
9  You know, she did all the -- she had
10  all the numbers, everything -- any
11  report or anything that I would need
12  to do my job, she had.  She wouldn't
13  answer the door.  She wouldn't give
14  me anything that I requested from
15  her.  She wouldn't answer her phone
16  if she knew it was me.  Very -- she
17  was just -- I don't know how to
18  explain it.  She was just rude.
19    **Q.  So the question was, what**
20  **did you tell HR that Debbie had done**
21  **to you, and you said that you told**
22  **them that Debbie had refused to give**
23  **you the new hire paperwork, she**

Page 91

1  **wouldn't even answer the door to her**
2  **office when it was you, wouldn't**
3  **answer the phone if you were calling?**
4    A.  Uh-huh.
5    **Q.  And wouldn't give you any**
6  **information or anything that you had**
7  **requested?**
8    A.  Yes.
9    **Q.  And you don't recall who it**
10  **was in HR that you spoke with?**
11    A.  No, I don't.
12    **Q.  Was it one of the hotline**
13  **numbers --**
14    A.  No.
15    **Q.  -- contained in the sexual**
16  **harassment policy?**
17    A.  No -- well, it may be.  I
18  don't know if it was the same number
19  that's there that -- I don't know
20  what number I dialed.
21    **Q.  Do you know where you got**
22  **the number from in order to call?**
23    A.  It was posted; just the

Page 92

1  human resources number.
2    **Q.  Did you ask them in human**
3  **resources to take any action in**
4  **response to your complaint about**
5  **Debbie?**
6    A.  At that time I was trying
7  to do my job and get keep the
8  facility from going -- falling apart.
9  And I was concentrating more on
10  getting the information that I needed
11  at the time.
12    **Q.  But the question was, did**
13  **you ask anybody in HR to do anything**
14  **for you?**
15    A.  Not specifically.
16    **Q.  How about generally?**
17    A.  Not that I can think of,
18  no.
19    **Q.  Did Debbie ever tell you**
20  **why she had responded that way to**
21  **you, or reacted that way to you?**
22    A.  No.
23    **Q.  Other than Debbie, during**

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  the course of time that we've talked
2  about, did anybody else treat you
3  unfairly at Flying J -- or strike
4  that. Rephrase the question.
5       The question is this.
6  During that period of time, which is
7  from the time Butch Jacobs was
8  terminated until the time you were
9  terminated, other than the complaint
10  you had made about -- the remark you
11  had made about Debbie, did you make
12  any other complaints about any other
13  employees at Flying J?
14      A.  Tanisha had been very
15  hostile as well, and I had -- also
16  the district manager, whoever he was
17  that came in to do the investigation,
18  I had called him, because right after
19  he had come before Butch had been
20  terminated, he and Debbie were both
21  calling my phone and blowing it up,
22  wanting to know what was going on.
23  And I had complained to him about

Page 94

1  that.
2      Q.  I don't think I follow.
3  Let me ask you. During this period
4  of time we talked about, from the
5  time Jacobs was terminated through
6  the time that you were terminated,
7  you had said that you had a
8  conversation with the DM who
9  investigated your complaint about
10  Butch?
11      A.  Uh-huh.
12      Q.  The one as a result of the
13  March 30 letter, right?
14      A.  Right.
15      Q.  So when you spoke with the
16  DM, was that while he was
17  investigating that complaint letter,
18  or did you call him back afterwards?
19      A.  I had called him back
20  afterwards.
21      Q.  And, again, does Mike
22  Walton sound like the name, or do you
23  know?

Page 95

1      A.  I honestly cannot remember.
2      Q.  Real tall fellow?
3      A.  This guy was like kind of
4  pudgy.
5      Q.  Okay.
6       MR. MOREL:  Good technique
7  though.
8      A.  I mean, I can't remember if
9  he was tall or short, but I just
10  remember him. He wasn't like really
11  skinny. I wouldn't even say pudgy,
12  but he wasn't thin.
13      Q.  (BY MR. WORLEY:)  All
14  right. And, so, you said you called
15  him back?
16      A.  Right. He had given me his
17  number and had said that if I had any
18  more difficulties to contact him.
19      Q.  And how many days before
20  you were terminated was it that you
21  called him?
22      A.  I'm not sure.
23      Q.  Okay. And what did you

Page 96

1  tell that DM when you called?
2      A.  I had let him know about
3  Butch and Debbie calling my cell
4  phone, and I believe I had also told
5  him like about Tanisha being very,
6  very hostile towards me -- just being
7  rude, cussing at me, just giving me
8  problems in general.
9      Q.  So at the time you called
10  the district manager, Butch had
11  already been terminated, right?
12      A.  I believe so.
13      Q.  I mean, why else would
14  you -- rephrase the question.
15       Keep in mind the period of
16  time we're talking about is the time
17  beginning with the date that Butch
18  was terminated through the date you
19  were terminated, and you would be
20  calling a DM to complain about Butch
21  even after he was terminated?
22      A.  The phone calls were prior
23  to his termination.

24  (Pages 93 to 96)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 97

1    Q.  The period of time I'm
2    talking about would be --
3         MR. MOREL:  I think she's
4    saying -- you correct me if I'm
5    wrong, the phone calls to her cell
6    phone by Butch and Debbie were made
7    prior to Butch's termination, but her
8    phone call to this person was made
9    during the timeframe that you're
10   asking her about.
11       A.  Yeah.
12       Q.  (BY MR. WORLEY:)  And, so,
13   when you called the DM back, which
14   would be after Butch was terminated,
15   you told him what?
16       A.  About Tanisha, the Tanisha
17   stuff.  I believe I spoke with him
18   about it.
19       Q.  All right.  Again, like we
20   did with the others, I want to make
21   sure I understand each thing that you
22   complained to him that Tanisha was
23   doing.

Page 98

1    A.  Right.
2        Q.  You said that she was being
3    rude?
4        A.  Uh-huh.
5        Q.  Right?
6        A.  Yes.
7        Q.  She was being hostile to
8    you?
9        A.  Yes.  Her and I basically
10   got into an argument.  I cannot
11   recall how it started, but we got
12   into an argument either the day Butch
13   was fired or the day after.
14       Q.  By the way, was Debbie --
15   it's Debbie McCollough, right?
16       A.  Yes.
17       Q.  Was she one of your
18   supervisors?
19       A.  Different stores ran
20   different ways.  Basically the way it
21   was explained to me was Butch was
22   above her, and then there would have
23   been me, her, and John basically on

Page 99

1    the same level, each with our own
2    responsibilities.
3        Q.  Because she was the
4    accounting manager?
5        A.  Right.
6        Q.  I see.  And, then,
7    Tanisha -- do you remember Tanisha's
8    last name?
9        A.  Means or Upshaw.  We had
10   two, and I get them confused.
11       Q.  All right.
12       A.  She would have been the
13   merchandise manager.
14       Q.  Again, not your supervisor?
15       A.  Oh, no.
16       Q.  All right.  So you said
17   that Tanisha was rude, hostile, and
18   she would cuss at you?
19       A.  Yeah.  And I --
20       Q.  Did she do anything else to
21   you?
22       A.  I had had comments made to
23   me that led me to believe that she

Page 100

1    had told my cashiers basically that I
2    had caused Butch to get fired.
3        Q.  And, so, what I want to ask
4    is what you actually told the
5    district manager about Tanisha, and
6    you said, did you, that she was rude
7    to you, number one.  Number two, she
8    was hostile to you.  Number three,
9    she would cuss at you.  And number
10   four, did you tell him that she
11   said -- that she told her cashiers
12   that you had caused Butch to get
13   fired?
14       A.  My cashiers.  She had
15   nothing -- she was not supposed to
16   have anything to do with them.  She
17   was a separate entity unto herself.
18       Q.  Did she tell the district
19   manager that she told your cashiers
20   that you had caused Butch to get
21   fired?
22       A.  Yes.
23       Q.  When you say that she was

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1  hostile to you, she was not hostile
2  in a sexual way?
3      A.  No.
4      Q.  Did you tell did you tell
5  the district manager anything else
6  about Tanisha, the way that she
7  treated you?
8      A.  Not that I can think of.
9      Q.  Other than telling HR,
10 during this period of time we've
11 described, which is after Butch was
12 fired and up until the time you were
13 fired, you said you had spoken to HR
14 about what Debbie did?
15     A.  Right.
16     Q.  And you spoke to the DM,
17 because you called them back about
18 Tanisha, right?
19     A.  Right.
20     Q.  Did you speak to anybody
21 else in management about anyone else
22 by way of complaint, other than those
23 two during that period of time?

Page 102

1      A.  Not that I can think of.
2      Q.  Okay.  How did you learn of
3  your -- and by the way, if you need
4  to take a break anytime --
5          MR. WORLEY:  In fact, let's
6  go off the record just a second.
7          (Whereupon, a discussion
8          Was held off the record.)
9      Q.  (BY MR. WORLEY:)  How did
10 you learn of your termination?
11     A.  I believe it was Keith
12 Staples called me Friday morning and
13 told me that I was terminated.
14     Q.  Did he tell you that over
15 the telephone?
16     A.  Yes.
17     Q.  Did he say why you were
18 terminated?
19     A.  Because of my absences.
20     Q.  Did you have any response
21 to him at that time?
22     A.  I told him that he was
23 aware that it was a medical issue,

Page 103

1  and that I had -- that I had had a
2  doctor's excuse for those days, and
3  that I could bring it to -- well, I
4  couldn't bring it to him that day,
5  but that it could be brought to him.
6      Q.  Did he say anything in
7  response to your saying that you had
8  a medical excuse?
9      A.  He said that he didn't have
10 it in hand, and I said that I was
11 confined to my bed, and, you know,
12 wasn't able to bring it to him, but
13 that I did have documentation and
14 that I could provide it.
15     Q.  Did he say anything at that
16 point?
17     A.  That was the gist of the
18 entire conversation.  At that point
19 was when I actually said that I was
20 pregnant, because at that point --
21 prior to that I had not stated that I
22 was pregnant.  I wasn't sure if the
23 pregnancy was going to continue.  I

Page 104

1  didn't want to deal with all the
2  apologies if I had, you know, if I
3  had lost the baby.  So.
4      Q.  Sympathetic words and that
5  kind of thing?
6      A.  Yeah, it would just make it
7  worse.
8      Q.  So, it was after Keith told
9  you during that conversation?
10     A.  Uh-huh.
11     Q.  During that conversation
12 over the telephone, Keith told you
13 that you were terminated?
14     A.  Right.
15     Q.  And he said it was due to
16 your absences?
17     A.  Right.
18     Q.  At that point you had told
19 someone at the Flying J for the first
20 time that you were pregnant?
21     A.  Yes.
22     Q.  And he said he didn't have
23 that information in hand, or

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  something like that?
2      A.  He said that he didn't have
3  my actual doctor's note.  I said that
4  I should be able to return to work on
5  Tuesday, and that I would be able to
6  bring it then if I couldn't get it to
7  him sooner.  My husband was a
8  recruiter, so his schedule was really
9  weird.
10     Q.  Did he tell you which
11 absences he was holding against you,
12 and were these absences from the
13 beginning of when you first started
14 working there?
15     A.  There were no other
16 absences.
17     Q.  Do you accept that as the
18 true reason for your termination.
19     A.  No.
20     Q.  What is your belief as far
21 as the reason for your termination --
22 the true reason for your termination?
23     A.  Retaliation.  I think it

Page 106

1  was because of my complaint against
2  Butch.
3      Q.  And what facts do you have
4  that lead you to that conclusion?
5      A.  I missed four days.  I had
6  employees who missed two weeks, and
7  I -- they weren't terminated.  I know
8  of -- I can think of three people off
9  of the top of my head who missed at
10 least double the amount of time that
11 I did, who had -- pretty much every
12 employee that I had missed days here
13 and there.  I cannot think of really
14 anyone who didn't at some point miss
15 at least three or four days, and none
16 of them were terminated.  They all
17 still have their jobs.
18     Q.  Can you give me their
19 names, please?
20     A.  Let's see.  Shamarra
21 Bethel.
22     Q.  Shamarra?
23     A.  Uh-huh.

Page 107

1      Q.  Bethel?
2      A.  Yes.
3      Q.  Okay.  Who else?
4      A.  Laquisha Means, or Mona.
5      Q.  Means or Mona?
6      A.  Mona is what she went by.
7      Q.  All right.  Who else?
8      A.  Oh, gosh, what was her
9  name?  Ginnifer -- I can't think of
10 her last name, but it was Jenni --
11 G-I, not J; not Jennifer -- Ginnifer.
12 They had long period absences.
13     Q.  Do you remember Ginnifer's
14 last name?
15     A.  I can't think of it off the
16 top of my head, no.
17     Q.  So, you have Shamarra?
18     A.  Shamarra.
19     Q.  Shamarra Bethel?
20     A.  Yes.
21     Q.  Number two, Laquisha Means
22 or Mona?
23     A.  Yes.

Page 108

1      Q.  Three, Ginnifer last name
2  unknown.  Anybody else who had more
3  absences than you that was not
4  terminated?
5      A.  Those three had long --
6  like they missed like more than a
7  week at a time.  I'm trying to think
8  who all called out.  Pretty much
9  everybody called out at least one
10 shift a week.  I can't think of
11 names.  If I had a schedule or
12 something I could look at I could
13 probably name them to you, but I
14 can't think of names right now.  But
15 I can say without a doubt that there
16 were a number of people who missed
17 way more than four days and still had
18 their jobs.  I had Angela -- oh, what
19 was her last name?  Angela, she
20 missed at least four days, because I
21 had to cover her shift at least
22 twice.  And I think -- I can't say
23 for sure, but I think Tanisha, the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 109

1  merchandise manager, she missed a
2  period of time as well.
3    Q. Did Mr. Staples tell you
4  who made the decision to terminate
5  you?
6    A. No.
7    MR. WORLEY: I want to take
8  a break, if we could, and just go
9  over my notes.
10    MR. MOREL: Okay.
11    (Whereupon, a short recess
12    Was taken.)
13    Q. (BY MR. WORLEY:) Are you
14  aware of Butch Jacobs sexually
15  harassing anybody else at Flying J?
16    A. Yes.
17    Q. Tell me about that.
18    A. He -- I was told that he
19  had grabbed Sandrella -- I think her
20  last name was Yelder, something along
21  those lines -- her breasts. And,
22  then, Sherrie -- I can't think. I
23  want to say Appleton, but that may

Page 110

1  not be correct. He had grabbed her,
2  attempted to pull her into his lap,
3  made comments to her. I'm trying to
4  think of what else she said;
5  attempted to touch her, I believe, as
6  well. I can't remember. What all
7  did she say? I know he had made a
8  number of sexually explicit comments
9  to her. She'd actually complained to
10  me about it.
11    Q. Had he sexually harassed
12  anybody else besides Sandrella Yelder
13  and Sherrie Appleton, to your
14  knowledge? And I'm not including you
15  in that. You've already told me
16  about you.
17    A. Not that I can think of at
18  this time.
19    Q. Do you have any information
20  that Sandrella or Sherrie had
21  complained to Flying J management
22  about that?
23    A. Sherrie had told me, and I

Page 111

1  had told her. I want to say it was
2  after the fact she told me, after I
3  had made my complaint.
4    Q. Go ahead.
5    A. I'm just not sure of the
6  timing for sure. And Sandrella, I
7  found out about hers after I made the
8  complaint. Somebody had mentioned it
9  to me and I called her and asked her
10  about it, and I asked her why she
11  didn't tell me.
12    Q. Do you know whether or not
13  Sandrella Yelder had complained to
14  management about Butch Jacobs?
15    A. No.
16    Q. Do you know whether or not
17  Sherrie Appleton had complained to
18  management about Butch Jacobs?
19    A. No.
20    Q. Do you know other than --
21  I'm not asking you about your
22  situation.
23    A. Right.

Page 112

1    Q. Do you know whether anybody
2  had complained that Butch Jacobs had
3  sexually harassed them?
4    A. No.
5    Q. Have you held any jobs
6  since being terminated from Flying J?
7    A. Two.
8    Q. What jobs are those?
9    A. Car sales at Towbin Dodge
10  in Las Vegas, and then I was the
11  assistant store manager. The store
12  was Vegas Express, and it was for the
13  Marshall retail group, also in Las
14  Vegas.
15    Q. When did you work as car
16  salesperson at Towbin?
17    A. I can't remember the exact
18  dates. I know I started in February.
19  I didn't stay long. The hours were
20  just too much, and it wasn't my cup
21  of tea.
22    Q. February of '07?
23    A. Yes.

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1      Q. A few weeks; is that right?
2      A. Yeah.
3      Q. And what about Marshall
4  retail?
5      A. Marshall I quit in July,
6  and I started -- when did I start?
7      Q. Quit Towbin in July?
8      A. No, I quit Vegas Express in
9  July.
10      Q. Okay. I may have missed
11  that one. Sorry, Vegas Express?
12      A. Marshall retail group.
13  That's all in one. That's the second
14  job that I had.
15      Q. Well, you worked for a few
16  weeks in February of '07 at Towbin
17  Dodge?
18      A. Yes.
19      Q. What's the next company you
20  worked for?
21      A. Vegas Express is the store.
22  Marshall retail group is the company.
23      Q. So, when did you work at

Page 114

1  the Vegas Express store?
2      A. I want to say it was March
3  to July.
4      Q. And, so, those are the only
5  two jobs you've held since Flying J?
6      A. Yes.
7      Q. Have you looked for any
8  other jobs besides those two?
9      A. Yes.
10      Q. Can you tell me where
11  you've looked?
12      A. Everywhere. I'm trying to
13  get into government jobs. I had my
14  resume for that. I've applied for
15  jobs through Emerald Coast help
16  wanted. I've gone to job fairs. I
17  applied for Starbucks. I can't
18  think. There's been a bunch.
19      Q. What cities have you looked
20  for work in?
21      A. Las Vegas and Fort Walton
22  Beach.
23      Q. When did you all move from

Page 115

1  the Birmingham area?
2      A. The Montgomery area?
3      Q. I'm sorry, Montgomery?
4      A. We left there September of
5  '06.
6      Q. Have you sought any
7  professional treatment for any
8  physical or mental problems that
9  arose from your working at Flying J?
10      A. No.
11      Q. Have you needed to seek
12  medical treatment for such things?
13      A. Medical, no.
14      Q. Or psychological
15  counseling?
16      A. No, not to say I wasn't
17  stressed out or anything like that,
18  but my husband is a very good
19  listener.
20      Q. When you say you're
21  stressed out, can you be more
22  specific?
23      A. I lost a huge chunk of

Page 116

1  income, and it wasn't my intention.
2  I had no intentions whatsoever of
3  walking away from that job any time
4  soon. When I took that job I had
5  every intention on becoming a general
6  manager myself and, you know, we had
7  just gotten a new car and I had a
8  baby on the way and didn't know how I
9  was going to feed the two I had.
10      Q. Are you looking for --
11  well, strike that.
12      You're still looking for
13  work?
14      A. Yes.
15      Q. Bear with me just a minute.
16  I may be almost done.
17      MR. WORLEY: I don't have
18  anything further.
19      MR. MOREL: I've got just a
20  couple, but I have to run down to my
21  office, because I left the document I
22  wanted.
23      MR. WORLEY: Yeah, go

29  (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 117

1  ahead.  Let's go off the record.
2       (Whereupon, a discussion
3       Was held off the record.)
4
5  EXAMINATION BY MR. MOREL:
6       Q.  Let me show you what I'm
7  going to mark as Plaintiff's Exhibit
8  1 in a moment, and ask you if you can
9  identify that?
10      (Handing document to
11      Witness.)
12      A.  Oh, the charge of
13  discrimination -- what I filed with
14  the EEOC.
15      (Whereupon, Plaintiff's
16      Exhibit Number 1 was
17      Marked for identification.)
18      Q.  Okay.  And did you sign
19  that?
20      A.  Yeah.
21      Q.  And is everything that is
22  written in there true?
23      A.  Yes.

Page 118

1       Q.  All right.  And, so,
2  anything that you wrote in there when
3  you filed your charge about actions
4  taken than you were offended by with
5  regard to Butch Jacobs -- whatever is
6  in there that refers to that, those
7  are true?
8       A.  Yes.
9       Q.  All right.  You testified
10 earlier about employees that had
11 missed at least as much time as you
12 had or more?
13      A.  Yes.
14      Q.  And did you testify that
15 you weren't able to remember some of
16 those names?
17      A.  Yes.
18      Q.  And would your recollection
19 be refreshed if you saw a list of
20 employee names?
21      A.  Yes.
22      Q.  All right.  Let me show you
23 what has been provided to us by the

Page 119

1  defendant with a list of employee
2  names during the period of time that
3  you were employed by them.  Does that
4  refresh your recollection at all?
5       (Handing document to
6       Witness.)
7       A.  Yes.
8       Q.  And are there any other
9  employees that missed more time, or
10 the same amount or more time than you
11 did, and yet were not terminated?
12      A.  Yes.
13      Q.  And who were they?
14      A.  Let's see.  Bernice Beard,
15 she missed time.  She called out
16 often.  She was not fuel desk.
17      MR. MOREL:  Just stay on
18 the question.
19      A.  Pamela Holcomb, she called
20 out.
21      Q.  (BY MR. MOREL:)  And
22 remember the question.  The question
23 is I want you to identify employees

Page 120

1  who missed four or more days and were
2  not terminated?
3       A.  Yeah.  No, she missed.
4  I've already said Laquisha.  Tanisha
5  Means, I'm fairly certain that she
6  did as well.  Angela Nichols --
7  that's what it was, Angela Nichols.
8  Erica Rudolph, she missed days.
9  Dominique Stowes, that's a
10 possibility.
11      Q.  I want you just to tell me
12 the people that you know for sure.  I
13 don't want you to give me people that
14 you think maybe.
15      A.  Ginnifer for sure.
16      Q.  What's Ginnifer's last
17 name?
18      A.  Ginnifer Wyatt, W-Y-A-T-T,
19 and Sandrella Yelder.
20      Q.  The people that you've
21 named in your deposition today that
22 you say have missed as much time or
23 more than you without being

30 (Pages 117 to 120)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 121

1  terminated, do you have personal
2  knowledge of those facts?
3      A.  Yes.
4      Q.  And tell me how that is?
5      A.  For one, I did the
6  scheduling.  Two, more often than not
7  they would call out to me since I was
8  their immediate supervisor.  If they
9  called out to anyone else I had to be
10  made aware of it as soon as they were
11  aware of it.  If they were not there
12  for their shift, I was the one that
13  had to find somebody to cover their
14  shift, or I had to cover it myself.
15  And I knew who was supposed to be
16  there, and I would see that they're
17  not there.
18      Q.  You testified earlier that
19  you assumed that the visit by the
20  managers to the strip club was open
21  knowledge.  The other lawyer asked
22  you if you were saying that, and you
23  said yes.  My question is, did you

Page 122

1  have any basis for assuming that?
2  Why did you assume it?
3      A.  It was so openly discussed.
4  It was discussed constantly in front
5  of -- there was no caution on who
6  they discussed it in front of.
7      Q.  What kinds of employees did
8  they discuss it in front of?
9      A.  Everybody.
10      Q.  Strike that.  Did they ever
11  discuss that issue in the presence of
12  subordinate employees?
13      A.  Yes.
14      Q.  Did they discuss that issue
15  in the presence of other managers?
16      A.  Yes.
17      Q.  When you -- you testified
18  about having a conversation with HR
19  when you were trying to get some new
20  hire information.  Do you recall that
21  testimony?
22      A.  Yes.
23      Q.  All right.  And you

Page 123

1  testified that you complained about
2  various aspects of noncooperation and
3  other hostile conduct?
4      A.  Yes.
5      Q.  Did you ever say to anybody
6  at HR in that conversation that you
7  believed it was retaliation, or
8  connected in any way to your
9  complaints about Butch Jacobs?
10      A.  Yeah.
11      MR. MOREL:  That's all I
12  have.
13      MR. WORLEY:  Nothing
14  further.
15
16  FURTHER THE DEPONENT SAITH NOT
17
18
19
20
21
22
23

Page 124

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA:
4  JEFFERSON COUNTY:
5
6      I hereby certify that the
7  above and foregoing deposition was
8  taken down by me in stenotype, and
9  the questions and answers thereto
10  were reduced to typewriting under my
11  supervision, and that the foregoing
12  represents a true and correct
13  transcript of the deposition given by
14  said witness upon said hearing.
15      I further certify that I am
16  neither of counsel nor kin to the
17  parties to the action, nor am I in
18  any way interested in the result of
19  said cause.
20
21      _____
22      Sunnie Gillespie
23      CCR#: 145

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

## A

ability 13:7
able 37:22 39:11
  41:5 48:6
  103:12 105:4,5
  118:15
Aboard 19:7
absences 102:19
  104:16 105:11
  105:12,16
  107:12 108:3
accept 105:17
accounting 25:6
  28:14 53:7
  61:3,11,12,14
  62:3 99:4
acknowledged
  29:19
acknowledgm...
  4:14 29:1,2,11
  29:18 69:8
act 26:5
acted 66:2
acting 6:3 82:18
action 92:3
  124:17
actions 118:3
activities 35:6
actual 105:3
Adam 2:4 5:5
  6:9 69:17
  71:15,18
add 36:5 45:20
addition 42:8
additional 63:5
address 10:16
  12:12,16,23
affair 39:18
  41:11 48:11
  56:19 57:4
affect 13:7
afternoon 81:14
agency 16:11
ages 10:6

ago 7:3,15 89:8
AGREED 1:21
  2:10,18 3:6
agreement 7:12
ahead 54:21
  57:12 62:10
  66:13 74:1
  81:8 111:4
  117:1
Alabama 1:2 2:3
  2:6 5:8 6:3,10
  12:4,5 21:13
  124:3
allegations 7:7
allowing 81:22
alluding 49:15
American 21:11
  23:13
amount 106:10
  119:10
Andrews 82:9
Angela 108:18
  108:19 120:6,7
anger 64:14
Annex 12:19
answer 8:14,17
  34:11 71:3,7
  71:10 73:3
  88:21 90:7,13
  90:15 91:1,3
answers 8:1
  13:8 124:9
anybody 25:1
  52:15 59:13
  78:9 86:18
  92:13 93:2
  101:20 108:2
  109:15 110:12
  112:1 123:5
anytime 102:4
apart 92:8
apologies 104:2
APPEARING
  5:4,10

Appleton 109:23
  110:13 111:17
application 23:4
applied 114:14
  114:17
apply 23:1
applying 24:18
apprised 85:4
appropriate
  68:10
approve 40:20
April 73:1,8
  78:19
area 115:1,2
argument 98:10
  98:12
arm 51:11
arose 115:9
art 15:19 18:8
artist 18:10
artists 18:9
asked 24:8,17,19
  58:20 77:12
  79:10,12 80:19
  82:4 111:9,10
  121:21
asking 8:15 38:9
  40:3 42:7 46:9
  48:21 65:18
  73:22 74:9,14
  77:7 78:10
  97:10 111:21
aspects 123:2
assign 3:1
assist 25:23
assistance 77:15
assistant 11:21
  61:4,15,17,22
  62:2 112:11
assume 122:2
assumed 60:17
  78:7 121:19
assuming 76:8
  122:1

assumption
  67:21
ate 49:7 50:6
attempt 26:9
  37:21 39:4,10
  41:2 51:6
  63:23
attempted 35:13
  47:22 48:4
  110:2,5
attempting
  37:15
attempts 50:12
attend 14:11
attended 14:23
Attorney 5:6
August 11:8
  21:21
authorizations
  84:6
Avenue 5:14
  10:19
avoid 43:3
aware 54:12
  57:22 102:23
  109:14 121:10
  121:11
awhile 69:16
a.m 2:8

## B

B 4:8 5:11
babies 18:2
baby 104:3
  116:8
back 15:13
  19:14 34:11
  35:21 41:21
  45:11 46:22
  47:1 48:14,22
  58:3 59:9
  62:13 79:14
  81:6,14 85:1,3
  94:18,19 95:15

97:13 101:17
basically 26:4
  34:21 57:13
  98:9,20,23
  100:1
basis 75:23
  122:1
Bates 31:17 62:9
battery 18:4
Beach 10:20
  13:23 17:12
  114:22
Beacon 2:5 5:7
  6:9
beanie 18:2
Bear 30:20
  116:15
Beard 119:14
becoming 116:5
bed 103:11
bedroom 34:21
  35:1 37:2,5
  38:17,20 40:11
  40:14 45:1
  47:16,19
began 15:4
beginning 96:17
  105:13
behalf 5:4,10
  70:7
behavior 45:9
  48:17 54:12
  67:20
belief 68:7
  105:20
believe 7:17
  12:10 25:3
  34:15 41:13
  57:1,8 73:7
  75:17,19 80:1
  80:17 96:4,12
  97:17 99:23
  102:11 110:5
believed 82:17

# FREEDOM COURT REPORTING

123:7
**Bernice** 119:14
**best** 8:13 16:17
23:20 33:9
42:4 43:13
48:17 74:14
**Bethel** 106:21
107:1,19
**bill** 15:12
**biopsy** 80:17,17
81:12
**Birmingham** 2:5
5:8 6:10 115:1
**birth** 9:7
**birthday** 83:15
**bitch** 89:5
**blank** 38:1
39:23 42:16
**blatant** 60:16
**blow** 49:9 57:9
57:10
**blowing** 93:21
**body** 41:3 48:5
**born** 9:9,13
**boys** 10:4
**brag** 38:16
40:10
**branch** 18:21
**Brandon** 64:19
65:17 66:20
**break** 8:11
66:11,14 102:4
109:8
**breasts** 109:21
**Brevard** 14:12
14:21 15:1
**brief** 75:23
**briefer** 49:14
**briefly** 28:8 47:7
**bring** 103:3,4,12
105:6
**brought** 56:8
103:5
**bunch** 79:7

114:18
**Butch** 23:7,12
23:19 26:6
27:14,22 28:4
32:19 36:7
38:9 40:4 47:9
59:13 65:2
66:22,23 67:15
72:14 73:6,20
75:3,15,19
77:22 78:2,11
78:18 79:2,5
86:15 93:7,19
94:10 96:3,10
96:17,20 97:6
97:14 98:12,21
100:2,12,20
101:11 106:2
109:14 111:14
111:18 112:2
118:5 123:9
**Butch's** 25:8
97:7
**butt** 37:20 39:10
41:1 48:3
52:21

‑‑‑‑‑‑‑ **C** ‑‑‑‑‑‑‑

**C** 25:17,18,21
32:14 124:1,1
**calendar** 73:2
74:18 75:8,10
**call** 64:4,7,10
77:10 79:17
80:15 84:15
89:13,15 91:22
94:18 97:8
121:7
**called** 22:17
26:3 64:18,21
64:22 82:13,20
84:17 85:5,9
93:18 94:19
95:14,21 96:1

96:9 97:13
101:17 102:12
108:8,9 111:9
119:15,19
121:9
**calling** 88:3,6
91:3 93:21
96:3,20
**calls** 96:22 97:5
**Canaveral** 13:22
**Cape** 13:22
**car** 112:9,15
116:7
**card** 80:5
**Care** 21:11
23:13
**Carrere** 5:13
**case** 1:9 16:2,5
**cash** 26:2,7
**cashiers** 26:1,6
100:1,11,14,19
**cause** 6:13
124:19
**caused** 33:19
100:2,12,20
**caution** 122:5
**CCR** 124:23
**cell** 96:3 97:5
**centered** 57:13
**Central** 10:19
**certain** 67:19
71:8 120:5
**certified** 2:2 5:2
6:2 76:18
**certify** 6:4 124:6
124:15
**chance** 66:6
**charge** 4:10 16:7
117:12 118:3
**Charles** 5:14
**children** 10:3
**Chris** 28:13,13
61:18 82:2,8
83:1 85:23

**Chris's** 82:3
**chunk** 115:23
**cities** 13:3
114:19
**Civil** 6:6 7:14
**claim** 72:3
**clarify** 74:8
**class** 18:6
**clear** 38:6 58:23
73:22
**clock** 80:3
**close** 73:4
**Clovis** 14:14
15:2,5
**club** 39:16 41:8
48:9 55:23
56:7,14 60:12
60:15,22
121:20
**Coast** 114:15
**Cocoa** 13:22
**Cole** 19:7
**collect** 26:10
**college** 14:4,8,12
14:14,19 22:7
**colleges** 14:10
**com** 50:5
**come** 23:11 24:6
24:19 32:18
44:9 77:13
79:9,10 87:13
93:19
**comes** 36:4 43:8
**coming** 85:1
**commencing** 2:7
**comment** 37:6
38:20 40:8,14
44:19 45:4
47:19 49:1,5
50:3 53:13,16
53:19
**commented**
36:23 47:15
**commenting**

49:19
**comments** 33:20
34:8,16,18,20
34:23 35:3,6
36:8,14,15,19
38:12,14 40:6
42:1,3,23
43:12,23 44:23
45:7 47:12,13
48:17,22 55:19
57:9,11 99:22
110:3,8
**Commission**
16:9
**commissioner**
2:2 3:7 6:4
**communicatio...**
71:2,9
**Community**
14:12,14
**company** 17:21
20:7 21:15
44:4 113:19,22
**complain** 59:12
64:23 68:8
70:8 86:18
96:20
**complained** 60:8
66:21 67:6
93:23 97:22
110:9,21
111:13,17
112:2 123:1
**complaint** 53:22
59:22 60:21
64:11 65:5,9
72:18 74:22
78:4 92:4 93:9
94:9,17 101:22
106:1 111:3,8
**complaints**
93:12 123:9
**completes** 48:16
**completion** 56:5

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

complex 25:10
26:17,19 61:7
73:20 74:7,17
compliance 2:14
complications
20:23 21:3,7
components
27:16
concentrating
92:9
conclusion
106:4
conduct 62:21
123:3
conducted 70:19
71:22
conducting 33:4
confined 103:11
confused 99:10
connected 123:8
connection 78:3
consider 38:10
47:10
considered 34:9
36:9 40:5
constantly 122:4
contact 64:1
68:1,8 70:6
87:13 95:18
contained 91:15
context 49:12
continue 103:23
continued 75:3
76:2,9
continuing 63:2
control 53:21
54:10
convenience
25:19 26:22
27:3,12 32:16
conversation 8:4
53:11 94:8
103:18 104:9
104:11 122:18

123:6
convicted 15:21
cooperating
88:9
copied 70:1
copies 31:16
copy 30:22,23
31:11 32:8
69:4 70:2
corn 35:10
37:12 49:4,6,7
49:19 50:3
corner 62:11
corporate 60:3
64:10 65:7,18
65:22 66:1,22
correct 26:14
28:1,2 32:9,16
36:3 42:14
59:8,20 70:1
83:12,17 85:19
97:4 110:1
124:12
correctly 63:17
69:18
counsel 1:22
2:20,22 6:7
28:15 68:23
69:2 71:3
124:16
counseling
115:15
count 50:15
County 14:21
15:1 124:4
couple 23:21,22
24:12 33:23
35:2 56:3 74:4
84:2,22 116:20
course 43:22
59:18 93:1
court 1:1 2:2,15
5:2 6:2,19 8:6
12:13,17 32:12

cousin 24:10
cover 108:21
121:13,14
covers 41:13
credence 60:14
67:13
crime 15:21
cup 112:20
current 10:15
cuss 99:18 100:9
cussing 96:7
customer 26:9
customers 26:8

**D**

D 4:1
danced 56:10
date 6:5 9:7,11
20:12 29:12
33:7 73:5 74:3
74:9,21 76:15
76:15 78:18
96:17,18
dated 29:5 69:21
72:19 75:21
dates 19:15
112:18
daughter 9:9
Dawn 8:23 9:3
day 2:6 6:11
50:19 63:15
72:22 73:10,18
78:20 79:4,13
79:14,21,23
80:8,11,23
82:11 83:6,7
84:16 87:3,7
98:12,13 103:4
days 33:14
73:11 74:5
75:16 84:3,22
86:5 87:4
95:19 103:2
106:5,12,15

108:17,20
120:1,8
Daytona 17:12
deal 18:3,12
26:8 89:4
104:1
dealt 18:10,13
Debbie 25:2
53:2 54:22
55:12,15 56:2
57:18,19 87:18
88:9,14 89:11
89:17 90:20,22
92:5,19,23
93:11,20 96:3
97:6 98:14,15
101:14
December 20:12
21:22 23:10
29:5,8 33:10
decision 109:4
defendant 1:14
5:10 16:3
119:1
Defendant's
4:13 28:16,18
29:21 32:1
68:18
definitely 84:21
degree 14:8
15:14,15
demeanor 89:1
Denegre 5:13
department
27:2,7,11
63:10,12,13
64:2 67:16
68:2,5
DEPONENT
123:16
depos 45:23
deposition 1:17
1:23 2:11,12
3:2,7 7:10

120:21 124:7
124:13
depositions 2:16
described 59:4
86:10 101:11
desk 51:19
119:16
detail 32:23
34:12
determine 33:9
dialed 91:20
different 13:3
77:18 98:19,20
difficulties
95:18
diploma 14:2
direct 60:10
directly 57:16
60:3
discharge 19:9
discrimination
4:11,15 16:7
30:9,14 62:17
63:5,9 117:13
discuss 16:15
39:14 41:7
48:7 122:8,11
122:14
discussed 39:16
41:8,10,17
48:9,11 54:18
56:1,19 60:15
78:15 122:3,4
122:6
discussing 54:23
55:13 57:17,18
discussion 39:18
68:16 102:7
117:2
displeased 32:19
33:3
district 1:1,2
28:3,6 61:3,8
61:11,12 62:2

62:3,4 63:11
67:11,17 72:1
72:7,8 77:11
77:12,16,19,20
79:1 80:20
93:16 96:10
100:5,18 101:5
**DIVISION** 1:3
**DM** 72:12 78:12
94:8,16 96:1
96:20 97:13
101:16
**doctor's** 103:2
105:3
**document** 4:10
4:14,15,17
28:21,23 30:1
30:6 32:4 69:1
69:4 116:21
117:10 119:5
**documentation**
103:13
**Dodge** 112:9
113:17
**dog** 35:10 37:12
49:4,6,7,19
50:3
**doing** 11:17
23:14 40:18
59:2 74:3
97:23
**Dominique**
120:9
**door** 90:7,13
91:1
**double** 106:10
**doubt** 108:15
**downstairs** 84:6
**dozen** 43:16
45:5
**drawing** 38:1
39:23 42:15,16
**drink** 35:4 37:7
38:21 47:20

49:2
**drinking** 35:3,4
40:15
**drive** 26:10
**drug** 23:14
24:15
**due** 104:15
**duly** 6:17
**duties** 25:21
**dwelling** 10:21
**D-A-W-N** 9:3

_____ E _____
**E** 4:1,8 124:1,1
**earlier** 82:5
118:10 121:18
**earn** 14:7
**Eastern** 14:15
**eat** 37:7 38:21
47:20 49:2,17
**eating** 35:10
37:11 40:16
49:4,6
**education** 13:11
22:6,8
**EEOC** 117:14
**effect** 2:13 89:20
**egregious** 63:4
**eight** 9:22 41:7
48:8 52:22
**either** 16:2 36:8
61:14 70:6
83:1 85:13
98:12
**Electronic** 22:16
**eluded** 31:10
**eluding** 35:5
**Emerald** 114:15
**eminent** 63:6
**employed** 28:7
56:15 62:1
74:10 119:3
**employee**
106:12 118:20

119:1
**employees** 23:15
32:15 52:9
64:10 93:13
106:6 118:10
119:9,23 122:7
122:12
**employment**
12:1 16:8,14
**ended** 88:3
**endometriosis**
19:13 82:18
**entire** 103:18
**entitled** 28:23
29:2 30:8
**entity** 100:17
**Equal** 16:8
**Erica** 120:8
**Erwin** 12:17
**estimate** 23:20
50:17
**everybody** 108:9
122:9
**evidence** 3:3
**exact** 20:12 33:7
74:2 87:3
112:17
**exactly** 84:23
**examination** 4:3
6:13 7:1 117:5
**examined** 6:18
**example** 37:11
49:3
**examples** 42:8
42:12
**excerpt** 31:22
**excerpts** 30:10
**excuse** 103:2,8
**Exhibit** 4:9,13
28:19 29:22
30:3,5 31:14
32:2 62:8
68:19 69:14
72:18 117:7,16

**explain** 46:6
90:18
**explained** 88:5
98:21
**explicit** 55:11
110:8
**expound** 74:8
**expounding**
42:12
**Express** 11:22
112:12 113:8
113:11,21
114:1
**extra** 31:16
**E-R-W-I-N**
12:18
**E-4** 19:5

_____ F _____
**F** 124:1
**facility** 27:8,9,11
35:8 50:9 56:5
70:16 77:1
92:8
**fact** 29:14 60:18
76:11 77:3
88:14 102:5
111:2
**facts** 106:3
121:2
**fair** 7:7 8:18
16:19 17:2
41:12 66:4
77:5 78:17
**fairly** 89:18
120:5
**fairs** 114:16
**falling** 92:8
**familiar** 26:13
30:13
**Family** 21:11
23:13
**far** 58:15 88:18
105:20

**February**
112:18,22
113:16
**Federal** 6:5 7:13
**feed** 116:9
**feel** 36:4 59:15
67:12
**feet** 84:2
**fellow** 95:2
**felt** 60:7
**female** 87:11
**file** 53:22
**filed** 16:6 117:13
118:3
**filing** 3:6
**filled** 23:4
**find** 69:16
121:13
**fine** 6:22 8:12
31:8,12 33:8
38:8 43:11
66:9 71:6
**fingers** 47:1
48:14 58:2,8
**finish** 8:14,16
15:13 71:4
**finished** 15:5
16:22 34:22
37:3 38:18
40:12 47:17
**fired** 98:13
100:2,13,21
101:12,13
**first** 6:17 17:5
17:13 30:7
33:1 34:13,15
36:13 41:23
70:6 104:19
105:13
**fishermen** 18:7
**five** 10:7 37:13
39:3 40:19
45:14 47:22
50:12

# FREEDOM COURT REPORTING

**FJ144** 30:7
**FJ145** 30:8
**Florida** 13:19
 17:16 20:18
 81:4,12
**Flying** 1:12 7:5
 16:6 22:4 23:2
 23:16,20 24:4
 26:12 29:15
 30:18,22 31:18
 31:22 36:11
 56:16 57:3
 59:2,14,19
 61:23 62:9,15
 70:7,19 71:21
 72:23 74:10
 81:21 86:6,18
 93:3,13 104:19
 109:15 110:21
 112:6 114:5
 115:9
**follow** 36:1 94:2
**following** 6:14
 63:8 79:21
 83:9 85:3
 86:11
**follows** 6:18
**force** 2:13
**foregoing** 6:7
 124:7,11
**forgetting** 45:12
**forgot** 53:22
 84:7
**form** 2:21
**formal** 22:8
**Fort** 10:20
 114:21
**forth** 7:17
**found** 83:22
 84:18 111:7
**four** 37:6 38:20
 40:14 47:1,19
 48:13 58:2
 100:10 106:5

106:15 108:17
 108:20 120:1
**fraud** 63:14 64:4
**Frazier** 49:22
 50:2,8
**free** 36:5
**Friday** 83:4
 86:13 102:12
**front** 37:21
 39:11,13 41:3
 41:5 48:4,7
 49:17 56:2
 122:4,6,8
**fuel** 119:16
**full** 2:14 8:21
 49:12 79:13,23
 82:4
**full-time** 16:15
 16:22 17:6
 20:3 21:10,17
**fun** 56:12
**further** 2:9,17
 3:5 45:19
 116:18 123:14
 123:16 124:15

___ **G** ___
**geared** 18:6
**general** 25:9
 27:20 96:8
 116:5
**generally** 92:16
**generated** 76:16
**Generous** 12:13
**genitalia** 34:19
 36:19,21 38:15
 39:9 40:9 41:1
 43:13 44:14
 45:4 47:14
 48:3 52:18,21
**genitalias** 37:19
**getting** 54:9
 88:6 92:10
**GI** 15:12

**Gillespie** 2:1 5:1
 6:1 124:22
**Ginnifer** 107:9
 107:11 108:1
 120:15,18
**Ginnifer's**
 107:13 120:16
**gist** 103:17
**give** 13:8 50:16
 60:13 84:9
 87:20,23 88:15
 90:2,13,22
 91:5 106:18
 120:13
**given** 85:11
 95:16 124:13
**giver** 35:1 37:4
 38:19 40:13
 47:18
**gives** 63:13,16
**giving** 49:9 57:9
 96:7
**gleaned** 71:1
**go** 13:13 14:4
 19:14 32:23
 34:11 35:21
 41:21 48:22
 54:21 57:12
 62:10,13 66:13
 68:13 74:1
 79:9 102:6
 109:8 111:4
 116:23 117:1
**going** 9:22 15:10
 15:11,13,13
 49:22 50:1,4,5
 51:20 53:22
 60:19 66:6
 67:12 80:16
 84:19 87:19
 92:8 93:22
 103:23 116:9
 117:7
**good** 7:2,9 8:5

8:20 9:11 10:5
 49:8 55:10,16
 66:13 95:6
 115:18
**Goodness** 42:6
**Gordon's** 20:6
**gosh** 107:8
**gotten** 64:12
 66:23 68:10
 87:18 116:7
**government**
 114:13
**grab** 35:17 39:5
 51:8,16
**grabbed** 45:9
 46:22 47:23
 48:13 58:2
 109:19 110:1
**grabbing** 37:16
 40:22 45:16
**graduated** 16:20
**great** 56:11
**grocery** 57:2
**grounds** 3:1
 4:17 31:20
**group** 112:13
 113:12,22
**groups** 27:16
**guess** 19:15
 45:19 50:7
 90:3
**Gunter** 12:18
**guy** 18:7,14 95:3
**G-E-N-E-R-O...**
 12:14
**G-I** 107:11

___ **H** ___
**H** 4:8
**hand** 51:23
 58:14 62:11
 103:10 104:23
**handbook** 29:10
 29:15 30:11,22

31:23 32:9
 62:16 69:11
**handed** 30:5
**Handing** 28:21
 30:1 32:4 69:1
 117:10 119:5
**handle** 64:14
 79:7
**handled** 24:16
**handling** 26:8
**hands** 45:11
**happen** 33:1
 50:22
**happened** 76:1
**harassed** 54:6
 110:11 112:3
**harassing** 70:12
 109:15
**harassment** 4:16
 30:9,14 44:17
 53:17,20 54:10
 59:20 62:18
 63:6,10 65:5
 68:9 70:20
 71:22 91:16
**Harvey** 18:7,14
**head** 63:12 68:2
 68:5 106:9
 107:16
**headquarters**
 60:3
**hear** 33:22
**heard** 55:3
**hearing** 124:14
**held** 16:16 17:6
 68:17 102:8
 112:5 114:5
 117:3
**help** 8:18 79:3
 114:15
**high** 13:10,13,15
 16:20 19:18
 22:5
**highest** 19:3

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

hire 25:15 87:15
  90:5,23 122:20
hired 25:13 33:6
  33:10
hiring 24:9
history 12:1
  15:18 16:14
Holcomb 119:19
hold 16:21 20:4
  21:10
holding 105:11
home 11:20
honestly 28:10
  42:16 61:20
  95:1
honorable 19:9
  19:10
hoped 85:1,2
hostile 93:15
  96:6 98:7
  99:17 100:8
  101:1,1 123:3
hotel 75:11
hotline 63:14
  64:5 91:12
hour 66:7 81:17
hours 63:15
  112:19
hour-and-a-half
  81:18
HR 87:9,14 88:8
  88:12,18 89:11
  89:16,17,23
  90:20 91:10
  92:13 101:9,13
  122:18 123:6
hug 35:18 37:17
  39:6 40:23
  45:17 48:2
  52:7,13
huge 115:23
hugged 52:10
human 63:12
  64:1,8 66:19

67:16 68:8
  86:21 88:3
  92:1,2
hundred 50:18
husband 9:23
  13:4 15:8
  19:16 80:18
  105:7 115:18
husband's 9:17
  24:10

_____ I _____

idea 24:19 66:3
identification
  28:23 29:23
  32:3 68:20
  117:17
identify 117:9
  119:23
imagine 49:8
immediate 4:18
  27:23,23 31:21
  60:10 121:8
immediately
  63:7
inappropriate
  33:18 34:10
  36:10 38:11
  40:5 44:16
  45:9 47:10
  52:2 54:12
inappropriately
  37:14 46:10
incident 56:15
  58:7
including
  110:14
income 116:1
incorrect 17:4
information
  71:1,21 87:16
  88:1,4,15 91:6
  92:10 104:23
  110:19 122:20

innuendo 38:23
  40:17
inside 47:2 58:9
instance 51:18
instruct 71:10
insure 26:7
  83:13
intention 116:1
  116:5
intentions 71:5
  116:2
interested 24:17
  124:18
interject 70:23
interview 24:23
investigated
  77:17 94:9
investigating
  94:17
investigation
  70:20 71:23
  93:17
involved 15:23
  63:8
Island 17:11,15
  20:18
issue 19:12 21:3
  102:23 122:11
  122:14
issues 26:9
item 45:14 46:3
items 42:22 43:5
  46:4

_____ J _____

J 1:12 7:5 16:6
  22:4 23:2,16
  23:20 24:4
  26:12 29:15
  30:18,22 31:22
  36:11 56:16
  57:3 59:2,14
  59:19 61:23
  70:8,19 71:21

72:23 74:11
  81:21 86:6,18
  93:3,13 104:19
  107:11 109:15
  110:21 112:6
  114:5 115:9
Jacob 50:1
Jacobs 23:7,12
  23:19 25:1
  27:14 32:20
  36:7 38:10
  40:4 41:10
  47:9 59:2,13
  64:12 66:22
  67:15 70:8,11
  70:16 73:20
  77:6 86:16
  87:4 89:9 93:7
  94:5 109:14
  111:14,18
  112:2 118:5
  123:9
January 9:10,12
JEFFERSON
  124:4
Jenni 107:10
Jennifer 107:11
jeopardy 84:1
jewelry 20:5,22
job 17:6 20:3
  21:9 22:16
  24:7,11 39:20
  41:12 48:12
  49:9 56:20
  90:4,8,12 92:7
  113:14 114:16
  116:3,4
jobs 16:15,22
  57:10,10
  106:17 108:18
  112:5,8 114:5
  114:8,13,15
John 35:8 49:22
  50:2,6,8 51:1

56:4 57:18
  98:23
join 18:18
joined 18:17
joked 56:11
  57:22
Jones 1:5,17,23
  4:19 5:12 6:12
  6:16 7:2 8:23
  9:19 28:19
  29:22 32:2
  66:18 68:19,22
Jr 5:11 9:19
July 113:5,7,9
  114:3
J144 62:15
J145 62:9
J150 31:18

_____ K _____

keep 39:12 85:4
  92:7 96:15
Keith 61:13
  102:11 104:8
  104:12
Kerry 56:7 83:2
  86:1
kin 124:16
kind 17:23
  19:17 22:22
  27:4 49:14
  95:3 104:5
kindly 7:23
kinds 122:7
knew 19:18
  45:12 49:15
  60:10 81:10
  90:16 121:15
know 7:19 8:12
  23:11 28:6
  31:3,5 35:7
  37:20 38:4
  42:21 45:1
  46:4 49:21

# FREEDOM COURT REPORTING

52:1,16 53:2,4
55:22 64:21,23
65:2,11,17,22
66:1,2 67:14
68:2 71:5,7
73:5 75:6,7
76:13,18 77:3
81:3,4,8 84:21
85:6,10 89:3
90:9,17 91:18
91:19,21 93:22
94:23 96:2
103:11 104:2
106:7 110:7
111:12,16,20
112:1,18 116:6
116:8 120:12
**knowledge**
43:19 45:7
49:20 52:4,12
53:1 60:23
65:8,14 67:19
68:6 110:14
121:2,21
**known** 23:18
60:18

----

**L**

**laborious** 38:5
**lap** 35:14 37:15
39:5 40:21
45:15 47:23
50:13,21 51:7
110:2
**Laquisha** 107:4
107:21 120:4
**Large** 2:3 6:3
**Las** 11:13,15,17
12:2,12 112:10
112:13 114:21
**lasted** 44:4
**late** 81:18
**laugh** 44:21
**laughed** 56:10

57:22
**law** 2:4 5:6 6:8
**laws** 2:15
**lawsuit** 7:7 16:1
**lawyer** 77:8
78:10 121:21
**lead** 106:4
**leadership** 22:19
**leading** 2:21
16:18
**leaned** 51:22
**learn** 70:18 77:5
102:2,10
**leave** 18:15 22:2
**led** 99:23
**left** 53:8 62:11
75:11 115:4
116:21
**leg** 35:17 37:16
39:5 40:22
45:16 48:1
51:16
**letter** 4:19 69:16
70:11,21 72:18
74:22 75:14,21
76:16 94:13,17
**let's** 32:11 34:2
42:2 44:22
62:13 66:13
89:7 102:5
106:20 117:1
119:14
**level** 99:1
**liaison** 26:5
**licenses** 22:22
**liked** 24:16 49:5
57:10
**lines** 109:21
**list** 34:3,13 36:7
89:10 118:19
119:1
**listed** 46:10
50:11
**Listen** 54:13

**listener** 115:19
**little** 12:1
**live** 11:11,14
12:3,7,21
20:15
**lived** 13:3
**located** 17:10
**long** 9:20 11:6
11:14 12:7
18:23 20:8
21:19 23:18
75:7 81:11
107:12 108:5
112:19
**look** 19:14 31:6
31:16 62:7
68:14 108:12
**looked** 114:7,11
114:19
**looking** 24:11
53:12 69:14
71:14 116:10
116:12
**lose** 32:12
**losses** 26:11
**lost** 104:3
115:23
**lot** 45:18 52:9,10
**Louisiana** 5:15
**lump** 45:13

----

**M**

**mail** 76:18
**Mailing** 10:17
**main** 18:9
**maintained** 27:9
**maintenance**
27:1,7,8,10
**major** 15:18
**majority** 41:14
**Male** 87:11,12
**mall** 17:11,12,13
**management**
59:14 81:22

101:21 110:21
111:14,18
**manager** 11:21
17:22 25:7,9
25:17,22 27:15
27:20 28:4,7
28:14 32:14
35:9 50:9 61:4
61:4,5,11,12
61:17,22 62:3
62:3,4 63:11
63:11 67:17
72:1,7,8 77:11
77:17 79:1
93:16 96:10
99:4,13 100:5
100:19 101:5
109:1 112:11
116:6
**managers** 26:7
61:9 121:20
122:15
**March** 69:21
70:14 72:19
74:21,22 75:2
75:14,22 76:8
78:4 94:13
114:2
**mark** 30:3 117:7
**marked** 4:9,13
28:16,20 29:23
30:5 31:14
32:3 68:20,22
117:17
**married** 9:15,21
14:18
**Marshall** 112:13
113:3,5,12,22
**Massachusetts**
9:14
**matter** 44:1,2,4
80:6
**McCollough**
25:3 53:2

87:18 98:15
**mean** 46:1 53:10
61:22 63:20
88:23 95:8
96:13
**means** 46:5 99:9
107:4,5,21
120:5
**meant** 54:9,15
**medical** 19:10
19:11 21:3
102:23 103:8
115:12,13
**medication** 13:6
**meet** 19:15
**mental** 115:8
**mention** 42:22
47:4
**mentioned** 43:5
111:8
**merchandise**
99:13 109:1
**Merchants** 17:7
**Merritt** 17:11,15
20:17
**met** 7:3
**meticulous** 38:5
**Mexico** 12:23
14:15
**middle** 1:2 9:2
53:11
**Mike** 28:11 72:4
94:21
**Milissa** 1:5,17
1:23 4:19 6:12
6:16 8:23
**military** 13:5
18:17 19:16,20
22:11,13
**mind** 8:16 36:4
43:8 96:15
**minimize** 26:11
**minor** 15:19
**minute** 30:20

59:10 68:14
116:15
**missed** 81:15
106:5,6,9,12
108:6,16,20
109:1 113:10
118:11 119:9
119:15 120:1,3
120:8,22
**mistreated**
86:19 88:13
**moment** 7:3,15
89:8 117:8
**Mona** 107:4,5,6
107:22
**Monday** 79:5
80:21 83:10,22
84:18,20 87:22
87:22
**Mondays** 79:4
**Montgomery**
12:4,8,15,20
21:13 115:2,3
**month** 23:8 44:7
**months** 11:16
33:15
**Morel** 2:4 4:5,20
5:5 6:9,22 31:3
31:9 42:7,11
42:14,19 45:22
54:13 65:13
66:5,10 69:3,7
69:12,17,19,19
69:20 70:22
71:12 76:12,21
84:4 95:6 97:3
109:10 116:19
117:5 119:17
119:21 123:11
**morning** 7:2
86:11 102:12
**mother-in-law**
11:5 80:16
**move** 37:22

39:10,12 41:2
41:5 48:4,6
114:23
**moved** 15:7
**moving** 41:4
58:15

**N**

**N** 4:1
**name** 7:4 8:22
9:2,18 28:9
52:15 64:20
66:21 81:20
82:4 94:22
99:8 107:9,10
107:14 108:1
108:13,19
109:20 120:17
**named** 24:11
66:20 120:21
**names** 10:6
61:19 82:7
106:19 108:11
108:14 118:16
118:20 119:2
**nasty** 88:2,22,23
**nature** 33:21
34:17 36:16
37:9 38:12
40:7,19 42:2
43:7 47:12
**Navy** 18:22 19:1
20:1,11 22:15
**Near** 13:22
**necessary** 2:19
**need** 8:11 75:12
90:11 102:3
**needed** 26:2
44:16 77:14
79:3,8 81:10
87:16 90:8
92:10 115:11
**needing** 53:16
**negative** 57:21

**neither** 124:16
**never** 59:7
**new** 5:15 12:22
14:15 87:15
90:5,23 116:7
122:19
**Nichols** 120:6,7
**night** 56:12
80:15
**nine** 41:10 43:6
46:11 48:11
**noncooperation**
123:2
**Norfolk** 19:8
20:19
**normal** 8:4
**normally** 79:6
79:18 87:17
**NORTHERN**
1:3
**note** 105:3
**notes** 68:15
109:9
**notice** 3:6 7:11
**notify** 63:7
**November** 2:6
6:11
**number** 9:5
28:17,19 29:22
32:2 35:14
36:18,23 38:11
38:13,15 39:3
40:5,7,9 45:14
45:20 46:19
47:11,12,14
50:11 57:11
60:2 62:20
63:14,16 64:5
68:19,23 91:18
91:20,22 92:1
95:17 100:7,7
100:8,9 107:21
108:16 110:8
117:16

**numbered** 42:22
**numbers** 63:20
90:10 91:13
**numerous** 57:7
**nurses** 55:1

**O**

**oath** 7:6
**objections** 2:19
2:23
**objector** 45:23
**obtain** 14:7
**obtained** 19:4
**obviously** 24:21
**occasion** 37:13
39:3
**occurs** 84:5
**offended** 55:4
118:4
**offered** 3:3 22:3
23:3,5 24:7
**Offhand** 41:19
**office** 50:23 51:2
51:6 53:7,8
55:3 57:7 88:7
90:7 91:2
116:21
**officer** 22:19
**offices** 2:4 6:9
**offs** 26:10
**off-site** 74:14
**Oft** 54:20
**oh** 31:7 35:7
45:8 99:15
107:8 108:18
117:12
**okay** 7:22 8:20
19:19 31:2
34:5,14 35:23
36:12 38:3
42:19 43:11
48:21 54:4
59:9,11 61:10
65:15 66:4

69:12 73:5
75:12 77:4
84:11 95:5,23
102:2 107:3
109:10 113:10
117:18
**old** 10:12
**oldest** 9:9
**ones** 7:17
**open** 24:18
67:19 121:20
**openly** 39:15
41:7 48:8
54:19 60:14
122:3
**operated** 18:4
**operations** 19:8
**Opportunity**
16:8
**opposed** 42:11
67:17
**oral** 6:13
**order** 91:22
**Orleans** 5:15
**outpatient** 81:6
**overheard** 55:2
89:2
**owned** 20:7

**P**

**P** 2:4 5:5 6:9
**page** 4:3 30:7,8
62:8,14,14,15
63:1 70:2
**Pamela** 119:19
**pants** 45:11
46:22 47:2,2
48:14 58:3
**paperwork**
35:16 51:5,22
90:3,5,23
**paragraph** 63:2
**Parkway** 2:5 5:7
6:10

part 67:2,4,5,9
  69:11
parties 1:21
  2:23 124:17
partner 34:22
  38:18 40:12
  47:17
partners 37:3
party 16:1
part-time 16:16
passing 52:8
penetrate 58:11
people 34:7
  77:12 80:20
  106:8 108:16
  120:12,13,20
perfectly 71:6
performance
  38:16 44:23
performed
  34:20 37:1
  40:10 47:15
period 43:22
  75:21 93:6
  94:3 96:15
  97:1 101:10,23
  107:12 109:2
  119:2
permitted 7:13
person 64:17
  77:21 78:1
  81:21 86:23
  88:5,8,13 97:8
personal 121:1
pertinent 90:3
petty 22:19
phone 63:13,19
  77:10 80:15
  89:12,15 90:15
  91:3 93:21
  96:4,22 97:5,6
  97:8
physical 10:18
  115:8

physically 72:23
  73:21 74:7,17
  77:1
Pittsfield 9:14
place 80:23
plaintiff 1:7 5:4
  16:2
Plaintiff's 4:9
  117:7,15
plaza 26:13,16
  61:23 75:4
please 7:19 8:22
  10:6 106:19
pleased 34:23
  37:4 38:19
  40:13 47:18
point 49:16
  52:14 53:18
  61:19 68:12
  70:14 80:5
  81:7 103:16,18
  103:20 104:18
  106:14
Poitevent 5:13
policy 30:15
  59:20 62:22
  63:4 67:23
  69:9,11 91:16
pornography
  39:15 41:7
  48:8 54:19
  55:19
port 19:8
Portales 12:22
portion 29:1
position 22:3
  23:3,6 25:4,8
  25:12,15
positions 24:9
  24:12
possibility
  120:10
possible 58:16
possibly 85:14

posted 91:23
pregnancy 21:1
  21:5 84:1
  103:23
pregnant 83:23
  84:19 103:20
  103:22 104:20
presence 122:11
  122:15
present 52:12
pretty 50:18
  51:1 67:18
  106:11 108:8
previous 39:18
  39:20 41:11
  48:12 62:14
prints 18:8
prior 3:3 16:5
  56:5 57:3
  72:13 96:22
  97:7 103:21
probably 15:3
  31:9 44:6,8
  46:23 52:22
  76:17 87:1
  108:13
problems 96:8
  115:8
procedure 6:6
  7:14 59:23
proceedings
  6:14
professional
  22:22 115:7
promised 41:20
prompts 38:7
pronouncing
  69:17
proper 26:7
provide 103:14
provided 118:23
psychological
  115:14
pudgy 95:4,11

pull 35:13 37:15
  39:4 47:23
  50:12,21 51:6
  110:2
pulling 33:23
  40:21 45:15
punch 80:2
purpose 70:10
purposes 7:12
pursuant 7:11
put 8:8 32:11
  45:10 46:2,23
  48:13 51:23
  58:2 62:21

        — Q —
question 7:21
  8:15,17 15:16
  24:5 36:6
  41:15 47:8
  54:14,14 58:21
  71:4,8,11,13
  76:20 78:22
  89:14 90:19
  92:12 93:4,5
  96:14 119:18
  119:22,22
  121:23
questions 2:20
  2:22 7:6,18
  88:21 124:9
quickly 58:15
quit 113:5,7,8

        — R —
R 124:1
ran 15:12 98:19
rank 19:3 28:4
reacted 92:21
read 63:16,19
reading 2:10
ready 66:11
real 47:7 95:2
realized 58:14
really 45:23

55:2 60:13
  79:9 95:10
  105:8 106:13
reason 66:18
  105:18,21,22
recall 12:16
  16:17 42:5
  48:18 55:20
  58:18 61:19
  73:16,18 74:15
  76:14 81:20
  91:9 98:11
  122:20
receive 29:14
  88:4
received 32:8
  70:2 80:14
receiving 64:15
receptionist
  21:16 22:1
recess 66:15
  109:11
recognize 30:4
recollection
  118:18 119:4
record 7:3,15
  8:22 40:2
  46:14 68:14,17
  102:6,8 117:1
  117:3
recruiter 105:8
rectangular
  51:3
reduced 124:10
reference 72:17
referring 35:8
  89:5
refers 118:6
reflect 80:7
refresh 119:4
refreshed
  118:19
refused 87:20
  88:20 90:2,22

**regard** 118:5
**regards** 72:2
  86:4
**registers** 26:2
**regular** 80:23
**relating** 2:15
**relation** 73:9
**relationship**
  67:10,15
**relative** 74:20
  74:21 86:9
**relevant** 10:9
**remark** 40:8
  43:15 93:10
**remember** 12:11
  13:1 14:22
  23:8 25:5 28:9
  38:7 56:22
  65:3 72:11
  76:17,21 82:3
  82:22 87:8
  95:1,8,10 99:7
  107:13 110:6
  112:17 118:15
  119:22
**removed** 52:1
**renting** 10:23
**repairs** 27:4
**rephrase** 7:20
  15:16 24:4
  25:13 71:13
  78:21 89:13
  93:4 96:14
**reply** 44:12
**report** 90:11
**reporter** 2:3 5:2
  6:2,19 8:6
  32:12
**represent** 7:4
**represents**
  124:12
**requested** 90:14
  91:7
**research** 24:14

**resided** 11:6
**residential**
  10:17
**resign** 84:8
**resolve** 26:9
**resources** 63:12
  64:1,8 66:19
  67:16 68:8
  86:21 88:3
  92:1,3
**respect** 89:8
**respective** 1:22
**responded** 92:20
**response** 57:20
  65:8 67:1
  68:10 70:20
  78:3 92:4
  102:20 103:7
**responses** 31:10
**responsibilities**
  99:2
**restaurant**
  24:13 26:20
  27:17,19
**result** 94:12
  124:18
**results** 85:8,10
**resume** 114:14
**retail** 112:13
  113:4,12,22
**retain** 30:23
**retaliation**
  105:23 123:7
**return** 105:4
**reviewing** 35:15
**right** 7:10 8:9
  11:5 14:13,16
  17:18 19:19,22
  21:9 24:1
  26:17 28:11
  32:13 33:11
  36:3 41:20
  42:10 43:1,12
  46:12 48:18,19

50:10 51:20
54:4 61:16,21
62:5 63:21,22
71:17 72:19
73:9,13 74:12
76:20 80:10
88:19 89:19
93:18 94:13,14
95:14,16 96:11
97:19 98:1,5
98:15 99:5,11
99:16 101:15
101:18,19
104:14,17
107:7 108:14
111:23 113:1
118:1,9,22
122:23
**risk** 63:5
**Rob** 7:4 66:5
**ROBERT** 5:11
**Rockledge** 13:15
  13:16,18
**rub** 37:19 41:1
  52:18,20
**rubbed** 39:8
  48:2 53:10
**rude** 88:2,20
  90:18 96:7
  98:3 99:17
  100:6
**Rudolph** 120:8
**Rule** 7:17
**rules** 2:15 6:6
  7:13
**run** 26:2 116:20
**R-O-C-K-L-E...**
  13:17

——————— **S** ———————

**S** 4:8
**SAITH** 123:16
**sales** 20:5 112:9
**salesperson**

112:16
**Sandrella**
  109:19 110:12
  110:20 111:6
  111:13 120:19
**Saturday** 83:10
  83:14
**saw** 33:22 53:3
  76:3 118:19
**saying** 37:2
  38:17 40:11
  43:19 47:16
  55:8,15 57:19
  97:4 103:7
  121:22
**says** 31:20 62:14
  62:20,22 63:3
  63:20 67:23
**schedule** 51:21
  105:8 108:11
**scheduled** 83:8
  83:11
**scheduling** 26:4
  121:6
**school** 13:10,14
  13:15 16:21
  19:18 22:5,12
  22:14,15,17
**schools** 14:23
  22:9,9
**screening** 23:14
**second** 30:7
  102:6 113:13
**Security** 9:4
**see** 19:19 36:2
  52:11 58:22
  62:10,18 99:6
  106:20 119:14
  121:16
**seeing** 73:2
**seek** 115:11
**seen** 30:10 31:21
  32:7 64:14
**selling** 20:22

**sent** 76:17
**separate** 27:2,11
  100:17
**September**
  115:4
**serious** 63:6
**servicing** 27:3
**set** 7:17
**Seven** 41:6 48:7
  52:22
**sex** 57:6
**sexual** 33:20
  34:17 35:5
  36:14,15 37:8
  38:12,23 40:7
  40:17,19 42:1
  42:22 43:7
  44:17,23 47:12
  53:17,20 54:9
  59:19 65:4
  68:9 70:19
  71:22 91:15
  101:2
**sexually** 38:23
  47:21 54:5
  70:12 109:14
  110:8,11 112:3
**Shamarra**
  106:20,22
  107:17,18,19
**shape** 51:3
**shaped** 35:11
  37:12
**shared** 51:2
**Sherrie** 33:23
  109:22 110:13
  110:20,23
  111:17
**She'd** 110:9
**shift** 80:5 108:10
  108:21 121:12
  121:14
**shifts** 83:13
**short** 66:15 95:9

109:11
shortly 33:5,13
59:1
shoulders 8:3
show 28:15
31:14 35:8
68:22,23 117:6
118:22
shrug 8:3
sick 82:13,14
84:15
side 24:13 51:20
sign 117:18
signature 2:11
29:3
signed 29:11
84:6
site 75:20
sitting 51:4,19
53:8 55:3
situation 85:5
85:12 111:22
six 39:8 40:23
48:2
size 34:19 36:20
38:14 40:8
47:13
skinny 95:11
Social 9:4
sociology 15:19
somebody 53:21
66:20 111:8
121:13
son's 83:14
soon 15:5 58:13
84:18 116:4
121:10
sooner 105:7
sorry 9:1 22:1
61:10 62:6
65:16 67:3
113:11 115:3
sort 19:17 38:4
51:22

sought 115:6
sound 73:12
94:22
sounds 7:9 8:5
8:20 73:4
source 71:2
speak 8:1 24:20
72:12 86:22
101:20
speaking 82:2
89:2
Specialty 17:7
specific 22:16
42:18 49:3
50:22 51:18
53:5 76:7
115:22
specifically 33:2
34:7 36:20
48:23 52:15
54:16 55:7,21
76:13,22 92:15
spelled 10:8
spent 22:7
spoke 72:2
80:19 82:23
84:20 85:13,21
86:2,2,20 87:9
91:10 94:15
97:17 101:16
spoken 101:13
St 5:14
stage 56:8
stamped 31:17
62:9
Staples 61:14
102:12 109:3
Starbucks
114:17
start 113:6
started 20:10
44:2,3,6,7
48:22 59:2
98:11 105:13

112:18 113:6
state 2:3 6:2
8:21 14:17
16:11,23 124:3
stated 103:21
statement 29:17
49:14
STATES 1:1
stationed 19:6
stay 84:2 112:19
119:17
stayed 11:20
staying 11:3,4
stenotype 124:8
STIPULATED
1:20 2:9,17 3:5
stipulations
1:19 6:7,20
7:16
stop 15:11 20:21
41:4 70:11,22
stopped 15:9
20:12 44:10
59:7
store 17:22,23
18:4,13 25:17
25:18,19,22
26:22 27:3,12
32:14,16 57:3
61:6 63:10
77:15 112:11
112:11 113:21
114:1
stores 98:19
story 60:11
Stowes 120:9
stressed 115:17
115:21
strike 52:19
65:23 73:17
78:21 84:14
93:3 116:11
122:10
strip 39:16 41:8

48:9 55:23
56:6,14 60:12
60:15,22
121:20
stripers 56:9
studying 15:17
stuff 34:1 79:7
97:17
Subjected 62:17
subordinate
122:12
subsequently
42:21
suffer 21:2,4
suggesting 37:8
40:17
suggestive 39:1
47:22
sum 35:22 38:4
40:3
Sunnie 2:1 5:1
6:1 8:18
124:22
supervised
32:15
supervision
67:11 124:11
supervisor 28:1
39:17 41:9
48:10 57:5
99:14 121:8
supervisors
60:11 61:1
98:18
suppose 46:2
supposed
100:15 121:15
sure 20:11 31:1
35:19 39:22
52:14 57:4
64:13 65:2
66:12 72:5
73:3 74:2,19
75:9 76:4

84:23 85:15
86:2 87:2,2,6
95:22 97:21
103:22 108:23
111:5,6 120:12
120:15
swipe 80:4
sworn 6:17
Sympathetic
104:4

### T

T 4:8 124:1,1
take 8:7 38:3
40:1 66:13
92:3 102:4
109:7
taken 2:1 7:11
66:16 109:12
118:4 124:8
takes 83:16
talk 25:2 34:6,11
41:21 42:2
43:2 44:22
talked 93:1 94:4
talking 55:9
61:1 81:2
96:16 97:2
tall 95:2,9
Tanisha 51:1
89:2 93:14
96:5 97:16,16
97:22 99:7,17
100:5 101:6,18
108:23 120:4
Tanisha's 99:7
Tavin 10:13
tea 112:21
technique 95:6
telephone
102:15 104:12
tell 17:5 24:3
42:4 43:21
44:15 46:20

# FREEDOM COURT REPORTING

Page 136

49:22 50:2
51:15 54:5,8
54:15 55:6,22
58:23 65:19
71:15,20 77:21
78:1,11,13,14
78:23 88:12
89:9,22 90:20
92:19 96:1
100:10,18
101:4,4 102:14
105:10 109:3
109:17 111:11
114:10 120:11
121:4
**telling** 57:15,17
79:1 101:9
**ten** 45:21 46:19
48:13
**tend** 8:3
**term** 26:14
**terminate** 109:4
**terminated**
72:14 73:6
77:6,9,14,22
78:2,12,19
79:3,8 86:8,16
86:17 87:5
93:8,9,20 94:5
94:6 95:20
96:11,18,19,21
97:14 102:13
102:18 104:13
106:7,16 108:4
112:6 119:11
120:2 121:1
**termination**
4:18 31:21
96:23 97:7
102:10 105:18
105:21,22
**terrible** 82:6
**test** 85:8,10
**testified** 6:18

118:9 121:18
122:17 123:1
**testify** 77:9
118:14
**testimony** 8:7
75:13 76:10
122:21
**tests** 24:15
**Thank** 32:13
84:11
**Thanks** 32:7
**thereto** 3:4
124:9
**thigh** 35:17
37:16 39:5
40:22 45:16
48:1 51:17,23
**thin** 95:12
**thing** 27:5 34:4
34:15 35:9
36:13 42:4
81:6 89:10,23
97:21 104:5
**things** 43:5
44:13 59:3
85:7 115:12
**think** 22:17
28:13 35:18
41:16 43:9,20
47:3 48:19
51:14 53:6
59:6 60:12
64:19 66:21
75:12 87:21
92:17 94:2
97:3 101:8
102:1 105:23
106:8,13 107:9
107:15 108:7
108:10,14,22
108:23 109:19
109:22 110:4
110:17 114:18
120:14

**thought** 33:18
82:19
**three** 10:4,9,13
18:1,11 27:15
36:23 38:15
40:9 47:14
69:3,10 73:11
100:8 106:8,15
108:1,5
**throws** 18:8
**Thursday** 81:7,9
81:14,15 85:14
85:17 86:9
**Tieler** 10:7
**time** 3:1,2 11:19
22:6,18 30:17
32:18 38:3
40:2 41:6
43:10,22,22
44:9 47:6 53:5
63:15 66:13
70:3 74:16
75:21 78:13
79:18,20 80:2
81:8,18 82:17
86:15,17 92:6
92:11 93:1,6,7
93:8 94:4,5,6
96:9,16,16
97:1 101:10,12
101:23 102:21
104:20 106:10
108:7 109:2
110:18 116:3
118:11 119:2,9
119:10,15
120:22
**timeframe** 86:1
97:9
**times** 34:1 35:2
35:14 37:18
43:13 45:2
49:10,13,13
50:13 52:17,20

56:3 57:7 58:5
**timing** 59:10
111:6
**today** 13:7 21:4
84:10 120:21
**told** 19:23 47:11
59:7 71:19
77:8 78:10
84:2 88:8
89:11,16,23
90:21 96:4
97:15 100:1,4
100:11,19
102:13,22
104:8,12,18
109:18 110:15
110:23 111:1,2
**Tommy** 9:19
**tone** 89:1
**top** 62:10 106:9
107:16
**topic** 16:19
**touch** 37:14
40:20 110:5
**touching** 45:14
**Towbin** 112:9
112:16 113:7
113:16
**town** 74:4 76:5
**toy** 18:3,13
**toys** 18:5
**trade** 22:9
**training** 22:11
22:14,20 26:1
26:4 56:4 74:3
**transcript** 8:8
124:13
**transferred** 15:8
**travel** 26:12,16
61:23
**Travis** 10:7
**treat** 93:2
**treated** 101:7
**treating** 89:17

**treatment** 115:7
115:12
**trial** 3:2
**trick** 42:20
46:17
**tried** 48:1 50:20
52:7,13 68:7
**trip** 39:16 41:8
48:9
**Troy** 14:17 15:5
15:10 16:23
**trucks** 27:4
**true** 29:18,18
72:21 105:18
105:22 117:22
118:7 124:12
**truthful** 13:8
**try** 7:20 26:11
35:18 37:17
39:6 40:23
51:9,16 52:17
58:11 64:7
81:9
**trying** 8:7 35:18
42:20 43:3
45:16 46:17
58:21 92:6
108:7 110:3
114:12 122:19
**Tuesday** 72:15
72:15 80:15
83:9,17,19
84:16 85:3,5,9
87:22 105:5
**turn** 62:8 63:1
70:1
**twice** 108:22
**two** 33:16 36:18
38:13 40:7
43:6 47:13
49:12 69:8
86:3 87:7
99:10 100:7
101:23 106:6

# FREEDOM COURT REPORTING

Page 137

107:21 112:7
114:5,8 116:9
121:6
**two-page** 30:6
**typewriting**
124:10
**T-I** 10:10
**T-I-E** 10:8
**T-I-E-L-E-R**
10:11
**T-shirts** 18:7

---
### U
**uh-huh** 8:2
17:17 20:2
23:23 31:19
36:17,22 39:7
62:12 91:4
94:11 98:4
104:10 106:23
**unclear** 7:19
**uncollectibles**
26:10
**uncooperative**
88:22
**underpants** 58:9
**understand**
46:16 58:22
59:19 65:17
97:21
**unfairly** 93:3
**unfortunately**
31:15
**unhappiness**
33:19
**unhappy** 33:2
**Unit** 10:19
**UNITED** 1:1
**University** 14:15
14:17
**unknown** 108:2
**unnecessarily**
46:1
**un-huh** 8:2

**upper** 18:6
35:17 37:16
39:5 40:22
48:1 51:16,23
**upset** 64:12
66:23 80:18
**Upshaw** 99:9
**usual** 6:19 7:15
**usually** 37:22
45:3 48:5 79:4
**Utah** 60:4
**U.S.S** 19:7

---
### V
**varied** 44:8
**various** 123:2
**Vegas** 11:13,15
11:18,21 12:2
12:12 112:10
112:12,14
113:8,11,21
114:1,21
**verbalize** 8:1
**video** 44:17
53:17 54:23
55:10,16
**violates** 62:21
**violation** 63:4
**Virginia** 20:17
**visit** 55:23
121:19
**votech** 22:9
**VS** 1:9

---
### W
**Waechter** 5:12
**waist** 51:11
**waiting** 85:8
**waived** 2:12 3:8
**walked** 55:5
**Walker** 5:12
**walking** 45:10
46:21 116:3
**Walton** 10:20
28:12 72:4

94:22 114:21
**want** 15:2 18:19
21:21 46:3,13
51:21 56:7
57:2,5 61:13
64:15 65:1
66:10 71:14,20
82:1 97:20
100:3 104:1
109:7,23 111:1
114:2 119:23
120:11,13
**wanted** 89:4
114:16 116:22
**wanting** 93:22
**wants** 76:12
**Warfare** 22:16
**wasn't** 34:22
38:17 47:16
64:13 65:4
84:23 95:10,12
103:12,22
112:20 115:16
116:1
**watch** 44:17
53:17
**way** 16:18 24:16
32:20 33:3
35:4 37:7,9,13
37:23 38:21
40:15 47:20,22
49:1,5,7 50:6
71:7 72:17
84:4 92:20,21
98:14,20 101:2
101:6,22 102:3
108:17 116:8
123:8 124:18
**ways** 40:20
98:20
**Wednesday**
72:13,15,16
80:22 81:1,13
85:14,17

**week** 33:16 85:2
108:7,10
**weeks** 23:21,22
44:1,3,5 106:6
113:1,16
**weird** 105:9
**went** 22:18
45:18 76:4
79:11 107:6
**weren't** 106:7
118:15
**West** 2:5 5:7
6:10
**we'll** 11:23
32:22 43:3
89:10
**we're** 11:4 38:6
96:16
**we've** 30:5 66:6
93:1 101:10
**whatsoever**
116:2
**wind-up** 18:4
**witness** 2:12
6:12 28:22
30:2 32:5 69:2
69:6 84:9
117:11 119:6
124:14
**witnessed** 84:8
**witnesses** 43:18
45:6 49:18
51:12 52:3,23
58:17
**words** 89:20
104:4
**work** 18:8 20:8
21:12,19 23:1
44:7 59:1
72:23 75:3,15
76:9 79:13
82:11 83:8,11
83:19 85:16
86:5 105:4

112:15 113:23
114:20 116:13
**worked** 11:20
20:15 23:19
30:17 57:1
73:10,14,19
74:16 75:19
76:23 78:20
79:21 80:21
83:12 113:15
113:20
**working** 20:14
70:15 73:21
76:2,14 105:14
115:9
**Worley** 4:4 5:11
6:21 7:1,4 31:7
31:12,13 42:10
46:6,8 54:17
65:15 66:8,12
66:17 68:13,21
69:10,13,20
76:19 77:4
84:11,13 95:13
97:12 102:5,9
109:7,13
116:17,23
123:13
**worse** 104:7
**wouldn't** 8:16
49:16 87:23
88:15 90:6,12
90:13,15 91:1
91:2,5 95:11
**wrist** 51:10
**written** 117:22
**wrong** 82:16
97:5
**wrote** 118:2
**Wyatt** 120:18
**W-Y-A-T-T**
120:18

---
### X

---

**X** 4:1,8

**Y**

yeah 12:6 19:17
  20:20 37:18
  42:15 56:21
  66:8 69:6,19
  73:15 97:11
  99:19 104:6
  113:2 116:23
  117:20 120:3
  123:10
year 11:9 12:9
  14:1 18:18
  23:9
years 9:22 14:22
Yelder 109:20
  110:12 111:13
  120:19

**Z**

Zale's 20:6

**0**

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 9:6
05 21:22,22
  23:10 29:6,8
06 115:5
07 112:22
  113:16

**1**

1 4:10,14 28:17
  28:19 117:8,16
1st 29:8
1-800 60:2
1/17/79 9:8
10th 73:7,15
  78:19 79:5
10:44 2:7
11 11:16
11th 73:15 87:2
117 4:11
117-123 4:5
13 73:1

13th 73:15
145 124:23
17th 9:10,12
18 10:20
1979 9:12
1998 19:22

**2**

2 4:15 29:22
  30:3,5 62:8
2:07CV273-W...
  1:10
2001 19:2,23
  20:13
2003 15:3
2004 15:4,6
2005 15:4,6
  33:10
2005ish 15:6
2006 15:10
  69:21 70:15
  72:19 73:1
  74:22 75:14,22
  76:8 78:4,19
2007 2:7 6:11
201 5:14
229-A 12:17
24 63:15
28 4:14
29 4:16

**3**

3 4:17 31:15
  32:2
30 72:19 75:14
  94:13
30th 69:21 70:15
  74:21,22 75:2
  75:22 76:8
  78:4
32 4:18 7:17
32547 10:20
35209 5:8

**4**

4 4:19 68:19,23
  69:14 72:18
4109 12:13
49 62:15

**5**

517 2:5 5:7 6:9

**6**

68 4:20

**7**

7-117 4:4
70170-5100 5:15

**8**

8th 2:6 6:11

**9**

940 10:19
96 14:3 17:8,9
97 15:2 17:8
98 18:20
99 17:9

## NATIONAL COURT REPORTING

```
 1        UNITED STATES DISTRICT COURT

 2    IN THE MIDDLE DISTRICT OF ALABAMA

 3           NORTHERN DIVISION

 4

 5   MILISSA JONES,

 6

 7            Plaintiff,

 8

 9      VS.              CASE NO.

10                       2:07CV273-WKW

11

12   Flying J, INC.,

13

14            Defendant.

15

16     DEPOSITION OF KEITH STAPLES

17

18            STIPULATIONS

19         IT IS STIPULATED AND

20   AGREED, by and between the parties,

21   through their respective counsel,

22   that the deposition of KEITH STAPLES

23   may be taken before Sunnie Gillespie,
```

# NATIONAL COURT REPORTING

| Page 2 | Page 4 |
|---|---|
| 1  Commissioner, Certified Court | 1      I N D E X |
| 2  Reporter, State of Alabama at Large, | 2 |
| 3  at the law offices of Adam P. Morel, | 3  EXAMINATION BY:          PAGE NO. |
| 4  517 Beacon Parkway West, Birmingham, | 4  Mr. Morel              8-156 |
| 5  Alabama, on the 9th day of November, | 5  Mr. Worley             156 |
| 6  2007, commencing at or about 10:52 | 6 |
| 7  a.m. | 7 |
| 8        IT IS FURTHER STIPULATED | 8      E X H I B I T S |
| 9  AND AGREED that the reading and | 9  PLAINTIFF'S EXHIBIT NO.       MARKED |
| 10  signature to the deposition by the | 10  1 - Letter            23 |
| 11  witness is not waived, said | 11  2 - Letter            24 |
| 12  deposition to have the same force and | 12  3 - Letter            30 |
| 13  effect as if full compliance had been | 13  4 - Document           32 |
| 14  had with all laws and rules of court | 14  5 - Document           36 |
| 15  relating to taking of depositions. | 15  6 - Document           38 |
| 16        IT IS FURTHER STIPULATED | 16  7 - Document           47 |
| 17  AND AGREED that it shall not be | 17  8 - Document           62 |
| 18  necessary for any objections to be | 18  9 - Document           88 |
| 19  made by counsel as to any questions, | 19  10 - Document          98 |
| 20  except as to form or leading | 20  11 - Document         100 |
| 21  questions, and that counsel for the | 21  12 - Document         101 |
| 22  parties may make objections and | 22  13 - Document         101 |
| 23  assign grounds at the time of the | 23  14 - Document         102 |

| Page 3 | Page 5 |
|---|---|
| 1  trial, or at the time said deposition | 1  15 - Document         106 |
| 2  is offered in evidence, or prior | 2  16 - Document         124 |
| 3  thereto. | 3  17 - Document (notes)    126 |
| 4        IT IS FURTHER STIPULATED | 4  18 - Document         135 |
| 5  AND AGREED that notice of filing of | 5  19 - Employee Handbook    144 |
| 6  the deposition by the Commissioner is | 6 |
| 7  waived. | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |

## 367 VALLEY AVENUE

# NATIONAL COURT REPORTING

Page 6

1  BEFORE: Sunnie Gillespie
2      Certified Court Reporter
3
4  APPEARING ON BEHALF OF THE PLAINTIFF:
5    MR. ADAM P. MOREL
6    Attorney at Law
7    517 Beacon Parkway West
8    Birmingham, Alabama  35209
9
10  APPEARING ON BEHALF OF THE DEFENDANT:
11    MR. ROBERT B. WORLEY, JR.
12    Jones, Walker, Waechter,
13      Poitevent, Carrere & Denegre
14    201 St. Charles Avenue
15    New Orleans, Louisiana 70170-5100
16
17
18  ALSO PRESENT:
19    Milissa Jones
20
21
22
23

Page 7

1        I, Sunnie Gillespie,
2  Certified Court Reporter, State of
3  Alabama at Large, acting as
4  commissioner, certify that on this
5  date, in accordance with the Federal
6  Rules of Civil Procedure and the
7  foregoing stipulations of counsel,
8  there came before me at the law
9  offices of Adam P. Morel, 517 Beacon
10  Parkway West, Birmingham, Alabama, on
11  the 9th day of November, 2007, KEITH
12  STAPLES, witness in the above cause
13  for oral examination, whereupon the
14  following proceedings were had:
15
16        KEITH STAPLES,
17  having been first duly sworn, was
18  examined and testified as follows:
19        THE COURT REPORTER:  Usual
20  stipulations?
21        MR. MOREL:  That's fine.
22        MR. WORLEY:  Yeah.
23

Page 8

1  EXAMINATION BY MR. MOREL:
2    Q.  State your name for the
3  record, please.
4    A.  Keith Staples.
5    Q.  And where do you work?
6    A.  Flying J.
7    Q.  What is your position?
8    A.  District accounting
9  manager.
10    Q.  When did you start with
11  Flying J?
12    A.  November, 2004.
13    Q.  And what do you do as the
14  district account manager?
15    A.  I'm responsible for all
16  daily accounting procedures for the
17  company within my district.
18    Q.  And what is your district?
19    A.  Georgia, Alabama, and
20  Tallahassee.
21    Q.  Do you have any other
22  operational responsibilities other
23  than the accounting side?

Page 9

1    A.  Yes, sir.
2    Q.  Tell me about those.
3    A.  As it relates to day to day
4  activity within the Plaza
5  supervising, whether it be
6  merchandising, operation
7  safety requirements, things like
8  that.
9    Q.  Describe for me with
10  respect to the Tyson facility how you
11  fit into that chain of command.
12    A.  I actually helped open that
13  facility, so I was very familiar with
14  it. I was responsible for the
15  district accounting procedures for
16  that facility, daily accounting
17  practices, and whatever else I was
18  called upon to do.
19    Q.  Who reported to you
20  directly?
21    A.  Who reported to me
22  directly?
23    Q.  Right. And let's talk

# NATIONAL COURT REPORTING

Page 10

1  about the timeframe of December of
2  '05 until -- or December of, yeah,
3  December of '05 until April of '06?
4      A.  Okay.  I have -- within a
5  Plaza I have a district.  I mean, I
6  am the district accounting manager,
7  so I have an accounting manager at
8  that location.  They have dotted line
9  responsibility to me.  They report to
10 the general manager.  So I have no
11 direct reports.
12     Q.  Okay.  Does the general
13 manager have dotted line
14 responsibility to you, or does he
15 report to you in any way?
16     A.  Yes, as it relates to
17 accounting practices.
18     Q.  Okay.  Only as it relates
19 to accounting practices.  What about
20 personnel issues and human resource
21 issues at Tyson, for instance?
22     A.  That can fall within the
23 district staff as assigned by the

Page 11

1  district manager.
2      Q.  So the district manager is
3  ultimately the one in charge, but he
4  can just say to you as the district
5  accounting manager, "I want you to go
6  handle this for me"?
7      A.  That's correct.
8      Q.  Because I noticed,
9  obviously, in the chronology of what
10 happened in this case, you were there
11 instead of a district manager during
12 the period after Mr. Jacobs was
13 fired, right?
14     A.  I was there off and on from
15 the time we opened the store through
16 that period.
17     Q.  Okay.  When Mr. Jacobs was
18 fired -- and you agree Mr. Jacobs was
19 fired, right, Butch Jacobs?
20     A.  Mr. Jacobs was terminated
21 from the company, yes.
22     Q.  He was involuntarily
23 terminated, correct?

Page 12

1      A.  Yes, sir.
2      Q.  And the reason for his
3  involuntary termination was that the
4  company found that Ms. Jones'
5  allegations of sexual misconduct on
6  the part of Mr. Jacobs were at least
7  in part true?
8      A.  I have no knowledge of
9  that.
10     Q.  You don't know that?
11     A.  No, sir.
12     Q.  Well, what is your
13 information about why Mr. Jacobs was
14 fired?
15     A.  During that period I was
16 told there was an investigation.
17     Q.  And were you told anything
18 about why he was fired?
19     A.  No, sir.
20     Q.  What were you told about
21 the investigation?
22     A.  I was told there was an
23 investigation at the Plaza.  I'm

Page 13

1  referring to that time period.
2      Q.  All right.
3      A.  I was told there was an
4  investigation at the Plaza and that,
5  you know, it would be business as
6  usual until the investigation was
7  complete.
8      Q.  What were you told the
9  investigation was about?
10     A.  I wasn't given any
11 information about the investigation.
12     Q.  So you weren't told that
13 the investigation was about sexual
14 harassment?
15     A.  No, sir.
16     Q.  You were the person that
17 communicated to Ms. Jones that she
18 was terminated, correct?
19     A.  Yes, sir.
20     Q.  Who made the decision to
21 terminate her?
22     A.  I did.
23     Q.  And you did that in

# NATIONAL COURT REPORTING

Page 14

1  consultation with the human resources
2  director, correct?
3      A.  Yes, sir.
4      Q.  And also in consultation
5  with the senior counsel, Kelley
6  Lowery, correct?
7      A.  Yes, sir.
8      Q.  You also kept in the loop
9  Kerry Lake; is that right?
10     A.  Yes, sir.
11     Q.  Remind me the name of the
12  HR director, Jerry?
13     A.  Beckman.
14     Q.  Beckman.  And you discussed
15  with those folks the situation with
16  Milissa prior to terminating her, and
17  then at the time you terminated her,
18  right?
19     A.  Yes, sir.
20     Q.  All right.  You knew that
21  Ms. Jones had made sexual harassment
22  allegations, correct?
23     A.  No, sir.

Page 15

1      Q.  You didn't know that?
2      A.  No, sir, I didn't.
3      Q.  Ms. Lowery didn't tell you
4  that?
5      A.  No, sir.
6          MR. WORLEY:  Objection to
7  what counsel would say, and instruct
8  him not to answer on the basis that
9  that would be privileged.
10         MR. MOREL:  I didn't mean
11  to do that.  It's not a habit.
12         MR. WORLEY:  Just for the
13  record, I have to say it.
14         MR. MOREL:  And I should
15  just say part of the reason that led
16  me down the path is y'all produced
17  several memos that I assume you don't
18  have with producing -- you've decided
19  that we were entitled to them.
20         MR. WORLEY:  Right.
21     Q.  (BY MR. MOREL:)  You
22  terminated Ms. Jones for what reason?
23     A.  Absenteeism.

Page 16

1      Q.  And what was it about her
2  absenteeism that caused you to
3  terminate her?
4      A.  She was not coming to work
5  and was not communicating with me at
6  all.
7      Q.  She wasn't communicating
8  with you at all?
9      A.  As to why she wasn't coming
10  to work.
11     Q.  Well, let's make sure that
12  we're precise about the language you
13  use, because the jury is going to
14  want to know.
15     A.  Okay.
16     Q.  Was she communicating with
17  you at all?
18     A.  Yes.
19     Q.  In fact, she had
20  communicated with you several times
21  during her absences, correct?
22     A.  Yes.
23     Q.  She also communicated with

Page 17

1  other members of management,
2  including Kerry Lake, correct?
3      A.  Yes.
4      Q.  And she had informed
5  management that the reason for her
6  absenteeism was medical, correct?
7      A.  I have no knowledge of
8  that.
9      Q.  Tell me what documents you
10  reviewed before you sat for your
11  deposition today.
12     A.  The notice of deposition,
13  and the documents that I guess we
14  produced.
15     Q.  Okay.  So you saw the
16  interoffice e-mails that were going
17  on during that time between -- or the
18  interoffice communications that were
19  going on about her absenteeism
20  between you and Kerry Lake and
21  corporate?
22     A.  I did not see all the
23  documents.  I saw the documents that

## NATIONAL COURT REPORTING

Page 18

1  I produced.
2      Q.  What documents did you
3  produce?
4      A.  A statement as to the
5  conversation I had with Milissa the
6  day she was terminated.  The notes as
7  far as scheduling that I was keeping.
8      Q.  Do you believe that it
9  would have been appropriate to
10  terminate Ms. Jones for absenteeism
11  if she had provided medical
12  information to management?
13      MR. WORLEY: Object to the
14  form of the question.  Calls for
15  conclusion.  But now that I've
16  objected, go ahead and answer.
17      MR. MOREL: Every question
18  calls for a conclusion.  It doesn't
19  call for a legal conclusion.
20      MR. WORLEY: No, no.  It's
21  not appropriate to ask a witness to
22  give a conclusion.
23      MR. MOREL: If he doesn't

Page 19

1  have personal knowledge he can tell
2  me.
3      MR. WORLEY: Still, even if
4  he has personal knowledge, you can't
5  ask a fact witness to give a
6  conclusion.  An expert can give a
7  conclusion.
8      MR. MOREL: You're saying
9  I'm asking him for opinion.
10      MR. WORLEY: A conclusion.
11      Q.  (BY MR. MOREL:) My
12  question stands, though.  Would it
13  have been appropriate to terminate
14  her for excess -- or for absenteeism,
15  I should put it, if she had been
16  communicating with management about
17  her medical condition?
18      MR. WORLEY: Same
19  objection.
20      A.  No.
21      Q.  (BY MR. MOREL:) Would you
22  have terminated her if she had been
23  communicating with management about

Page 20

1  her medical condition?
2      MR. WORLEY: Object to the
3  form of the question.
4      MR. MOREL: What's
5  objectionable about that one?
6      MR. WORLEY: Calls for
7  speculation.  It's a hypothetical
8  about what he would have done, not
9  what in fact did happen.
10      Q.  (BY MR. MOREL:) I want you
11  to assume every fact just as if it
12  happened -- just the way it actually
13  happened, except for I want you to
14  add the fact that Ms. Jones
15  communicated to management at Flying
16  J, during her absenteeism,
17  information about her medical
18  condition, and told them that her
19  medical condition was the reason for
20  her absenteeism.  Would you have
21  fired her if that had been the case?
22      MR. WORLEY: I object to
23  the form of the question on the

Page 21

1  foundational basis, and speculation.
2      Q.  (BY MR. MOREL:) You can
3  answer it.
4      A.  No.
5      Q.  And why wouldn't you have?
6      MR. WORLEY: Same
7  objection.
8      A.  There was obviously would
9  have been more information that I
10  would have had to consider before
11  making any kind of decision on that.
12      Q.  (BY MR. MOREL:) Tell me
13  what Kerry Lake's title was during
14  that time?
15      A.  District manager.
16      Q.  And was he your boss?
17      A.  Yes, sir.
18      Q.  And as far as the chain of
19  command from Tyson up would go, it
20  would be the managers at the store,
21  the general manager, and then Kerry
22  Lake, correct?
23      A.  That's correct.

## 367 VALLEY AVENUE
### 1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205

6 (Pages 18 to 21)

## NATIONAL COURT REPORTING

Page 22

```
1       Q.   And then you would have
2   also been there on the dotted line as
3   an accounting manager -- district
4   accounting manager, and you would
5   have also reported on a direct line
6   to Kerry Lake?
7       A.   Yes, sir.
8       Q.   And do you believe that it
9   is prudent for a manager who was
10  about -- for a district accounting
11  manager who was about to terminate a
12  C Store manager, that the district
13  accounting manager make sure that he
14  has all the information with respect
15  to that person's absence before she's
16  fired?
17         MR. WORLEY:  Objection.
18      A.   Yes.
19      Q.   (BY MR. MOREL:)  And why
20  would that be important?
21         MR. WORLEY:  Same
22  objection.
23      A.   You want all the facts
```

Page 23

```
1   before making any decision like that.
2       Q.   (BY MR. MOREL:)  And it
3   would have been extremely easy for
4   you to get all the facts that Kerry
5   Lake knew before you fired her,
6   right?
7       A.   Yes.
8       Q.   You had all the access in
9   the world to Mr. Lake, correct?
10      A.   Yes.
11      Q.   And, in fact, Mr. Lake was
12  involved in the communications during
13  the time, and specifically before she
14  was fired, right?
15      A.   Yes.
16         (Whereupon, Plaintiff's
17         Exhibit Number 1 was
18         Marked for identification.)
19      Q.   Let me show you what I've
20  marked as Plaintiff's Exhibit 1.
21  Have you ever seen that letter
22  before?
23         (Handing document to
```

Page 24

```
1         Witness.)
2       A.   No, sir.
3       Q.   Did anybody at Flying J,
4   other than Ms. Lowery, ever talk to
5   you about a letter in which somebody
6   on behalf of Ms. Jones was making
7   allegations against Mr. Jacobs?  Did
8   anybody ever tell you about it?
9       A.   No, sir, I don't recall
10  that at all.
11      Q.   All right.  And you see the
12  date of that letter was March 30th;
13  is that right?
14      A.   Yes, sir.
15         (Whereupon, Plaintiff's
16         Exhibit Number 2 was
17         marked for identification.)
18      Q.   What about the letter that
19  I wrote to Kelley Lowery on April
20  6th; did anybody ever tell you about
21  that letter?
22      A.   No, sir.
23      Q.   Incidentally, did you fire
```

Page 25

```
1   Ms. Jones because she had too many
2   absences?
3       A.   Yes, sir.
4       Q.   All right.  How many was
5   too many?  I mean, when did she --
6   did she violate an absenteeism
7   policy?
8       A.   Yes, sir.
9       Q.   Which absenteeism policy
10  did she violate?
11      A.   As defined in our company
12  handbook.
13      Q.   So just whatever is in the
14  company handbook?
15      A.   Well, it specifically
16  states that employees should give
17  notice.  There's a specific timeframe
18  that they should give notice
19  before -- if they're not coming to
20  work for a schedule shift and that
21  kind of thing.
22      Q.   Well, my question is, did
23  you fire her because she had too many
```

## 367 VALLEY AVENUE
### 1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205

# NATIONAL COURT REPORTING

Page 26

1 absences, or are you saying you fired
2 her because she didn't give proper
3 notice?
4   A.  Well, it's both.
5   Q.  I want you to explain for
6 me in detail, if you can, how she
7 violated the company's absenteeism
8 policy?
9   A.  Yes, sir.  There was a
10 published schedule that at the time I
11 think Milissa was writing for the
12 store.  She would not come in for
13 that scheduled shift, okay.  There
14 were times when there was no calls,
15 no notice of any kind, just wouldn't
16 come to work.  There was times when a
17 notice was made -- a phone call was
18 made, but it was left with a field
19 desk cashier.  It wasn't actually
20 having a direct contact with the
21 manager.  I would leave messages.
22 And at one conversation we had she
23 told me that she wouldn't be in this

Page 27

1 week.  I said you're not coming in
2 all week, no.  What's going on?  I'm
3 not coming in this week.  I said
4 well, what about next week?  Well,
5 I'm call you next week and let you
6 know if I'm coming in next week.  I
7 just couldn't run a business like
8 that.
9   Q.  Did you discuss with
10 Mr. Lake what he knew about why she
11 wasn't coming in, or anything about
12 her communications with him, before
13 you fired her?
14   A.  I had regular conversations
15 with Kerry on a daily basis as to the
16 events at Tyson.
17   Q.  My question is, did you
18 check with the district manager about
19 her absences and what information he
20 had before you fired her?
21   A.  Yes, sir.
22   Q.  All right.  And what did he
23 tell you?

Page 28

1   A.  He told me that he had
2 actually asked Milissa to call me and
3 tell me what was going on.
4   Q.  Is it your testimony that
5 she never gave you any reason why she
6 wasn't coming in?
7   A.  That is correct.
8   Q.  So, I assume you had -- you
9 must have been puzzled about what the
10 reason was?
11   A.  That is correct.
12   Q.  So, did you ask Mr. Lake if
13 he knew what the reason was?
14   A.  I did.
15   Q.  What did he tell you?
16   A.  I had no information.
17   Q.  My question is, what did
18 Mr. Lake tell you when you asked him
19 what her reason was?
20   A.  He said he had asked
21 Milissa to call me and tell me, and
22 explain what was going on.
23   Q.  Did he tell you that he

Page 29

1 didn't know why she was out?
2   A.  He didn't -- I don't think
3 had any ides what was going on.  He
4 seemed as puzzled as I was as to what
5 was going on.
6   Q.  Did he ever tell you he
7 didn't know why she was out, or words
8 to that effect?
9   A.  I can't -- I can't say
10 honestly.  We had so many
11 conversations during that time.
12 There was never any information as to
13 any specific reason.  He was just
14 saying she called me, she left a
15 message, I had a missed call, I did
16 eventually talk to her, I told her to
17 call you.  You know, it was that kind
18 of thing back and forth.
19   Q.  But when you asked him why
20 is she out, you came away with no
21 answer from him?
22   A.  No, sir, that is correct.
23   Q.  And is it fair to say that

# NATIONAL COURT REPORTING

Page 30

1 he either told you something along
2 the lines of he didn't know, or he
3 didn't say one way or the other, and
4 you just walked away without the
5 information, one or the other?
6    A.   The only thing that I
7 recall is that he said I asked
8 Milissa to call you.
9        (Whereupon, Plaintiff's
10       Exhibit Number 3 was
11       Marked for identification.)
12   Q.   Let me show you what I'll
13 mark as Plaintiff's Exhibit 3, but
14 before I do, this is my April 20th
15 letter to Kelley Lowery (indicating),
16 and I just want the record to reflect
17 that we are not waiving our legal
18 position that any offer of settlement
19 or any other negotiations made in
20 this or any other letter is
21 inadmissible. So, by using this
22 letter we're not waiving that
23 argument. Depending on what your

Page 31

1 position is going to be on it, if it
2 comes down to it we're just going to
3 ask the judge to redact it
4 appropriately.
5        MR. WORLEY:  And our
6 position is right now I'm not waiving
7 any potential defenses we may have.
8        MR. MOREL:  I'm not asking
9 you to. I just don't want you to
10 come back to me and say you used the
11 letter, you waived the position. I'm
12 not waiving it. I'm putting it on
13 the record.
14       MR. WORLEY:  I'm just
15 saying we may or we may not. We'll
16 just take that up as --
17       MR. MOREL:  I'm not asking
18 you to stipulate. I just want the
19 record to show that I'm not waiving
20 it.
21       MR. WORLEY:  I know your
22 position. Our position is we may or
23 may not take that position. We're

Page 32

1 not waiving anything right now.
2        MR. MOREL:  Okay.
3    Q.   (BY MR. MOREL:)  Have you
4 ever seen that letter before?
5    A.   No, sir.
6    Q.   Did anybody ever tell you
7 about it?
8    A.   No, sir.
9    Q.   Do you see the date of the
10 letter was April 20th?
11   A.   Yes, sir.
12   Q.   And do you see how it was
13 faxed that day -- at least it
14 purports to have been faxed on that
15 day, on April 20th?
16   A.   Yes, sir.
17   Q.   And you fired her on the
18 21st, right?
19   A.   Yes, sir.
20       (Whereupon, Plaintiff's
21       Exhibit Number 4 was
22       Marked for identification.)
23   Q.   Let me show you what I'll

Page 33

1 mark as Plaintiff's Exhibit 4. Are
2 you familiar with that document?
3        (Handing document to
4        Witness.)
5    A.   No, sir.
6    Q.   Did you go to a strip club
7 with Butch Jacobs, and Kerry Lake,
8 and Chris Andrews, and Jonathan
9 Frazier in October of 2005?
10   A.   I did.
11   Q.   In Baytown, Texas?
12   A.   I did.
13   Q.   And were y'all there on
14 company business -- not the strip
15 club, but in Baytown?
16   A.   Yes, sir.
17   Q.   I assume -- were you doing
18 company business at the strip club?
19   A.   No, sir. We were opening a
20 new facility in Texas.
21   Q.   Did y'all conduct any
22 business at the strip club?
23   A.   I wasn't there long enough

# NATIONAL COURT REPORTING

Page 34

1  to do anything.
2      Q.  Did you expense any costs
3  that you incurred while you were at
4  the strip club with the company?
5      A.  I didn't incur any costs at
6  the strip club.
7      Q.  Did you have to pay to get
8  in?
9      A.  Not that I recall.
10     Q.  Did you purchase anything,
11  any drinks?
12     A.  No, sir.
13     Q.  Alcoholic or otherwise?
14     A.  I did not.
15     Q.  So I guess your answer is
16  you didn't expense anything?
17     A.  To my knowledge, I did not.
18     Q.  Have you ever expensed
19  anything to the company where the
20  cost was incurred at a strip club?
21     A.  No.  Well --
22     Q.  There's not a question
23  pending right now.

Page 35

1      MR. WORLEY:  Unless he has
2  to finish his answer.
3      Q.  (BY MR. MOREL:)  Do you
4  have more to say about the last
5  question?
6      A.  I would -- it's referred to
7  as a strip club.  When the van pulled
8  up and we got out, we thought it was
9  a game room.
10     Q.  Okay.
11     A.  Okay.  You walk in and
12  there's pool tables on one side, and
13  you start looking around and you see
14  what's going on.  Some people went in
15  and I left.  I walked back to the
16  hotel.
17     Q.  Did you stay long enough to
18  see Kerry Lake get the dance?
19     A.  No, sir.
20     Q.  How long did you stay in
21  there?
22     A.  Long enough to walk in,
23  walk around the room and see what it

Page 36

1  was, and walk out.
2      Q.  And your testimony is that
3  you didn't know until you got inside
4  the door that it was a strip club?
5      A.  I didn't know what it was.
6      Q.  How much do you travel with
7  the company?
8      A.  Every week.
9      Q.  And how long have you been
10  doing that?
11     A.  Two years.
12     Q.  How many days a week do you
13  spend out in hotels?
14     A.  Depending on financials and
15  when they're due.  This past year
16  I've gone to Utah one week a month.
17  The rest of the time I'll be on the
18  road at least three days a week.
19         (Whereupon, Plaintiff's
20         Exhibit Number 5 was
21         Marked for identification.)
22         (Handing document to
23         Witness.)

Page 37

1      Q.  Let me show you what I've
2  marked as Plaintiff's Exhibit 5.
3  Have you ever seen that document?
4      A.  No, sir, I haven't.
5      Q.  I want you to look -- this
6  is a -- does this appear to you to be
7  an e-mail from Chris Bone at Flying J
8  HR top Scott McMillan, with a copy to
9  attorney Kelley Lowery and
10  Mr. Beckman?
11     A.  Yes, sir.
12     Q.  Look at the third line in
13  the body of the e-mail.  Do you see
14  where he says quote, "The problem is,
15  as a senior manager Kerry went with
16  subordinate staff who have talked
17  about it in the Plaza."  Did you ever
18  talk about it afterwards?
19     A.  No, sir.
20     Q.  Did you ever hear anybody
21  else talk about it afterwards?
22     A.  No, sir.
23     Q.  You've never talked about

# NATIONAL COURT REPORTING

Page 38

1  it with Kerry since it happened?
2  A.  No, sir.
3  Q.  How about Mr. Beckman?
4  A.  Not that I recall, no, sir.
5  Q.  What about Chris Bone?
6  A.  No, sir, not that I recall.
7  Q.  Have you discussed it with
8  anybody at Flying J other than Kelley
9  Lowery, or your counsel here?  But I
10  mean --
11  A.  I can't recall anyone ever
12  bringing it up.
13  (Whereupon, Plaintiff's
14  Exhibit Number 6 was
15  Marked for identification.)
16  (Handing document to
17  Witness.)
18  Q.  Let me show you Plaintiff's
19  Exhibit 6, and ask you if you've ever
20  seen that one?
21  A.  I have not seen this.
22  Q.  Tell me what your
23  employment relationship is with Scott

Page 39

1  McMillan, as far as the flow chart
2  goes?
3  A.  Scott McMillan?
4  Q.  Yeah.
5  A.  He was at that time
6  director of operations.
7  Q.  Would he have been your
8  second line supervisor?  Is that an
9  appropriate way to put it?
10  A.  It would have been Kerry
11  Lake and then Scott McMillan, yes,
12  sir.
13  Q.  And Debbie was the
14  accounting manager at Tyson, correct?
15  A.  Yes, sir.
16  Q.  What was her last name?  Is
17  it McCollough or McCue?  What was
18  Debbie's last name?
19  A.  McCollough.
20  Q.  McCollough.  But Debbie
21  McCollough reported to you, though,
22  right?
23  A.  Yes, sir.

Page 40

1  Q.  Did you have a supervisor
2  that was on the accounting side so to
3  speak, or was there a regional
4  accounting person, or -- I know
5  you've said you were a direct report
6  to Kerry Lake?
7  A.  That's correct.
8  Q.  All right.  You didn't have
9  any other --
10  A.  I have dotted line
11  responsibility to the CFO.
12  Q.  Okay.  And who was the CFO?
13  A.  Andre Lortz.
14  Q.  Tell me what all members of
15  management above the Tyson level,
16  above GM, spent any time at the Tyson
17  store from the time -- that you're
18  aware of, from the time of Mr.
19  Jacobs' termination forward until
20  Ms. -- until Ms. Jones was
21  terminated?
22  A.  Above the Plaza management,
23  myself, Kerry Lake, Chris Andrews.  I

Page 41

1  know Robert Clark, are I think Mike
2  Walton; those guys, that's about it.
3  Q.  Let me tell you how it
4  sounds to me and you tell me if I'm
5  describing it fairly or not.  Were
6  you are kind of doing a
7  merry-go-round of management trying
8  to keep things together because you
9  just lost your GM, or was there more
10  structure to it than that, or were
11  y'all just trying to cover your bases
12  as best you could?
13  A.  Well, I think we have a
14  pretty defined organizational
15  structure, but when you lose the
16  general manager you want to make sure
17  that there's somebody there to make
18  decisions.  So we were rotating in
19  and out.
20  Q.  Okay.  And was that
21  rotating done during that roughly
22  11-day period from the date he was
23  terminated -- the 11 or 12 days he

# NATIONAL COURT REPORTING

Page 42

1  was terminated on the 10th and she
2  was fired on the 21st?  During that
3  period did you know before you went
4  down to Tyson how long you'd be
5  there, or were y'all doing it on an
6  ad hoc basis and just making sure
7  somebody was always there?
8      A.  I knew pretty much I would
9  be there for the week.
10     Q.  Were you there all week?
11     A.  Yes, sir, usually.
12     Q.  What about Kerry?
13     A.  I think it was the same
14  situation.
15     Q.  There all week?
16     A.  Yes, sir.
17     Q.  All right.  Who made the
18  decision about who would go down to
19  Tyson and be in charge during that
20  week?
21     A.  Kerry.
22     Q.  Kerry did?  Do you know if
23  he had any input from anybody else?

Page 43

1      A.  I do not know that.
2      Q.  Do you know whether Kerry,
3  or you, or anybody else went up to
4  HR, or talked to anybody at HR and
5  said we wonder if Kerry Lake should
6  be one of the people down there
7  considering this --
8      A.  I'm not aware of that.
9      Q.  -- this situation?
10     A.  I'm not aware of that.
11     Q.  All right.  Were you
12  involved in any investigation that
13  was performed by the company with
14  respect to any issue brought up by
15  the Ms. Jones?
16     A.  No, sir.
17     Q.  Do you know whether there
18  was any such investigation?
19     A.  There was an invest -- I
20  was told that there was an
21  investigation when I was, you know,
22  first asked to go down there.  But I
23  was never privy to who it was, or

Page 44

1  what was going on, or what the
2  problem was, or anything like that.
3      Q.  Who told you there was an
4  investigation?
5      A.  Kerry.
6      Q.  He told you it was of
7  Butch, but he didn't say what it was
8  about?
9      A.  No, sir.
10     Q.  Is that correct?
11     A.  That's correct.
12     Q.  Were you interviewed as
13  part of that investigation?
14     A.  No, sir.
15     Q.  How often, when there was a
16  GM in place -- let's talk
17  specifically about December to April,
18  and if that wasn't a typical time for
19  you, tell me.  But how often during
20  that time were you down in Tyson?
21     A.  December until that time,
22  very regular basis, yes, sir.
23     Q.  Were you there daily?

Page 45

1      A.  Before opening that
2  facility I was probably there three
3  weeks continuously.
4      Q.  That was a brand new store?
5      A.  To get it ready, yes, sir.
6  There's banking and things like that
7  to get established.  After that we
8  went home for Christmas.  After that
9  we were in and out continuously.
10     Q.  And we meaning you?
11     A.  I'm sorry.
12     Q.  We would include you?
13     A.  Yes, sir.
14     Q.  And who else?
15     A.  Kerry Lake, Chris Andrews.
16     Q.  And that was continuously
17  right through Ms. Jones' termination
18  date?
19     A.  Yes, sir.
20     Q.  And was it continuously for
21  some period of time after that?
22     A.  Yes, sir.
23     Q.  And why was that?

# NATIONAL COURT REPORTING

Page 46

1    A.   The same.  We wanted to
2  make sure the business was, you know,
3  maintaining.
4    Q.   Brand new store just lost a
5  GM; is that right?
6    A.   Yes, sir.
7    Q.   Did you get another GM in
8  place eventually?
9    A.   Yes, sir.
10    Q.   Who did you hire?
11    A.   We actually already had a
12  person in training.  We try to have,
13  you know, sort of a team in place.
14    Q.   Who was it?
15    A.   Rebecca Robinson ended up
16  coming down to the facility.
17    Q.   Became the GM there?
18    A.   Yes, sir.
19    Q.   Is she still the GM there?
20    A.   No, sir.
21    Q.   Why is she not there?
22    A.   She -- we opened another
23  new store.  She wanted the other new

Page 47

1  store.  It's closer to home.
2    Q.   Who replaced her?
3    A.   Ricky Brown.
4    Q.   Male or female?
5    A.   Ricky Brown, male.
6    Q.   Is he still there?
7    A.   Yes, sir.
8       (Whereupon, Plaintiff's
9       Exhibit Number 7 was
10       Marked for identification.)
11       (Handing document to
12       Witness.)
13    Q.   Let me show you what I'm
14  marking as Plaintiff's Exhibit 7.  If
15  you can identify that for me I'd
16  appreciate it.  Can you tell me what
17  it is?
18    A.   It looks like a statement
19  that I wrote just documenting a
20  conversation with Milissa.
21    Q.   And did you write the
22  statement on April 19th, 2005?
23    A.   Yes, sir.

Page 48

1    Q.   And what prompted you to
2  write a statement?
3    A.   I don't recall the exact
4  circumstances that prompted me to
5  write it, other than just documenting
6  what was going on.
7    Q.   Well, tell me, were there
8  any general circumstances that
9  prompted you to write it?
10    A.   Just the appeal desk.  The
11  business was not -- needed
12  supervision, and we needed people to
13  work.
14    Q.   Had you ever written a
15  similar kind of statement due to the
16  absenteeism of any other employee at
17  Tyson?
18    A.   At Tyson I can't recall.
19    Q.   I mean, it wasn't your
20  habit to do that every time somebody
21  was absent, was it?
22    A.   If there was continuous
23  issues, yes, sir.

Page 49

1    Q.   At what point did you make
2  some -- well, did you make some
3  determination that there were
4  continuous issues with respect to
5  Milissa Jones and her absenteeism?
6    A.   Yes, sir.
7    Q.   At what point did you make
8  that conclusion?
9    A.   About this timeframe.
10    Q.   April 19th?
11    A.   About that timeframe.  That
12  was during the timeframe we had the
13  conversation where I said, "When are
14  you going to come back to work?"  She
15  said, "I don't know.  I'll call you
16  next week and let you know."
17    Q.   And when you had that
18  conversation, you didn't tell her
19  that she was going to be subject to
20  some kind of discipline for that
21  comment that she made?
22    A.   I told her we couldn't
23  continue to operate this way.

## NATIONAL COURT REPORTING

Page 50

1    Q.  My question is, you never
2  told her that she was subject to any
3  form of discipline, did you?
4    A.  No, sir.
5    Q.  In fact, you never told her
6  that at any time, did you?
7    A.  No, sir.
8    Q.  Was Milissa Jones ever --
9  did she ever receive a written
10  reprimand for absences at any time?
11    A.  I'm not aware of that.
12    Q.  In fact, she never did, did
13  she?
14    A.  I'm not aware.
15    Q.  And she never received any
16  other type of lesser discipline than
17  termination either, did she?
18    A.  I'm not aware of that.
19    Q.  If I told you that it's Ms.
20  Jones' testimony, and the reflection
21  of if you look at her personnel file,
22  she was never suspended, written up,
23  or verbally counseled in any way

Page 51

1  that's memorialized in that file, do
2  you have any reason to dispute that?
3    A.  No, sir.
4    Q.  Why wasn't she?
5    A.  Why wasn't she written up
6  or disciplined in any way?
7    Q.  Why wasn't any form of
8  lesser disciplined used?
9    A.  I can only speak for the
10  time that I was there.
11    Q.  Well, let's speak for it.
12    A.  That during that timeframe
13  I was only reacting to what I was
14  being -- what I was encountering on a
15  daily basis.  Now, what happened
16  before, you know, different issues,
17  I'm not sure.  It should have been
18  documented.  There should have been
19  verbal counseling, written
20  counseling.  There should have been a
21  number of things that would happen.
22    Q.  And, of course, you
23  wouldn't think that those things

Page 52

1  should happen if there had never been
2  a problem before with any of that
3  stuff with Milissa Jones, right?
4      MR. WORLEY:  Objection.
5    Q.  (BY MR. MOREL:)  I mean, if
6  Milissa had never been absent before
7  you got there, ever, there wouldn't
8  be any reason for any of that stuff
9  to exist in her file, right?
10    A.  That's correct.
11    Q.  Did you -- well, you tell
12  me what steps did you take before you
13  fired her to determine what her
14  attendance history was prior to that
15  week?
16    A.  I was reviewing payroll
17  records.
18    Q.  Did you review per payroll
19  records?
20    A.  Yes, sir.
21    Q.  And, so, you knew then that
22  prior to -- well, what did you learn
23  about prior to the general manager

Page 53

1  being terminated and you coming down
2  there on a continuous basis, what did
3  you learn about what her attendance
4  record was prior to that?
5    A.  She was not working the
6  published manager's schedule.
7    Q.  Was she -- was her
8  attendance a problem with the
9  operation of the store, as far as you
10  knew?
11    A.  I'm sorry?
12    Q.  Was her attendance causing
13  a problem with the store as far as
14  you knew?
15    A.  Yes, sir, it was.
16    Q.  And when did you come to
17  that conclusion?  I'm talking about
18  was her attendance, prior to you
19  becoming continuously down at the
20  store after the GM was fired -- prior
21  to that date, was her attendance in
22  any way an issue with the operation
23  of the store?

# NATIONAL COURT REPORTING

Page 54

1   A.   Yes, sir.
2   Q.   All right. And tell me how
3   it was.
4   A.   Well, in that roll as C
5   Store manager, you're supervising all
6   the other cashiers, and shift change,
7   you know, you're writing the
8   schedule, publishing the schedule,
9   that kind of thing. And if the
10  manager's not there at specific times
11  to do their job, it impacts the
12  whole -- the whole store.
13  Q.   So tell me what
14  information, specifically, you were
15  looking at to make the conclusion
16  that she wasn't -- that she had come
17  problem with attendance?
18  A.   Just time records, clock in
19  clock out.
20  Q.   That's all?
21  A.   Payroll records.
22  Q.   What was the company's
23  policy on -- she was exempt, right?

Page 55

1   A.   Yes, sir.
2   Q.   Paid a salary?
3   A.   Yes, sir.
4   Q.   What was the company's
5   policy on clocking in for Milissa
6   Jones?
7   A.   Exempt employees are to
8   clock in at the beginning of the
9   shift like any other hourly employee.
10  They just don't have to clock out.
11  Q.   Was that the practice that
12  was being employed by your direct
13  subordinate, Debbie McCollough?
14  A.   I do not know.
15  Q.   Don't you think it would
16  matter?
17  A.   Oh, absolutely. That's a
18  very important issue.
19  Q.   Well, why didn't you keep
20  up with it if it's a very important
21  issue -- or Debbie McCollough?
22  A.   That was left up to the
23  general manager.

Page 56

1   Q.   Well, wasn't it also left
2   up to the general manager to keep up
3   with Milissa Jones, who wasn't even
4   in accounting, but had a drop line
5   with the general manager?
6   A.   All employees at that
7   Plaza.
8   Q.   Right. So, did you check
9   with the general manager who had been
10  her general manager, to determine
11  whether there had been any
12  absenteeism problems?
13  A.   Well, the general manager
14  was not at the facility, so I did not
15  have a conversation with him about
16  that.
17  Q.   If I told you that it was
18  the custom and practice of Milissa
19  Jones, Debbie McCollough, the
20  merchandise manager at Tyson, to hit
21  the clock at any time during their
22  shift -- and it didn't matter when,
23  just as long as they hit it at least

Page 57

1   one time during the shift that they
2   were there, do you have any reason to
3   dispute that that was the case?
4   A.   Do I have any reason to
5   dispute that that was the case?
6   Q.   Right. Okay. Is that a
7   violation of a written policy
8   somewhere?
9   A.   Yes, sir.
10  Q.   And where is that policy?
11  A.   In the employee book.
12  Q.   And do you know whether
13  they were instructed to do that by
14  the general manager?
15  A.   I do not know that.
16  Q.   Would it matter to you if
17  that was the case?
18  A.   Yes, sir.
19  Q.   If you learned that that
20  was the custom and practice at Tyson,
21  than you would clock in any time
22  during the shift -- it didn't matter
23  when, and that that was pursuant to

## 367 VALLEY AVENUE
### 1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205
### 15 (Pages 54 to 57)

# NATIONAL COURT REPORTING

Page 58

1  the guidelines provided by the
2  general manager, and nobody had ever
3  been written up for it, or no
4  discipline ever been imposed; would
5  that have mattered to you?
6      A.  Yes.  You can't have
7  anybody working off the clock.
8      Q.  I've got to ask you about
9  that question.  If she's exempt and
10  salaried, how does that work?
11     A.  You still have to account
12  for your presence.
13     Q.  Can you account for your
14  presence by just clocking in at any
15  time during your shift?
16     A.  You're still working off
17  the clock.
18     Q.  Your point is that the
19  policy in the book says you've got to
20  clock in when you get there?
21     A.  When you arrive at the
22  beginning of your shift, you should
23  clock in.

Page 59

1      Q.  And just to make sure I'm
2  clear, you never checked to see if
3  Debbie McCollough, your direct
4  subordinate, was doing the same
5  thing?
6      A.  During that timeframe?
7      Q.  During the whole timeframe
8  prior to her leaving the company?
9      A.  I did not check any
10 employees.  That was the
11 responsibility of the general
12 manager.
13     Q.  The general manager is the
14 one who ultimately has the
15 responsibility for determining
16 whether the employees are clocking in
17 and out according to policy?
18     A.  That is correct.
19     Q.  All right.  And it's also
20 the general manager's responsibility
21 to document that appropriately if
22 that's the case?
23     A.  That is correct.

Page 60

1      Q.  Let's get back to
2  Plaintiff's Exhibit 7.  Did anybody
3  ask you to write this statement?
4      A.  No, sir.
5      Q.  And what did you do with
6  the statement after you wrote it?
7      A.  I don't recall.
8      Q.  Well, what was your
9  intention of -- why did you put it
10 down on paper?
11     A.  I just wanted a written
12 documentation as to what was going
13 on.  I felt the situation was
14 deteriorating.
15     Q.  It sounds to me that by the
16 19th you were foreseeing the
17 possibility that you might need to
18 let her go?
19     A.  Yes, sir.
20     Q.  Did you ever communicate
21 that to Ms. Jones?
22     A.  Yes, sir.
23     Q.  Well, I thought you

Page 61

1  testified a few minutes ago that you
2  never, you never --
3      A.  I'm sorry.  You are
4  correct.  I never told Ms. Jones that
5  if you miss another day you're going
6  to be terminated.
7      Q.  Or, you know, that she was
8  getting close to judgment day, or
9  anything like that.  I mean, you
10 started feeling on the 19th like this
11 may not get any better, I may need to
12 let her go, but you never told her
13 that?
14     A.  That was the conversation
15 we had, "When are you coming back?"
16 "I'll let you know next week."  And I
17 thought -- I was just -- at the end
18 there I didn't know what else to do.
19     Q.  How many absences did she
20 have that you considered in
21 determining that she was being fired
22 for absenteeism?
23     A.  Multiple throughout the

Page 62

1 previous couple of weeks.
2 Q. How many? What document
3 are you referring to?
4 A. I'm looking at my notes
5 during that time period.
6 Q. Let me show you this
7 (indicating) before I mark it, and
8 ask you is this what you're looking
9 at?
10 A. Yes, sir.
11 Q. All right. I'm going to go
12 ahead and mark it as Plaintiff's
13 Exhibit 8.
14 (Whereupon, Plaintiff's
15 Exhibit Number 8 was
16 Marked for identification.)
17 Q. I'm going to go ahead and
18 mark it as Plaintiff's Exhibit 8.
19 And actually, I think I only have one
20 copy of this, if you wanted to
21 continue to look at your notes. Is
22 this a document regularly kept in the
23 business of the company, or did you

Page 63

1 just create this?
2 A. I created it.
3 Q. When did you create it?
4 A. I actually put my notes
5 together when this was all over.
6 Q. After you fired her?
7 A. Yes, sir.
8 Q. How long after you fired
9 her?
10 A. Immediately.
11 Q. Same day?
12 A. Or within the next day.
13 Q. Okay. And why did you do
14 that?
15 A. I just felt like -- I had
16 the time records. I had garbled
17 notes on sheets of paper, and I
18 wanted to organize my thoughts as to
19 what had happened.
20 Q. But why did you feel it
21 necessary to document it after the
22 fact?
23 A. I just felt like with this

Page 64

1 sort of situation -- I mean, I knew
2 that there was an investigation. I
3 did not know what the investigation
4 was about, and I was terminating an
5 employee during an investigation. I
6 just felt like it was necessary to
7 document everything. So the time
8 records that I had here, to answer
9 your question, were six or seven days
10 there, and then working off the
11 schedule and the tardiness, I was
12 trying to document what was happening
13 on a regular basis.
14 Q. Tell me each date that you
15 believe Ms. Jones did not come into
16 work and did not call, that provided
17 you a basis for firing her? Any
18 day -- date that she did not call and
19 did not show?
20 A. Taking into consideration
21 from April 9th, most of the time what
22 would happen, there would be a
23 message left at the field desk with

Page 65

1 the cashier.
2 MR. WORLEY: Listen to his
3 question. I don't think he's asking
4 you about that. He's asking you the
5 number of days that -- well, I don't
6 want to phrase it.
7 MR. MOREL: Thank you.
8 Q. (BY MR. MOREL:) My
9 question is, I want you to give me
10 every specific date from April 9th
11 forward that Milissa Jones failed to
12 call and failed to show.
13 A. I can't give you the exact
14 information.
15 Q. Well, you're looking right
16 at it, right?
17 A. Yeah, but these -- these
18 are my notes.
19 Q. And those were notes that
20 you felt compelled to make, that are
21 not a regular part of doing business,
22 because you understood that the
23 situation had a little more gravity

## NATIONAL COURT REPORTING

Page 66

1  because there was an investigation
2  going on, and you were firing an
3  employee from the same store, right?
4      A.   That's correct.
5      Q.   And your point in making
6  the notes was to document
7  specifically what had happened with
8  her attendance, because that's what
9  you had used to fire her, right?
10     A.   That's correct.
11     Q.   And it's prudent for you in
12 your position, when undertaking such
13 a task, to do it thoroughly and
14 competently, correct?
15     A.   Yes, sir.
16     Q.   Especially when you're
17 claiming that she didn't thoroughly
18 and competently manage her schedule,
19 right?  Is that right?
20     A.   That's correct.
21     Q.   So, is it your testimony
22 that based on this two-page document
23 of typewritten notes with five or six

Page 67

1  different columns, that you are
2  unable to tell me any specific date
3  that she was a no call no show?
4      MR. WORLEY:  That's
5  actually not the question you asked.
6  Are you asking a different question?
7      MR. MOREL:  Yeah, I'm
8  asking the question I asked.
9      MR. WORLEY:  Well, I object
10 to the form of the question, because
11 I don't think you are.  It's a
12 different question.
13     MR. MOREL:  No.  I mean, it
14 might be a different question.
15 That's fine.
16     Q.   (BY MR. MOREL:)  The
17 question is, is it your testimony
18 that having looked at your notes --
19 these notes that we're looking at,
20 Plaintiff's Exhibit 8, and given the
21 reason that you've testified that you
22 created the notes --
23     A.   Right.

Page 68

1      Q.   -- you can't identify any
2  specific date that Milissa Jones was
3  a no call no show?
4      A.   No, I can.
5      Q.   Okay.  Well, tell me which
6  ones they were.
7      A.   Let me work from -- let me
8  work backwards here; the 21st, the
9  20th.  We did have a conversation on
10 the 19th, but this was after me
11 contacting her, okay.
12     Q.   So, is that a no call no
13 show, if you talked to her on the
14 phone?
15     A.   Well, if I have to call the
16 employee, that's a no call no show.
17     Q.   So what date was that?
18     A.   That was the 19th.
19     Q.   Okay.
20     A.   On the 18th -- now, that
21 was leave a message with the field
22 desk -- with the cashier.  Our policy
23 specifically states that you've got

Page 69

1  to give a notice and you have to
2  speak to a manager.
3      MR. WORLEY:  So it's your
4  answer that it was or was not?  He's
5  asking you a question to give him the
6  days.
7      A.   The 18th, and that's all.
8      Q.   (BY MR. MOREL:)  All right.
9  So that's four days, right?
10     A.   Yes, sir.
11     Q.   Did Milissa Jones provide
12 any information to any manager of
13 Flying J, to your knowledge, about
14 what her status was going to be on
15 the 18th, 19th, 20th or 21st, on any
16 date prior to April 18th?
17     A.   The 18th through the 21st I
18 was at the facility, and I had no
19 information as to where she was or
20 what she was doing.
21     Q.   Had she provided you or any
22 other manager any information about
23 those days prior to the 18th?  In

# NATIONAL COURT REPORTING

Page 70

1  other words, did she call and tell
2  any manager, prior to the 18th, that
3  I'm not going to be able to work on
4  the 18th, 19th, 20th, 21st?
5      A.  No, sir.
6      Q.  Okay.  So, we have four
7  days no call no show.  I want you to
8  point any day out, or identify any
9  specific date that Ms. Jones called
10  in and didn't show -- called in and
11  said she wasn't going to be there?
12      A.  The 14th, the 12th, and
13  that's all.
14      Q.  When she called in on the
15  14th and couldn't come in, was she in
16  violation of any company policy?
17      A.  Violation of a company
18  policy -- when you assume that job,
19  you assume that it's -- the job is a
20  24/7 operation.  Now, we have a work
21  schedule, but we also have a business
22  to run.  If somebody's calling me and
23  I'm not returning their phone calls,

Page 71

1  that's a problem.  Was she in
2  violation of a company policy, I
3  think that's subjective.
4      Q.  My question is, are you
5  able to identify any Flying J policy
6  that Ms. Jones violated when she
7  called in and said she couldn't be
8  there on the 14th?
9      A.  No, sir.
10      Q.  Same question for the 12th.
11  Are you able to identify any Flying J
12  policy that Ms. Jones violated when
13  she called in on the 12th and said
14  she couldn't be there?
15      A.  Other than a four-hour
16  notice, no, sir.
17      Q.  Tell me what you mean.
18      A.  If you're going to be out
19  for any specific period of time, you
20  need to give a four-hour notice if
21  you're not going to make your shift.
22  Now --
23      Q.  When did she give notice

Page 72

1  compared to her shift?
2      A.  I don't have that.
3      Q.  So, you have no way of
4  knowing whether she violated even
5  that, correct?
6      A.  I don't have those times,
7  no, sir.
8      Q.  So, again, my question is,
9  are you able to identify any Flying J
10  policy that she violated on the 12th?
11      A.  No, sir.
12      Q.  So, we've got a total for
13  absenteeism of six days, correct?
14      A.  Yes, sir.
15      Q.  Let me ask a question about
16  Plaintiff's Exhibit 8.  I assume it's
17  on yours too, but I'll show you the
18  second page (indicating).  See out
19  here where in bold it says, "Kerry
20  Lake," and then what does it say next
21  to that?
22      A.  "Told to call Keith."
23      Q.  Yeah, what is that?

Page 73

1      A.  That was a note where
2  Kerry -- I made a note after Kerry
3  told me that he had instructed her to
4  have direct contact with me about her
5  schedule.
6      Q.  That's shorthand for you
7  saying Kerry Lake told her to call
8  me?
9      A.  Yes, sir.
10      Q.  All right.  Let's look at
11  April 14th.  And you write there in
12  the comments on the end, it says,
13  "Would not answer phone or return
14  calls."  Did you try to call her?
15      A.  I did.
16      Q.  How many times did you try
17  to call her?
18      A.  I don't recall.
19      Q.  Give me your best estimate.
20      A.  I don't recall.
21      Q.  Did you try to call her a
22  thousand times?
23      A.  No, sir, I received a call

# NATIONAL COURT REPORTING

Page 74

1  from the facility manager, and they
2  were telling me that they were trying
3  to make contact with her. And I
4  said, "Are you sure you're using the
5  right number? Give me the numbers
6  you're calling." I just wanted to
7  check for myself that they were
8  actually dialing the right number.
9  So I probably one time.
10      Q.  So you only called her one
11  time?
12      A.  Yes, sir.
13      Q.  And who is it that you're
14  saying told you they'd called her?
15      A.  Jonathan Frazier.
16      Q.  All right. And how many
17  times did Jonathan Frazier call her?
18      A.  I do not know.
19      Q.  And what phone number did
20  Jonathan Frazier use?
21      A.  I don't know.
22      Q.  Did he call her cell number
23  or her house number?

Page 75

1      A.  I do not know.
2      Q.  What number did you use?
3      A.  I used her home number.
4      Q.  Are you sure of that?
5      A.  No, sir.
6      Q.  Could have been her cell
7  number?
8      A.  Could have.
9      Q.  All right. Who is FM?
10      A.  Facility manager.
11      Q.  Do you know who made out
12  the schedule for the week of April
13  9th for Ms. Jones?
14      A.  No, sir.
15      Q.  Is the answer no?
16      A.  No, sir.
17      Q.  Do you know who made out
18  the schedule for Ms. Jones for the
19  following week?
20      A.  No, sir.
21      Q.  Do you know when either of
22  those schedules were made out?
23      A.  They are supposed to be

Page 76

1  posted the Thursday before -- of the
2  prior week.
3      Q.  Do you know when they were
4  made out, either one of them?
5      A.  No, sir.
6      Q.  Do you know whether
7  Mr. Jacobs had any involvement in
8  making out either of those two-week
9  schedules, or approving either of
10  those two -- week schedules?
11      A.  He was not at that
12  facility. It would have to have been
13  done at the facility.
14      Q.  Well, if you don't know
15  when they were done, I assume they
16  were done before the week in
17  question, right?
18      A.  Yes, sir. Typically what
19  happens, our week begins on Sunday --
20  Sunday through Saturday, so we ask
21  they be posted on Thursday, so people
22  have enough notice to plan the
23  upcoming week.

Page 77

1      Q.  And are they done one week
2  at a time or two weeks at a time?
3      A.  We like them to be done two
4  weeks.
5      Q.  And, so, if these two weeks
6  were done on a Thursday, and
7  Mr. Jacobs wasn't fired until a
8  Monday, he could have been involved
9  in writing both those schedules or
10  approving both those schedules,
11  correct?
12      A.  Yes, sir.
13      Q.  And you have no idea one
14  way or the other, do you?
15      A.  No, sir.
16      Q.  Who is ultimately
17  responsible at the Flying J Plazas
18  for schedules and attendance?
19      A.  General manager.
20      Q.  At one point you told
21  Milissa that she needed to come in --
22  or let me ask you this.
23          Did you ever tell Milissa,

# NATIONAL COURT REPORTING

Page 78

1  "Look, we don't have a GM now. And,
2  so, you need to work more, because
3  we're trying to keep things
4  together?"
5      A.  Yes, sir.
6      Q.  All right.  And your
7  testimony is that when you said that,
8  you didn't know that Milissa Jones
9  was involved as the person making the
10  allegations that spawn the
11  investigation?
12      A.  That's correct.
13      Q.  As the person who -- were
14  you the acting GM during that time?
15      A.  No, sir.
16      Q.  Okay.  Were you just the
17  person in charge when you were there?
18      A.  Yes, sir.
19      Q.  All right.  And as that
20  person -- let me strike that.
21          You've learned since then
22  that Milissa Jones had made
23  allegations against --

Page 79

1      A.  Yes, sir.
2      Q.  -- Butch Jacobs, right?
3      A.  Yes, sir.
4      Q.  And you knew they were
5  allegations of sexual misconduct
6  directed at her, correct?
7      A.  Yes , sir.
8      Q.  And you learned that that's
9  what the investigation was about?
10      A.  Yes, sir.
11      Q.  And you learned that that
12  investigation led to the company
13  firing Mr. Jacobs?
14      A.  I never knew that.
15      Q.  So, you never -- no one has
16  ever told you why he was fired, or
17  even generally?
18      A.  I was told that he was
19  fired for not cooperating during an
20  investigation.
21      Q.  Did anybody ever tell what
22  you the nature of her allegations
23  were?

Page 80

1      A.  No sir.
2      Q.  Is that something you would
3  have liked to have known?
4      A.  No, sir.
5      Q.  Well, do you think it was
6  appropriate to have Ms. Jones bearing
7  the brunt of more work at the Plaza,
8  because the company needed to replace
9  the person that had been harassing
10  her?
11          MR. WORLEY:  I object to
12  the form of the question.
13      A.  I didn't know anything
14  about the investigation other than
15  there was an investigation at that
16  time.
17      Q.  (BY MR. MOREL:)  But I
18  mean, as you sit here now, you know,
19  what you've learned is that you were
20  telling her you need to come in, we
21  don't have a GM, you've got to work
22  more hours to help us --
23      A.  Well, not more hours, just

Page 81

1  work the hours.
2      Q.  Well, what hours did she
3  not work that she was supposed to
4  work, just the days you told me?
5      A.  Well, from my outline here
6  there was quite a few hours where it
7  was off the schedule.  So it was --
8  you know, we can't operate come and
9  go as you want.
10      Q.  But you already have said
11  that you never had any information
12  about what the general manager had
13  told them to do for that week, right?
14      A.  I pulled my own records,
15  that's correct.
16      Q.  Well, let's not -- I mean,
17  you didn't have any information from
18  the general manager, right?
19          MR. WORLEY:  I object to
20  you saying he's -- that's
21  argumentative.
22          MR. MOREL:  I withdraw it.
23      Q.  (BY MR. MOREL:)  You never

## NATIONAL COURT REPORTING

Page 82

1  got any information from the general
2  manager?
3      A.  No, sir.
4      Q.  All right.  So as far as
5  you knew, she was doing exactly what
6  she was supposed to do pursuant to
7  the directions of the general
8  manager?
9      A.  That's correct.
10     Q.  All right.  And as far as
11  you knew, she was proceeding -- as
12  far as the days she worked compared
13  to the schedule, the public schedule,
14  she was proceeding as had been the
15  custom of all the managers in that
16  Plaza for some time?
17     A.  It was my understanding
18  everybody was working our published
19  corporate schedule.
20     Q.  Was that your assumption,
21  or was that your understanding?  You
22  just assumed that was happening at
23  the Plaza?

Page 83

1      A.  I assumed that was
2  happening, right.
3      Q.  But you didn't know whether
4  in fact it was going on?
5      A.  That is correct.
6      Q.  All right.  For all you
7  know, she could have been working off
8  the published schedule, but according
9  to the last four months of custom at
10  the Plaza?
11     A.  That's possible.
12     Q.  And what did you do to
13  determine whether or not that was the
14  case, before you fired her?
15     A.  My decisions, sir, were
16  based on the recent events of those
17  last couple of weeks.  The other
18  information that I viewed there and
19  printed off was simply informational.
20     Q.  You spoke with Jerry
21  Beckman, the director of HR, about
22  Ms. Jones' circumstances on April
23  20th, the day before you fired her,

Page 84

1  correct?
2      A.  Yes, sir.
3      Q.  What time of day was it
4  when you called Ms. Jones on Friday,
5  April 21st?
6      A.  About 9:00 a.m. central
7  standard time.
8      Q.  What time was her shift
9  supposed to start that day?
10     A.  1:00.
11     Q.  Do you agree with me that
12  she was, according to the schedule,
13  off and not supposed to work on April
14  10th?
15     A.  Yes, sir.
16     Q.  But that she actually did
17  come in and work that day?
18     A.  That's correct.
19     Q.  Would you agree with me
20  that she was not scheduled or
21  supposed to work on April 15th or
22  April 16th?
23     A.  That's correct.

Page 85

1      Q.  When you wrote your note,
2  which is Plaintiff's Exhibit 7, on
3  April 19th, was it your intent to be
4  thorough about anything material that
5  was said during that conversation?
6      A.  No, sir.
7      Q.  You weren't trying to be
8  complete?
9      A.  I'm sorry?
10     Q.  My question was, did you
11  intend to be complete with your notes
12  about what all was said on that day
13  in that conversation?
14     A.  No, sir.  It was just to
15  document the conversation.
16     Q.  Well, were you trying to
17  document it inadequately, or did you
18  try to get it all in?
19     A.  No, just tried to make a
20  note of the conversation.
21     Q.  Did you pick and chose what
22  you put in your note?
23     A.  No, sir.

## NATIONAL COURT REPORTING

Page 86

1    Q.  You tried to put everything
2    in that mattered?
3    A.  I would think I would just
4    want to document the conversation
5    took place.
6    Q.  My question is did you put
7    everything in that mattered?
8    A.  I can't recall.
9    Q.  Well, do you think that
10   would have been a prudent thing to
11   do?
12   A.  Oh, yes.
13   Q.  Do you try to do the
14   prudent thing?
15   A.  Yes.
16   Q.  Do you expect that you
17   tried to do the prudent thing in this
18   particular document?
19   A.  Yes.
20   Q.  Do you believe that you
21   wrote everything that mattered that
22   was said?
23   A.  That I recall, yes, sir.

Page 87

1    Q.  All right.  And you wrote
2    this how soon after the conversation
3    ended?
4    A.  Probably immediately after
5    the conversation.
6    Q.  So you probably recalled it
7    pretty will, didn't you?
8    A.  Probably.
9    Q.  Are you aware of anything
10   that you left out of that note?
11   A.  I'm not aware of anything.
12   Q.  You're not going to come to
13   trial and say, "Oh, yeah, I know this
14   happened in that conversation, but
15   it's not in the note"?
16   A.  No.  What I was trying to
17   document was the fact that we still
18   didn't -- I didn't know what was
19   going on.  She would let us know
20   later.  She's just not coming to
21   work.  That was what I was trying to
22   make a note to myself, is there's
23   still no information.

Page 88

1        (Whereupon, Plaintiff's
2        Exhibit Number 9 was
3        Marked for identification.)
4    Q.  Let me show you what I've
5    marked as Plaintiff's Exhibit 9, and
6    then we'll take a break.  Have you
7    ever seen that before?
8        (Handing document to
9        Witness.)
10   A.  No, sir.
11   Q.  Does that appear to be a
12   TIF file that -- do you see at the
13   bottom where it says, "Hi Jerry.
14   This is from our district accounting
15   manager, Keith Staples"?
16   A.  Yes.
17       MR. MOREL:  Okay.  Let's go
18   off the record for a second.  I want
19   to make sure I'm clear about that.
20       (Whereupon, a discussion
21       Was held off the record.)
22   Q.  (BY MR. MOREL:)  Look at
23   the second sheet I gave you, and

Page 89

1    we'll come back and clean this up.
2    Page 17 of 60 it says in the top
3    right.  Do you see where it says,
4    "Hello Jerry," and then there's a
5    note from you?
6    A.  Yes, sir.
7    Q.  You wrote that to Jerry
8    Beckman, the HR director?
9    A.  That's correct.
10   Q.  And did you e-mail it to
11   him?
12   A.  Yes, sir.
13   Q.  Okay.  And did you copy
14   Kerry Lake and Mike Walton?
15   A.  I did.
16   Q.  All right.  And who is --
17   is it Damn Jackson?  Is he --
18   A.  That's me.
19   Q.  That's you?
20   A.  District accounting
21   manager.
22   Q.  Okay.  All right.  From
23   Jackson.

# NATIONAL COURT REPORTING

Page 90

1    A.   That's my e-mail address.
2    Q.   All right. I got you.
3    A.   And I live in Jackson.
4    Q.   All right. So you sent
5  this note to HR, and Kerry Lake, and
6  Mike Walton?
7    A.   Yes, sir.
8    Q.   And did you send this after
9  you spoke with her?
10   A.   Yes, sir.
11   Q.   This was after you told her
12  she was fired?
13   A.   Yes, sir.
14   Q.   And you sent this on 8:52
15  a.m., correct?
16   A.   Yes, sir.
17   Q.   All right. So you must
18  have had a conversation with her
19  somewhere around that time?
20   A.   Yes, sir.
21   Q.   Give or take mountain --
22  you sent it to mountain time
23  probably, right?

Page 91

1    A.   Yes, sir.
2    Q.   Because it says you called
3  Milissa at 9:15. Would that have
4  been 8:15 Utah time?
5    A.   Yes, sir.
6    Q.   So, does it square up with
7  your recollection that you called her
8  and fired her, and then within the
9  hour sent the e-mail?
10   A.   Yes, sir.
11   Q.   All right. And what you --
12  you're telling Mr. Beckman the actual
13  things that you said to -- you're
14  talking about your conversation with
15  Milissa, right?
16   A.   That's correct.
17   Q.   And you tell him that you
18  told Milissa that based on her
19  attendance during the past two weeks
20  we have concluded her employment with
21  Flying J would be terminated as of
22  April 21st, correct?
23   A.   Yes, sir.

Page 92

1    Q.   And, then, you say that
2  Milissa told me that she had a
3  medical condition. She told you
4  during that conversation that she had
5  a medical condition?
6    A.   Yes, sir.
7    Q.   And did she tell you that
8  she could bring you documentation?
9    A.   No, sir. She told me that
10  she had a medical condition. And I
11  said, "Well, you know, why have you
12  not produced something? Why are you
13  telling me now?"
14   Q.   All right. And did she
15  tell you that you had already told
16  another manager?
17   A.   No, sir.
18   Q.   Did you ask her if she had?
19   A.   No, sir.
20   Q.   Did you tell Milissa that
21  she had not produced any information
22  about a medical condition?
23   A.   Yes, sir.

Page 93

1    Q.   And if she had produced
2  information about a medical condition
3  through her communications with Kerry
4  Lake, then that statement there would
5  be false, right? If I'm right about
6  that?
7    A.   If she had produced
8  information -- she still had not
9  produced any information during the
10  dialogs that I had had with her. I
11  had no knowledge of it. So my
12  conversation was that she's telling
13  me now she has a medical condition,
14  and when I said, "Why haven't you
15  produced anything," she said, "Well,
16  tell my attorney," and hung up on me.
17   Q.   Okay. And she told you she
18  was pregnant and having
19  complications, correct?
20   A.   Yes, sir.
21   Q.   All right. Did you tell
22  her that you would give her some
23  period of time to provide medical

## 367 VALLEY AVENUE
1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205

24 (Pages 90 to 93)

## NATIONAL COURT REPORTING

Page 94

1  documentation?
2      A.  She hung up on me.
3      Q.  Well, you had already told
4  her that she was fired, right?
5      A.  I told her based on the
6  last couple of weeks performance,
7  yes, sir, we were going to terminate
8  her employment.
9      Q.  And my question is, at any
10 time did you tell her -- at any time
11 after she said -- I mean, she told
12 you that she had a medical condition,
13 and then you said she hasn't produced
14 anything, and then she said she was
15 pregnant, having complications due to
16 stress.  At any time during that part
17 of the conversation did you ever say
18 to her, "Just get me the
19 documentation and everything will be
20 okay"?
21     A.  She hung up on me.
22     Q.  So I guess the answer is
23 no, you never said that to her?

Page 95

1      A.  That's correct.
2      Q.  All right.  And then after
3  that conversation did you -- what did
4  you do to go back and see whether
5  maybe someone else had some kind of
6  knowledge that maybe she did have a
7  medical condition?
8      A.  I just sent that in to
9  Terry.
10     Q.  So the answer is you didn't
11 do anything, did you?
12     A.  That's correct.
13     Q.  Did you believe that she
14 was lying to you about a medical
15 condition?
16     A.  I didn't know what to think
17 at that point.  I mean, you have no
18 information, and then when you find
19 out there's repercussions for your
20 actions, then you want to make a
21 statement like, "Well, I have a
22 medical condition, but deal with my
23 attorney."  Now I'm thinking why are

Page 96

1  we dealing with an attorney?
2      Q.  Well, you already knew --
3  your radar was already up, though,
4  because you knew there was an
5  investigation going on, and you were
6  firing an employee from the same
7  Plaza, and you were documenting
8  everything more than usual and all
9  that, right?
10     A.  Yes, sir.
11     Q.  And, so, after this
12 conversation with her, my question
13 is, did you think she was lying, just
14 making it up because it was expedient
15 that she was pregnant or had a
16 medical condition?
17     A.  I had no knowledge of that.
18 I don't know.
19     Q.  You didn't make a judgment
20 on it?
21     A.  No, sir.
22     Q.  Did it matter to you
23 whether she was telling the truth

Page 97

1  about it or not, at the time?
2      A.  Would it have mattered?
3      Q.  No, did it matter to you --
4      A.  Did it matter?
5      Q.  -- about whether or not she
6  was telling the truth?
7      A.  No, sir.
8      Q.  Why not?
9      A.  Based on her performance of
10 the last couple of weeks, we made a
11 decisions.
12     Q.  So, if she was telling the
13 truth that she was really pregnant
14 and that she really couldn't come to
15 work, and she had a medical
16 condition, you didn't care at that
17 point because she had already missed
18 the days and you had never heard
19 anything before that about that?  Is
20 that fair?  Is that you thought
21 process?
22     A.  Hindsight is 20/20.  You
23 know, if somebody -- I'm an employee

## NATIONAL COURT REPORTING

Page 98

1   advocate. If somebody comes to me
2   and says I have a problem, I'm going
3   to help that employee. But I have no
4   knowledge, and I have to make a
5   decision based on what I have seen
6   personally for the last couple of
7   weeks, you know, that decision would
8   stand. Milissa had every opportunity
9   to share with me what was going on in
10  her life, and she did not do that.
11      Q. Or share with other members
12  and managers, including your own
13  boss, right?
14      A. That's correct.
15      Q. All right.
16          (Whereupon, Plaintiff's
17          Exhibit Number 10 was
18          Marked for identification.)
19      Q. Let's mark that Plaintiff's
20  Exhibit 10.
21          MR. WORLEY: Which one?
22          MR. MOREL: Which is the
23  one that says page 17 of 60, which

Page 99

1   contains Mr. Staples e-mail to
2   Mr. Beckman.
3       Q. (BY MR. MOREL:) Now let's
4   go back to the other page I gave you.
5   Let's go back to that one, then,
6   which is Plaintiff's Exhibit what?
7           MR. WORLEY: 9.
8       Q. (BY MR. MOREL:) 9. I
9   assume that you anticipated that your
10  e-mail would be passed on to Kelley
11  Lowery, correct?
12      A. Yes, sir.
13      Q. All right. And that's what
14  happened according to this document,
15  correct?
16      A. Yes, sir.
17      Q. And do you agree with
18  Mr. Beckman's characterization when
19  he says, "Here is Keith's full
20  statement regarding call with Milissa
21  this morning"?
22      A. Yes, sir.
23      Q. Okay.

Page 100

1           (Whereupon, Plaintiff's
2           Exhibit Number 11 was
3           Marked for identification.)
4           Let me show you Plaintiff's
5   Exhibit 11. Does that appear to you
6   to be Milissa Jones' I-9 form?
7           (Handing document to
8           Witness.)
9       A. Yes, sir.
10      Q. And what member of
11  employment management signed off and
12  handled that document?
13      A. The accounting manager.
14      Q. Who was that?
15      A. Debbie McCollough.
16      Q. She had more seniority than
17  Ms. Jones with the company, correct?
18      A. More seniority?
19      Q. Yeah.
20      A. By a short period of time,
21  yes, sir.
22      Q. Was she a new hire to open
23  that store?

Page 101

1       A. Yes, sir.
2       Q. Roughly how much time had
3   she been around?
4       A. I really don't recall how
5   much.
6       Q. But in any event, when
7   Milissa presented herself to sign HR
8   documents, the person who ever saw
9   that was Ms. McCullough?
10      A. That's correct.
11      Q. And that would also be
12  indicated by Ms. McCollough's
13  signature on Plaintiff's Exhibit 12,
14  which is the 8850, correct? If you
15  look at the second page?
16          (Whereupon, Plaintiff's
17          Exhibit Number 12 was
18          Marked for identification.)
19          (Handing document to
20          Witness.)
21      A. Yes, sir.
22          (Whereupon, Plaintiff's
23          Exhibit Number 13 was

## NATIONAL COURT REPORTING

Page 102

1    Marked for identification.)
2    Q.   Let me show you what I've
3    marked as Plaintiff's Exhibit 13.
4    (Handing document to
5    Witness.)
6    Does that appear to you to
7    be a statement from Kathleen Brown at
8    Flying J to whom it may concern,
9    dated January 5th of 2006?
10   A.   Yes, sir.
11   Q.   And do you see where the
12   comment says that Ms. Jones, as of
13   that date her probability of
14   continued employment was good,
15   correct?
16   A.   Yes, sir.
17   (Whereupon, Plaintiff's
18   Exhibit Number 14 was
19   Marked for identification.)
20   Q.   Let me show you Plaintiff's
21   Exhibit 14.  Have you ever seen that
22   document before?
23   (Handing document to

Page 103

1    Witness.)
2    A.   No, sir.
3    Q.   This appears to be the
4    termination form for Mr. Jacobs,
5    correct?
6    A.   Uh-huh.
7    Q.   Is that a yes?
8    A.   Yes, sir.
9    Q.   And it says he was
10   terminated on April 10th of 2006 for
11   violation of company policy; is that
12   correct?
13   A.   Yes, sir.
14   Q.   It says reason,
15   misrepresentation during
16   investigation?
17   A.   Yes, sir.
18   Q.   And who does it show was
19   the requester of the form?
20   A.   That was me.
21   Q.   And then it was approved by
22   Kerry Lake and Scott McMillan; is
23   that correct?

Page 104

1    A.   That's correct.
2    Q.   When did you request the
3    form?
4    A.   I did the E form on --
5    Q.   Didn't you do it on April
6    12th at 4:13 p.m.?
7    A.   That's correct.
8    Q.   And that would have been
9    nine days before you fired Ms. Jones,
10   right?
11   A.   Yes, sir.
12   MR. MOREL:  Let's take a
13   break.
14   (Whereupon, a short recess
15   Was taken.)
16   Q.   (BY MR. MOREL:)  Looking at
17   Plaintiff's Exhibit 14, did you fill
18   that form out?
19   A.   Yes, sir.  Can I clarify
20   something?
21   Q.   Sure.
22   A.   When I said I had not seen
23   the document, I have not seen the

Page 105

1    document.  I did create the
2    electronic form, but I haven't seen
3    the printed form.  But yes, sir, I
4    did that.
5    Q.   Let's look at Plaintiff's
6    Exhibit 5 again.  This is -- we've
7    looked at this once, but this is a --
8    this is an e-mail from Chris Bone,
9    who was the human resource manager,
10   to Scott McMillan, CCed to Kelley
11   Lowery and Jerry Beckman, right?
12   A.   Yes, sir.
13   Q.   Do you agree with
14   Mr. Bone -- is that a male?
15   A.   Yes, sir.
16   Q.   Do you agree with Mr.
17   Bone's statement where he says in the
18   second paragraph, second sentence, "I
19   have advised Kerry based on the
20   evidence to terminate Butch for
21   violation of the company's policies
22   against harassment and
23   discrimination, as well as creating a

# NATIONAL COURT REPORTING

Page 106

1  hostile work environment," or
2  "hostile environment." I'm sorry.
3  It doesn't say work.
4      A.  I'm sorry.  I was reading
5  the paragraph.  What was your
6  question?
7      Q.  Do you agree with his
8  statement there that I read?  Is that
9  an accurate characterization of what
10  occurred?
11      A.  That I would not know.
12      Q.  And your testimony is that
13  you requested and filled out the
14  termination paperwork for Mr. Jacobs,
15  but that you don't know whether this
16  statement is accurate or not?
17      A.  That's correct.  Yes, sir.
18  I was told to complete this document,
19  the electronic form.
20          (Whereupon, Plaintiff's
21          Exhibit Number 15 was
22          Marked for identification.)
23      Q.  Let me show you Plaintiff's

Page 107

1  Exhibit 15.  And I'll ask you if
2  you've ever seen that in any form;
3  hard copy, electronic, hieroglyphic?
4      A.  Have I ever seen this, no,
5  sir.
6      Q.  I want you to take your
7  time and read it, and when you're
8  done you can let me know, because I'm
9  going to ask you several questions
10  about it.
11      A.  Okay.
12      Q.  This is an e-mail or a
13  letter from Kerry Lake to Jerry
14  Beckman, correct?
15      A.  Yes, sir.
16      Q.  It starts off by talking
17  about Monday, April 9th, and the
18  termination of Butch Jacobs, correct,
19  just in terms of the first subject
20  matter?
21      A.  That's correct.
22      Q.  Do you see in that, near
23  the end of that first paragraph where

Page 108

1  Kerry says, "I called Milissa Jones,
2  the assistant manager, and told her
3  we needed to see if she would
4  come in.  She said she was busy, but
5  would take care of her business and
6  come in as soon as she could.
7  Probably sometime between 4:00 and
8  5:00 p.m. Milissa showed up, and one
9  other cashier came in at 4:00"?
10      A.  Yes, sir.
11      Q.  That is what occurred,
12  correct?
13      A.  To my knowledge.
14      Q.  And do you see where the
15  next paragraph says that, "On Tuesday
16  I," Kerry Lake I guess, he's saying,
17  "I had just left the store around
18  9:00 p.m., and I received a call from
19  Milissa who I had just left at the
20  store, to inform me that her in-law
21  was going in for emergency surgery
22  and she would not be back to work on
23  Wednesday"?  Do you see that?

Page 109

1      A.  Yes, sir.
2      Q.  Do you see where she says
3  they had to go to Florida about four
4  hours away, but she would return on
5  Thursday, but would be late?
6      A.  Yes, sir.
7      Q.  So, she actually did call
8  in well within the policy of four
9  hours before your shift as far as
10  that absence goes, correct?
11          MR. WORLEY:  I object to
12  the form of the question.
13      Q.  (BY MR. MOREL:)  Do you
14  know whether she actually did that?
15      A.  No, sir.
16      Q.  Do you have any reason to
17  question whether Mr. Lake is telling
18  the truth here?
19      A.  No, sir.
20      Q.  And if he is telling the
21  truth, then she wouldn't be in
22  violation of any company policy as
23  far as notice goes for that absence,

## 367 VALLEY AVENUE
1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205

28 (Pages 106 to 109)

## NATIONAL COURT REPORTING

Page 110

1  correct?
2      A.  That's correct.
3      Q.  And then he says that -- if
4  you look at the last sentence or so,
5  the last couple of lines of the
6  second paragraph he says that,
7  "Sometime around 4:00 p.m. that day
8  Milissa showed up at work," correct?
9      A.  Yes, sir.
10     Q.  The next thing he says is
11 that, "On Friday morning Milissa
12 called me," Kerry Lake, "and told me
13 she had been to the doctor and would
14 not be to work on Friday."  Is today
15 the first time you've learned that?
16     A.  That she went to the
17 doctor?
18     Q.  And that she called Kerry
19 Lake and told him?
20     A.  The documents that I've
21 seen today?
22     Q.  Yes, that's the first time
23 you've gotten wind of that?

Page 111

1      A.  Yes, sir.
2      Q.  And you testified earlier
3  that before you fired her you went to
4  Kerry Lake and asked him why is she
5  out, and you came away from the
6  conversation with no answers,
7  correct?
8      A.  Well, just that he had
9  asked her to call me.
10     Q.  He didn't tell you why she
11 was out?
12     A.  No, sir.
13     Q.  And he certainly didn't say
14 anything about her having provided
15 him with any kind of medical
16 information, correct?
17     A.  No, sir.
18     Q.  And do you see there where
19 Kerry Lake said, "I told Milissa when
20 she returned to work on Tuesday I
21 would need a doctor's excuse, and she
22 said that would be no problem, that
23 this was an old illness that caused

Page 112

1  her to get medical leave from the
2  service, and that she told me she was
3  going to her regular doctor Monday,
4  and she would be to work on Tuesday."
5  Do you see that?
6      A.  Yes, sir.
7      Q.  Now, you were there those
8  days, correct, in Tyson?
9      A.  Yes, sir.
10     Q.  And so was Kerry Lake,
11 correct?
12     A.  Yes, sir.
13     Q.  All right.  Did anybody --
14 Kerry Lake or anybody else ever tell
15 you why Milissa was not in on Friday?
16     A.  No, sir.
17     Q.  Did he ever tell you that
18 she had called him and told him she
19 had to go to the doctor and could
20 easily get a doctor's excuse?
21     A.  No, sir.
22     Q.  Would that have mattered to
23 you to know that?

Page 113

1      A.  Yes, sir.
2      Q.  Why?
3      A.  Any time an employee is
4  absent you want to understand the
5  circumstances.
6      Q.  And as an employee advocate
7  it makes a big difference about
8  decisions of whether to fire somebody
9  for absenteeism, doesn't it?
10     A.  Yes, sir.
11     Q.  And Kerry Lake, you've
12 testified earlier, was well in the
13 loop along with the other people you
14 described, regarding her termination,
15 as well as the investigation and the
16 particulars of the investigation
17 against Butch Jacobs, correct?
18     A.  I don't know that if
19 anybody was ever aware of the
20 circumstances as to the
21 investigation.
22     Q.  Well, Kerry Lake was told
23 to go down to fire him, right?

# NATIONAL COURT REPORTING

Page 114

1    A.   Yes, sir, after the fact.
2    Q.   And that occurred, correct?
3    A.   Yes, sir.
4    Q.   All right. And do you --
5  you're not saying that Kerry Lake
6  didn't know why he was firing him
7  when he told him he was fired?
8    A.   No, I'm saying I didn't
9  know.
10    Q.   But Kerry Lake knew?
11        MR. WORLEY:  Objection.
12    Q.   (BY MR. MOREL:)  Right, as
13  far as you could tell?
14    A.   I don't know.
15        MR. WORLEY:  He's not a
16  mind reader.
17    Q.   (BY MR. MOREL:)  I'm just
18  scratching an itch.  Don't mind me.
19  Do you see the next paragraph where
20  it says that, "On Monday evening
21  Milissa called me and told me she
22  would not be to work on Tuesday as
23  she was still not feeling well"?

Page 115

1    A.   Yes, sir.
2    Q.   Did anybody ever tell you
3  that occurred?
4    A.   No.
5    Q.   Kerry never told you that;
6  is that true?
7    A.   Yes, sir.
8    Q.   Would it have mattered to
9  you to know that?
10    A.   Of course.
11    Q.   That would have been
12  another day that she was giving prior
13  notice and a medical reason, correct?
14    A.   Yes, sir.
15    Q.   I want you to skip a
16  sentence.  Look at the next sentence.
17  It says, "Tuesday morning I called
18  Keith," this is Kerry speaking, "to
19  see if he had heard from Milissa, and
20  he said he had not.  Later that
21  morning Keith called me and said that
22  Milissa had just called him." So,
23  she called you on Tuesday, correct?

Page 116

1    A.   That's correct.
2    Q.   And she told you that she
3  would not be able to work the rest of
4  the week, and that she would call on
5  Monday to let you know about that
6  week; is that correct?
7    A.   That's correct.
8    Q.   All right.  And she also
9  told you that when she returned to
10  work she didn't think she was going
11  to be able to work ten hours a day
12  anymore, correct?
13    A.   I don't recall that.
14    Q.   Is it true that you asked
15  Ms. Jones if she could give you a
16  little more notice the next Monday,
17  and she said she would if she could?
18    A.   Well, I recall the
19  conversation being more like, "If
20  you're not coming in this week, how
21  about next week?"  "Well, I'll let
22  you know next week if I can work next
23  week."  But it wasn't said in that

Page 117

1  kind of tone.  It was like, "I'll let
2  you know then what I'm going to do
3  next week."
4    Q.   My question is, did you ask
5  Ms. Jones if she could give you a
6  little more notice the next Monday?
7    A.   I did.
8    Q.   And did she say she would
9  if she could?
10    A.   I don't recall.
11    Q.   Well, do you have any idea
12  where Kerry Lake could have gotten
13  this information, other than from
14  you?
15    A.   No, sir.
16    Q.   When Milissa -- you agreed
17  that on Tuesday morning Kerry goes to
18  you and says, "Have you heard from
19  Milissa?"  And you say, "No, I
20  haven't."  And then later that
21  morning you called Kerry and said
22  Milissa called?
23    A.   Yes, sir.

## 367 VALLEY AVENUE
**1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205**

## NATIONAL COURT REPORTING

Page 118

1  Q.  And you agreed that she
2  informed you that she would not be
3  able to work the rest of the week,
4  and that she would call you the
5  following Monday for the following
6  week?
7  A.  And I may have called her.
8  Q.  My question, though, is you
9  agree it's true that later Tuesday
10  morning Milissa called you and told
11  you she would not be able to work the
12  rest of that week, and that she would
13  call you the following Monday for
14  that week?
15  A.  That's correct.
16  Q.  Okay.  So it's not true
17  what you testified earlier that on
18  the 18th, when she missed those four
19  days of no call no show, that you
20  didn't get prior notice of all that.
21  You got prior notice of every one of
22  those days from Milissa Jones, didn't
23  you?

Page 119

1  A.  No.
2  Q.  Didn't she tell you --
3  Tuesday was April 18th, right?
4  A.  Tuesday was April 18th.
5  Q.  Okay.  And when I asked you
6  what days do you claim that you used
7  as a basis for firing her where she
8  was a no call no show, you told me
9  the 18th, the 19th, the 20th, and
10  21st; Tuesday, Wednesday, Thursday,
11  Friday?
12  A.  That's right.
13  Q.  And I asked you didn't she
14  give you prior information, or
15  anybody else in management prior
16  information that she wouldn't be
17  there those days ahead of time, so
18  that she wasn't truly a no call no
19  show.  She told you she couldn't be
20  there those days, and you said, "No,
21  she didn't."
22  MR. WORLEY:  I object to
23  the form of the question.

Page 120

1  Q.  (BY MR. MOREL:)  We'll let
2  the record stand, but the question
3  is, isn't it a fact that she was not
4  a no call no show for the 18th, 19th,
5  20th, and 21st, because in fact she
6  had told you on the 18th that she
7  could not come in those days?
8  MR. WORLEY:  Objection.
9  Asked and answered.  Go ahead.
10  A.  My notes indicate that she
11  called the store and left a message.
12  She did not speak with the manager.
13  She called the store and left a
14  message, "I won't be in," okay.  Now,
15  I have called her at this point -- at
16  some point between the 18th and the
17  19th, I have called and left a
18  message.  Now she calls and tells me
19  she wouldn't be in this week, and
20  she'll call me next week to let me
21  know about next week.
22  Q.  Isn't it true that on the
23  morning of Tuesday, the 18th, Milissa

Page 121

1  Jones called you and told you she
2  would not be able to work the rest of
3  the week?  And I would direct your
4  attention to the fourth paragraph.
5  A.  I think the dates are mixed
6  up in Kerry's statement.
7  Q.  You think his days of the
8  week are mixed up, because he doesn't
9  use dates?
10  A.  I think his -- he says
11  Tuesday.  I think he meant Wednesday.
12  Q.  Well, my question is, did
13  Milissa call you -- are you now
14  saying that she called you on
15  Wednesday and told you she wouldn't
16  be in the rest of the week?
17  A.  There was a note on Tuesday
18  that she called out, left a message
19  at the field desk, I won't be there.
20  This is not speaking with a manager
21  or speaking with me.  And then on
22  Wednesday Milissa called to tell
23  me -- now, this is after I have

### 367 VALLEY AVENUE
1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205
31 (Pages 118 to 121)

## NATIONAL COURT REPORTING

Page 122

1  called, she called me back and tells
2  me she would not be in that week.
3      Q.  Okay.  That's what I to
4  know.  So you will admit -- you
5  believe Kerry has got it wrong, and
6  you believe that on Wednesday she
7  called you and said I won't be in the
8  rest of the week?
9      A.  That's correct.
10      Q.  All right.  Which means
11  that Wednesday the 19th, Thursday the
12  20th, and Friday the 21st were not no
13  call no shows.  Those were no shows
14  with notice directly to you, right?
15      A.  Well, if you're on the
16  schedule and you're calling to say I
17  may come to work or I may not, I'll
18  let you know next week when I'm
19  coming to work -- so she left a
20  message on Tuesday with somebody --
21  anybody that would pick up the phone,
22  I'm not coming, okay.  And then I'm
23  trying to make contact with her to

Page 123

1  figure out what's going on.  And then
2  when I do make contact with her, I'm
3  not going to be in this week.  Okay.
4  Now, I'm doing the calling.  I'm
5  initiating the call.  If I'm
6  initiating the call, that's still a
7  no call no show.  Now, if I have a
8  conversation, you know, later on in
9  that day, I'm the one initiating the
10  action there.
11      Q.  Let me ask you another
12  question. As of Wednesday Kerry
13  still hadn't said a word to you about
14  her telling about her medical problem
15  and that she could provide
16  documentation, correct?
17      A.  That's correct.
18      Q.  And just not to let it
19  alone until we get it where it's
20  understandable by the jury, Milissa
21  Jones did not call you on Wednesday
22  or Tuesday, whichever day it was, and
23  tell you that she may or may not be

Page 124

1  in the rest of the week.  She called
2  you and told you she would not be in
3  the rest of the week, correct?
4      A.  She told me she would not
5  be in the rest of the week.
6      Q.  All right.  And you knew
7  that at least by Wednesday?
8      A.  By Wednesday.
9      Q.  Kerry thinks that you knew
10  it on Tuesday, right, at least
11  according to his --
12      A.  According to that -- his
13  statement there.
14      Q.  And according to your
15  earlier testimony agreeing with the
16  statement?
17      A.  I'm sorry?
18      Q.  Strike it.
19          (Whereupon, Plaintiff's
20          Exhibit Number 16 was
21          Marked for identification.)
22          (Handing document to
23          Witness.)

Page 125

1      Q.  Let me she you what I'll
2  mark as Plaintiff's Exhibit 16, and
3  ask you to identify that, please?
4  That's yours, isn't it?
5      A.  I'm sorry?
6      Q.  This is your document,
7  isn't it?
8      A.  No.
9      Q.  You didn't write this?
10      A.  No.
11      Q.  Who wrote this?  Mike
12  Walton wrote this?
13      A.  Mike Walton.
14      Q.  I'm sorry.  And have you
15  ever seen this before?
16      A.  No, sir.
17      Q.  Did you ever have a
18  conversation with Mike Walton about
19  Milissa's absences?
20      A.  No, sir.
21      Q.  Have you ever talked to him
22  at all, even up to today, about it?
23      A.  Not about this, no.

## NATIONAL COURT REPORTING

Page 126

1  Q.  About her absences?
2  A.  No.
3  Q.  Or about this litigation?
4  A.  No, to my knowledge, no.
5  Mike was sent to the Plaza as part of
6  the investigation, but he's another
7  district manager, so I knew he was
8  there.
9  Q.  He was there during this
10  same week when all this was going on,
11  correct?
12  A.  I'm not sure if his -- when
13  he was there.
14  Q.  Well, let me show you what
15  I'll mark then as Plaintiff's Exhibit
16  17, and ask you if this appears to be
17  the interviews forms for the
18  investigation that was make taking
19  place the week of the 19th at the
20  Plaza by Mike Walton?
21        (Whereupon, Plaintiff's
22        Exhibit Number 17 was
23        Marked for identification.)

Page 127

1        (Handing document to
2        Witness.)
3  A.  Yes, sir.
4  Q.  Would that indicate to you
5  that he was there that week?
6  A.  Yes, sir.
7  Q.  All right.  And Mike
8  Walton's note at the bottom of this
9  document indicates that he received
10  information from you prior to writing
11  the document, correct?
12  A.  Yes, sir.
13  Q.  Do you remember talking
14  to -- so I want to ask you again,
15  isn't it true that you talked to Mike
16  Walton during that week about her
17  absences?
18  A.  I just don't recall.
19  Q.  Well, do you have any
20  reason -- I mean, you see the
21  information there that Mike Walton
22  has written.  Do you know of any
23  other possible way in the world he

Page 128

1  could have known that, other than
2  getting it from you?
3  A.  Now, when did he -- what's
4  the date of this document?
5  Q.  You can ask me questions
6  another day, but not today.
7  A.  I'm sorry.  There's no date
8  on it.  That's why I wondered.
9  Q.  Let's read what he wrote.
10  He said, "Milissa called Keith
11  Staples on April 19th and told Keith
12  she wouldn't be in the rest of the
13  week, and would let him know on
14  Tuesday if she could work next week.
15  Keith told her he needed to know
16  before Tuesday, and Milissa told
17  Keith she would call him on Monday,
18  April 25th."
19  A.  Okay.
20  Q.  Do you remember having that
21  conversation with Mr. Walton?
22  A.  No, sir, I don't.
23  Q.  Do you have any -- do you

Page 129

1  deny that it happened?
2  A.  I don't recall the
3  conversation at all with Mike.
4  Q.  Do you have any --
5  A.  I mean, if he got that from
6  Jerry Beckman, or Kerry, or anybody
7  else, I don't know.  But the 19th is
8  the day that my records indicate when
9  I had the conversation about not
10  going to be here this week, maybe
11  next week.
12  Q.  Of course, your records
13  don't indicate that she spoke to you
14  directly, do they?
15  A.  Mine, yeah.
16  Q.  Or do they?
17  A.  Yeah.
18  Q.  Do they indicate that she
19  called you?
20  A.  No.
21  Q.  What do they say about
22  that?
23  A.  I just made a note,

## 367 VALLEY AVENUE
1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205

# NATIONAL COURT REPORTING

Page 130

1  "Milissa called and told me she would
2  not be in this week".
3      Q.  So do you have any idea
4  where -- so you have no idea.  You
5  might have talked to Mike, but you
6  have no recollection of it?
7      A.  I don't know if I'm part of
8  his interview forms here or not, but
9  I don't recall having a conversation
10  with Mike.
11      Q.  Well, I'll represent to you
12  there's no interview form there from
13  you.  Do you see where -- what
14  does -- what did Mike Walton write
15  down next to April 14th?
16      A.  Sick.  Call Kerry Lake.
17      Q.  And request?
18      A.  Request a doctor's slip.
19      Q.  And what did he write down
20  for April 18th?
21      A.  Sick.
22      Q.  And what about April 19th?
23      A.  Sick.

Page 131

1      Q.  So, we know now at least
2  two different Flying J management
3  officials who were aware that Milissa
4  Jones was sick on those days, or at
5  least was saying she was sick on
6  those days, correct?
7      A.  Yes, sir.
8      Q.  But your testimony is you,
9  the person that filled out the form
10  terminating Mr. Jacobs, and you the
11  person that actually fired Ms. Jones,
12  you were left out of the loop.  You
13  weren't given that information by
14  your management team?
15      A.  Correct.
16      Q.  Is there some term of art
17  or nomenclature in the company's
18  culture called a call in?  Is there
19  something called a call in?
20      A.  On the field desk.
21      Q.  What is a call in?
22      A.  Somebody's calling in not
23  coming to work.

Page 132

1      Q.  Calling in because they
2  can't be there?
3      A.  That's correct.
4      Q.  All right.  How many, in
5  those two weeks from April 9th until
6  the 21st -- how many call ins did Ms.
7  Jones make?  I mean, we may have
8  covered it.  We talked about days she
9  called in and then didn't come into
10  work, and you said that was the 12th
11  and the 14th?
12      A.  Right.
13      Q.  Are those the days?
14      A.  Yes, sir.
15      Q.  So is it correct to say
16  that there were two days that Milissa
17  Jones -- she had two call ins during
18  those two weeks?  Let me strike it
19  and make it clean.
20          Ms. Jones had two call ins
21  from April 9th until the 21st,
22  correct?  And those were on April
23  14th and the 12th?

Page 133

1      A.  Well, a call in too, now,
2  will also be if you're not coming to
3  work to make your shift for any
4  reason, versus calling in sick.  Just
5  a generic terminology.
6      Q.  Do you see additional call
7  ins other than the 12th and the 14th?
8      A.  No, I've got the 18th.  You
9  said the 12th, the 14th.
10      Q.  I asked you earlier how
11  many times did she call in and not
12  show up -- not come to work, and you
13  said two, the 14th and the 12th.  And
14  I guess I'm just re-asking the
15  question, how many call ins did she
16  have?
17      A.  Okay.  On my notes I've got
18  as far as call ins, I have the 12th,
19  the 14th, and the 18th.
20      Q.  Okay.
21      A.  And, then, now she told me
22  she wasn't coming in on the 19th.
23      Q.  So is that a call in?

## 367 VALLEY AVENUE

# NATIONAL COURT REPORTING

Page 134

1    A.   But I don't know if I
2  called her or she called me.  I mean,
3  I know I was calling her during that
4  timeframe.
5      Q.   I guess my question is, is
6  the 19th a call in?
7      A.   I would say that's more of
8  a -- if I call them, the employee, I
9  would say that's more of a no call.
10     Q.   So we've got a total of --
11 whether you want to call them no call
12 no show or just a call in, we've got
13 according to you the 12th, the 14th,
14 and then you say the 18th, because
15 you think Kerry Lake has got it
16 wrong, because that was Tuesday,
17 right?
18     A.   That's correct.
19     Q.   And then the 19th would not
20 be one, because she called you.  No,
21 we're counting call ins, too.  The
22 19th, the 20th, and the 21st, right?
23     A.   That's correct.

Page 135

1      Q.   Okay.  So the full -- all
2  of the absences, whether they were
3  call ins, or whether they were no
4  calls no shows, would be the 12th,
5  the 14th, the 18th, the 19th, the
6  20th and the 21st, correct?
7      A.   That's on my records, yes,
8  sir.
9      Q.   All right.
10          (Whereupon, Plaintiff's
11          Exhibit Number 18 was
12          Marked for identification.)
13          (Handing document to
14          Witness.)
15     Q.   Let me show you what I'll
16 mark as Plaintiff's Exhibit 18.  Is
17 that the employee termination form
18 for Ms. Jones?
19     A.   Yes, sir.
20     Q.   And who filled this one
21 out?
22     A.   It's the requester is the
23 bookkeeper in Tyson.

Page 136

1      Q.   Who is that?
2      A.   That could have been --
3  that's a generic log in used for the
4  financial department there.  It could
5  have been an accounting manager from
6  another facility.
7      Q.   But it would have been
8  somebody within the district that was
9  in accounting?
10     A.   Yes, sir.
11     Q.   Somebody who reported to
12 you?
13     A.   Yes, sir.
14     Q.   Who was responsible to you?
15     A.   Yes, sir.
16     Q.   And it shows that it was
17 approved by Kerry Lake, and then GM
18 Tyson.  And at the time the GM at
19 Tyson, from a practical standpoint,
20 would have been you?  Is that right?
21     A.   That was probably my log
22 in, probably, that approved that.
23     Q.   This document is incorrect

Page 137

1  in terms of the comments, is it not?
2      A.   Well, if we're using my
3  records, it might be.  If we're using
4  some unknown other records that I'm
5  not aware of, it may be accurate.
6      Q.   All right.  But you kept
7  records for the express purpose of
8  documenting her absences, correct?
9      A.   My experience.
10     Q.   And you also were the
11 person that fired her, correct?
12     A.   That's correct.
13     Q.   And you also were the
14 person who approved this termination
15 form, correct?
16     A.   That's correct.
17     Q.   All right.  And this
18 termination form says she had too
19 many call ins in seven days, right?
20     A.   Yes, sir.
21     Q.   And that's the part that's
22 incorrect, correct?
23     A.   Well, let's see.  Now, if

## 367 VALLEY AVENUE

# NATIONAL COURT REPORTING

Page 138

1  we go back -- go back to April the
2  9th and we start looking at -- we're
3  talking about call outs and no shows,
4  I'm talking about not coming to work,
5  okay. So that's where I think some
6  of the confusion is. No shows and
7  calls in, yes, sir. Was she out
8  excessively, yes, sir.
9      Q. If you would, take a look
10  at the interview form packet that I
11  gave you. What number is that, 17?
12      A. 17.
13      Q. Those investigations,
14  according to the dates on the
15  documents, were going on on April
16  19th and on the 18th; is that
17  correct, those two days?
18      A. Yes, sir.
19      Q. And you were there those
20  days, right?
21      A. I was.
22      Q. Do you have any idea why
23  the company was still performing an

Page 139

1  investigation a week after they had
2  already terminated Butch Jacobs?
3      A. No, sir.
4      Q. Did you ever discuss that
5  with anybody?
6      A. No, sir.
7      Q. Did you ever wonder why
8  they were investigating when your
9  knowledge was that he had already
10  been terminated for not cooperating
11  with the investigation?
12      A. Well, from working in the
13  accounting department, I think any
14  time there is a problem and there is
15  an investigation, you want to know
16  the outcome. I mean, are there
17  assets missing, you know, what's
18  involved with the investigation? So
19  it would not be unusual for me for
20  there to be an investigation, but the
21  investigation to continue to fully
22  understand the problem.
23      Q. Would it be unusual to you

Page 140

1  if all of the investigation -- if 90
2  percent of the investigation forms
3  are full of derogatory comments about
4  Milissa Jones?
5      A. I'm sorry, sir?
6      Q. Would it be unusual to you
7  to have an investigation a week after
8  the alleged harasser has been fired,
9  wherein 90 percent of the comments
10  that are made are just derogatory
11  comments about Ms. Jones and how her
12  performance is?
13      A. Would it be unusual about
14  one person?
15      Q. Yeah.
16      A. If that person was involved
17  with the investigation it would not
18  be unusual, I guess.
19      Q. But if they're all about
20  Milissa Jones, they wouldn't be
21  trying to follow up to make sure that
22  assets weren't missing, or there were
23  other loose ends in terms of the

Page 141

1  allegations, right?
2      A. I would be guessing at what
3  they would be trying to do.
4      Q. Yeah. Did you think it
5  would be important for you, as one of
6  the managers who was running the
7  store, running the Plaza during that
8  period of time and for the future, to
9  know what the outcome of the
10  investigation was, so you could
11  determine whether there was an
12  ongoing problem with either victims
13  or other harassers?
14      A. I think it would be
15  important for me to know -- to
16  understand the investigation and the
17  outcome of the investigation.
18      Q. And that would entail -- to
19  do a good job of it, you'd have to
20  know what the investigation was
21  about, find out whether anything else
22  similar was going on, or whether
23  there were any other victims out

# NATIONAL COURT REPORTING

Page 142

1  there, right?
2      A.   That's right.
3      Q.   But your testimony is that
4  nobody ever told you those details of
5  the investigation?
6      A.   Not until after everything
7  was over, sometime later.
8      Q.   When was that?
9      A.   I don't even know.
10     Q.   Many months later?
11     A.   Yes, sir, quite some time.
12     Q.   Did you ever go to anybody
13 and say well, look, I'm responsible
14 for running the Plaza at times now
15 without a GM in place, and I'm going
16 to be here for the foreseeable
17 future.  I need to know what was
18 alleged, are there any other possible
19 victims, are there any other possible
20 harassers, are there any other things
21 in play here that are still going on?
22 Did you ever go to anybody and say
23 that?

Page 143

1      A.   I had asked that question
2  early on as to explain what the
3  investigation is about, and I was
4  told that there was an investigation
5  and that they were bringing in people
6  from other districts to conduct that
7  investigation; Mike Walton, those
8  kind of guys.  They would bring in
9  outsiders.  That's very unusual.
10     Q.   But did you ever ask for
11 the details so you could handle
12 things at your Plaza?
13     A.   I was told I would be, you
14 know, given the information when the
15 investigation was over.
16     Q.   So, I don't want to presume
17 anything, but it sounds like you're
18 telling me that yes, you asked, and
19 you wanted it then, and they said
20 we'll give it to you later?
21     A.   Yes, sir.
22     Q.   All right.  Did you ask why
23 they wouldn't give it to you then?

Page 144

1      A.   I don't recall.
2      Q.   Who told you they wouldn't
3  give it to you then?
4      A.   Kerry.
5      Q.   And did he tell you why
6  not?
7      A.   He just told me there was
8  an investigation, not to discuss it.
9      Q.   Did he -- was he the person
10 you went to find out the details you
11 were talking about of the
12 investigation?
13     A.   He was my manager, yes,
14 sir.
15          (Whereupon, Plaintiff's
16          Exhibit Number 19 was
17          Marked for identification.)
18          (Handing document to
19          Witness.)
20     Q.   Let me show you what I'll
21 mark as Plaintiff's Exhibit 19.  Can
22 you identify that?
23     A.   An employee handbook.

Page 145

1      Q.   Is this the employee
2  handbook that you've referenced a
3  couple of times today?
4      A.   No, sir.
5      Q.   What were you talking about
6  when you said there were policies and
7  handbooks?
8      A.   Well, it's just a 2001
9  version.
10     Q.   Okay.  Well, this is what
11 was provided to me by Flying J.  My
12 question to you is, was this handbook
13 applicable to Milissa Jones?
14     A.   Yes, very well, yes, sir.
15 I'm sorry.
16     Q.   That's what matters I
17 think.  This was applicable to
18 Milissa Jones?
19     A.   Yes, sir.
20     Q.   And to Butch Jacobs and
21 anybody else in the Plaza?
22     A.   That is correct.
23     Q.   All right.  Did you ever

## 367 VALLEY AVENUE

## NATIONAL COURT REPORTING

Page 146

1  believe that Milissa Jones -- either
2  at the time you fired her or today,
3  do you ever have any judgment that
4  she was dishonest at all with the
5  company?
6      A.  No, sir.
7      Q.  About her absences?
8      A.  I never felt that she was
9  dishonest at all.
10     Q.  Okay.  If you'd look at
11  page 13 under absenteeism, do you see
12  that section?
13     A.  Uh-huh.
14     Q.  Do you see the first
15  sentence where it says, "We
16  understand that emergencies and
17  illness do arise making some absences
18  unavoidable?
19     A.  Yes.
20     Q.  Is that an accurate
21  statement of the company's actual
22  policy and practice as far as you
23  know?

Page 147

1      A.  Yes, sir.
2      Q.  I want you to skip two
3  sentences and look at the sentence
4  that begins with excessive absences.
5  Do you see where it says, "Excessive
6  absences, whether excused or
7  otherwise, may result in a
8  performance evaluation by your
9  manager?"
10     A.  Yes, sir.
11     Q.  Was a performance
12  evaluation ever performed on Ms.
13  Jones due to excessive absences?
14     A.  Not to my knowledge.
15     Q.  Do you see the next
16  sentence where it says, "If the
17  matter is not resolved it will result
18  in disciplinary action, up to and
19  including termination?"
20     A.  Yes, sir.
21     Q.  Do you know whether there
22  was any -- I guess you've said
23  already there wasn't any other

Page 148

1  disciplinary action prior to the
2  termination, and there wasn't an
3  evaluation -- it just went straight
4  to termination, correct?
5      A.  To my knowledge, that's
6  correct.
7      Q.  Okay.  Look at schedules,
8  the section above.  Do you see where
9  it says, "Knowing when and where to
10  work is a joint responsibility?"
11     A.  Yes, sir.
12     Q.  I assume that -- does that
13  mean that it's a joint responsibility
14  between the employee and the
15  employee's manager?
16     A.  That's correct.
17     Q.  And, so, in this case it
18  would be a joint responsibility
19  between Milissa Jones and Butch
20  Jacobs during the time that he was
21  there when schedules were made?
22     A.  That's correct.
23     Q.  All right.  Do you see

Page 149

1  where it says, "Each employee is
2  expected to work his or her scheduled
3  work shift"?
4      A.  Yes, sir.
5      Q.  That would be a work shift
6  scheduled by the manager at the local
7  Plaza, correct?
8      A.  Well, yes, sir, but there
9  is a published corporate schedule.
10     Q.  My question is, does this
11  employee policy manual say anything
12  anywhere about a published schedule
13  that's different from this language
14  here that says, "Each employee is
15  expected to work his or her scheduled
16  work shift?"
17     A.  No.
18     Q.  All right.  Do you know
19  whether it is common throughout the
20  company for managers to switch shifts
21  with each other to help each other
22  out, if necessary, to cover shifts?
23     A.  Is it common?

# NATIONAL COURT REPORTING

Page 150

1    Q.   Yeah.
2    A.   I wouldn't say it's common.
3  It does happen.
4    Q.   I mean, it happens -- it's
5  not a once in a blue moon kind of
6  thing with a company the size of
7  Flying J, right?  I mean, merchandise
8  managers and C Store managers, it
9  wouldn't be unusual for them to
10  switch days on the fly to cover each
11  other if things happened, right?
12    A.   It does happen, but
13  there's, you know, certain
14  responsibilities of the merchandise
15  manager as far as receiving freight
16  and log ins, and things like that.
17  It's not something that we would want
18  to happen on a regular basis, but it
19  does happen.
20    Q.   I'm not asking you to admit
21  that it's the company's goal.  But it
22  does happen, right?
23    A.   It does happen.

Page 151

1    Q.   And it's not a fireable
2  offense if that happens?
3    A.   No, sir.
4    Q.   Look at page 30, if you
5  would, at the sick leave policy.  Is
6  it true that during the time period
7  in question that the company's policy
8  was that full-time employees
9  classified as exempt are eligible for
10  sick leave with pay?
11    A.   That is correct.
12    Q.   And at the time that Ms.
13  Jones was fired, she was a full-time
14  employee classified as exempt,
15  correct?
16    A.   That is correct.
17    Q.   Do you see the next
18  paragraph where it says, "Paid sick
19  leave duration will be approved on a
20  discretionary basis by the general
21  manager"?
22    A.   Yes, sir.
23    Q.   It wasn't one general

Page 152

1  manager during this week in
2  question -- these two weeks in
3  question, correct?
4    A.   That's correct.
5    Q.   It was a resolving coverage
6  with you guys, correct?
7    A.   That's correct.
8    Q.   And do you know whether
9  Kerry Lake ever told Milissa Jones
10  that she couldn't have any sick
11  leave?
12        MR. WORLEY:  Object to the
13  form of the question.
14    Q.   (BY MR. MOREL:)  Do you
15  know whether or not he ever said that
16  to her?
17    A.   I'm not aware of that.
18    Q.   For all you know he could
19  have told you that?
20        MR. WORLEY:  Same
21  objection.
22    Q.   (BY MR. MOREL:)  Did he
23  ever tell you that?

Page 153

1    A.   I'm not aware of that.
2    Q.   Did anybody ever say to
3  Milissa Jones, "Hey, you're eligible
4  for sick leave, maybe even pay?"
5        MR. WORLEY:  Same objection
6  Foundation.
7    Q.   (BY MR. MOREL:)  Did you
8  ever tell her that?
9    A.   No.
10    Q.   Do you know whether anybody
11  else ever told her that?
12    A.   I do not.
13    Q.   Is that something you would
14  expect an employee advocate to do?
15    A.   Well, I would expect the
16  employee to call me and tell me
17  what's wrong, just not -- not show up
18  to work, or I'll tell you this week
19  if I'm working next week.  This was a
20  deteriorating situation.
21    Q.   Do you see on the next page
22  where it says, "Employees who will be
23  absent due to illness or injury for

## 367 VALLEY AVENUE

1-800-638-3917 Birmingham, Alabama 35209 (205) 252-6205

39 (Pages 150 to 153)

# NATIONAL COURT REPORTING

Page 154

1 more than five consecutive days must
2 complete an application for leave of
3 absence form"?
4    A.  Yes, sir.
5    Q.  Ms. Jones was never out for
6 five consecutive days, was she?
7    A.  No, sir.
8    Q.  But even if she had been,
9 there was a policy and a process in
10 place for handling employees in that
11 situation, correct?
12    A.  That's correct.
13    Q.  That isn't the kind of
14 thing that would be upsetting to
15 management or cause termination of an
16 employee under regular circumstances,
17 would it?
18        MR. WORLEY:  Objection.
19    Q.  (BY MR. MOREL:)  And that
20 is for an employee to have to use
21 this sick leave, and apply for it
22 because they were going to be out for
23 five consecutive days?

Page 155

1    A.  No.
2    Q.  It's all about the
3 communication with the company from
4 the employee, right?
5    A.  If we're aware of what's
6 going on, yes, sir.
7    Q.  Then they're fine?
8    A.  Well, again it's a
9 situation where if we understand
10 what's going on.  We value our
11 employees.  We just have to know
12 what's going on to make decisions.
13 But when there's no information at
14 all, and in fact a consistent lack of
15 information, that's the problem.
16    Q.  If an employee is
17 providing -- strike that.
18        If an employee is making
19 multiple calls to management and
20 providing a manager with information
21 that she's got a medical problem and
22 that she can get a doctor's note, is
23 that okay conduct on the part of the

Page 156

1 employee?  Is that proper?
2    A.  Yes.
3    Q.  All right.
4        MR. MOREL:  I have no
5 further questions.
6
7 EXAMINATION BY MR. WORLEY:
8    Q.  Is it okay conduct on the
9 part of the employee if they miss
10 work excessively, even if they happen
11 to call in to say they'll be out?
12        MR. MOREL:  Object to
13 leading.
14    A.  No.
15        MR. WORLEY:  No further
16 questions.
17        MR. MOREL:  That's all.
18
19
20
21    FURTHER THE DEPONENT SAITH NOT
22
23

Page 157

1        C E R T I F I C A T E
2
3 STATE OF ALABAMA:
4 JEFFERSON COUNTY:
5
6        I hereby certify that the
7 above and foregoing deposition was
8 taken down by me in stenotype, and
9 the questions and answers thereto
10 were reduced to typewriting under my
11 supervision, and that the foregoing
12 represents a true and correct
13 transcript of the deposition given by
14 said witness upon said hearing.
15        I further certify that I am
16 neither of counsel nor kin to the
17 parties to the action, nor am I in
18 any way interested in the result of
19 said cause.
20
21    _____
22        Sunnie Gillespie
23        CCR#: 145

LAW OFFICES OF

# ADAM MOREL, LLC

*Admitted to Alabama & Florida*

2300 10th Court South • Birmingham, Al. 35205 • Phone (205) 252-8841 • Fax (205) 252-7787
adam@morellawfirm.com

March 30, 2006

ATTN: General Counsel
Flying J. Inc.
1104 Country Hills Drive
Ogden, Utah 84403

      **RE:   Ms. Milissa Jones**

Dear Sir or Madam:

This office represents Ms. Melissa Jones in connection with her employment by Flying J. Inc. Please direct any response to this correspondence to the undersigned.

Ms. Jones is presently employed by Flying J as Convenience Store Manager at its location in Hope Hull, Alabama. This correspondence will serve as Ms. Jones' written complaint, pursuant to the company's reporting policy, that she is being subjected to a sexually hostile work environment.

During the course of Ms. Jones' employment, she has been subjected to sexual harassment by Convenience Store General Manager Butch Jacobs. The harassment began shortly after Ms. Jones was hired in December of 2005 and continues to date. Because Ms. Jones had hoped the conduct would cease if she continued to make it clear that it was unwelcome and because Mr. Jacob's has chastised other employees for contacting the corporate office with problems, Ms. Jones has waited until now to make this written complaint. In addition, because upper management has been aware of prior inappropriate conduct and failed to address it, Ms. Jones has had little confidence that making such a complaint would be effective.

Since December of 2005, Mr. Jacob's has regularly directed sexually inappropriate comments toward Ms. Jones. These comments include but are not limited to ongoing comments about the size of his genitalia - which he calls his "package" and lewd comments whenever he sees Ms. Jones drinking from a Starbucks bottle or eating certain foods such as corndogs. Jacob's usual comment is "Umm. Let me watch you do that again" and/or "Let [Facility Manager] John see you do that." In addition, Jacobs regularly makes comments to Ms. Jones about his personal sexual practices such as "I like to please my partner" and "In bed, I'm the kind of man who isn't finished until my partner is pleased." Jacobs has also made comments to Ms. Jones about her looks, comparing her to other employees. On several occasions, Jacobs has discussed pornographic videos while at work. After hearing that a prostitute was on the premises, Jacobs asked if she was good looking, stating "Don't kick her out, come get me instead." Jacobs also discusses a prior affair he had with a co-worker at another place of business from time to time.

PLAINTIFF'S EXHIBIT

FJ 0100

In addition to the making sexually charged comments, Jacobs has repeatedly touched Ms. Jones in sexually offensive ways. On a regular basis, and apparently whenever he can manage to do it, Jacobs has pressed his pelvis into Ms. Jones' buttocks and front side. On five or six occasions, he has tried to pull Ms. Jones down into his lap. He has repeatedly placed his hands on Ms. Jones' legs and attempted to massage her shoulders. He has hugged her against her will both from the front and the side. On one occasion, Jacobs grabbed the back of Ms. Jones' pants and forced his fingers into her undergarment.

Since it began, Ms. Jones has made it clear to Jacobs that his conduct is offensive and unwelcome. Jacobs has made it clear that he understands Ms. Jones is upset by his conduct as evidenced by conversations between Jacobs and Facility Manager John Frazier in which they laugh while pointing out that sex talk makes Ms. Jones uncomfortable. In one such conversation, Jacobs pointed out "It embarrassed her so bad she left the room."

Regrettably, we believe the evidence will show Ms. Jones is not the first female subjected to Jacobs' sexual misconduct at Flying J. We anticipate one former and one present employee will testify, if necessary, that they were subjected to similar conduct and that the management team at Flying J was well aware of it. We anticipate that one of the young ladies will testify she was fondled by Jacobs. We are also troubled to note that upper management has also been aware for some time that Jacobs and other management employees visited a strip club while on company training time in Texas in 2005. On that occasion, Ms. Jones' District Manager was not only present but actually got on stage with the dancers where he engaged in inappropriate conduct. This incident, demonstrating the company's tolerance for this kind of conduct, has been a conversation piece among the management team in Hope Hull, further undermining any confidence Ms. Jones has had in company management adequately addressing her concerns.

We are prepared to file a Charge of Discrimination against the company with the Equal Employment Opportunity Commission stating clams of sexual harassment/gender discrimination in violation of Title VII of the Civil Rights Act, as amended. In addition, we plan to file litigation against Jacobs and Flying J in the Circuit Court for Lowndes County, Alabama for negligent supervision, retention and/or training, as well as invasion of privacy and assault and battery.

If the company has any interest in resolving this matter amicably and in lieu of litigation, please contact me no later than Monday, April 10, 2006. If I have not been contacted by that date, I will assume the company would prefer to litigate and I will proceed accordingly. In the meantime, we trust that Ms. Jones will suffer no retaliation for reporting this unlawful conduct.

Respectfully,

Adam P. Morel

cc:   Ms. Milissa Jones

LAW OFFICES OF

# ADAM MOREL, LLC

*Admitted in Alabama & Florida*

2000 10th Court South • Birmingham, AL 35205 • Phone (205) 252-8841 • Fax (205) 252-7787
adam@morellawfirm.com

April 6, 2006

**VIA U.S. MAIL & FACSIMILE 801-395-8560**

Kelly Lowrey
Senior Corporate Counsel
Flying J Inc.
1104 Country Hills Drive
Ogden, Utah 84403

     **RE:  Milissa Jones**

Dear Ms. Lowrey:

    I am in receipt of your letter of today's date. This morning my client informed me that both Mr. Jacobs and the accounting manager from the Hope Hull location telephoned her after hours at her residence multiple times last night with incessant questions about the nature of the visit by a member of your management team. Please take whatever steps are necessary to protect Ms. Jones from further contact of this nature, particularly in the midst of an investigation of her claims against Mr. Jacobs.

    In the meantime, I will await your response to my March 30th letter.

Respectfully,



Adam P. Morel



FJ 0007

LAW OFFICES OF

# ADAM MOREL, LLC

*Educated in Alabama & Florida*

2300 10th Court South • Birmingham, AL 35205 • Phone (205) 252-8841 • Fax: (205) 252-7787
adam@morellawfirm.com

April 20, 2006

**VIA U.S. MAIL & FACSIMILE 801-395-8560**

Kelly Lowrey
Senior Corporate Counsel
Flying J Inc.
1104 Country Hills Drive
Ogden. Utah 84403

   RE: **Milissa Jones**

Dear Ms. Lowrey:

  This correspondence follows up our discussion of April 18, 2006. Unfortunately, since Ms. Jones made her complaints regarding Butch Jacobs, the working environment she now finds herself in is making it increasingly difficult to perform her duties.

  The morning after the investigation began, the merchandise manager verbally attacked Ms. Jones indicating she was aware that Ms. Jones reported various problems to management. The treatment was hostile enough to cause Ms. Jones to walk outside to compose herself so that other employees would not see her crying. Subsequently, the accounting manager refused to communicate with Ms. Jones when Ms. Jones needed the phone number of a newly hired employee. Realizing her knocks on the closed office door were being ignored, Ms. Jones called into the office by telephone and was told the managers weren't sure if they wanted to hear anything Ms. Jones had to say. Ms. Jones ended up contacting Human Resources to get the phone number she needed.

  For the last several days, the merchandise manager continues to treat Ms. Jones rudely and unprofessionally. Several cashiers have told Ms. Jones that they have been told Ms. Jones "made everything up." Many have begun to treat Ms. Jones with disrespect.

  Ms. Jones has been told that with Mr. Jacobs gone, she will be expected to work even more hours than she has regularly been working. It was also made clear that Ms. Jones was to bring back a back up manager who was let go previously or be forced to work unscheduled hours on her son's birthday. Once she re-hired that individual, the DM made caustic remarks about Ms. Jones' decision to bring her back due to that employee's repetitive uncollectibles. In the meantime, that employee is also treating Ms. Jones with undeserved hostility.



FJ 0109

Under Title VII, Flying J is liable for the sexually hostile work environment created by Butch Jacobs, who was a member of management and the highest ranking person at the facility during the relevant time. In addition, if necessary we intend to prove that the company's District Manager not only was previously aware of Mr. Jacob's sexual misconduct and failed to address it, but that he had participated in inappropriate and sexually charged conduct himself with Jacobs, thus condoning Jacob's actions.

My client would prefer to come to an amicable resolution of this matter which would contemplate her voluntary resignation from Flying J. However, if we cannot arrive at a mutually agreeable resolution, we intend to prosecute Ms. Jones' claims both administratively and through litigation.

At this time, Ms. Jones offers to settle all claims in exchange for a lump sum payment equal to six months salary, plus benefits at her present rate of compensation.

Please let me know how you wish to proceed.

Sincerely,

Adam P. Morel

cc:    Milissa Jones

FJ 0110

To Chris Bone,                                        April 6, 2006

On October 15th 2005 I was in Baytown TX. with my District Staff Chris Andrews and Keith Staples along with the management staff from Tyson AL. Butch Jacobs, Jonathan Fraizer, & Tenesha Upshaw to help with the store setup and to show the staff what they would be looking at as we were going to open Tyson on Dec.20th. A few of us went to have dinner at a restaurant and then we went back to our motel where a few of us decided to go have a drink at a gentlemen's club that was within walking distance to the motel. I was saying goodbye and getting ready to leave when to my surprise some employees from the club came and grabbed me and took me up on the stage in front of everyone where 2 girls danced for me. I have never been so embarrassed so as soon as the dance was over I returned to the table for just a couple of minutes and then I left by myself. I knew that I had made a bad judgment call going to this club, so as soon as I got to my room I called my wife and told her what happened and she agreed that I had made a bad choice.

The rest of the week I stayed at the motel at night and did not go out at all. The night was never talked about between us at we all just went about our jobs as before very professional.

Kerry Lake

FJ 0011

Chris Bone/hr/corp/Flyingj          To   Scott McMillan/cash/acct/corp/Flyingj@Flyingj
04/07/2006 04:03 PM                 cc   Kelly Lowrey/legal/service/corp/Flyingj@Flyingj, Jerry
                                         Beckman/hr/corp/Flyingj@Flyingj
                                    bcc
                                Subject   Fw: Baytown Opening

Hello Scott,
I received the attached response from Kerry Lake, regarding the visit to a "gentleman's club" last October
in Texas, during the opening of Baytown. I thought you should have the opportunity to review. Although
this event was after hours, the problem is....as a Senior Manager, Kerry went with subordinate staff, who
have talked about it in the plaza. The exercising of poor judgement has complicated the situation and
opened the door to a third party to speculate that Flying J and it's "upper management" are tolerant of
inappropriate behavior. I believe this has unnecessarily put the company in an awkward position, and one
that is more difficult to defend.

Butch has been told not to return to the Plaza until he hears from Kerry Lake regarding his status with the
Company. I have advised Kerry, based on the evidence, to terminate Butch for violation of the Company's
policies against harassment and discrimination, as well as, creating a hostile environment. Kerry will
most likely meet with Butch on Monday morning. Until then, Kerry is working to have Chris Andrews in the
Plaza over the weekend.

As follow up to the investigation that was opened in Tyson regarding Butch Jacobs, we believe we need to
have a 3rd party (whoever you designate), go into Tyson and interview virtually all of the female
employees, to determine if the atmosphere was pervasive to the point where there could be other
mangers or employees who have engaged in similar sexually inappropriate behavior or other
unacceptable behaviors.

Your Thoughts?
Chris


Chris Bone
Flying J Inc
Human Resource Manager
----- Forwarded by Chris Bone/hr/corp/Flyingj on 04/07/2006 11:28 AM -----

       Kerry Lake/rd/corp/Flyingj
       04/06/2006 05:09 PM              To   Chris Bone/hr/corp/Flyingj@Flyingj
                                        cc
                                   Subject   Baytown Opening



Baytown Opening.doc

Thanks,

Kerry
801-791-4628



FJ 0008

Jerry Beckman/hr/corp/Flyingj

04/11/2006 09:24 AM

To  Scott McMillan/cash/acct/corp/Flyingj@Flyingj

cc  Kelly Lowrey/legal/service/corp/Flyingj@Flyingj

bcc

Subject  Tyson, AL Status

Scott, I am not sure if Kerry Lake has updated you on Tyson, AL. Butch Jacobs, the GM was terminated yesterday. The accounting manager, Debbie, gave her notice and today is her last day. There is the possibility the facility manager will also leave. Kelly is encouraging someone going into to Tyson to interview more employees to determine if anyone has been harassed, or to find out about any other issues. Robert Clark had mentioned he was busy with an opening. Is there someone you can get to go interview people as soon as possible. It would not be wise to have Kerry Lake interview as he has been implicated in unprofessional conduct.

Kerry mentioned he was going to have his district accounting manager there to review cash issues. Do you want anyone else such as Internal Audit involved?



FJ 0094

April 19, 2005

I called Melissa Jones at 5:40 pm. (334-300-6514). I told Melissa that we would only pay her for two days of the time missed. I also told her that we needed her to report to work. We are very short on the schedule. Melissa told me there was no way she could return to work. She would let us know later.



**Pay Period Feb 26-2006 Through Mar 11-2006**

| | | Mgr's Schedule | Actual In | Clock Out | Week | Comments |
|---|---|---|---|---|---|---|
| 26-Feb | Sun | Off | Off | Off | 1 | |
| 27-Feb | Mon | Off | Off | Off | 1 | |
| 28-Feb | Tue | Noon - 10pm | 6:10 AM | 4:10 PM | 1 | Off Schedule |
| 1-Mar | Wed | Noon - 10pm | 3:12 PM | 1:12 AM | 1 | Off Schedule |
| 2-Mar | Thu | Noon - 10pm | 7:12 PM | 5:12 AM | 1 | Off Schedule |
| 3-Mar | Fri | 1-11 pm | 12:57 PM | 10:57 PM | 1 | |
| 4-Mar | Sat | Noon - 10pm | 1:32 PM | 11:32 PM | 1 | Off Schedule |
| 5-Mar | Sun | 9:00 pm - 7:00 am | 12:04 AM | 10-04 AM | 2 | Off Schedule |
| 6-Mar | Mon | Off | Off | Off | 2 | |
| 7-Mar | Tue | Noon - 10pm | 3:14 PM | 1:14 AM | 2 | Off Schedule |
| 8-Mar | Wed | Noon - 10pm | 11:49 AM | 9:49 PM | 2 | |
| 9-Mar | Thu | Noon - 10pm | 6:54 PM | 4:54 AM | 2 | Off Schedule |
| 10-Mar | Fri | 1-11 pm | 1:44 PM | 11:44 PM | 2 | Off Schedule |
| 11-Mar | Sat | Off | Off | Off | 2 | |

**Pay Period Mar 12- 2006 Through March 25- 2006**

| | | Mgr's Schedule | Actual In | Clock Out | | Comments |
|---|---|---|---|---|---|---|
| 12-Mar | Sun | Off | Off | Off | 3 | |
| 13-Mar | Mon | Off | 11:00 PM | 6:00 AM | 3 | Off Schedule |
| 14-Mar | Tue | Noon - 10pm | 10:49 PM | 8:49 AM | 3 | Off Schedule |
| 15-Mar | Wed | Noon - 10pm | Off | Off | 3 | Off Schedule |
| 16-Mar | Thu | Noon - 10pm | 10:14 AM | 8:14 PM | 3 | Off Schedule |
| 17-Mar | Fri | 1-11 pm | 3:32 PM | 1:32 PM | 3 | Off Schedule |
| 18-Mar | Sat | Noon - 10pm | 8:34 AM | 6:34 PM | 3 | Off Schedule |
| 19-Mar | Sun | Off | Off | Off | 4 | |
| 20-Mar | Mon | Off | Off | Off | 4 | |
| 21-Mar | Tue | Noon - 10pm | 2:00 PM | 12:00 AM | 4 | Off Schedule |
| 22-Mar | Wed | Noon - 10pm | 2:34 PM | 12:34 AM | 4 | Off Schedule |
| 23-Mar | Thu | Noon - 10pm | 2:02 PM | 12:02 AM | 4 | Off Schedule |
| 24-Mar | Fri | 1-11 pm | 2:59 PM | 12:59 AM | 4 | Off Schedule |
| 25-Mar | Sat | Noon - 10pm | 12:07 PM | 10:07 PM | 4 | Late |

**Pay Period 3-26-06 through 4-8-06**

| | Mgr's Schedule | Actual In | Clock Out |
|---|---|---|---|



FJ 0155

| Date | Day | Mgr's Schedule | Actual In | Clock Out | | Notes | | |
|------|-----|----------------|-----------|-----------|---|-------|---|---|
| 26-Mar | Sun | Off | Off | Off | 4 | | | |
| 27-Mar | Mon | Off | Off | Off | 4 | | | |
| 28-Mar | Tue | Noon - 10pm | 4:01 PM | 2:01AM | 4 | Off Schedule | | |
| 29-Mar | Wed | Noon - 10pm | 7:20 PM | 5:20 AM | 4 | Off Schedule | | |
| 30-Mar | Thu | Noon - 10pm | 12:11 PM | 10:11 PM | 4 | Late | | |
| 31-Mar | Fri | 1-11 pm | 2:12 PM | 12:12 AM | 4 | Late | | |
| 1-Apr | Sat | Noon - 10pm | 12:51 AM | 10:51 AM | 4 | Off Schedule | | |
| 2-Apr | Sun | Off | Off | Off | 1 | | | |
| 3-Apr | Mon | Off | Off | Off | 1 | | | |
| 4-Apr | Tue | Noon - 10pm | 1:23 PM | 11:23 PM | 1 | Off Schedule | | |
| 5-Apr | Wed | Noon - 10pm | 6.05 PM | 4:05 AM | 1 | Off Schedule | | |
| 6-Apr | Thur | Noon - 10pm | 1.51 PM | 11:51 PM | 1 | Off Schedule | | |
| 7-Apr | Fri | 1-11 pm | 11.04 AM | 9:04 PM | 1 | Off Schedule | | |
| 8-Apr | Sat | Noon - 10pm | 10.56 AM | 8:56 PM | 1 | Off Schedule | | |

### Pay Period April 9-2006 Through April 22-2006

| Date | Day | Mgr's Schedule | Actual In | Clock Out | | Notes | | |
|------|-----|----------------|-----------|-----------|---|-------|---|---|
| 9-Apr | Sun | 9.00 pm - 7.00 am | 1:05 PM | 11:05 PM | 2 | Off Schedule | | |
| 10-Apr | Mon | Off | 4:24 PM | 2:24 AM | 2 | Off Schedule.  Butch Term. | | |
| 11-Apr | Tue | Noon - 10pm | 12:26 PM | 10:26 PM | 2 | Late | | |
| 12-Apr | Wed | Noon - 10pm | Out | Out | 2 | Relative died out of state.  May be out four days. Returnd next day. | | |
| 13-Apr | Thu | Noon - 10pm | 3.38 pm | 1:38 AM | 2 | Late - Last day worked | | |
| 14-Apr | Fri | 1-11 pm | Out | | 2 | Called Out / Also had employee injured, could not work, needed replacement. Milissa would not answer phone or return calls.  FM called Millissa 9:30 am and told her injured employee could not work until 4-20-06. A replacement was needed.  FM was told she had a birthday party to attend, was not making calls, and was not working. | Kerry Lake | Told to call Keith |
| 15-Apr | Sat | Off | Off | Off | 2 | | | |
| 16-Apr | Sun | Off | Off | Off | 3 | | | |
| 17-Apr | Mon | Off | Off | Off | 3 | | | |
| 18-Apr | Tue | Noon - 10pm | Out | Out | 3 | Called Out. LM  Milissa called and told me she would not be in this week.  She will call me Tuesday and let me know about next week.  I told her I needed to know before then.  Melissa told me that she would call Monday.  I told her I needed her to come to work we did not have a GM and she was 2nd in command. | | |
| 19-Apr | Wed | Noon - 10pm | Out | Out | 3 | | | |
| 20-Apr | Thu | Noon - 10pm | Out | Out | 3 | Spoke with Jerry Beckman. | | |
| 21-Apr | Fri | 1-11 pm | Out | Out | 3 | Milissa terminated based on attendance. | | |
| 22-Apr | Sat | Noon - 10pm | | | 3 | End of pay period | | |

FJ 0156

| | | |
|---|---|---|
| Jerry Beckman/hr/corp/Flyingj | To | Kelly Lowrey/legal/service/corp/Flyingj@Flyingj |
| | cc | |
| 04/21/2006 10:08 AM | bcc | |
| | Subject | Fw: Statement |

Here is Keith's full statement regarding the call with Milissa this morning.
----- Forwarded by Jerry Beckman/hr/corp/Flyingj on 04/21/2006 10:07 AM -----



| bk tyson/site/road/Flyingj | | |
|---|---|---|
| 04/21/2006 09:30 AM | To | Jerry Beckman/hr/corp/Flyingj@Flyingj |
| | cc | |
| | Subject | Statement |

Hi Jerry,

This is from our district accounting manage, Keith Staples.

Have a great weekend,
Jason Noel
Accounting Manager

📄 - bmi.tif



FJ 0012

| | | |
|---|---|---|
| Jerry Beckman/hr/corp/Flyingj | To | Kelly Lowrey/legal/service/corp/Flyingj@Flyingj |
| | cc | |
| 04/21/2006 09:59 AM | bcc | |
| | Subject | Fw: Melissa Jones / Tyson Alabama |

Here is the results of the phone discussion with Milissa this morning.
----- Forwarded by Jerry Beckman/hr/corp/Flyingj on 04/21/2006 09:59 AM -----

| | | |
|---|---|---|
| dam jackson/site/road/Flyingj | To | Jerry Beckman/hr/corp/Flyingj@Flyingj |
| 04/21/2006 08:52 AM | cc | Kerry.Lake@FlyingJ.com, Mike Walton/road/Flyingj@Flyingj |
| | Subject | Melissa Jones / Tyson Alabama |

Hello Jerry,

I called Melissa Jones this morning at 9:15. Gary Jones, General Manager, Temple, Ga., sat in on the call. I told Melissa I wanted to make her aware of the current situation. Based on her attendance during the past two weeks, we have concluded her employment with Flying J would be terminated as of April 21, 2006. Melissa told me she had a medical condition. I told Melissa that she had not produced any information about a medical condition. Melissa told me she was pregnant and having complications due to stress. She then told me I could deal with her attorney. She then hung up the phone. Gary Jones and I will document the call and scan email a copy to your attention. Please let me know if I can be of assistance.

Best Regards,


Keith Staples
District Accounting Manager
678-230-4459



FJ 0111

legemp:: Print Que

pr_hr_eforms:: Print Que                                      Page 1 of 1

U.S. Department of Justice                                           OMB No. 1115-0136
Immigration and Naturalization Service              **Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| JONES | MILISSA | D | Gaspardi |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| 229 A Irwin Ct | | 1/7/79 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| Montgomery | AL | 36115 | 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 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- [X] A citizen or national of the United States
- [ ] A Lawful Permanent Resident (Alien # A _____
- [ ] An alien authorized to work until __/__/__
  (Alien # or Admission #) _____

| Employee's Signature | Date (month/day/year) |
|---|---|
| _(signature)_ | 12/1/05 |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| | |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: | | FL DL | | SS Card |
| Issuing authority: | | DMV | | SS Adm |
| Document #: | | J520-544-79-517-0 | | # 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 |
| Expiration Date (if any): __/__/__ | | 1/7/07 | | __/__/__ |
| Document #: | | | | |
| Expiration Date (if any): __/__/__ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) 12/1/2005 and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| _(signature)_ Debbie McCullough | Debbie McCullough | Acct Mngr |

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|
| | | 12-6-05 |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | | B. Date of rehire (month/day/year) (if applicable) |
|---|---|---|
| | | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____ Document #: _____ Expiration Date (if any): __/__/__

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| | |

Form I-9 (Rev. 11-21-91)N Page 2



FJ 0024

legemp:: Print Que

pr_hr_eforms:: Print Que                                            Page 1 of 1

| Form **8850** | **Pre-Screening Notice and Certification Request for** | |
|---|---|---|
| (Rev. October 2007) | **the Work Opportunity and Welfare-to-Work Credits** | OMB No 1545-1500 |
| Department of the Treasury Internal Revenue Service | ▶ See separate Instructions. | |

Job applicant: Fill in the lines below and check any boxes that apply. Complete only this side.

Your name  Jones, Milissa Dawn                                    Social security number ▶ 019 : 80 : 4261

Street address where you live  229a Erwin Ct

City or town, state, and ZIP code  Montgomery, AL 36115

Telephone number  ( 334 )  356  -5060

If you are under age 25, enter your date of birth (month, day, year)  __ / __ / __

---

**Work Opportunity Credit**

1  ☐ Check here if you received a conditional certification from the state employment security agency (SESA) or a participating local agency for the work opportunity credit.

2  ☒ Check here if any of the following statements apply to you.

- I am a member of a family that has received assistance from Temporary Assistance for Needy Families (TANF) for any 9 months during the last 18 months.
- I am a veteran and a member of a family that received food stamps for at least a 3-month period within the last 15 months.
- I was referred here by a rehabilitation agency approved by the state or the Department of Veterans Affairs.
- I am at least age 18 but not age 25 or older and I am a member of a family that:
  a Received food stamps for the last 6 months or
  b Received food stamps for at least 3 of the last 5 months, but is no longer eligible to receive them.
- Within the past year, I was convicted of a felony or released from prison for a felony and during the last 6 months I was a member of a low-income family.
- I received supplemental security income (SSI) benefits for any month ending within the last 60 days.

---

**Welfare-to-Work Credit**

3  ☐ Check here if you received a conditional certification from the SESA or a participating local agency for the welfare-to-work credit.

4  ☐ Check here if you are a member of a family that:
- Received TANF payments for at least the last 18 months, or
- Received TANF payments for any 18 months beginning after August 5, 1997, and the earliest 18-month period beginning after August 5, 1997, ended within the last 2 years, or
- Stopped being eligible for TANF payments within the last 2 years because Federal or state law limited the maximum time those payments could be made.

---

**All Applicants**

Under penalties of perjury, I declare that I gave the above information to the employer on or before the day I was offered a job, and it is, to the best of my knowledge, true, correct, and complete.

Job applicant's signature ▶ _Milissa Dawn Jones_                          Date 12 / 11 / 05

For Privacy Act and Paperwork Reduction Act Notice, see page 2.      Cat. No. 22851L      Form **8850** (Rev. 10-02)

PLAINTIFF'S EXHIBIT

FJ 0032

Form 8850 (Rev. 10-02)                                                          Page 2

## For Employer's Use Only

Employer's name _____ Telephone no. (___) ___-____ EIN ▶ __:__

Street address _____

City or town, state, and ZIP code _____

Person to contact, if different from above _____ Telephone no. (___) ___-____

Street address _____

City or town, state, and ZIP code _____

If, based on the individual's age and home address, he or she is a member of group 4 or 8 (as described under Members of Targeted Groups in the separate instructions), enter that group number (4 or 8) . . . . . . . . . . . . ▶ _____

| Date applicant: | Gave information | Was offered job | Was hired | Started job |
|---|---|---|---|---|
| | 11/23/05 | 12/6/05 | 12/6/05 | 12/8/05 |

Under penalties of perjury, I declare that I completed this form on or before the day a job was offered to the applicant and that the information I have furnished is, to the best of my knowledge, true, correct, and complete. Based on the information the job applicant furnished on page 1, I believe the individual is a member of a targeted group or a long-term family assistance recipient. I hereby request a certification that the individual is a member of a targeted group or a long-term family assistance recipient.

Employer's signature ▶ _____ Title Acct Mngr Date 12/8/05

## Privacy Act and Paperwork Reduction Act Notice

*Section references are to the Internal Revenue Code.*

Section 51(d)(12) permits a prospective employer to request the applicant to complete this form and give it to the prospective employer. The information will be used by the employer to complete the employer's Federal tax return. Completion of this form is voluntary and may assist members of targeted groups and long-term family assistance recipients in securing employment. Routine uses of this form include giving it to the state employment security agency (SESA), which will contact appropriate sources to confirm that the applicant is a member of a targeted group or a long-term family assistance recipient. This form may also be given to the Internal Revenue Service

for administration of the Internal Revenue laws, to the Department of Justice for civil and criminal litigation, to the Department of Labor for oversight of the certifications performed by the SESA, and to cities, states, and the District of Columbia for use in administering their tax laws. In addition, we may disclose this information to Federal, state, or local agencies that investigate or respond to acts or threats of terrorism or participate in intelligence or counterintelligence activities concerning terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file this form will vary depending on individual circumstances. The estimated average time is:

Recordkeeping . . . . 2 hr., 46 min.

Learning about the law or the form . . . . . . 36 min.

Preparing and sending this form to the SESA . . . . . . . 36 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making this form simpler, we would be happy to hear from you. You can write to the Tax Forms Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001.

Do not send this form to this address. Instead, see When and Where To File in the separate instructions.

Form 8850 (Rev. 10-02)

⊕

FJ 0033



**FLYING J INC**
1104 Country Hills Drive, Ogden, Utah 84403   Phone (801) 624-1000   www.flyingj.com

To Whom It May Concern:

Per your request employment verification is provided:

NAME: Milissa D. Jones, SSN 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

DATE OF HIRE: December 8, 2005

DATE TERMED: N/A

JOB POSITION/TITLE: C-Store Manager

AVERAGE HOURS WORKED: N/A

BASE RATE OF PAY: $35,000.00 annually

GROSS AMOUNT OF FINAL PAY: N/A

DATE COMPLETED: January 5, 2006

COMMENTS: Probability of continued employment: Good

KATHLEEN BROWN
Payroll Clerk
Flying J, Inc.
801.624.1499 (Voice)
801.395.8004 (Fax)



FJ 0037

 **Employee Termination Form**

(Employee Termination Travel Plaza)

Requester: dam Jackson  Phone#  Date: 04/12/2006 04:13 PM

*x -- Required Field*

| | |
|---|---|
| ˣ Last Name | Jacobs |
| ˣ First Name | Thomas |
| Middle Name | Butch |
| ˣ Social Security Number | 422 - 78 - 5283 |
| ˣ Branch # (7 digit) | 0500143 |
| ˣ Branch # (5 digit) | 05143 |
| Branch Description | TYSON, AL FC |

*Note: If you have an address change for the employee, make the change under the Employee Change of Address Form.*

| | |
|---|---|
| ˣ Last day worked | 04/10/2006 |
| ˣ Termination Date | 04/10/2006 |
| Enter the employee's actual termination date. | NOT THE DATE THIS FORM IS BEING SUBMITTED. |
| ˣ Was the employee transferred to another Flying J location? | No |
| ˣ Type of Termination: | Involuntary |
| ˣ Reason for Termination: | MISREPRESENTATION DURING INVESTIGATION |
| ˣ Would you rehire this employee? | N |
| ˣ Comments: (120 characters max) | Violation of Company Policy |

**Approval Information**

Status          Complete by Kerry Lake

Requester          Approvers
dam jackson    ⇨   Kerry Lake
                   Scott McMillan

*Other Approval Information*

| Approver Name | Function | Due Date | Exp Action | Advance | Status | Date |
|---|---|---|---|---|---|---|
| Kerry Lake | Manager | 04/14/2006 | Notification | Skip | Approved | 04/13/2006 05:48:28 AM |
| Scott McMillan | Supervisor | 04/13/2006 | Notification | Standard | Skipped | 04/12/2006 04:13:49 PM |



To: Jerry Beckman,

    On Monday April 9th, 2006 myself and my assistant Chris Andrews went to Tyson AL. where I been instructed to terminate Butch Jacobs for violation of company policy. When I terminated Butch he told me that most of his people would walk out on me. After terminating Butch I talked with the accounting manager Debbie and she informed that tomorrow would be her last day.  At 2pm the 2 cashiers on duty were auto clocked out and we had no cashiers so Chris and I pulled tills and ran the fuel desk. I called Melissa Jones the assistant manager and told her we needed help to see if she would come in. She said she was busy but would take care of her business and come in as soon as she could. Probably sometime between 4 and 5pm Melissa showed up and 1 other cashier came in at 4.

    Tuesday I had just left the store around 9pm and received a call from Melissa who I had just left at the store to inform me that her in-law was going in for emergency surgery and she would not be to work on Wednesday. She said they had to go to Florida about 4 hours away for the surgery and she would return to work on Thursday but would be late. I thought it very unusual that this was an emergency yet she knew she would return to work on Thursday. Melissa called me sometime Thursday afternoon and told me she was driving home from Florida and would be to work as soon as she could, sometime around 4pm Melissa showed up at work and seemed fine.

    Friday morning Melissa called me and told me she had been to the doctor and she would not be to work on Friday. I told Melissa when she returned to work on Tuesday I would need a doctor's excuse, she said that would be no problem as this was an old illness that caused her to get a medical leave from the service. She told me that she was going to her regular doctor Monday and she would be to work on Tuesday.

    On Monday evening Melissa called me and told me she would not be to work on Tuesday as she was still not feeling well. I told her that Keith Staples was at the store this week and if she needs anything else to call Keith unless she felt it necessary to speak to me as I would be there next week. Tuesday morning I called Keith to see if he had heard from Melissa and he said he had not. Later that morning Keith called me and said that Melissa had just called him and informed him she would not be to work the rest of the week and she would call him next Monday to let him know of that week. She also told Keith that when she returned to work that she would not be able to work 10 hours a day anymore. Keith asked her if she would give him a little more notice than next Monday and she said she would if she could.

    Since Butch's termination on Monday April 9th Melissa has only worked 3 days and 2 of those where not even full days. Last Friday the 14th when I got to the store and the night manager Marzet informed me that Melissa had left her there alone the night before, as an employee had called and said they where running late and she was alone for about half an hour. On Friday morning when Melissa called me I asked her about this incident and she said she knew of the employee calling in but left anyway. Remember Melissa came to work late that day because of driving home from Florida. I just don't see Melissa stepping to the plate to help out at all.

    Thanks, Kerry Lake



FJ 0114

Milissa Jones Work Schedule For Last Two Weeks

4/9   7-11ᴾ    Worked
4/10  4-2ᴬ     Worked
4/11  12ᴾ-10ᴾ  Worked
4/12  Family Emergency
4/13  3ᴾ-1ᴬ    Worked
4/14  Sick   Called Kerry Lake   Requested Dr Slip
4/15  OFF
4/16  OFF
4/17  OFF
4/18  Sick
4/19  Sick
4/20
4/21
4/22

Milissa called Keith Staples on 4/19 and told Keith she wouldn't be in the rest of the week and would let him know on Tuesday if she could work next week. Keith told her he needed to know before Tuesday and Milissa told Keith she would call him on Monday. 4/25/06



legcmp:: Print Que



# INTERVIEW FORM FOR INVESTIGATING
# EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| Tyson Al. | 4/19/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| Pauletta Thomas | Mike Walton |

| Where did the interview take place? |
|---|
| Mgr Office |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for** witnesses other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?"

_____

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| | |

If more than one occurrence, list all dates and times.

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/01

FJ 0069

Milissa has an attitude problem.
Doesn't respect employee's
Changes schedule without telling anyone

*Michele O'Walton*

*Paulette Thomas*



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location Tyson AL. | Date of Interview 4/19/06 |
|---|---|
| Person being interviewed Linda Lewis | Person conducting interview Mike Walton |
| Where did the interview take place? Mgr. Office | |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for** witnesses other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?"

"Nothing Really SAY"

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| If more than one occurrence, list all dates and times. | |

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1

FJ 0071



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| Tyson AL. | 04/19/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| BRANDON FOSTER | Mike Walton |

| Where did the interview take place? |
|---|
| MANAGERS OFFICE |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for witnesses other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?"**

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| | |

If more than one occurrence, list all dates and times.

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/0

FJ 0072



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of interview |
|---|---|
| Tyson | 4/19/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| Tenesha Means | Mike Walton |

| Where did the interview take place? |
|---|
| Mars Office |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for** witnesses other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?" FRAZIER UPSET WITH JOHN (BOTH JOKING AROUND) AND JOHN GOT MAD AT TENESHA THROWING HER PAPER WORK AT BUTCH. BUTCH DIDN'T SAY ANYTHING AND LATER TOLD TENESHA HE'D HANDLE JOHN. TENESHA SHOULD OF HANDLED AT THE TIME      FEELS LIKE BUTCH

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| | |

If more than one occurrence, list all dates and times.

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/1

FJ 0073

MILISSA CHANGES SCHEDULE AND TELLS TENESHA AT ADVANCE
SHE'S STAMPING WEATHER YOU LIKE IT OR NOT.
MILISSA SAY'S STAY TO 5 AND YOU HAVE TO STAY
TILL 6.00
TENESHA SAYS THEY ~~NEVER~~ SELDOM DOT SCHEDULE.

MILISSA NEVER HELPS WHEN LOADS BACKED UP TO
COOLERS. LEAVES CASHIERS HANGING.
TO MUCH TO DO FOR 2-CASHIERS WATCHING COFFEE
BAR. WE NEED MORE CASHIERS

*[signature]*
*[signature]*     4/19/06

FJ 0074



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| Tyson | 4/19/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| SHERRIE Smuilton | Mike Walton |

**Where did the interview take place?**
Mars OFFICE

---

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for witnesses** other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?"

_____

_____

_____

_____

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| | |

If more than one occurrence, list all dates and times.

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**What resolution does the complainant recommend?**

| |
|---|
| |
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/01

FJ 0075

legemp:: Print Que



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| Tvson AL | 4/19/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| TANESHIA IDSHAK | MIKE WALTON |

| Where did the interview take place? |
|---|
| MGRS OFFICE |

---

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for witnesses other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?"**

TANESHIS FEELS LIKE GUY C-STORE MGR. ISO'T DOING HER
JOB. CALLED THE STORE MILISSA NEVER SHOWED UP ON
4/14/06 TOLD JOHN IT WAS HER SONS BIRTHDAY.
CAUSING TANESHIA TO PULL DIFFERENT SHIFTS AND NOT DOING
HER JOB

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| | |

If more than one occurrence, list all dates and times.

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/0

FJ 0076

legemp:: Print Que



## INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| Tyson | 4/18/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| LAQUISHA "MONA" MAGEE | MIKE WALTON |

| Where did the interview take place? |
|---|
| MILLER'S OFFICE IN TYSON |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for witnesses other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?"**

MILISSA MADE SHAMAYFA BETHEL EMPTY HER POCKETS IN FRONT OF A CUSTOMER WHEN THE CUSTOMER SAID SHE LEFT HER MONEY ON COUNTER.

MILISSA TOLD BUTCH MONA QUIT WHEN SHE DIDN'T. FELT LIKE MILISSA LIED TO BUTCH.

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| SEVERAL INCIDENTS | 4/04/06 TOLD BUTCH LaQuisha QUIT |
| If more than one occurrence, list all dates and times. | |

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| Shamayfa Bethel | Cashier | | | |
| Butch Lovett | Cashier | | | |
| Dan Holcomb | Cashier | | | |
| Carly Bracken | Clerk | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/01

FJ 0077

Feels Like Butch was a great Mgr. Felt Like Aligation on Butch were Not True.

Tanishia Has never heard Butch Comment About Any Sexual Advances. Did Mention That All Mgrs. Butch, Milissa, Tanishia, John, Debbie All Joked Around, never About Sex or Racism.

Talked About Prostitute in Parking Lot Just Jokng when he mentioned Not to Kick off Lot it Might Be my Next Wife, Every one Just Laughed it Off.

Tanisha Upshaw
04/19/06

Michelle Walter
4/19/06

Angela Nichols and Milissa got in . an
Arguement in office and Milissa told her to shut up
told Milissa not to talk to her like a child

Pamala Holcome had same down talking to
her also

Better Communication between Mona & Milissa
felt like Butch was best manager she has
ever worked for

Karey Breaden had a line from Cash stand
to the Restaurant and Milissa wouldn't
help him page 5 time w/o answer

Milissa sits in count down room 95% of
her time and 5% on Desk. According to Laquisha

Taneshia Means need to talk to
Marzett Thomas   "   "    "    "

X Laquisha L. Mag___
_____

legemp:: Print Que

· April 19, 2006

To whom this may concern:

I Laquisha "Mona" Magee am writing a statement in regards to incidents that have occured between Milissa & I and Milissa and other employees. Milissa and I have had several disagreements with each other when and comes down to how she talks to the employees she talks to them like they are children she told one employee when she asked her to not give all the hours to Pam she told her she gives all the hours to Pam because Pam doesn't Bitch. another incident occurred when a customer said she Prepayed for 40.00 in fuel but she didn't Milissa then had the cashier Shamarra Bethel to empty her pockets in front of all the guests and employees to make it look like she felt as if Shamarra was stealing. She later had another incident with Angela Nichols when Angela came to work about 5 mins late whereas she later fired Angela but then had to call her back to work, if it wasn't for Butch she would not have called her back because he told her that wasn't enough grounds for termination there have been several occassion where Milissa could see that the fuel desk needed help when alot of guests where in line she would not answer her phone or hand-out

legemp:: Print Que

she was called to come help out the
fuel desk she would say hold up I was
busy in the back doing something but what
is more important than the guests.
   The incident that occured between Melissa +
I was in the cooler on April 4, 2006 when
I asked her in the presence of the merchandising
Manager Teresha Upshaw if she could find
a replacement for me that Wednesday or so
that I could take my son to the doctor because
he has heart problems I also informed her
that he might be having open heart surgery
she said to me oh that not that serious I
had it done when I was 4 years old was her
reply. So the rest of the shift went by fine
with Melissa and I until she got off @ 10pm
and she left about 10:30 because she
later called me on my cell phone @ 10:40
p.m. while I was still working and said
to me Mona I don't want you to think
I'm trying to be mean or sound bossy
but I really don't think your son is all
that sick. I gave her a few choice words
let her know how I felt about what
she said and then I hung up in her
face. She later called Butch and told
him I quit in the cooler which was
a lie

                Sincerly "Mona" Mona    4-4-06

FJ 0081

legemp:: Print Que



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| Tysen | 4/19/06 |

| Person being interviewed | Person conducting Interview |
|---|---|
| Hay Pam Holcomb | Mike Walton |

| Where did the interview take place? |
|---|
| Mgr's Office |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question** for witnesses other than the Complainant. "Are you aware of any violation of the Company's Policy Against Discrimination and Harrasment, or any other Company policy?" Melissa talks down to her in front of customer. One time about dropping cash, not helping with long lines. 2 people. Talks mgrs to track people like she treats people. Mgrs not talking till consistantly, not trust between mgrs & employees

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| If more than one occurrence, list all dates and times. | |

#### Please list those involved.

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

#### Please list witnesses.

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/0

FJ 0082



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| Tyson Al. | 4/19/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| Zyrellia Jackson | Mike Walton |

**Where did the interview take place?**
Mgrs Office

---

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question** for witnesses other than the Complainant: "Are you aware of any violation of the Company's Policy Against Discrimination and Harassment, or any other Company policy?"  Working Zee by Herself, Melissa sitting in office.
Wants the Zee to tell Melissa she's a good Manager
Zee doesn't feel its right.
Customers telling Cashiers that Melissa needs to get off her behind and help.

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| | |

If more than one occurrence, list all dates and times.

---

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**What resolution does the complainant recommend?**

| |
|---|
| |
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/t

FJ 0083

MANAGERS NEED TO BE PART OF TEAM (Nilissa)
FEELS MERCH MANAGER AT TIME GETS A POOR
ATTITUDE ABOUT HELPING W CUSTOMERS.
MANAGERS NEVER PULL OWN TILLS.

Zykellis Jackson
4/19/06
Michele E. Walton

legemp:: Print Que

Page 17 of 26

[illegible] change [illegible] crying [illegible] a [illegible] that
[illegible] giving personal [illegible] at work)
[illegible] one [illegible] of [illegible]
[illegible] will tell the other person
[illegible] talking about

[illegible] manager

[illegible] pull [illegible]
[illegible] know pump the amount was
[illegible] only [illegible] once
[illegible] first opened

[illegible] all the managers had a bad habit of
[illegible] someone [illegible]
[illegible] appropriate to that
[illegible] stealing [illegible] I [illegible]
[illegible]

[illegible]

Zykellia Jackson

FJ 0085

http://gildersleeve/fjiasp/print.asp?Count=26&Query=1&Page=1&PageSize=12&Zoom=&c... 4/4/2007

legemp:: Print Que



# INTERVIEW FORM FOR INVESTIGATING
# EMPLOYEE COMPAINTS
### CONFIDENTIAL

| Plaza Location | Date of Interview |
|---|---|
| SHAWAYYA BETHEL | 4/18/06 |

| Person being interviewed | Person conducting interview |
|---|---|
| Tyson, Al. | Mike Walton |

| Where did the interview take place? |
|---|
| Mgr's OFFICE |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question for** witnesses other than the Complainant: **"Are you aware of any violation of the Company's** Policy Against Discrimination and Harrasment, or any other Company policy?"

SEE ◆ STATEMENT

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| | |

If more than one occurrence, list all dates and times.

Please list those involved.

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Please list witnesses.

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

What resolution does the complainant recommend?

| |
|---|
| |
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/01

FJ 0086

legemp:: Print Que

04-18-06

I am not very sure of the date but it was around the last weekend in March about 9:30 pm my shift ends at 10:00 pm. A customer who speaks (no english) apparently come in to pay for fuel but because we were so busy I think she just layed her money down on the counter and walked out of the store. About five minutes later the customer returns. She is asking for her change out of $10.00 she must have pressed the pay inside button because she pumped only $1.00 I told her she did not give me any money because if she did I would have preset her pump for the amount she gave me. The lady refused to pay for the fuel she pumped because she had already paid An

FJ 0087

(10-05) So Milissa told me to empty my pockets to show that I didn't have the money.

                                    Shamarre Bottle

Shamayya told me empting her pockets at the time didn't bother her she just wanted to issue Resolved

Milissa explaine she wanted to prove to the customer that Shamayya didn't steal the money.

                                    Mike Walton

FJ 0088



# INTERVIEW FORM FOR INVESTIGATING
## EMPLOYEE COMPAINTS
### CONFIDENTIAL

| | |
|---|---|
| Plaza Location _Tysons, AL._ | Date of Interview _4/18/06_ |
| Person being interviewed _Angela Nichols_ _Sukmanna Butler_ | Person conducting interview _Mike Walton_ |
| Where did the interview take place? _Managers Office_ | |

What did the person see or hear? Describe what was said or done and who was involved. **Suggested question** for witnesses other than the Complainant: "Are you aware of any violation of the Company's <u>Policy Against Discrimination and Harrasment</u>, or any other Company policy?"

_See Statement_

| Where did the incident take place? | When did the incident occur? (date & time) |
|---|---|
| If more than one occurrence, list all dates and times. | |

**Please list those involved.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| _Doug_ | _Rest Mgr_ | | | |
| | | | | |
| | | | | |

**Please list witnesses.**

| Name | Position | Address | Telephone # | Social Security # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**What resolution does the complainant recommend?**

| |
|---|
| |

Attach additional notes as necessary. Forward all documentation to the Corporate Human Resources Director.

1/

MILISSA WOULD HELP IF CALLED BUT ONLY
IF CALLED

ANGELA ~~SHANIKFA~~ FEELS LIKE EVERYONE WANTS TO BE
THE EXAMPLE BRANDON, MONA,


Angela Nichols


FJ 0090

4/18/06

I came into work on Friday night
about 3 wks. ago and Millissa
called me into the mangers office
and she was talking about me being
late and leaving early. I'm a 3rd
shift worker and I had ask her
the week before she fired me if
I could probably work from 8pm
to 4a.m because my mother was
keeping my kids and she had to be
@ work @ 5a.m. so I was going
to need those hours. And thats
why I left early two times and
it was only 45mins. when we got
in the mans. office she explain all
that to me and I agreeded that
I was late and I did leave
early a few times, and I told her
that I couldn't change that, becaus.
it was in the past so she told me
that if it happens again that I
was fired, and I said ok thats
fine so she keep going on and on aba
the situation and telling me was
I was going do and what I can
and can't do. so I took it for awhile
and then I told her you're going
to lose a lot of employees on...

FJ 0091

legemp:: Print Que

you don't know how to talk to
them I told her I'm a grown
woman and she said well act
like one, and that's when
I told her you don't know
me like that, after I signed
the write-up and correoled
to my mistake I put on
my comment, I want to speak
to Mr. Butch!! and that's when
She fired me she said I could
write that. I had to put the
reason why I wanted to
speak with Butch so I told
her that I would just scratch
that out and not put anything
but she said no for me to just
go, and I say why? you can't
get mad cause I won't
write why I want to speak with
Butch. So she called Butch
and talk with him and told
him what happen and he told
me to just leave and come back
when he come's from out of town
So I left. And she called me
back Sat. and told me to come
in

FJ 0092

I apologize to her if she thought I had did something wrong and or said something and that was that.

Angela Nichols

FJ 0093

 **Employee Termination Form**

(Employee Termination Travel Plaza)

Requester: bk tyson  Phone#  Date: 04/25/2006 06:48 AM

* -- Required Field

| | |
|---|---|
| * Last Name | jones |
| * First Name | milisa |
| Middle Name | dawn |
| * Social Security Number | |
| * Branch # (7 digit) | 0500143 |
| * Branch # (5 digit) | 05143 |
| Branch Description | TYSON, AL FC |

*Note: If you have an address change for the employee, make the change under the Employee Change of Address Form.*

| | |
|---|---|
| * Last day worked | 04/13/2006 |
| * Termination Date | 04/21/2006 |
| Enter the employee's actual termination date. | NOT THE DATE THIS FORM IS BEING SUBMITTED. |
| * Was the employee transferred to another Flying J location? | No |
| * Type of Termination: | Involuntary |
| * Reason for Termination: | EXCESSIVE ABSENTEEISM |
| * Would you rehire this employee? | N |
| * Comments: (120 characters max) | too many call in (seven days) |

**Approval Information**

Status          Complete by gm tyson

| Requester | Approvers |
|---|---|
| bk tyson | ⇨ gm tyson |
| | Kerry Lake |

*Other Approval Information*

| Approver Name | Function | Due Date | Exp Action | Advance | Status | Date |
|---|---|---|---|---|---|---|
| gm tyson | Manager | 04/27/2006 | Notification | Skip | Approved | 04/28/2006 02:42:29 PM |
| Kerry Lake | Supervisor | 04/28/2006 | Notification | Standard | Skipped | 04/25/2006 06:48:33 AM |



FJ 0118

AUGUST 2001



FLYING J INC

Retail/Interstate Operations
Employee Handbook

FJ 0120

FJ 0121

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007

## Table of Contents

Superseding Effect ................................................................. 3
Welcome! ............................................................................. 5
Employment At-Will ............................................................. 6
The Flying J Story ................................................................. 7
The Flying J Team ............................................................... 10
Starting To Work ................................................................. 12
    Training ......................................................................... 12
    Employment Status - Full time/Part time ...................... 12
    Schedules ...................................................................... 13
    Absenteeism .................................................................. 13
    Punctuality .................................................................... 13
Personal Conduct ............................................................... 14
    Personal Hygiene .......................................................... 15
    Appearance ................................................................... 15
    Uniforms ....................................................................... 16
    Work Shoes ................................................................... 17
    Breaks and Meals ......................................................... 17
    Parking ......................................................................... 18
    Off-Duty Visitation ....................................................... 18
    On-Duty Visitation ....................................................... 18
    Company Telephones .................................................... 18
    Lost and Found ............................................................. 18
    Solicitation ................................................................... 18
    Food Handler's Permit ................................................. 19
Your Pay ............................................................................. 20
    Pay Days ....................................................................... 20
    Time Clock .................................................................... 20
    Jury Duty ...................................................................... 20
Employee Recognition and Rewards .................................... 22
    Length of Service Awards ............................................. 22
    Employee Discounts ..................................................... 22
    Recruitment Bonus ....................................................... 22

(continued on next page)

Page 28 of 60

regemp:: Print Que

|  |  |
|---|---|
| Employee of the Quarter and Year | 23 |
| Benefits Highlight | 24 |
| Cafeteria Style Benefit Package | 24 |
| Retirement Benefits | 24 |
| The 401(k) Plan | 25 |
| Vacation | 28 |
| Holidays | 30 |
| Sick Leave | 30 |
| Compassionate Leave | 31 |
| Company Policies and Regulations | 32 |
| Antitrust Guidelines | 32 |
| Drug and Alcohol Policy | 33 |
| Sale of Tobacco Products | 38 |
| Sale of Alcoholic Beverages | 38 |
| DRAM Shop Act Information | 39 |
| Leave of Absence Policy | 40 |
| FMLA Leave | 40 |
| Military Leave | 47 |
| Discrimination and Harassment | 48 |
| Workplace Violence Policy | 52 |
| Personal Computer Policy | 53 |
| Personal Computer Usage | 53 |
| Loading a Disk or Data | 53 |
| Repairs | 54 |
| Policy on Confidentiality | 54 |
| Anti-nepotism Policy | 55 |
| Gifts and Gratuities | 56 |
| Safety Rules | 57 |
| Lifting Policy | 59 |
| Cutting Glove Policy | 59 |
| Tip Reporting Policy | 59 |
| Grounds for Immediate Termination | 60 |
| Employee Discipline Policy | 61 |
| How to Contact the Corporate Office | 65 |
| Deduction/Withholding of Wage Authorization | 68 |
| Acknowledgement | 68 |

FJ 0122

## Superseding Effect

The provisions and policies contained in this employee handbook supersede all other representations or practices of any officer, director or employee of the Company to the contrary. The policies and terms contained in this handbook may be changed only in writing explicitly changing or modifying a designated policy contained herein, which written modification shall be signed by a Corporate President or Vice President.

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...     4/4/2007

Page 29 of 60

.egemp:: Print Que

FJ 0123

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c... 4/4/2007

This handbook contains certain policies and employment guidelines of Flying J Inc., and its affiliated entities (collectively referred to as "Flying J" or the "Company"). These policies are excerpts from the *Flying J Interstate Operations Policy Manual*. You are required to certify that you know and understand each policy and employment guideline. If you have any questions about anything in this handbook, you should ask your supervisor or the Corporate Human Resource Department for clarification.

This handbook applies to all Flying J Retail Operation employees except to the extent that anything in this handbook is inconsistent with written employment contracts for a term certain, signed by the employee and by the Company. Retail Operation employees are those who are employed at travel plazas, gasoline stations, convenience store, J-care centers, restaurants, motels, and all other retail operations.

Flying J reserves the right at any time, in its sole discretion exercised from time to time, to delete from or change policies in this manual and/or add new policies to this manual.

After you have read this handbook, please sign the certificate on the last page of this book and submit it to the Corporate Human Resource Department.

## Welcome!

WELCOME to Flying J! We want to welcome you and wish you success in your new job.

We are firmly convinced that the greatest assets any company can have are conscientious, reliable and skilled employees. You were selected because you stand apart from others who applied — because there is something special about you. This handbook has been prepared to explain some of the benefits and responsibilities you have as a member of our organization and to provide information for you and your family about your job and future with Flying J. This handbook explains policies and procedures which have made Flying J Travel Plazas great places to work! It will also answer many of your current questions, as well as others which may arise in the future.

As you begin work, ask questions — address them to your General Manager or supervisor. We all want to help you and to make sure our relationship together is mutually fruitful.

_____

Your General Manager

_____

Your Immediate Supervisor

_____

Work Telephone Number

Page 30 of 60

legemp:: Print Que

FJ 0124

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007

## Employment At-Will

Flying J believes that it will be successful only if its employees are satisfied with the Company and if the Company is satisfied with its employees. To foster this kind of relationship, Flying J maintains an Employment At-Will policy. Employees who are not satisfied with any aspect of their employment with Flying J are free to leave Flying J's employ at their will. Likewise, when Flying J is dissatisfied for any reason with any aspect of an employee's performance, Flying J reserves the right to terminate the employment relationship at its will.

Nothing contained in this employee handbook or in the employee's application for employment or in any other written or verbal communication (with the exception of a written employment agreement signed by both the employee and an officer of the Company wherein it is expressly stated that the parties intend to create a binding employment agreement for a term certain) shall be construed to impose any obligation of continued employment upon the Company. It is understood that the relationship between the Company and the employee is at-will and may be terminated by either the employee or the Company at any time with or without prior notice. No Company supervisor or other employee is authorized to make any representations, promises or employment commitments contrary to the Company's policy of at-will employment (except that an officer of the Company may enter into a written employment agreement with one or more employees, but only for a term certain); and employees shall not rely upon any statement of a supervisor or other employee as an employment commitment contrary to the Company's policy of at-will employment. Furthermore, no employee may rely upon any custom or program of the Company, such as a progressive discipline program, to override or replace the Company's policy of employment at-will. Neither the employee nor any local, state or federal adjudicator shall rely upon or construe any language contained in this policy manual or any other written or oral statement (except a written contract signed by an officer of the Company and the employee expressly creating an employment contract for a term certain) as creating an employment contract, express or implied, or otherwise modifying the at-will relationship intended to exist between the Company and each employee.

## The Flying J Story

By way of introduction, we would like to give you a brief history of Flying J's growth and development as well as the reasons for our success. Flying J has been built upon a strong commitment to excellence. This commitment to excellence has been a tradition at Flying J since the early 1960's when Jay Call opened his first gasoline station in Willard, Utah. Jay's philosophy paid dividends in the form of customer satisfaction and a rapidly expanding business, with the opening of several self-service gasoline stations in 1968.

In an effort to supply these stations with motor fuel products more reliably and economically, Flying J acquired its first tanker truck in the early 1970's. This was the beginning of Flying J's wholesale and transportation operations, which today consists of a fleet of over 250 tractors and trailers and distributes over 200 million gallons of motor fuel monthly to outside customers in addition to supplying some of Flying J's retail operations.

Because of the success of the first stations, more stations were planned and built. In order to minimize construction costs, Flying J developed its own design and construction department. Later, when plans were made to expand into restaurant and motel operations, the design and construction department grew to accommodate those increased needs.

In 1978, a major innovation in motor fuel sales was introduced by Flying J. As gasoline prices increased in the 1970's, it was evident that the growth in gasoline demand experienced in the 1960's would not continue. In order to sustain the rate of growth Flying J had experienced, it was necessary to promote additional products and to identify new markets for the Company to target. It was determined that the transportation industry would continue to experience growth, and the industry did not have the option to cut back its fuel consumption as did most gasoline users and that interstate commerce and demand for motor fuels would increase. With its continuously growing operations and its aggressive retail marketing program, Flying J was prepared to establish a nationwide network of Flying J Travel Plazas.

The first Travel Plaza was completed in Ogden, Utah in 1979. The extraordinary success of the Ogden Travel Plaza confirmed that the expectations of the motoring public had been met and exceeded in this

Page 31 of 60

legemp:: Print Que

FJ 0125

http://gildersleeve/fjasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...     4/4/2007

market.

In 1980, Flying J acquired a group of affiliated companies from Inter-City Gas, a Canadian oil and gas company. This acquisition provided Flying J with oil and gas properties, retail sales facilities similar to the existing Flying J stations discussed earlier and retail propane operations.

The next major expansion for Flying J was the 1985 acquisition of Husky Oil LTD's United States downstream operations which included refineries, marketing properties, and transportation operations. Flying J acquired important refining, supply, and distribution capabilities, including its North Salt Lake City, Utah, refinery and its pipelines and terminals. In addition, Flying J gained a strategically situated network of interstate marketing facilities which have been upgraded to conform to Flying J standards.

In 1988 Flying J purchased the oil and gas holdings of Great Western Resources which included properties in the Uintah Basin of Eastern Utah. This acquisition further solidified Flying J's position to supply its refineries with a steady supply of crude oil.

In early 1991, Flying J and Conoco Inc., announced a joint venture to establish a national chain of full service travel plazas along the nation's interstate highway system. Under the agreement, Conoco acquired 50 percent in the existing network of Flying J facilities, and will participate in the acquisition and construction of future plazas.

Flying J's signature technology has revolutionized the interstate marketplace with its fully automated fuel desks and Express Pay Cardreaders at the fuel islands. Fuel transactions are literally processed at the speed-of-light through a dedicated communications network. Flying J's development of the most influential, high-tech industry information services, an intensely competitive fuel pricing structure, and unique service philosophy puts this company in the enviable position of being the largest retail distributor of diesel fuel in North America.

Today, Flying J has established itself as a leader in interstate motor fuel marketing and is numbered among <u>Forbes</u> top 100 privately held companies. Your commitment to excellence in your work with Flying J will guarantee our continued success in the future. This thought in mind, please read this employee handbook carefully and commit yourself to Flying J's standard of excellence.

In addition to the support you receive from your plaza management team, your plaza is supported by your District Manager, and the Corporate Office of Flying J. Employees at the Corporate Office handle payment of bills, collection of accounts, general accounting work, and the administration of your pay and benefit plans.

Learn from the managers and your fellow employees what is done in each department. You will want to know about opportunities for your career advancement, as well as how to answer customer questions.

Flying J's goal is to become the world leader in providing highway hospitality. You are an important part of the growing Flying J reputation. Our travel plazas are known for their cleanliness and excellent customer service. We are a 24 hour - 7 day a week operation. This places special burdens on you and all Flying J employees. Our customers are away from home and are looking for a friendly place to stop. No matter what time of day or night, we always have time to be helpful and friendly. Our responsibility is to meet our customer's needs — promptly, completely, and efficiently.

legemp:: Print Que

## The Flying J Team

Flying J's future success and strength are based upon the continuous development of each individual. We want to encourage a spirit of teamwork. Therefore, we desire the following for and from our employees:

1. The Company and its employees should respect the individual dignity of each employee.

2. When possible, employees should be provided avenues and opportunities for advancement. The Company attempts to promote from within whenever possible.

3. The Company attempts to hire and promote the best, qualified person available to do a particular job, without regard to race, religion, color, sex, age, national origin or disability.

4. The Company attempts to pay fair and equitable wages based on the relative value of the jobs within the location and with due consideration to rates paid in our operating area and in the same industry for comparable work.

5. As long as it is economically feasible to do so, the Company desires to make available certain group insurance programs which are designed to lessen or eliminate the economic impact of a personal injury or illness.

6. The Company encourages management to give informal appraisals of employee progress from time to time and to conduct formal employee performance reviews annually.

7. The Company provides employees with an effective means to voice complaints and make suggestions. No member of our management team is too busy to hear problems or complaints of any employee and no employee will be discriminated against, lose their job, or be treated less favorably because of voicing a complaint.

8. The Company's goal is to provide effective leadership conducive to high level of performance. Training, coaching, and counseling will be available to all employees so their performance can meet the

10

required level.

9. The Company considers employees its most valuable asset; the human side of our business is and always will be the major factor in Flying J's success.

We ask and expect from you the following:

1. Put in an honest days labor for the wage you will be paid. Be honest in all your dealings with Flying J.

2. Look for ways to improve your job and make the Company's operation more efficient. Communicate your ideas to management.

3. If you ever feel that you need more training to do your job effectively, continue to remind your supervisor until you feel adequately trained.

4. Be positive and pleasant in your communications with customers, management and fellow employees.

5. Take care of Company property and do not abuse Company benefits or programs.

6. Comply with all Company policies and procedures.

11

FJ 0126

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007

## Starting To Work

Nervous? Sure. Why not! We all were. But at Flying J we will help you learn your responsibilities and skills so you can do the job "RIGHT" and can take pride in the services you are providing. Ask questions. Judge your effort as if you were the customer.

### Training

We will train you "on-the-job." Back up materials and instruction will be provided by your supervisor before you begin and at monthly employee meetings, which you will be expected to attend. You will learn most about your job by actually doing it.

You will be trained by a Certified Trainer whom will take you through a structured training program to help you get off to a great start. When your formal training is completed you, your trainer, and manager will sign a commitment to success indicating you have all the tools and information needed for a successful work experience.

If you have questions about a job or if you feel you have not been adequately trained for your job, talk to your supervisor or General Manager. You must take responsibility to see that you are trained adequately.

### Employment Status - Full time/Part time

At the time of employment with Flying J, all personnel must be classified as either full-time, part-time, casual, or temporary. Full-time employees are those who regularly work 30 hours or more a week. Part-time employees are those employees who regularly work less than 30 hours a week.

Active "casual" employees are those employees who work sporadically full-time or part-time. The status of these employees should be reviewed every six (6) months.

Active "temporary" employees are those employees who are hired on a project or temporary basis only, but who may work up to 40 hours per week or more. Generally the project or assignment will last less than six months. Temporary employees are not eligible for any Company fringe benefits.

Change in full-time or part-time classification may occur at any time and may be contingent upon criteria established by Company management.

### Schedules

Knowing when and where to report to work is a joint responsibility. Your manager will show you the schedule and where it will be posted each week. It will be posted in advance to minimize schedule conflicts that may arise. Each employee is expected to work his/her scheduled work shifts. Any changes or exceptions require prior management approval. You are responsible to report as scheduled or to notify your manager well in advance (minimum 4 hour notice) if you will be unable to meet the schedule. You need to be ready and available to work at the scheduled time.

Remember, we are a 24 hour, 7 day operation, and it is likely you will be asked to work some nights, weekends, and holidays. Also remember, both your associates and your company are counting on you for the times indicated on the schedule.

### Absenteeism

We understand that emergencies and illness do arise making some absences unavoidable. At least four hours notice must be given to the manager on duty if you cannot work a scheduled shift. Not reporting to work will be cause for job abandonment and can result in job termination. Excessive absences, whether excused or otherwise may result in a performance evaluation by your manager. If the matter is not resolved it will result in disciplinary action up to and including termination.

### Punctuality

Tardiness promotes ill feelings among your fellow workers and is ultimately reflected in poor service. It is essential that you start your shift at the scheduled time. Excessive tardiness will result in disciplinary action up to and including discharge.

12

13

FJ 0128

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...   4/4/2007

## Personal Conduct

While you are employed with us, you are a representative of Flying J. Your personal conduct influences your work performance as well as the image our customers form about our company. The following are guidelines for appropriate personal conduct:

1. Do not chew gum, toothpicks or any object while on duty.

2. Do not discuss tips or wages in any public area of our facilities.

3. Drinking beverages, smoking and eating are permitted only in designated areas.

4. Employees may NOT take "doggie bags" out of the restaurant or delis when leaving work.

5. When you are in the travel plaza while off duty, please conduct yourself as a customer. It becomes quickly apparent to other customers that you are employed with the company and your appearance should be appropriate. Do not enter the kitchen, deli, or go behind any counter or bar. Do not wear your uniform at the plaza when you are not on duty.

6. Leave your personal problems at home.

7. Enter and exit the building by the front door only.

8. Always be positive with customers. If it is impossible to fill a customer's needs, tell the customer in a positive, not negative, manner. If the customer continues to be upset, refer them to your General Manager.

9. If you see someone who needs help, pitch in!

10. Under no circumstances should an employee disclose any information that he may overhear while serving a customer. This relates to business discussions as well as personal matters

11. Clean up after yourself in the employee dining areas.

14

12. Treat co-workers in a professional manner, with respect and a positive attitude.

13. Remember, our customers are the reason you get a paycheck and they should be treated in a professional manner with a pleasant attitude.

### Personal Hygiene

In the interest of cleanliness, always wash your hands:

1. When you cough, sneeze, touch your face or blow your nose.
2. After smoking.
3. At the beginning of your shift.
4. After using the restrooms.
5. Whenever your hands become soiled.

A clean, orderly work place enhances your ability to do your job and imparts a positive image of our business to our guests. It is a shared responsibility. If you see something out of place, return it to where it belongs. If you see a spill make sure it is immediately cleaned.

### Appearance

Your personal appearance should be as professional as your job performance. Therefore, there are basic appearance standards that apply to all employees regardless of their job function:

1. Shower or bathe daily and use a good antiperspirant.

2. Men may wear mustaches that are neatly trimmed. Shave daily. You must be clean-shaven prior to your shift. This means no beards allowed.

3. Make up should be moderately applied and wholesome in appearance. Perfume and cologne should be subdued. Jewelry should be kept to a minimum, and what you do wear should be unobtrusive One small ring per hand allowed. No wrist or ankle bracelets are allowed. Post earrings, no larger than a nickel, no dangle earrings of any type. Men may not wear earrings while on

15

duty.  No sunglasses are allowed.

4.  Hands and nails should be clean at all times.  Hand sinks are provided so that you may wash your hands during your shift when necessary.

5.  Maintain a clean, neat hairstyle.  All styles should be maintained to present a well-groomed appearance.  If you are required to wear a uniform, all hairstyles must be worn above the shirt collar.  No ponytails for men will be allowed.  Those employees working around food must have their hair back away from the face and restricted.  No unusual cuts allowed.

6.  Shoes must be clean, in good repair, and non-skid.  No tennis shoes or open toed shoes are allowed.  Socks must be white, black or brown, depending on the uniform worn.  Nylons must be skin tone or suntan in color only.

7.  All clothing must be well pressed, in good repair and clean.  Appropriate undergarments are to be worn.

8.  Brush your teeth daily.  Make sure your breath is fresh.  Smokers, use mints before work.

9.  All personal belongings must be kept in lockers.

10.  No chains are to be hanging outside of your uniform.

11.  Report to work in your uniform.

12.  First impressions are important.  Customers develop impressions of the service they can expect based upon your appearance.  A smile is always appropriate.

13.  Visible tattoos and visible body rings or bars (other than earrings for female employees) are not allowed.

## Uniforms

Our policies of cleanliness and customer service begin with your appearance.  You are Flying J's ambassador and your appearance — your

16

impression on the customer makes a difference.  We take pride in you as our representative and we ask you to take pride in how you represent Flying J.

Required uniforms are provided free of charge.  Your manager will explain the procedures.  The uniform should be kept neat and clean and replaced as needed.  If your uniform becomes worn, soiled or ill-fitting, ask your manager for a replacement.  The uniform must be returned to your manager if your position is changed to a different job classification or if your employment is terminated.

## Work Shoes

Flying J is concerned about your safety.  Wearing proper shoes is an important factor when working around any kind of equipment.

Due to the potential for wet and/or slippery areas that Flying J retail employees may encounter, and the injuries that can result from slipping and/or falling, the following is adopted:

Except under special conditions requiring management approval, all Flying J Retail Operation employees (e.g., restaurant, convenience store, saloon, motel, etc.), as a condition of employment, are required to wear "non-skid" rubber or neoprene soled shoes when working.

## Breaks and Meals

Your job is providing service with a smile.  Doing this sometimes requires special effort.  At times you will feel pressure.  We recognize this and want to help you in coping with it.  Meal and 10 minute breaks are part of this assistance and are assigned by your manager with consideration to the level of business activity and the schedules of the employees.

Employees are entitled to one 1/2 hour unpaid meal break and two 10 minute breaks per 5 hours worked, except as otherwise required by local law.  It is not intended that the break periods be combined to make one continuous break period.  Employee meals are restricted to on duty employees only.  Employees are not allowed to eat in the customer service area when the employee is on duty.  Meals may be purchased 1/2 hour before or 1/2 hour after your shift begins or ends.  Employee meals may not be made "to

17

FJ 0130

## Your Pay

It is Flying J's desire to pay wages to it's employees that are competitive with wages paid for similar work in the industry or in the surrounding work area. Flying J also desires to make opportunities for advancement in employment available to employees who prove their value to the Company. Your manager has told you what your starting pay will be. Now it is up to you to show you are willing to accept more responsibility and earn more pay.

Overtime is paid in accordance with applicable law. Generally, the rate is 1.5 times the regular rate of pay. State and federal law determines what overtime rules apply.

### Pay Days

Paydays are bi-weekly (every two weeks) for the pay period beginning on Sunday and ending on Saturday (14 days). Generally, employees will be paid on the next Thursday following the end of the pay period. We cannot accommodate any requests for pay advances.

### Time Clock

Employees classified as non-exempt are required to clock in accurately to record time worked. You are paid for actual time worked. You must begin working at the time you clock in. You may not clock in more than 5 minutes prior to the beginning of your assigned shift. No one is allowed to work "off the clock," ever. All employees must review their hours worked at the end of the pay period, verifying accuracy of hours. To clock in or out for another employee or to falsify or modify any person's time card is cause for immediate dismissal.

### Jury Duty

Flying J encourages employees to participate in civic affairs. If you are called for jury duty, you will be excused from work for the period necessary to serve on the jury with no loss of job status. For each day during the first five (5) full business days that you serve as a juror at a trial you will be paid the daily difference between the daily pay received for jury duty and your pay for the scheduled hours missed that particular day.

If the trial extends beyond five (5) business days you will be excused to serve on the jury but Flying J will not pay your wage after the first five (5) business days unless (i) required by law to do so or (ii) your Department Head authorizes additional payment. You must present a certificate from the court clerk specifying both the time you served on the jury and the jury earnings as proof of service and request for subsidization.

20

21

legemp:: Print Que

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...   4/4/2007

## Employee Recognition and Rewards

### Length of Service Awards

We are proud of the many employees who have been with Flying J for long periods of time. Awards recognizing length of service are presented to all full time employees after three, five, ten, fifteen, and twenty years of service.

### Employee Discounts

Full-time employees of Flying J Travel Plazas are allowed discounts for restaurant meals, convenience store purchases, deli food and fast food item purchases at the plaza where they are assigned. Employee purchases must be approved by the manager on duty and must not be rung up by the employee making the purchase.

Full-time employees are entitled to a 20% discount on most merchandise purchased through the convenience store. This discount is not available on non-deli food items, alcohol, tobacco, gasoline, magazines or items if discounted would be below Flying J cost, and requires a minimum purchase of $10.00. Merchandise must be purchased for employee use only.

You can receive a 50% discount in the fast food restaurants and deli (scheduled employees only) on one meal only purchased during your shift. This meal also may be taken within one-half hour before or one-half hour after the scheduled shift. Meals must be consumed in the break room. You are not allowed to eat in the restaurant.

### Recruitment Bonus

We hope you will find this such a good place to work that you will encourage your friends to work here also. If you do, we will reward you with:

1. A free dinner of your choice on the first day the person you recruited comes to work.

2. A $50.00 gift certificate when the individual completes 30 days.

22

3. Another $50.00 gift certificate when the individual completes 60 days.

This benefit is available each time you recruit an employee and does not apply to re-hires. Watch your employee bulletin board for information about job openings and encourage qualified acquaintances to apply. Tell your manager and tell the applicant to let us know the application comes from your recommendation.

### Employee of the Quarter and Year

Flying J offers recognition to those employees who go "above and beyond the call of duty" in their daily work, offering outstanding customer service and exhibiting unparalleled teamwork. These employees are nominated by fellow workers and/or supervisors and become eligible for "Employee of the Quarter." All "Employees of the Quarter" then become eligible for "Employee of the Year." Employees are encouraged to nominate co-workers for this award. See your General Manager for details.

23

FJ 0132

## Benefits Highlight

## Cafeteria Style Benefit Package

New employees that have worked 6 consecutive months of 30 hours per week or more are eligible to enroll into the Benefits Package and receive benefits effective the first of the month following 6 consecutive months of full-time employment. The Benefits Package includes:

<div align="center">

Health Insurance
Dental Insurance
Life Insurance
Disability Insurance
Health Care Reimbursement Account
Dependent Care Reimbursement Account

</div>

Flying J will add a predetermined amount of "Flex Dollars" to an eligible employee's paycheck to help them purchase the Benefits Package. If employees waive the Benefits Package their "Flex Dollars" will be converted, at a reduced amount, to taxable income. Since the Benefit Package is a qualified Section 125 Plan, according to provisions of the Internal Revenue Code, employees can only make changes, enter, or terminate coverage from the Plan yearly during an announced Annual Enrollment period. In most facilities the Accounting Manager will coordinate with the Corporate Benefits Department in answering your questions, or employees may call the Corporate Benefits Department.

## Retirement Benefits

The Company's retirement plans can help you toward a secure financial future while you're working at Flying J. The retirement plans include:

- A 401(k) Plan that lets you put away money for retirement with help from both Flying J and the government.

- The Federal Social Security system, where your coverage is

<div align="center">24</div>

funded through equal contributions from you and Flying J.

### Eligibility and Enrollment

You may start contributing to the 401(k) Plan the first of the month following your completion of one year of credited service. Your Social Security coverage at Flying J begins on your date of hire. Both you and the Company start paying Social Security (FICA) taxes when you receive your first paycheck.

### The 401(k) Plan

The 401(k) Plan lets you save between 1% and 12% of your pre-tax pay for retirement. When you do:

1. Flying J adds 50 cents to your 401(k) account for every dollar you contribute, up to a maximum company contribution of $1200 per year.

2. You can save money on your current federal and state income taxes. This is because your 401(k) contributions are not included in your pay when income taxes are figured.

3. You decide how you want your money and the Company's matching contributions invested. The Plan offers several investment funds - and lets you put all your 401(k) money in one fund, or divide your money up among the funds. Each fund offers different degrees of growth potential and investment risk. The growth of your account depends on how the funds you choose perform.

4. Investment earnings go into your account on a tax-deferred basis. You don't pay income taxes on what your 401(k) investments earn until you get a benefit payment from the Plan.

5. More detailed Plan information and a description of the investment choices available will be forwarded to you when you become eligible to participate.

<div align="center">25</div>

401(k) Loans and Withdrawals

While the 401(k) Plan has been designed to encourage personal saving for the future, you do have some access to the money in your account while you are working at Flying J. First, you can borrow money from your 401(k) account. Loans are available up to 50% of your vested amount with a minimum loan of $1000.00. Generally, you can take out a loan for up to five years. Loans are paid back through payroll deductions, interest is charged at prime plus 1% determined when the loan is approved.

In certain times of "severe financial hardship," you also may ask to withdraw some or all of your own contributions to the 401(k) plan. Hardship Withdrawals are strictly limited by the Internal Revenue Service - usually the amounts needed to buy a home you will live in or to prevent being evicted from your home, or to pay for immediate family medical expenses and to pay college expenses for you or your immediate family. You can only withdraw your pre-tax contributions when funds are not available from other sources outside the Plan. A Hardship Withdrawal is a taxable distribution and as such federal taxes must be withheld on withdrawals made before you reach age 59 1/2.

Benefit Payments

Normally, benefits from the 401(k) Plan are paid at normal retirement age, which is 65. However, the Plan also may pay benefits if you leave Flying J before age 65, or in the event of your death or disability. The benefits you collect depend on:

- What you and Flying J have contributed to your 401(k) account and how your 401(k) investments have performed.

- Your years of service at Flying J. Service determines whether you are "vested" in your account - that is, whether you have a guaranteed right to the money in your account when you leave Flying J. Your pre-tax contributions to the 401(k) Plan are always 100% vested. Your vested right to the company contributions in your 401(k) account grows with your years of service at Flying J based on the schedule below:

| Years of Continuous Service | Vested Percentage |
|---|---|
| Less than 3 years | 0 |
| 3 years but less than 4 years | 20 |
| 4 years but less than 5 years | 40 |
| 5 years but less than 6 years | 60 |
| 6 years but less than 7 years | 80 |
| 7 years or more | 100 |

You will become 100% vested in company contributions at age 65 or in the event of your death or disability.

The usual method of payment is a lump sum cash payment of your vested 401(k) account balance. If your balance is $5,000 or more, Flying J must have your written consent to pay the balance to you. If your balance is less than $5,000, you must receive a distribution from the Plan.

How Benefits are Taxed

Benefits from the 401(k) Plan is taxed as ordinary income when you receive a benefit payment from the Plan. If you collect your benefits before you reach age 59 1/2, you may be subject to a 10% penalty. However, you may be able to roll over your money into another company's qualified retirement plan or an Individual Retirement Account (IRA) and continue to defer taxes on what you have saved. Check with your personal tax advisor for more information about your tax situation.

The Flying J 401(k) Plan can significantly increase retirement benefits. Participants will receive periodic statements from the trustee showing the balance in their account. If an employee wishes additional information regarding the Plan, the complete plan document is available for inspection at the Corporate Office.

## Vacation

Vacation time is intended for the personal rest and relaxation of full-time employees. Vacation time should provide an opportunity for employees to separate themselves from the responsibilities of full-time employment and dedicate the time to activities of their own choice.

All qualifying employees are encouraged to take their vacation. Employees will not, therefore, be paid for vacation time not taken during a year. No paid vacation time may be taken during the first (1st) year of employment.

All qualifying employees who work thirty (30) hours or more a week and who are either hourly employees that turn in all required time cards or who are salaried employees that make all required certifications as to vacation, sick leave or other leave ("Leave Certification") each pay period shall be eligible for the paid vacation leave according to the following vacation benefit levels:

   1st Anniversary of Employment ("Anniversary") - 1 Week
   2nd Year to 7th Anniversary - 2 Weeks
   8th Year to 19th Anniversary - 3 Weeks
   After 19th Anniversary - 4 Weeks

Vacation will be credited and accrued to qualifying employees who work forty (40) or more hours a week as follows:

No vacation shall accrue to any employee between the employee's employment date and the employee's first (1st) anniversary of employment. On the employee's first (1st) anniversary of employment, the employee will be credited with one (1) week of vacation and will begin to accrue vacation at the rate of 3.08 hours per eighty (80) hour pay period. On the employee's seventh (7th) employment anniversary date, the employee's accrued vacation account will be credited with one (1) week of vacation and the employee will begin accruing vacation at the rate of 4.62 hours per eighty (80) hour pay period. On the employee's nineteenth (19th) employment anniversary date, the employee's accrued vacation account will be credited with one (1) week of vacation and the employee will begin accruing vacation at the rate of 6.16 hours per eighty (80) hour pay period.

At no time will an employee's accrued vacation balance be allowed to exceed the employee's applicable vacation benefit level multiplied by 1.5. For example, an employee accruing two (2) weeks of vacation per year cannot have an accrued vacation balance at any time greater than three (3) weeks (two (2) weeks times 1.5 equals three (3) weeks).

Vacation accruals for employees who work less than forty (40) hours per week but more than thirty (30) hours a week shall be adjusted as follows:

Employees who work thirty (30) or more hours a week but less than thirty-five (35) hours a week shall accrue and be paid vacation based on a thirty-two and one-half (32.5) hour work week. Employees who work thirty-five (35) hours or more a week but less than forty (40) hours a week shall accrue and be paid vacation based upon a 35-hour workweek. Employees who work forty (40) or more hours a week shall accrue and be paid vacation based upon a forty (40) hour workweek.

No payment will be made for vacation time not taken except that an employee who has submitted to the company all appropriate time cards or Leave Certifications as applicable and whose employment is terminated for any reason other than for misconduct as defined below, shall be paid for vacation time credited and accrued but not taken.

For purposes of this policy, "misconduct" shall mean theft, fraud, embezzlement, deliberate disregard of company rules or policies and the breach of any agreement with the Employer. Employees terminated for misconduct do not qualify for and will not be paid accrued vacation.

Management and supervisory personnel are directly responsible for keeping an account of vacation time available and vacation time used by each employee. Vacation time is not to be taken before it is earned and will not be paid unless the time is reported on the time card or the appropriate Certification is made. Correct accrual information will be forwarded periodically from the Corporate Human Resource Department to assist with this responsibility. Vacation balances are printed on employee paystubs.

Questions relating to the vacation policy which cannot be answered by an employee's supervisor should be directed to the Corporate Human Resource Department.

28

29

In the event that local law supersedes any provision in this policy, this policy shall be deemed amended to include only that portion of the local law that supersedes by operation of law the applicable provision of this policy.

## Holidays

Regular full-time employees of Flying J Inc. that have been employed for at least 90 days shall be entitled to holiday pay or time off with pay for the following holidays:

<div align="center">

Thanksgiving Day

Christmas Day

</div>

Employees classified as non-exempt who are required to work on a Company authorized holiday will receive holiday pay, plus be paid regular hours for any hours worked on the holiday. Holiday hours not worked will not be counted to determine overtime nor added to an employee's regular rate of pay in computing overtime. Any hours worked on the holiday will be added to an employee's regular rate of pay in computing overtime.

## Sick Leave

Full-time employees classified as EXEMPT are eligible for sick leave with pay. Sick leave is intended to protect eligible full-time employees against undue financial loss in the event of personal illness or injury. Eligible employees are encouraged, within limitations of the Company's sick leave accrual plan to accumulate as much sick leave as possible to meet serious situations. Sick leave may not be used to intentionally extend weekend vacation time or holidays.

Paid sick leave duration will be approved on a discretionary basis by the General Manager, but may not be less than seven and one-half (7 1/2) days or more than thirty days for a calendar year. Paid sick leave in excess of thirty days must be approved by a District Manager, and requests to pay sick leave for more than a 90 day period must be approved by the Division Vice President or by the President of Flying J. Hourly or NON-EXEMPT employees are not eligible for paid sick leave.

Employees who will be absent due to illness or injury for more than five consecutive days must complete an "Application for Leave of Absence" form. The appropriate amount of paid sick leave can then be determined and approved. Questions regarding this policy should be directed to the Corporate Human Resource Department.

## Compassionate Leave

Full-time employees classified as EXEMPT are eligible for compassionate leave with pay. The purpose of this leave is to allow time off for taking care of funeral arrangements or traveling to funerals in connection with the death in the family. Eligible full-time Interstate Operations employees will be given compassionate leave with pay in the event of a death in the family as follows:

| | |
|---|---|
| Three (3) days leave | Spouse or Child |
| Two (2) days leave | Parent, Parent-in-law, |
| | Legal Guardian (other than parent) |
| One (1) day leave | Sister, Brother, Grandparent |

Employees classified as NON-EXEMPT are not eligible for compassionate leave.

FJ 0136

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007

## Company Policies and Regulations

In the interest of maintaining order and efficiency, employees are expected to observe Company rules and regulations. Disciplinary action, up to and including discharge, may be imposed for the offenses or violations described below. Nothing contained herein shall prevent the Company from taking severe disciplinary action in the case of a first time offense.

## Antitrust Guidelines

One of your primary responsibilities as an employee of Flying J is to become sensitive to issues that may adversely affect competition and after spotting issues or areas of concern, discuss them with the Flying J Legal Department.

Because compliance with federal and state antitrust laws is so important, it is Flying J's policy that any person who violates, encourages, directs, or otherwise aids in the violation of any antitrust law will be subject to disciplinary action, including, but not limited to, discharge from employment. You should, therefore, read and reread this policy frequently. Make sure you understand generally the type of activity that the antitrust laws forbid. If you have any questions about antitrust laws or this policy, call the Flying J Legal Department.

IT IS IMPORTANT THAT YOU COMPLY STRICTLY WITH EACH OF THE FOLLOWING DIRECTIVES:

1. Never discuss prices with a competitor.

2. Do not blindly follow competitor's prices.

3. Do not communicate with any competitor about a division of markets.

4. Do not communicate with a competitor, a supplier, or a customer your decision not to do business with a supplier, purchaser of services or products or any other entity.

5. Do not create barriers to entry for competitors who operate in your

32

area or that provide services similar to those provided by you.

6. Do not tie or require the purchase of some services or products with the purchase of other services or products wherein you have market power.

7. The use of exclusive contracts should be reviewed by legal counsel.

8. Joint ventures or programs involving your competitors should be reviewed by legal counsel.

9. No exchange of competitive information.

10. Participation in trade association meetings should be discussed with management.

11. All documents dealing with business operations should be reviewed by management/Legal Department before being posted or otherwise acted upon.

12. Below-cost sales statutes exist in most states and prohibit the sale of products below the company cost.

13. Price discrimination is illegal. Any pricing programs must first be reviewed by our Legal Department.

## Drug and Alcohol Policy

In order to promote a productive, safe and pleasant environment for employees and customers, Flying J Inc. and its subsidiaries adopt the following policy relative to drug and alcohol in the work place:

1. It shall be in violation of Company policy for any employee to buy, sell, possess, or use any alcoholic beverage or drug during the course of employment, or during any work break lasting less then two (2) hours, except as specifically provided in the policy. It shall also be a violation of Company policy for any employee to be under the influence of or impaired by alcohol or drugs while on any premises

33

legemp:: Print Que

during work hours. It shall also be a violation of this policy for any employee to be on any Company property (real or personal) during work hours with a prohibited concentration or level of any drug or alcohol in such employee's blood, urine, or other sample, which may be tested pursuant to this policy. Prohibited concentrations or levels of drugs and alcohol are set forth in Schedule A attached incorporated therein by this reference.

For purposes of the policy, except as specifically provided herein, an employee shall be deemed to possess alcoholic beverages or drugs on Company premises where such beverages or drugs are carried on the employee while he or she is on Company premises or are on or with in any bag, locker, vehicle or other container within the control of the employee that is situated upon Company property, except that it shall not be a violation of this policy for an employee to possess drugs that are legally prescribed by his or her attending physician or doctor, or to use the same in dosages legally prescribed for use in the work place, provided that such drugs bear no caution, warnings, or contraindications for use in the work place.

Employees required to handle alcoholic beverages in the course of their employment shall not be considered to possess such alcoholic beverages in violation of this policy; e.g., bar tenders, bar maids, servers, convenience store merchandisers, cashiers, and other related employment. In addition, employees who are specifically authorized by the President of Flying J Inc., or its subsidiaries to entertain in the course of their employment shall not be considered to violate the alcoholic beverage provisions of this policy provided that such entertainment is limited to the authority so given.

2.  Flying J Inc. and its subsidiaries may require employees to submit to a drug and alcohol test in the following circumstances:

    a.  Where a supervisor or other manager has reason to suspect or believe (i) that any employee is under the influence of , or impaired by, any alcohol or drugs or any combination thereof in violation of Company policy (ii) any employee is either on duty or on Company premise, whether on duty or not, with a prohibited concentration or level of any drug or alcohol in such employees system;

34

    b.  Any employee involved in an accident or injury while on duty;

    c.  Where a supervisor or other manager has reason to suspect or believe that alcoholic beverages or illegal drugs are used, consumed, possessed, bought, sold, delivered, given, or supplied on Company premises or while on duty in violation of this policy;

    d.  All employees will be subject to random selection for testing during their ongoing employment unless state law prohibits random testing. Selections will be made by someone other than the immediate manager.

3.  Drug and alcohol testing shall be conducted in compliance with the laws of the state in which the person tested and/or is employed by the Company. Copies of these laws are available upon request to the Legal Department Corporate Office. These respective state laws are incorporated into this policy and made a part hereof by this reference. All drug and alcohol testing to be conducted under this policy shall be conducted under reasonable circumstances and conditions and in a manner reasonably calculated to prevent substitutions or interference with the reliability thereof, with due regard for the privacy of the person tested. Scientifically accepted methods and procedures shall be used in conducting such testing, and adequate safeguards shall be employed to assure proper sample collection, labeling, handling, testing and recording of results of such testing. In addition, confirmation testing shall be conducted of all positive tests for the presence of alcohol and drugs. It shall be a violation of this policy for any person to substitute, falsify, or adulterate any sample provided for testing under this policy, or to refuse to submit to a drug or alcohol test under this policy.

4.  Any employee tested for alcohol and drugs under this policy shall have a full opportunity to notify the *Medical Review Officer (MRO)* of any information bearing on the test, including the identification of any medications taken and any other relevant information. Any employee tested shall be informed of the test results as soon as practicable and shall have the opportunity to explain and rebut such results.

35

In addition, the employee shall have the opportunity to have the sample tested by an independent laboratory of his or her own selection, provided that such laboratory conducts such testing according to the standards set forth in paragraph 3 above, and that such additional testing shall be at the expense of the employee, unless otherwise required by law.

5. Where a verified or confirmed positive drug or alcohol test establishes a violation of this policy, where any employee refuses to submit to such testing under this policy, or where an employee violates any other provision of this policy, the Company shall take action, including without limitation of the following:

   a. Termination of employment;

   b. Suspension with or without pay.

In the event that the Company determines that disciplinary action to be taken shall require or include rehabilitation, treatment, or counseling, the employee shall undergo and complete such rehabilitation, treatment, or counseling to the satisfaction of the persons, hospital, clinic, or health care providers rendering these services as a condition to continued employment. In addition, an employee submitting to any of the foregoing shall consent in writing to such post-rehabilitation treatment, counseling, monitoring, or testing as the Company deems appropriate under the circumstances, unless otherwise required by law. *Nothing contained herein shall impose any obligation upon the employer to pay the costs of any rehabilitation.*

6. The Company reserves the right to search Company property and personal effects placed on or in Company property where there is reasonable suspicion that alcoholic beverages or drugs are present on Company premises.

7. It is the policy of this Company to conduct pre-employment drug and alcohol screen tests on all new hires, except with respect to states where such tests are unlawful. *The pre-employment screen will be done prior to or during the first 90 days of employment.* Employees who fail such tests *will not* be hired or if they are working

36

will be terminated. Employees who fail to take a pre-employment drug and alcohol test will be required to take one when the Company discovers that such a test was not taken at any time. Failure to take such a test when requested or failure to pass the test will result in termination of employment.

8. In the event that the test results of any employee's or prospective employee's drug or alcohol test shall be anything other than an unqualified "clean" or unqualified "negative", the result shall be deemed a test failure. Notwithstanding the foregoing, if an employee or prospective employee's drug or alcohol test results in a qualified "negative" or qualified "clean", such as a "negative dilute", the person shall provide to Flying J within three (3) days of notification of the test result a physician's certification that the test result was caused by a genuine medical condition and was not related to the use of alcohol or a prohibited drug, or the introduction of an adulterant, a diluent or any additive into the test specimen. If the employee or prospective employee shall fail to provide the required physician's certificate, the person shall not be qualified for employment or further employment with a Flying J entity.

9. In the event that any provision of this policy shall conflict with any applicable state law, then this policy shall be deemed amended with respect to persons within the jurisdiction of the state having the conflicting law to conform to the applicable state law.

## SCHEDULE A

The following constitute detectable concentrations or level of drugs the presence of which will result in a violation of the foregoing Drug and Alcohol Testing policy:

| Drug | Concentration |
|------|---------------|
| Amphetamine | 1000 NG/ML |
| Benzodiazepine | 300 NG/ML |
| Cannabinoids | 50 NG/ML |
| Cocaine | 300 NG/ML |
| Opiates | 300 NG/ML |
| Barbiturates | 300 NG/ML |
| Propoxyphene | 300 NG/ML |
| Phencyclidine (PCP) | 25 NG/ML |
| Methadone | 300 NG/ML |

37

Icgemp:: Print Que

## Sale of Tobacco Products

Many states have adopted laws regarding the sale of tobacco products. The minimum age to purchase varies by state. Be sure you are aware of your local laws regarding age to purchase. Violation can result in fines to Flying J and you may also be fined. Please realize it is essential to request valid identification to determine age. Ask your manager to clarify your local requirement.

## Sale of Alcoholic Beverages

The laws governing the sale of alcoholic beverages are very specific. No one under the age of 21 years may be sold alcoholic beverages, i.e., beer and wine. It is the responsibility of every employee to insure that alcoholic beverages are not sold to minors. Additionally, it is a violation of Company policy and in many cases against the law to sell alcoholic beverages to a known habitual drunk or a person under or apparently under the influence of alcohol or drugs.

By violating these laws, you as an individual may be subject to civil damages and or criminal punishment. In order to avoid the unpleasant consequences associated with selling alcohol to a minor, the Company shall require as a policy initiative that all persons 26 years old and under be asked to provide identification as proof of age (drivers license with picture ID). As a company, we feel it is imperative that all of our employees realize the importance of checking identification.

An employee adjudged guilty of selling alcoholic beverages to a minor or to a known habitual drunk or a person under or apparently under the influence of alcohol or drugs shall be subject to immediate termination as well as responsible for civil damages and or criminal punishment.

Remember, that as an employee, you have a responsibility to yourself, your employer, and to your community to abide by the laws governing our society. There will be no exceptions to this policy.

38

## DRAM Shop Act Information

You should not serve or provide alcoholic beverages to customers or patrons who appear to be intoxicated. Many states have Dram Shop laws that address this issue. An example of one such law is set forth below:

1.  Any person who gives, sells, or otherwise provides intoxicating liquor to another and thereby causes the intoxication of the other person, is liable for injuries in person, property or means of support to any third person, or the spouse, child, or parent of that third person, resulting from the intoxication.

2.  A person who suffers an injury shall have a cause of action against the intoxicated person and the person who provided the intoxicating liquor in violation of subsection (1.) above, or either of them.

3.  If a person having rights or liabilities under this section dies, the rights or liabilities provided by this section shall survive to or against that person's estate.

You should discuss your specific state's law with your manager.

39

FJ 0139

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007

## Leave of Absence Policy

It is the policy of Flying J Inc. to grant employees leaves of absence under certain circumstances. Except as stated below, employees will not receive compensation during a leave of absence.

There are three categories for which a leave of absence can be authorized.

1. Family Medical Leave Act (FMLA)
2. Non-Family Medical Leave Act (Non-FMLA)
3. Military Leave

### FMLA Leave

Flying J Inc. allows eligible employees to take up to 12 weeks of leave, paid and/or unpaid, in a 12 month period. The leave is available to care for a child after birth or adoption or due to a serious health condition of the employee and his or her parent, spouse, or child. This policy is intended to comply with the Federal Law, Family & Medical Leave Act.

The 12-month period (during which up to 12 weeks of leave is available) is a rolling 12-month period measured backward from the date leave is requested or taken. As authorized by law, Flying J will count leave that stems from a work-related injury or illness toward an FMLA-eligible employee's 12-week leave entitlement under the Family and Medical Leave Act.

Flying J Inc. will allow you to take up to 12 weeks of leave from your job in a 12-month period if you are an "eligible employee." Eligibility is determined by satisfying the following conditions:

1. You must have worked for Flying J Inc. for at least 12 months (need not be consecutive).

2. You must have worked at least 1,250 hours during the 12 consecutive months preceding the start of your requested leave.

3. You must work at an eligible work site. You work at an "eligible work site" if at least 49 other employees, including part-time

40

employees, work within a 75 mile radius of you. All Flying J work locations are deemed eligible work sites.

Leave is available for the following events:

1. Birth of a child, and to care for the child (must be taken within one year of birth). If both parents of the child are employees of Flying J Inc., or an affiliate, the aggregate amount of leave available to both employees shall not exceed twelve (12) weeks.

2. Placement of a child for adoption or foster care.

3. Because of your own serious health condition that makes you unable to perform the essential functions of your job.

4. The serious health condition of a spouse, child or parent.

### Application For a Leave

To qualify for a leave, you must apply using the "Application for Leave of Absence" form. All applications are kept confidential and separate from your personnel file. In the event of a foreseeable leave of absence, you must apply 31 days prior to the day you want to start your leave. IF you fail to do so, your leave starting date may be delayed for up to 31 days after you do apply. In the case of a leave that is not foreseeable, you must notify the Corporate Human Resource Department as soon as possible, generally within one or two days. After you submit your application for a leave, the employer will determine whether you need to provide additional information.

Flying J also will ask you to submit an "Application for Leave of Absence" form after you have missed 5 consecutive days of work, or if you request days off or time off in advance, other than for vacation.

Flying J will determine whether or not you meet the eligibility requirements at the time you apply for the leave.

### Approval of Leave

Flying J will approve or disapprove of the leave as qualifying under this policy as soon as practicable after all required information is received

41

from you.

In no event will Flying J Inc. tolerate outside employment in any capacity. Any outside employment or work for compensation on any basis by an employee on a leave under this policy will result in immediate dismissal and forfeiture of all rights under this policy.

### FMLA Leave/Medical Certifications

You will be required to provide a certification of a health care provider if you request a leave to care for a seriously ill family member or if you request a leave because you are unable to perform your essential job functions due to a serious health condition. You must use the form, "Certification of Physician or Practitioner," available from your General Manager or the Corporate Human Resource Department, and you must give your physician or practitioner a copy of your most recent job description. A similar certification will be required for a reduced hours or intermittent leave due to your health condition or that of a family member. In any case, the certification must include:

1.  The date upon which the serious health condition began;

2.  The probable duration of the condition;

3.  Appropriate medical facts regarding the condition;

4.  A statement that the employee is needed to care for a spouse, parent or child (along with an estimate of the time required) or that the employee is unable to perform his or her essential job functions;

5.  In the case of intermittent leave or a reduced schedule due to a planned medical treatment, the dates and duration of treatment to be given.

6.  In the case of intermittent leave or a reduced schedule due to the serious health condition of the employee, a statement of the medical necessity of the leave and expected duration of the leave.

7.  In the case of intermittent leaves or a reduced schedule due to the serious health condition of a spouse, parent or child, a statement

42

that the leave required is necessary for the care of the child, spouse or parent who has a serious health condition (or will assist in their recovery) and the expected duration of the leave.

Flying J may require a second certification at its own expense if it wants to confirm the first opinion. Flying J designates or selects this physician or practitioner for the second certification. Flying J may require a third certification, again at the Company's expense, if the first two opinions conflict, by a physician or practitioner jointly approved by you and Flying J. The third opinion is binding on everyone.

Re-certification may be required by Flying J not more often than every 31 days, in the absence of different circumstances, a request for an extension or when the employer has reason to question the validity of the original certification.

### Intermittent or Reduced Hour Leaves

You may be able to work reduced hours or take an intermittent leave (in other words, you can take hours or days off, rather than leaving work altogether for 12 weeks). The total leave is still limited to 12 weeks per rolling 12 months. The leave must be medically necessary to care for a seriously ill family member or due to your own illness, provided the physician or practitioner certifies it as medically necessary.

This type of leave schedule will need to be pre-approved by Flying J if it is requested for the care of a son or daughter following birth or preceding adoption or foster care placement, and approval is at Flying J's sole discretion for these events. Flying J may require you to have a schedule that does not disrupt its business operations.

If you must take leave on such a schedule due to the need to care for your ill family member or due to your own poor health, Flying J may transfer you to a position for which you are qualified (without your approval) that better accommodates your new schedule, while still providing you with equivalent pay and benefits.

### Substitution of Paid Leave

You must use up your accrued paid vacation, as part of your 12

43

legemp:: Print Que

weeks of leave. The use of accrued sick leave will be required where allowed by law. If you are taking paid time off when you have an event qualifying for a leave under this policy, your 12 weeks will be measured from the date of the event. In cases where worker's compensation leave is designated as FMLA leave, Flying J's FMLA policy will govern such leave except that an employee's paid leave will not be charged for time lost from work due to a worker's compensation-related condition.

### Health Benefits During FMLA Leave

Flying J will continue to provide you with coverage under our health plans under the same conditions as when you were not on leave. You also will be eligible for and subject to any new health plans or changes to the existing health plan that take effect while you are on your leave. Your regular health benefits will end when you indicate that you will not be returning to work, but you may choose to elect continued medical coverage under our plan at your expense at that time through COBRA.

If you are receiving a paycheck due to using paid time off (vacation or sick leave), the premiums may be deducted pre-tax, provided you designate that you agree to this procedure when you apply for the leave. Otherwise, you must pay your portion of the premiums on an after-tax basis due the first day of each month. All premium payments shall be submitted to the Corporate Human Resource Benefits department before the date the premium is due.

Flying J will continue to pay its share of the health premiums, if any. Your health coverage may be terminated following a 31-day grace period if you fail to pay your required premiums.

Flying J may collect its premiums relating to the unpaid portion of your leave (and any paid on your behalf, should you fail to pay them) from you if you fail to return to work. The only exceptions to Flying J's reimbursement rights are if (1) the event that prevents you from returning to work is a serious health condition of you or your family member or (2) is beyond your control (as determined by   Flying J in its sole discretion). Flying J will require you to provide a certification of the serious health condition within 31 days of Flying J's request if the event preventing your return to work is a serious health condition. If you fail to provide the certification, Flying J can recover the premiums.

44

### Return to Work and Restoration of Job

Prior to returning from a leave, you must obtain a fitness for duty certification from your physician. Upon returning from a leave under this policy, you will be entitled to be restored to the same position you held when your leave started, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. The equivalent position will be determined by Flying J, in its sole discretion under federal guidelines.

Some key employees (those in the top 19% of the work force in terms of compensation for a 75-mile radius) may not be eligible for reinstatement. If the leave of a key employee would cause substantial and grievous economic injury to the employer, based on factors such as workplace disruption, Flying J can deny his or her reinstatement.

If you desire more information about the rules relating to key employees, please contact Corporate Human Resources for details. You will be notified after you apply for a leave whether or not you are a "key employee" and that if you are, you may not be eligible for reinstatement.

Upon your return, you will also be entitled to participate in all of the employee welfare benefit plans you participated in prior to your leave, without meeting any otherwise applicable qualification requirements (such as satisfying a waiting period of pre-existing condition waiting period, waiting for open enrollment, or passing a medical examination). Any increases in benefits that do not depend on seniority or accrual during the leave period will be provided upon your return.

### FMLA Leave/Benefit Accruals

Except as otherwise provided by applicable law, vacation and sick leave will not continue to accrue during any leave. Existing accruals will be suspended for the duration of the leave and then will be resumed when the employee reports back to work.
 insurance. All premium payments shall be submitted to the Corporate Human Resource Benefits Department before the date the premium is due. Should the leave (other than FMLA approved) continue past 31 days, the employee will be offered continuation of coverage through COBRA.

45

## Personal (Non-FMLA) Leave

A Non-FMLA leave may be applied for by completing an "Application for Leave of Absence Form." A Non-FMLA leave will be determined as a leave not qualifying under the FMLA guidelines as outlined in the FMLA Leave section above. Such Non-FMLA leaves are granted at the discretion of the Company. Such leave will not be granted until an employee has worked for Flying J for at least three (3) months. This leave may not exceed 31 days and must first be approved by the employee's immediate supervisor, appropriate division head, and the Corporate Human Resource Department. Non-FMLA leaves should only be considered in the event of medical reasons not covered by FMLA, emergencies or other critical circumstances. Re-employment following a Non-FMLA leave will be granted contingent upon the following conditions.

1. The employee must report to work on or before the scheduled workday following expiration of the leave. Failure to do so will result in automatic termination.

2. Assignment will be at the Company's discretion to any position for which the employee is qualified. The Company does not guarantee placement in the same position or at the same pay vacated by the employee at the commencement of the leave.

## Personal Leave/Benefit Accruals

Except as otherwise provided by applicable law, vacation and sick leave will not continue to accrue during any leave. Existing accruals will be suspended for the duration of the leave and then will be resumed when the employee reports back to work.

## Insurance Coverage

Employees taking leaves for any reason except authorized FMLA leave of absence may continue insurance coverage for 31 days provided that the employee pays 100 percent of each monthly premium for said insurance. All premium payments shall be submitted to the Corporate Human Resource Benefits Department before the date the premium is due. Should the leave (other than FMLA approved) continue past 31 days, the employee will be offered continuation of coverage through COBRA.

46

## Military Leave

We administer Military Leave and your benefits in accordance to the Federal Uniform Services Employment and Re-employment Act.

A Military Leave may be applied for by completing an "Application for Leave of Absence" form. The form, along with the service order, should be sent to Flying J. Flying J will then determine whether or not you meet the eligibility requirements at the time you apply for the leave.

## Military Leave/ Benefit Accruals

Vacation and sick leave will continue to accrue during any Military Leave.

## Military Leave/Insurance Coverage

Employees taking Military Leaves may elect to continue insurance coverage. The maximum period of coverage under such election shall be the lesser of -

1. the 18-month period beginning on the date on which the employee's service absence begins; or

2. the day after the date on which the person fails to apply for or return to a position of employment.

An employee who elects to continue insurance coverage may be required to pay not more than 102 percent of the full premium, except when the absence of service is less than 31 days the employee will not be required to pay more than the employee share for such coverage. All premium payments shall be submitted to the Corporate Human Resource Benefits department before the date the premium is due.

47

## Discrimination and Harassment

It is the policy of Flying J Inc. to provide a work environment for all of its employees that is free from discrimination and harassment based on sex, race, religion, color, disability, age and national origin. To this end, the Company will comply with and strictly enforce within the Company, federal, state and local laws that prohibit discrimination or harassment based on sex, race, religion, color, disability, age and national origin (protected classifications). Employees who by act or omission discriminate against or harass any employee based upon a protected classification shall be subject to disciplinary action including discharge from employment. Without limiting the applicability or coverage of this policy to the conduct here described, the following conduct shall be deemed a violation of this policy.

1. Making any decision regarding the hiring, firing, promotion, or demotion of an employee or making any decision that affects the wages, benefits or working conditions of an employee based in whole or in part on sex, race, religion, color, disability, age or national origin.

2. Making sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature at the workplace. Making sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature outside of the workplace if: (i) The conduct is directed toward another employee and; (ii) The conduct is unwelcome or adversely affects the working conditions, morale or environment of employees at a Flying J workplace.

3. Making submission to or rejection of any conduct referred to in paragraph two above the basis for any employment decision affecting an employee.

4. Creating an intimidating, hostile, or offensive working environment by engaging in any of the following conduct or any similar conduct that offends another employee:

   a. Calling, addressing or referring to any person by a demeaning name that relates to a person's sex, race, color, religion, age,

48

disability or national origin.

   b. Belittling or denigrating another because of the person's sex, race, color, religion, age, disability or national origin.

   c. Relating stories, jokes, experiences or anecdotes that relate to sex, race, color, religion, age, disability or national origin and that might offend any person of a particular sex, race, color, religion, age, disability or national origin.

   d. Displaying pictures, photographs, depictions, artwork, quotes, stories, jokes or other media that may be offensive because of its sexual, racial or religious content or that may reasonably offend another because of his or her color, national origin, disability or age.

   e. Touching another employee in a manner that may be offensive to the other employee or making lewd or suggestive gestures or comments in the presence of another employee.

   f. Engaging in any conduct that tends to harass, annoy or inflame another employee, customer, or vendor based on sex, race, color, religion, age, disability or national origin including, but not limited to, the use of epithets, slurs, threats, offensive language, intimidation or hostile acts.

This list is not exclusive. Other conduct that results in discrimination or harassment based upon a protected classification may result in immediate disciplinary action, up to and including termination of employment.

### What To Do If You Are Subjected To Discrimination or Harassment

1. Do not put up with conduct that violates this policy. **Immediately send a written complaint to the Flying J Human Resources Department at 1104 Country Hills Drive, Ogden, Utah 84403.** Your complaint should identify specifically who has violated the policy. Your complaint should also describe in detail each act that you allege to be a violation of this policy. Your complaint should also list all witnesses to the policy violation. Finally, please include your name and home phone number in the complaint. Anonymous

49

legemp:: Print Que

complaints are acceptable but are much more difficult to investigate. If the policy violation is egregious, or if the risk of additional discrimination or harassment is serious and imminent, you should immediately notify one of the following who is not involved with the discrimination or harassment: your department or store manager, your District Manager, your department head, the Human Resource Department (801-624-1000) or the Fraud hotline anytime 24 hours a day at 1-888-569-1877. **Even if you verbally notify one of the persons or departments listed in the preceding sentence, you must send a written complaint** containing the information described above to the Flying J Human Resources Department within 5 days of the date you give verbal notice of your complaint.

2.  Management personnel receiving notice of a complaint should contact the Flying J Corporate Human Resource Department immediately upon receipt of the notice for instructions on how to proceed with an investigation. The Company will conduct an investigation of every charge of discrimination or harassment. The person conducting the investigation will interview witnesses, including the complainant, and the person or persons charged with engaging in discriminatory or harassing conduct. The Company will use its best efforts to keep the investigation confidential. If, because of the nature of the complaint, the identity of the complainant should reasonably be disclosed to the person charged with the offense, the person charged will be directed to take no retaliatory action against the employee. The Company will not permit any retaliation against an employee for making a good faith complaint about conduct that violates this policy. Management personnel who fail to conduct an investigation when notified of conduct that may violate this policy may be subject to disciplinary action.

3.  Upon conclusion of an investigation wherein discrimination or harassment is found to have occurred, the Company will take appropriate disciplinary action. The disciplinary action taken shall depend upon the evidence supporting violation of the policy and the gravity of the policy violation, but the Company reserves the right to terminate the employment of any person who violates this policy.

4.  If the offended employee is not satisfied with the result of the investigation, the employee may appeal the matter to the general

counsel of the Company or to the President of Flying J Inc. The appeal must be made in writing and must be delivered to the general counsel or President within twenty (20) calendar days of the date the offended employee learns of the disposition of his or her initial complaint. The general counsel or President shall consider all the evidence available and shall render a decision within thirty (30) days of the date he or she receives notice of the appeal. The person conducting the appellate review may uphold the prior action, reverse the prior action or impose any new disciplinary action he or she feels appropriate.

5.  If, after exhausting the procedures outlined above, the Company fails to remedy a violation of this policy, the employee should contact the state agency responsible for compliance with anti-discrimination laws or the Equal Employment Opportunity Commission.

Employees that are aware of conduct that violates this policy and who fail to notify the Company of the offending conduct may be subject to disciplinary action.

Occasionally, an employee having performance problems will complain of discriminatory conduct when none exists believing that the complaint will protect him or her from otherwise lawful disciplinary action. A discrimination claim will avert pending or eminent disciplinary action against the complaining employee only if the Company finds, after an investigation of the discrimination claim, that the claim is legitimate and that the discrimination may have contributed to the employee's faulty performance. A discrimination claim that cannot be confirmed, after a thorough investigation, will not avert disciplinary action otherwise justified. Employees should be aware that filing false claims of any kind is a violation of the Company's employee discipline policy. <u>NOTHING IN THIS POLICY SHOULD DISCOURAGE ANY EMPLOYEE FROM NOTIFYING THE COMPANY ABOUT CONDUCT THAT VIOLATES THIS POLICY.</u>

FJ 0145

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...  4/4/2007

legemp:: Print Que

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007

## Workplace Violence Policy

Flying J does not tolerate acts of workplace violence committed by or against employees. Flying J strictly prohibits employees from making threats or engaging in violent acts.

Prohibited conduct includes, but is not limited to:

1. Injuring another person physically.

2. Engaging in behavior that creates a reasonable fear of injury in another person.

3. Engaging in behavior that subjects another individual to extreme emotional distress.

4. Possessing, brandishing, or using a weapon while on Flying J premises or engaged in Flying J business.

5. Damaging property intentionally.

6. Threatening to injure an individual or damage property.

7. Committing injurious acts motivated by, or related to, domestic violence or sexual harassment.

Human Resource and Security personnel will immediately investigate any reported violence, harassment, or threats committed on Flying J premises. All employees who commit violent acts or who otherwise violate this policy are subject to corrective action or discipline, up to and including termination of employment.

Flying J will seek the prosecution of all of those who engage in violence on its premises or against its employees while they are engaged in employer business. Reporting acts of workplace violence should be done in the same manner as issues of harassment. You do not have to put up with any acts or threats of violence.

## Personal Computer Policy

Some of you may be in a position which requires the use of a personal computer (PC). Flying J has provided you with a PC in order to fulfill your job duties. The PC is the property of Flying J and should only be used as authorized by the Company.

It is the policy of Flying J to obtain a license or other proper authority to use any software in connection with the Company's business. Employees or independent contractors are not authorized to unlawfully reproduce, use, or distribute any software or other copyrighted material on behalf of the Company.

### Personal Computer Usage

All data on any personal computer furnished by Flying J is the property of Flying J and may be retrieved or inspected by Flying J at any time. This includes Electronic Mail messages.

PCs should not be used for personal use of any kind during business hours. Personal information/data should not be stored on Company PCs or the network.

Electronic Mail (E-Mail) and access to the Internet are to be used for business related purposes only. The transmission or display of personal, political, religious, or other non-business communications is prohibited. This includes sending or displaying messages containing sexually oriented images, jokes, ethnic slurs, racial comments or other non-business related messages. Employees should immediately notify their immediate supervisor, Corporate Human Resources, or the Chief Information Officer (IT Department) of any violations to this policy.

All PC software packages must be approved by the Information Technology Department. Only certain packages have been approved for use. Exceptions can be made for software packages not on the approved list with proper justification. This approval is obtained from the Chief Information Officer.

### Loading a Disk or Data

To minimize risk to software and hardware due to computer viruses,

it is essential employees carefully scan data or disks when loaded onto the PC. When data from an outside source must be loaded onto a PC, adequate editing controls need to be in place to scan and verify the incoming data. ANY DISK OR DATA, INCLUDING ELECTRONIC MAIL, FROM OUTSIDE FLYING J MUST BE VIRUS SCANNED AND, IF NECESSARY, "CLEANED" PRIOR TO USE. CALL THE IT SUPPORT GROUP FOR ASSISTANCE.

### Repairs

The IT Support Group is the first point of contact for PC support. All PC service calls must be reported through this group.

Violations of the Personal Computer Policy will result in disciplinary action up to and including termination of employment.

## Policy on Confidentiality

During the course of employment with Flying J, employees may be exposed to or otherwise learn information developed, acquired, owned, or otherwise held by Flying J, its suppliers, customers, contractors and subcontractors, agents, and business partners that may be considered confidential or proprietary in nature. Employees will generally, but not always, be advised that such information is confidential. If an employee of this Company is exposed to or otherwise learns information that the employee has been advised is confidential or proprietary or that the employee should reasonably know to be confidential or proprietary information, the employee shall keep the information confidential and shall not copy, duplicate, retain in his or her personal possession or otherwise disclose the confidential information to any person except as follows.

The employee may disclose confidential information to:

a.  Other employees of Flying J who are subject to this policy and who have a legitimate business reason to know the information. In the case of such a disclosure, the disclosing employee shall advise the other employee that the information conveyed is confidential;

b.  Anyone to whom the owner of the confidential information

54

authorizes the employee to convey the information.;

c.  Agents of Flying J who need the information to perform duties for Flying J or otherwise represent Flying J and have an ethical and/or legal duty not to disclose the information; and

d.  Government officials, executive, legislative, or judicial, who lawfully request the information and have exercised legal compulsory processes (e.g. subpoenas) to obtain the information.

Employees who violate this policy may be subjected to disciplinary action including, but not limited to, discharge from employment.

## Anti-nepotism Policy

In order to avoid potential conflicts of interest and the appearance of impropriety, it shall be a violation of Flying J policy for two employees who reside in the same household or who are or were at some time related to one another, either by blood or by law as husband and wife, son or daughter, step-son or step-daughter, son-in-law or daughter-in-law, father or mother, step-father or step-mother, father-in-law or mother-in-law, brother or sister, step-brother or step-sister, brother-in-law or sister-in-law, uncle or aunt, niece or nephew, grandfather or grandmother or grandson or granddaughter to work at Flying J in the following situations:

1.  In the same department, on the same shift.

2.  When one such person has in-line supervisory authority over the other person, no matter how far removed.

3.  Where one of the employees performs accounting or book keeping functions at the same retail location.

4.  When the two individuals have supervisory positions in the same retail location, whether or not they are in the same department or on the same shift. For example, it is a violation of this policy if a wife is employed as a restaurant manager in the same retail location

55

FJ 0148

where her husband is an assistant maintenance manager.

5. This policy shall apply to people who because of a cohabitation relationship, whether of opposite or same sex, bear a relationship to another that is substantially the equivalent of the relationships described in the first paragraph of this policy, whether legally recognized or not.

Nothing in this policy shall be construed as a recognition by the Company of any relationship not recognized by law or by the express language of Company health care and/or other benefit plans for the purpose of extending Company benefits to such a person.

## Gifts and Gratuities

It will be considered a violation of Company policy for any employee to accept a gift or gratuity valued in excess of $10.00 from those companies with whom Flying J Inc. conducts business. That kind of personal incentive usually constitutes a conflict of interest and tends to destroy the healthy objectivity of serving the Company's best interests.

Gifts or gratuities with a unit value of less than $10.00 may be accepted, but should be discouraged. Gifts and gratuities falling within this description need not be reported. Accepting lunch or dinner at the vendor or client's expense is acceptable.

### What to do if a gift is mailed to your home or office

Where the estimated value exceeds $10.00 and it is practical to return the item, do so as soon as possible and notify the sender that the gift is not acceptable. If returning the gift is not feasible, notify the Chief Financial Officer, Senior Vice President or President about the gift. The officer notified will determine what action to take with respect to the gift.

### Invitations to special events

Except as noted in the next succeeding paragraph, invitations to special events (ball games, operas, theatrical events, etc.) where entry into the event and/or transportation thereto will be paid by the vendor or client

56

and will exceed $10.00 in value shall be declined.

Invitees to special events, where the value of the invitation exceeds $10.00, may be accepted by the invitee if there is a genuine business purpose in accepting the invitation and if the division head approves in writing the invitee's acceptance of the invitation.

### What to do if a service or discount is offered to you personally in exchange for purchasing something

Advise the vendor that such an offer violates Company policy. Advise the vendor, too, that because of the offer Flying J will not do business with the vendor again. No further business should be conducted with that vendor.

### Purchases that feature a gift as an integral part of the purchase

Such a purchase should not be made. Vendors making an offer of a gift in connection with a purchase should be advised that Flying J does not do business with vendors making offers of gifts in connection with Company purchases. No further business should be conducted with that vendor.

## Safety Rules

We do not want you or our customers to get hurt. Safety rules are provided to prevent accidents. Learn the proper rules for your area from your supervisor.

Safety is everyone's responsibility. When you notice any unsafe condition, bring it to the attention of your supervisor to assure that action is taken to correct the situation. If you see someone with a problem maneuvering a large or heavy item, help out. Be particularly aware of spills and slippery items on the floor. If a spill should occur, stay there and alert those who are moving in the traffic path to the danger until you receive assistance in cleaning it up.

Some other general safety rules to note are:

1. Never run! Always be prepared to stop suddenly.

57

2.  Even if an accident seems slight, report it to a manager.

3.  Report ANY accident to a manager immediately!

4.  Keep floors clean and traffic ways clear.

5.  To avoid collisions, be careful when walking through "Blind Spots" as someone may not see you or be aware of your position.

6.  No horseplay or scuffling.

7.  Do not operate any machinery for which you have not been trained. If you are under the age of 18, you may not use certain equipment. Your General Manager will inform you of any restrictions.

8.  Wear shoes that are non-skid and in good repair.

9.  Be conscious of what you are doing and what is happening around you.

10.  Never place anything on the floor that someone could trip over.

11.  Keep all areas of the facility looking clean and orderly.

12.  Always keep your eyes looking in the direction in which you are moving.

13.  Traffic always moves to the right.

14.  Wear lifting belts at all times when stocking, doing inventory, exchanging soda canisters or anything requiring lifting. Use the proper technique when lifting. GET HELP FOR HEAVY LOADS!

15.  Wear the proper safety gloves when using sharp utensils.

16.  Know what to do in an emergency. Read the Emergency Response Plan. Learn the location of emergency equipment and exits.

17.  Safety suggestions are welcome and would be appreciated.

58

Our best defense is to prevent accidents, but when accidents happen we must be prepared. In an accident, our first responsibility is to people. Know and take steps to prevent injury and save human life. Know the location of off/on switches, fire equipment, first aid equipment and emergency telephone numbers. When an accident happens, take emergency action as instructed, call your supervisor immediately, and then follow their instructions.

## Lifting Policy

All employees working in an area that requires lifting, stocking, etc., of equipment, supplies or inventory are required to wear lifting belts, which are supplied by Flying J. Failure to wear proper safety equipment will result in disciplinary action up to and including termination.

## Cutting Glove Policy

Cutting gloves must be worn at all times when using a knife, slicer, vegetable peeler, or when using any sharp utensil. Failure to wear the cutting glove when performing one of the above mentioned tasks will be a violation of Company policy, and will result in disciplinary action, up to termination of your job.

## Tip Reporting Policy

It is your duty to report the amount of all tips you receive while waiting tables for Flying J. The amount of all tips you receive during a pay period must be reported on Internal Revenue Service Form 4070 and turned in to the payroll department with your time card. Both your manager and the Payroll Department will check your Form 4070 tip report and your time card to see that the total amount of your tips and your wage equals or exceeds the minimum wage you should be paid for that period.

If your tips do not equal or exceed the required minimum wage, then Flying J will check the total amount of all meal tickets issued on tables that you served and all tips reported on Form 4070 for the pay period. It is Flying J's experience that when a waiter or waitress fails to obtain at least minimum wage, the employee has either not reported all of his or her tips or the employee has failed to satisfactorily serve Flying J's customers. Upon

59

the first violation of this policy, you will receive a written warning. If you violate the policy a second time, your supervisor may discipline you in a manner that may include suspension or even discharge. A third violation of the policy will result in the termination of your employment.

## Grounds for Immediate Termination

All employees should read and be thoroughly acquainted with the employee discipline policy contained in the Flying J Corporate Policy Manual. In addition to the policy statement contained in the policy manual, the following is a list of conduct that could lead to your immediate dismissal. This list is not exclusive, but rather is set forth by way of example:

1. Drinking alcoholic beverages or using intoxicating drugs while on duty or reporting for work under the influence of either.

2. The sale or purchase of illegal substances on Company property.

3. Unauthorized possession of Company property.

4. Deliberately damaging Company property.

5. Theft or any act of dishonesty.

6. Fighting or threatening another employee or customer.

7. Failure to carry out instructions from a manager or supervisor.

8. Deliberate falsification of employment application or Company records.

9. Failure to report to work without notification.

10. Possession of any weapon.

11. Disrespectful conduct toward a customer or another employee.

12. Excessive tardiness or absenteeism.

13. Leaving the premises without permission during your shift.

14. Foul or abusive language.

15. Improperly charging or neglecting to charge for any item served or sold.

16. Failure to record sale at the retail amount of the product.

17. Failure to properly protect or control cash or merchandise.

18. Violating any rule outlined in the Company discipline policy.

## Employee Discipline Policy

The Company understands that reasons for discipline are so numerous that it is virtually impossible to list every type of employee conduct for which discipline may be imposed and the resultant disciplinary action. The Company recognizes, however, that employees should have notice of the type of conduct that may result in disciplinary action. In order to reconcile these competing interests within the framework of the Company's at-will employment policy, it is the purpose of this discipline policy to notify employees in general terms of the types of conduct that may subject an employee to disciplinary action. Employees should understand, however, that the policy is not intended to be a specific and exclusive list of conduct that may subject them to disciplinary action.

The Company reserves the right to discipline any employee for any reason including, but not limited to:

1. Failing to perform all responsibilities assigned to the employee in a manner and time satisfactory to the employee's supervisor.

2. Failing to follow any direction, request or command of a supervisor or an officer of the Company, including but not limited to, extraordinary, but lawful, requests of a supervisor or officer of the Company.

3. Acting or failing to act in such a manner that the act or omission

legemp:: Print Que

disrupts the business or morale of the Company. For example, fighting, quarreling, refusing to assist a customer or patron, refusing to take reasonable action necessary to continue business when such action does not endanger the employee, unreasonably failing to assist another employee in the furtherance of Company business, intentionally hindering or attempting to hinder in any manner the performance or morale of another employee in his or her duties.

4. Failing to protect company assets; allowing Company property to be lost or stolen while in the possession or control of the employee (except that an employee shall not be disciplined in circumstances where the employee reasonably believes that the health of the employee may be endangered by trying to protect Company property, for example, in the case of robbery, fire, riot and similar situations); stealing (whether Company property; property of other employees or property of vendors, customers, or anyone else); obtaining property of the Company, a fellow employee or a customer through false pretenses; embezzling property or committing fraud of any kind or committing any other dishonest act in connection with the employee's employment. For purposes of this policy, property and assets includes, but is not limited to, money, personal property, store merchandise or food products, real property, fixtures and intangible property.

5. Falsifying any document, report, application or other paper or making a false statement, written or oral, to any Human Resource or Payroll personnel, any supervisor or prospective supervisor, any management person or any investigator conducting any investigation for or on behalf of the Company including, but not limited to, pre-employment investigations or to any other person if the false statement could have a detrimental effect on the Company or any employee of the Company. Without limiting the generality of the foregoing, a person will be deemed to have falsified an expense report if a person seeks to be reimbursed for an expense that he or she has not paid or is otherwise legally obligated to pay or if an employee seeks a per-diem reimbursement for lodging or meals when someone else has paid for the lodging or meal.

6. Violating any Company policy, whether written, oral or implied by conduct, custom or course of dealing. It is the employee's obligation

to become familiar with all policies affecting the employee in the performance of his or her duties, including, but not limited to, policies directed against drug and alcohol abuse and against <u>discrimination or harassment of any kind.</u>

7. Violating any local, state, federal or international law other than minor citations or low-level misdemeanor charges that have no bearing on the Company's or the employee's reputation, the ability of the employee to perform his or her job and that do not involve moral turpitude. The Company, in its sole discretion, shall have the right to determine whether a violation of law may affect the Company's reputation or employee's ability to perform his or her job. The Company may immediately terminate or suspend without pay any employee charged with a crime that may adversely affect the reputation of the Company or the employee, may affect the employee's ability to perform his or her job or involve moral turpitude and may take further disciplinary action upon a conviction of a crime or upon a guilty, nolo contendre, no contest, deferred judgment or similar plea to any such crime. Conviction of, or plea (as outlined above) to any felony or to any other crime that may adversely affect the Company or the performance of the employee or that involves moral turpitude will subject an employee to immediate discharge.

8. Failing to act respectfully toward fellow employees, customers, vendors, supervisors and others while on the job. Using disrespectful, derogatory or profane language or displaying uncivil or discourteous attitude including a bad or ungovernable temper.

9. Writing a check to the Company that is returned to the Company uncollected (except checks, returned erroneously by the bank); cashing a check, kiting checks or failing to deposit a check in violation of Company policy; failing to pay the Company when due any amount of credit extended to the employee by the Company, or failing to pay when due any advance or other sums due the Company pursuant to a note, oral promise, contract or other obligation.

10. Acting in such a way as to impair the senses of the employee, any other employee, a customer or any other person at a Company location. Creating a nuisance or other distractions that may interfere

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007

with another employee's performance.

11. Unexcused absence from work or repeated, unexcused tardiness.

12. Breaching any agreement between the employee and the Company including, but not limited to, confidentiality agreements and agreements not to compete.

13. Repeated lack of neatness in person or dress, reasonably compatible with position held, or failure to use good personal hygiene.

14. Failing to get along with other employees or management or failure to adjust and cooperate with a new manager's style and zeal.

15. Failure to manage and deal with subordinates.

16. Refusal to cooperate in any investigation conducted by the Company, by a third party for the Company or by law enforcement officers at the Company's request or with the Company's consent.

17. Repeated unexcused and/or unreasonable use of Company time to take care of personal matters, or performing unauthorized non-company related work on Company time.

This list is not intended to be an exclusive list of conduct that may result in disciplinary action, but is a nonexclusive list of the type of conduct that may result in disciplinary action. Employees should understand that the Company reserves the right to discipline an employee for any reason, including reasons not listed herein, where the employer believes, in its sole discretion, that the employee's conduct is not in the best interest of the employer.

In the cases listed above and in other cases, depending upon the gravity of the offense, initial disciplinary action may include discharge. Any employee who believes he or she has been unfairly disciplined shall have the right to seek a review of the disciplinary action. The review shall be made by a supervisor who was not involved in the discipline of the employee and who is a supervisor in the chain of command above the supervisor who disciplined the employee. If no such supervisor is available, the review may be considered by any officer of the Company.

64

Each request for review of a particular disciplinary action shall be filed in writing with the Company representative who is requested to consider the action and shall be personally delivered or postmarked within ten days of the date on which the disciplinary interview is held; or, if no disciplinary interview is held within ten days of the date, the disciplinary action is actually communicated to the employee. Failure to file for review within ten days of the disciplinary action is communicated to the employee shall be conclusively deemed acceptance of the disciplinary action by the employee. A reviewing Company representative shall have the discretion to affirm the previous disciplinary action or to modify the action as he or she deems appropriate (whether reducing or increasing the severity of the disciplinary action). **The decision of the Company representative reviewing the disciplinary action taken by another Company employee shall be deemed final. Nothing contained in this policy shall be deemed to impose any contract of employment upon the Company, express or implied, or otherwise abrogate or modify in any manner the Company's express policy of employment at will.**

## How to Contact the Corporate Office

To contact employees at the Corporate Office you may write or call:

Flying J Inc Headquarters
P.O. Box 150310
Ogden, Utah 84415
(801) 624-1000

65

66

67

FJ 0153

FJ 0154

## Deduction/Withholding of Wage Authorization

Flying J is authorized to deduct and withhold from wages due the employee amounts equal to any lawful claim Flying J may have against the employee, including, but not limited to, past due credit account balances; contractual obligations; money or property entrusted to employee that the employee does not account for to Flying J; or uncollectable checks made by the employee.

## Acknowledgement

I, _____ hereby acknowledge that I have read, understand, and will abide by the rules, regulations, and service standards of the employee handbook, and the Interstate Operations Manual. I understand that failure to comply with policies or guidelines may result in disciplinary action including termination.

I understand that the material covered in this handbook and in Company policy and procedure manuals may be changed as business necessity requires. The above does not constitute a written contract and I understand my employment is for no definite period and may be terminated at will.

I acknowledge that I have had an opportunity to discuss all of the above with the manager signing below.

_____    _____    _____
Employee Signature          Social Security #    Date

_____    _____
General Manager Signature   Date

http://gildersleeve/fjiasp/print.asp?Count=60&Query=1&Page=1&PageSize=12&Zoom=&c...    4/4/2007