UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **MILISSA JONES,** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| versus | *   CASE NO: 2:07 CV273-WKW |
| | * |
| **FLYING J, INC.** | * |
| | * |
| **Defendant**. | * |
| | * |

* * * * * * * * * * * * * * * * * *

**FLYING J INC.'S RESPONSES TO PLAINTIFF'S OBJECTIONS TO
DEFENDANT'S EXHIBIT LIST**

**I.      INTRODUCTION**

Plaintiff, Milissa Jones, claims that her former employer, Flying J Inc., terminated her employment in retaliation for her complaint of sexual harassment against her supervisor, General Manager Butch Jacobs.[1]  As part of her claim of retaliation, Plaintiff challenges the reason given for her termination, excessive absenteeism. She testified during her deposition that other Travel Plaza employees missed more work than she, but were not discharged and identified these co-workers by name.  In defense of this claim, Flying J seeks to introduce various exhibits to dispute Plaintiff's anticipated testimony on this issue.  Specifically, Flying J seeks to introduce Exhibits 10-28 and 34, which are the termination sheets, time cards and work schedules for each individual identified by Plaintiff as a co-worker that missed more work than she, but was not terminated.

---

[1]      Plaintiff's Complaint asserted two claims:  (1) her immediate supervisor, General Manager Butch Jacobs, sexually harassed her in violation of Title VII, and (2) Flying J terminated her employment in retaliation for that complaint.  Pursuant to this Court's order granting Flying J's Motion for Summary Judgment in part, Plaintiff's claim of sexual harassment has been dismissed, leaving only her retaliation claim for trial.

{L0037519.1}                                       1

Plaintiff objects to Flying J's use of these exhibits on the basis of relevance. Specifically, Plaintiff argues that these individuals are not comparators, that is, these individuals did not hold the same title or position as Plaintiff. Plaintiff's objection is without merit because Plaintiff herself identified these nine individuals as comparators and Flying J's absenteeism policy applies to all of these individuals, Plaintiff included, regardless of title or position. For the reasons discussed herein, Plaintiff's objection should be overruled.

## II.  ARGUMENT

The only claim that remains for trial is Plaintiff's retaliation claim. Plaintiff asserts that she was discharged because a report of harassment was made by her lawyer on her behalf. (Excerpts from Plaintiff's Depo. attached as Exhibit A, pp. 105-06). Contrary to Plaintiff's claim, Flying J terminated Plaintiff due to excessive absenteeism, not in retaliation for her complaint of sexual harassment. Plaintiff missed six days of work during a twelve-day time period, four of these days were consecutive scheduled days of work (April 18, 19, 20, 21, 2006), and informed her acting manager, Keith Staples, that she did not know when she would work the following week. Plaintiff disputes this articulated reason for her termination and claims that other Travel Plaza employees missed more work than she, but were not terminated.

To meet her burden on her retaliation claim, Plaintiff must prove that (1) she engaged in protected activity; (2) she suffered adverse employment action; and (3) she suffered the adverse action **because of** the protected activity. *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Evidence that similarly situated employees were treated more favorably may be used to support Plaintiff's *prima facie* case. As noted in the very decision cited by Plaintiff, *Jones v. Bessemer Carraway Med. Ctr.*, 137

{L0037519.1}                                   2

F.3d 1306, 1311 (11th Cir. 1998), "in determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. **The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed**." (citations omitted) (emphasis added).  The converse is also true - - evidence that the company treated similarly situated employees the same would **negate** an inference of unlawful conduct. *DeLuca v. General Services Admin.*, 96 Fed. App. 669, 671 Ca. Fed. 2004) (employer's treatment of similarly situated individuals was relevant to whether plaintiff was subjected to unlawful conduct); *Jones v. Texas Air Nat'l Guard*, 584 F.2d 104, 106 (5th Cir. 1978) (fact that all employees that were similarly situated to plaintiff were subjected to a change in wages negated any inference of discriminatory conduct).

Plaintiff challenges the reason given for her termination, excessive absenteeism, and claims that other employees missed more work than she, but were not terminated. Plaintiff now objects to Flying J's use of the exhibits that disprove her claim.  Plaintiff argues that these exhibits are not relevant because these employees are not "proper comparators because they did not hold the same title or position as the Plaintiff, did not have the same responsibilities, nor had they missed the same number of days of work…." Plaintiff's argument is ill-founded for two reasons: (1) Flying J's attendance policy applies equally to Plaintiff and these employees; and (2) Plaintiff herself identified each and every one of the above employees as her comparator.

First, Flying J's employee handbook provides that excessive absenteeism is grounds for immediate termination. The policy applies equally to Plaintiff and the employees identified by Plaintiff regardless of title or position. Therefore, evidence that disputes Plaintiff's claim that various co-workers missed more work than she, but were not terminated would be highly relevant to Flying J's defense.

In a direct contradiction of her objection to Flying J's exhibits, Plaintiff herself identified at her deposition each employee she believed was a "comparator" - - an individual who allegedly committed the same conduct as Plaintiff, but was not discharged:

> Q: What is your belief as far as the reason for your termination - - the true reason for your termination?
>
> A: Retaliation. I think it was because of my complaint against Butch.
>
> Q: And what facts do you have that lead you that conclusion?
>
> A: I missed four days. I had employees who missed two weeks, and I - - they weren't terminated. I know of - - I can think of three people off the top of my head who missed at least double the amount of time that I did, who had - - pretty much every employee that I had missed days here and there. I cannot think of really anyone who didn't at some point miss at least three or four days, and none of them were terminated. They all still have their jobs.
>
> Q: Can you give me their names, please?
>
> A: Let's see. **Shamarra Bethel**.
>
> \* \* \*
>
> Q: Okay. Who else?
> A: **Laquisha Means**, or Mona.
> \* \* \*

> Q: All right. Who else?
>
> A: Oh, gosh, what was her name? Ginnifer . . .
>
> \* \* \*
>
> Q: Three, **Ginnfer** last name unknown. Anybody else who had more absences than you that was not terminated?
>
> A: . . . . But I can say that without a doubt that there were a number of people who missed way more than four days and still had their jobs. I had **Angela** - - oh, what was her last name? . . **. Tanisha**…she missed a period of time as well.
>
> \* \* \*
>
> Q: And are there any other employees that missed more time, or the same amount or more time than you did, and yet were not terminated?
>
> A: Yes.
>
> Q: And who were they?
>
> A. Let's see. **Bernice Beard** . . . **Pamela Holcomb…Tanisha Means…Angela Nichols**… **Erica Rudolph**…**Dominque Stowes** . . . **Ginnifer Wyatt, . . . and Sandrella Yeller**.

Exhibit A, pp. 105-109, 118-121) (emphasis added).

To rebut Plaintiff's anticipated testimony on this issue, Flying J seeks to introduce the termination sheet, time cards and work schedule for each of the individual identified by Plaintiff as her "comparator." Specifically, Flying J seeks to introduce the termination sheets and time cards for the following employees: **Laquisha Magee** (Exhibits 11-12); **Bernice Beard** (Exhibits 13-14); **Tenesha Means** (Exhibits 15-16); **Angela Nichols** (Exhibits 17-18); **Dominque Stowes** (Exhibits 19-20); **Erica Rudolph** (Exhibits 21-22); **Pamela Holcomb** (Exhibits 23-24); **Ginnifer Wyatt** (Exhibits 25-26); and **Sandrella Yelder** (Exhibits 27-28). Flying J also intends to introduce a chart that shows

all employees terminated from the Hope Hull store for excessive absenteeism (Exhibit 10) and work schedules pertaining to employees at that location (Exhibit 34). When the work schedule for each individual is cross referenced with that individual's time cards, it will show the number of absences for that employee, if any. In addition, the termination sheets reveal the reason the individual no longer works for Flying J and that all of these individuals are not eligible to be rehired. Regarding each individual identified by Plaintiff, the exhibits show the following:

1. Laquisha Magee was terminated for excessive absenteeism on August 13, 2006. Prior to her termination, the schedule indicates that Ms. Magee missed only three days of work over a three month time period.

2. Bernice Beard was terminated on February 14, 2006 for failing to follow Flying J's procedure. Prior to her termination, she missed only one day of work. This directly contradicts Plaintiff's testimony that Ms. Beard had more absences than she.

3. Taneshia Means was terminated for failing to follow company policies. Less egregious than Plaintiff, Ms. Means missed seven days of work over a five month period.

4. Angela Nichols was terminated for excessive absenteeism on August 4, 2006, after Plaintiff's date of discharge. Contrary to Plaintiff's testimony, Ms. Nichols missed only four days of work over a three month time period during the time Plaintiff was actually working for Flying J.

5. Dominique Stowes voluntarily abandoned her job on March 17, 2006. Prior to her resignation, Ms. Stowes missed four days of work during a three month time frame. This record is not as bad as Plaintiff who missed four consecutive days of work and reported that she was not certain whether she would report for work the following week.

6. Erica Rudolph voluntarily resigned from Flying J on March 15, 2006. She had seven absences in a row, which culminated in her resignation. Ms. Rudolph is not eligible for rehire.

7. Pamela Holcomb missed four days of work during the time Plaintiff worked for Flying J. These four absences occurred over a five month period and is clearly contrary to Plaintiff's representation that Ms. Holcomb was treated more

   favorably than Plaintiff. Ms. Holcomb was terminated for insubordination and job abandonment and is not eligible for rehire.

8. Ginnifer Wyatt missed seven days of work which culminated in her resignation. Ms. Wyatt is not eligible for rehire.

9. Sandrella Yelder voluntary resigned on March 9, 2006. Prior to her resignation, she did not miss any days of work. This is clearly contrary to Plaintiff's testimony that Ms. Yelder missed more work than Plaintiff.

Given that Plaintiff, herself, testified under oath that these employees **are** similarly situated to her (but received more favorable treatment), she should not be permitted to now argue that they are not. Moreover, given that it is likely Plaintiff will testify at trial in accordance with her deposition testimony, *i.e.*, that her termination was retaliatory because other employees committed the same misconduct and were not discharged, Flying J should be permitted to introduce evidence to rebut such testimony. Accordingly, Plaintiff's objections to the introduction of these exhibits are ill-founded, and Flying J should not be prohibited from introducing Exhibits 10-28 and 34 at trial.

Respectfully submitted,

 s/Olivia S. Regard
Olivia S. Regard (La. Bar No. 27114)
**Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.**
500 Dover Boulevard, Ste. 120
Lafayette, Louisiana 70503
Telephone: (337) 406-5613
Facsimile: (337) 406-5620
Email: oregard@joneswalker.com

and

        Robert B. Worley, Jr. (La. Bar No. 17212)
        **Jones, Walker, Waechter, Poitevent,**
          **Carrère & Denègre, L.L.P.**
        201 St. Charles Avenue, 47th Floor
        New Orleans, Louisiana  70170-5100
        Telephone:  (504) 582-8000
        Facsimile:   (504) 582-8015
        Email: rworley@joneswalker.com

        and

        Carole G. Miller
        Audrey Dupont
        **Maynard Cooper & Gale, P.C.**
        1901 Sixth Avenue North
        2400 AmSouth/Harbert Plaza
        Birmingham, Alabama 35203
        Telephone: (205) 254-1096
        Facsimile: (205) 254-1999
        Email: cmiller@maynardcooper.com

        ***Counsel for Defendant, Flying J Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on this 21ST day of July, 2008, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of filing will be sent to all counsel of record by operation of the court's electronic filing system.

         s/Olivia S. Regard
        Olivia S. Regard

# FREEDOM COURT REPORTING

Page 1

```
1   UNITED STATES DISTRICT COURT
2   IN THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4
5   MILISSA JONES,
6
7        Plaintiff,
8
9   VS.        CASE NO.
10             2:07CV273-WKW
11
12  Flying J, INC.,
13
14       Defendant.
15
16
17  DEPOSITION OF MILISSA JONES
18
19       STIPULATIONS
20       IT IS STIPULATED AND
21  AGREED, by and between the parties,
22  through their respective counsel,
23  that the deposition of MILISSA JONES
```

Page 2

```
1   may be taken before Sunnie Gillespie,
2   Commissioner, Certified Court
3   Reporter, State of Alabama at Large,
4   at the law offices of Adam P. Morel,
5   517 Beacon Parkway West, Birmingham,
6   Alabama, on the 8th day of November,
7   2007, commencing at or about 10:44
8   a.m.
9        IT IS FURTHER STIPULATED
10  AND AGREED that the reading and
11  signature to the deposition by the
12  witness is waived, said deposition to
13  have the same force and effect as if
14  full compliance had been had with all
15  laws and rules of court relating to
16  taking of depositions.
17       IT IS FURTHER STIPULATED
18  AND AGREED that it shall not be
19  necessary for any objections to be
20  made by counsel as to any questions,
21  except as to form or leading
22  questions, and that counsel for the
23  parties may make objections and
```

Page 3

```
1   assign grounds at the time of the
2   trial, or at the time said deposition
3   is offered in evidence, or prior
4   thereto.
5        IT IS FURTHER STIPULATED
6   AND AGREED that notice of filing of
7   the deposition by the Commissioner is
8   waived.
```

Page 4

```
1        I N D E X
2
3   EXAMINATION BY:        PAGE NO.
4   Mr. Worley             7-117
5   Mr. Morel              117-123
6
7
8        E X H I B I T S
9   PLAINTIFF'S EXHIBIT NO.    MARKED
10  1 - Document - Charge of
11      Discrimination        117
12
13  DEFENDANT'S EXHIBIT NO.    MARKED
14  1 - Document - Acknowledgment  28
15  2 - Document - Discrimination
16      and Harassment        29
17  3 - Document - Grounds for
18      Immediate Termination  32
19  4 - Letter to Milissa Jones
20      from Mr. Morel        68
```

EXHIBIT A

1 (Page

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 105

1  something like that?
2      A.  He said that he didn't have
3  my actual doctor's note.  I said that
4  I should be able to return to work on
5  Tuesday, and that I would be able to
6  bring it then if I couldn't get it to
7  him sooner.  My husband was a
8  recruiter, so his schedule was really
9  weird.
10     Q.  Did he tell you which
11 absences he was holding against you,
12 and were these absences from the
13 beginning of when you first started
14 working there?
15     A.  There were no other
16 absences.
17     Q.  Do you accept that as the
18 true reason for your termination.
19     A.  No.
20     Q.  What is your belief as far
21 as the reason for your termination --
22 the true reason for your termination?
23     A.  Retaliation.  I think it

Page 106

1  was because of my complaint against
2  Butch.
3      Q.  And what facts do you have
4  that lead you to that conclusion?
5      A.  I missed four days.  I had
6  employees who missed two weeks, and
7  I -- they weren't terminated.  I know
8  of -- I can think of three people off
9  of the top of my head who missed at
10 least double the amount of time that
11 I did, who had -- pretty much every
12 employee that I had missed days here
13 and there.  I cannot think of really
14 anyone who didn't at some point miss
15 at least three or four days, and none
16 of them were terminated.  They all
17 still have their jobs.
18     Q.  Can you give me their
19 names, please?
20     A.  Let's see.  Shamarra
21 Bethel.
22     Q.  Shamarra?
23     A.  Uh-huh.

Page 107

1      Q.  Bethel?
2      A.  Yes.
3      Q.  Okay.  Who else?
4      A.  Laquisha Means, or Mona.
5      Q.  Means or Mona?
6      A.  Mona is what she went by.
7      Q.  All right.  Who else?
8      A.  Oh, gosh, what was her
9  name?  Ginnifer -- I can't think of
10 her last name, but it was Jenni --
11 G-I, not J; not Jennifer -- Ginnifer.
12 They had long period absences.
13     Q.  Do you remember Ginnifer's
14 last name?
15     A.  I can't think of it off the
16 top of my head, no.
17     Q.  So, you have Shamarra?
18     A.  Shamarra.
19     Q.  Shamarra Bethel?
20     A.  Yes.
21     Q.  Number two, Laquisha Means
22 or Mona?
23     A.  Yes.

Page 108

1      Q.  Three, Ginnifer last name
2  unknown.  Anybody else who had more
3  absences than you that was not
4  terminated?
5      A.  Those three had long --
6  like they missed like more than a
7  week at a time.  I'm trying to think
8  who all called out.  Pretty much
9  everybody called out at least one
10 shift a week.  I can't think of
11 names.  If I had a schedule or
12 something I could look at I could
13 probably name them to you, but I
14 can't think of names right now.  But
15 I can say without a doubt that there
16 were a number of people who missed
17 way more than four days and still had
18 their jobs.  I had Angela -- oh, what
19 was her last name?  Angela, she
20 missed at least four days, because I
21 had to cover her shift at least
22 twice.  And I think -- I can't say
23 for sure, but I think Tanisha, the

27 (Pages 105 to 108)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**Page 109**

1  merchandise manager, she missed a
2  period of time as well.
3      Q. Did Mr. Staples tell you
4  who made the decision to terminate
5  you?
6      A. No.
7         MR. WORLEY: I want to take
8  a break, if we could, and just go
9  over my notes.
10         MR. MOREL: Okay.
11         (Whereupon, a short recess
12         Was taken.)
13     Q. (BY MR. WORLEY:) Are you
14  aware of Butch Jacobs sexually
15  harassing anybody else at Flying J?
16     A. Yes.
17     Q. Tell me about that.
18     A. He -- I was told that he
19  had grabbed Sandrella -- I think her
20  last name was Yelder, something along
21  those lines -- her breasts. And,
22  then, Sherrie -- I can't think. I
23  want to say Appleton, but that may

**Page 110**

1  not be correct. He had grabbed her,
2  attempted to pull her into his lap,
3  made comments to her. I'm trying to
4  think of what else she said;
5  attempted to touch her, I believe, as
6  well. I can't remember. What all
7  did she say? I know he had made a
8  number of sexually explicit comments
9  to her. She'd actually complained to
10  me about it.
11     Q. Had he sexually harassed
12  anybody else besides Sandrella Yelder
13  and Sherrie Appleton, to your
14  knowledge? And I'm not including you
15  in that. You've already told me
16  about you.
17     A. Not that I can think of at
18  this time.
19     Q. Do you have any information
20  that Sandrella or Sherrie had
21  complained to Flying J management
22  about that?
23     A. Sherrie had told me, and I

**Page 111**

1  had told her. I want to say it was
2  after the fact she told me, after I
3  had made my complaint.
4     Q. Go ahead.
5     A. I'm just not sure of the
6  timing for sure. And Sandrella, I
7  found out about hers after I made the
8  complaint. Somebody had mentioned it
9  to me and I called her and asked her
10  about it, and I asked her why she
11  didn't tell me.
12     Q. Do you know whether or not
13  Sandrella Yelder had complained to
14  management about Butch Jacobs?
15     A. No.
16     Q. Do you know whether or not
17  Sherrie Appleton had complained to
18  management about Butch Jacobs?
19     A. No.
20     Q. Do you know other than --
21  I'm not asking you about your
22  situation.
23     A. Right.

**Page 112**

1     Q. Do you know whether anybody
2  had complained that Butch Jacobs had
3  sexually harassed them?
4     A. No.
5     Q. Have you held any jobs
6  since being terminated from Flying J?
7     A. Two.
8     Q. What jobs are those?
9     A. Car sales at Towbin Dodge
10  in Las Vegas, and then I was the
11  assistant store manager. The store
12  was Vegas Express, and it was for the
13  Marshall retail group, also in Las
14  Vegas.
15     Q. When did you work as car
16  salesperson at Towbin?
17     A. I can't remember the exact
18  dates. I know I started in February.
19  I didn't stay long. The hours were
20  just too much, and it wasn't my cup
21  of tea.
22     Q. February of '07?
23     A. Yes.

28 (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 117

1  ahead. Let's go off the record.
2      (Whereupon, a discussion
3       Was held off the record.)
4
5  EXAMINATION BY MR. MOREL:
6      Q. Let me show you what I'm
7  going to mark as Plaintiff's Exhibit
8  1 in a moment, and ask you if you can
9  identify that?
10     (Handing document to
11      Witness.)
12     A. Oh, the charge of
13 discrimination -- what I filed with
14 the EEOC.
15     (Whereupon, Plaintiff's
16      Exhibit Number 1 was
17      Marked for identification.)
18     Q. Okay. And did you sign
19 that?
20     A. Yeah.
21     Q. And is everything that is
22 written in there true?
23     A. Yes.

Page 118

1      Q. All right. And, so,
2  anything that you wrote in there when
3  you filed your charge about actions
4  taken than you were offended by with
5  regard to Butch Jacobs -- whatever is
6  in there that refers to that, those
7  are true?
8      A. Yes.
9      Q. All right. You testified
10 earlier about employees that had
11 missed at least as much time as you
12 had or more?
13     A. Yes.
14     Q. And did you testify that
15 you weren't able to remember some of
16 those names?
17     A. Yes.
18     Q. And would your recollection
19 be refreshed if you saw a list of
20 employee names?
21     A. Yes.
22     Q. All right. Let me show you
23 what has been provided to us by the

Page 119

1  defendant with a list of employee
2  names during the period of time that
3  you were employed by them. Does that
4  refresh your recollection at all?
5      (Handing document to
6       Witness.)
7      A. Yes.
8      Q. And are there any other
9  employees that missed more time, or
10 the same amount or more time than you
11 did, and yet were not terminated?
12     A. Yes.
13     Q. And who were they?
14     A. Let's see. Bernice Beard,
15 she missed time. She called out
16 often. She was not fuel desk.
17     MR. MOREL: Just stay on
18 the question.
19     A. Pamela Holcomb, she called
20 out.
21     Q. (BY MR. MOREL:) And
22 remember the question. The question
23 is I want you to identify employees

Page 120

1  who missed four or more days and were
2  not terminated?
3      A. Yeah. No, she missed.
4  I've already said Laquisha. Tanisha
5  Means, I'm fairly certain that she
6  did as well. Angela Nichols --
7  that's what it was, Angela Nichols.
8  Erica Rudolph, she missed days.
9  Dominique Stowes, that's a
10 possibility.
11     Q. I want you just to tell me
12 the people that you know for sure. I
13 don't want you to give me people that
14 you think maybe.
15     A. Ginnifer for sure.
16     Q. What's Ginnifer's last
17 name?
18     A. Ginnifer Wyatt, W-Y-A-T-T,
19 and Sandrella Yelder.
20     Q. The people that you've
21 named in your deposition today that
22 you say have missed as much time or
23 more than you without being

## FREEDOM COURT REPORTING

Page 121

1  terminated, do you have personal
2  knowledge of those facts?
3     A.  Yes.
4     Q.  And tell me how that is?
5     A.  For one, I did the
6  scheduling.  Two, more often than not
7  they would call out to me since I was
8  their immediate supervisor.  If they
9  called out to anyone else I had to be
10 made aware of it as soon as they were
11 aware of it.  If they were not there
12 for their shift, I was the one that
13 had to find somebody to cover their
14 shift, or I had to cover it myself.
15 And I knew who was supposed to be
16 there, and I would see that they're
17 not there.
18    Q.  You testified earlier that
19 you assumed that the visit by the
20 managers to the strip club was open
21 knowledge.  The other lawyer asked
22 you if you were saying that, and you
23 said yes.  My question is, did you

Page 122

1  have any basis for assuming that?
2  Why did you assume it?
3     A.  It was so openly discussed.
4  It was discussed constantly in front
5  of -- there was no caution on who
6  they discussed it in front of.
7     Q.  What kinds of employees did
8  they discuss it in front of?
9     A.  Everybody.
10    Q.  Strike that.  Did they ever
11 discuss that issue in the presence of
12 subordinate employees?
13    A.  Yes.
14    Q.  Did they discuss that issue
15 in the presence of other managers?
16    A.  Yes.
17    Q.  When you -- you testified
18 about having a conversation with HR
19 when you were trying to get some new
20 hire information.  Do you recall that
21 testimony?
22    A.  Yes.
23    Q.  All right.  And you

Page 123

1  testified that you complained about
2  various aspects of noncooperation and
3  other hostile conduct?
4     A.  Yes.
5     Q.  Did you ever say to anybody
6  at HR in that conversation that you
7  believed it was retaliation, or
8  connected in any way to your
9  complaints about Butch Jacobs?
10    A.  Yeah.
11       MR. MOREL:  That's all I
12 have.
13       MR. WORLEY:  Nothing
14 further.
15
16 FURTHER THE DEPONENT SAITH NOT
17

Page 124

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA:
4  JEFFERSON COUNTY:
5
6        I hereby certify that the
7  above and foregoing deposition was
8  taken down by me in stenotype, and
9  the questions and answers thereto
10 were reduced to typewriting under my
11 supervision, and that the foregoing
12 represents a true and correct
13 transcript of the deposition given by
14 said witness upon said hearing.
15       I further certify that I am
16 neither of counsel nor kin to the
17 parties to the action, nor am I in
18 any way interested in the result of
19 said cause.
20
21       _____
22       Sunnie Gillespie
23       CCR#: 145

31 (Pages 121 to 124)